# 13-1720-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

VIACOM INTERNATIONAL INC., COMEDY PARTNERS, COUNTRY MUSIC TELEVISION, INC., PARAMOUNT PICTURES CORPORATION, BLACK ENTERTAINMENT TELEVISION LLC,

*Plaintiffs-Appellants,*

—against—

YOUTUBE, INC., YOUTUBE, LLC, GOOGLE INC.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## OPENING BRIEF FOR PLAINTIFFS-APPELLANTS

STUART J. BASKIN
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000

MATTHEW D. MCGILL
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8500

PAUL M. SMITH
SCOTT B. WILKENS
LUKE C. PLATZER
JENNER & BLOCK LLP
1099 New York Avenue, NW
Washington, DC 20001
(202) 639-6000

SUSAN J. KOHLMANN
JENNER & BLOCK LLP
919 Third Avenue
New York, New York 10022
(212) 891-1600

*Attorneys for Plaintiffs-Appellants*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiffs-Appellants Viacom International Inc., Comedy Partners, Country Music Television, Inc., Paramount Pictures Corporation, and Black Entertainment Television LLC, submit the following statement identifying their parent corporations and any publicly held corporation owning 10% or more of their stock:

Each of the Plaintiffs-Appellants is, directly or indirectly, a wholly-owned subsidiary of Viacom Inc., a company publicly traded on the New York Stock Exchange.  No publicly traded company owns 10 percent or more of the stock of Viacom Inc.

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................iv

INTRODUCTION ..............................................................................1

JURISDICTIONAL STATEMENT ........................................................2

ISSUES PRESENTED..........................................................................2

STATEMENT OF THE CASE................................................................3

I.      YouTube's Founders Build A Business Based On Infringement.....................4

II.     YouTube's Infringement-Based Business Persists After Google
        Purchases YouTube. ..............................................................13

III.    Viacom's Dealings With Defendants ............................................16

IV.     Procedural History ...............................................................19

        A.      Original Summary Judgment Proceedings............................19

        B.      First Appeal .........................................................20

        C.      Remand Summary Judgment Proceedings............................21

SUMMARY OF ARGUMENT ..............................................................24

ARGUMENT ..................................................................................26

I.      Defendants Profited Directly From Infringing Activity They Had The
        Right And Ability To Control. ...................................................26

        A.      YouTube Had The Ability To Control Infringing Activity That
                Pervaded Its Website. .............................................27

        B.      YouTube Received Enormous Financial Benefits Directly
                Attributable To The Infringing Activity................................38

II.     Defendants Had Actual Knowledge And Awareness Of Rampant
        Infringement Of Viacom's Clips-In-Suit.......................................41

A.    Defendants Failed To Satisfy Their Burden Of Showing That They Lacked Actual Knowledge Or Awareness Of Viacom's Clips-In-Suit. ........................................................................42

B.    Defendants Were Willfully Blind To Their Users' Acts Of Infringement. ......................................................................48

III.  This Court Should Exercise Its Discretion To Remand The Case To A Different District Court Judge. .........................................................57

CONCLUSION ........................................................................58

# TABLE OF AUTHORITIES

## CASES

*ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239
F.3d 619 (4th Cir. 2001) ..............................................................29, 43

*Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir.
2010) ...................................................................................................42

*Arista Records LLC v. Lime Group LLC*, 784 F. Supp.
2d 398 (S.D.N.Y. 2011).................................................................40, 41

*Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp.
2d 124 (S.D.N.Y. 2009)......................................................................45

*In re Bay Runner Rentals, Inc.*, 113 F. Supp. 2d 795
(D. Md. 2000) .....................................................................................45

*Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d
1020 (9th Cir. 2013)........................... 23, 28-31, 34-35, 40, 41, 43, 45

*Gelb v. Board of Elections*, 224 F.3d 149 (2d Cir.
2000) ...................................................................................................33

*Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159 (2d Cir. 1971)......................................42

*Meacham v. Knolls Atomic Power Laboratory*, 554
U.S. 84 (2008).....................................................................................45

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005)................................... 6, 21, 25, 28, 29, 31, 33, 42

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
454 F. Supp. 2d 966 (C.D. Cal. 2006) ..........................................31, 36

*Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102 (9th
Cir. 2007) .......................................................................................38, 39

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F.
Supp. 2d 1146 (C.D. Cal. 2002) ................................21, 27, 34, 39, 41

iv

*Redd v. New York State Division of Parole*, 678 F.3d
166 (2d Cir. 2012)................................................................26

*Scott v. Perkins*, 150 F. App'x 30 (2d Cir. 2005) ....................58

*Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d
304 (2d Cir. 1963)................................................................39

*Smith v. United States*, 133 S. Ct. 714 (2013) ......................47

*Sony Corp. of America v. Universal City Studios, Inc.*,
464 U.S. 417 (1984)..............................................................28

*Terracciano v. McAlinden Construction Co.*, 485 F.2d
304 (2d Cir. 1973)................................................................45

*Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 763
(S.D.N.Y. 2008), *aff'd in part, rev'd in part*, 600
F.3d 93 (2d Cir. 2010) ........................................................56

*Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93 (2d Cir.
2010) ....................................................................50, 51, 53

*UMG Recordings, Inc. v. Shelter Capital Partners
LLC*, No. 09-55902, --- F.3d ---, 2013 WL
1092793 (9th Cir. Mar. 14, 2013)........................28, 34, 51

*UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F.
Supp. 2d 1099 (C.D. Cal. 2009), *aff'd in part sub
nom. UMG Recordings, Inc. v. Shelter Capital
Partners LLC*, No. 09-55902, --- F.3d ---, 2013
WL 1092793 (9th Cir. Mar. 14, 2013)...........................38-39

*United States v. 15 Bosworth Street*, 236 F.3d 50 (1st
Cir. 2001) ............................................................................45

*United States v. Aina-Marshall*, 336 F.3d 167 (2d Cir.
2003) ....................................................................................51

*United States v. Appolon*, 695 F.3d 44 (1st Cir. 2012)..........52

*United States v. Butler*, 646 F.3d 1038 (8th Cir. 2011) ..........52

*United States v. Robin*, 553 F.2d 8 (2d Cir. 1977)..............................................57-58

*Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp.
    2d 724 (S.D.N.Y. 2012) ..............................................43, 45

**STATUTES**

17 U.S.C. § 512(c) ..........................................................................................1

17 U.S.C. § 512(c)(1)(A) ..............................................................................19

17 U.S.C. § 512(c)(1)(B) ..............................................................................20

17 U.S.C. § 512(m) ........................................................................................37

28 U.S.C. § 1291 ............................................................................................2

28 U.S.C. § 1331 ............................................................................................2

28 U.S.C. § 1338 ............................................................................................2

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 105-551(I) (1998)..................................................................45

# INTRODUCTION

YouTube went from a start-up to a multi-billion-dollar business between 2005 and 2008 by intentionally enabling and profiting from the posting of infringing clips of copyrighted shows and movies, including several highly popular shows owned by plaintiff Viacom like *South Park* and *The Daily Show*. It was only in 2008 (more than a year after being acquired by Google and after succeeding in becoming entrenched as the dominant video site) that YouTube began using readily-available filtering software to screen out the copyrighted works of major content companies like Viacom that had not licensed their content to YouTube.

Now, after more than six years of litigation and a prior reversal of summary judgment by this Court, the district court has again granted summary judgment to YouTube on its affirmative defense under Section 512(c) of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512(c). The renewed grant of summary judgment, like the prior one, strips the Section 512(c) safe harbor of several key independent requirements, reducing it to the notice-and-takedown provision in subsection 512(c)(3). Failing to heed this Court's guidance on remand, and ignoring much of the vast evidentiary record, the district court has again concluded that the DMCA safe harbor places the entire burden of combating online piracy on content owners, and grants immunity even to avowedly piratical websites that "welcome" and benefit from massive infringement, as long as they comply with take-

1

down notices initiated by copyright owners, scrupulously avoid learning the location of specific infringing clips, and do not "participate in" or "coerce" the infringing acts of users.

This grant of summary judgment is completely inconsistent with this Court's guidance on the "right-and-ability-to-control" and "knowledge" exceptions to the DMCA safe harbor.  Contrary to this Court's instructions, the district court failed to apply the *Grokster* inducement standard as a basis for determining the right and ability to control, and failed fairly to apply the doctrine of willful blindness in assessing knowledge of infringement.  Once these and other errors are corrected, the grant of summary judgment must again be reversed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338.  It entered final judgment on April 30, 2013, and Viacom appealed that day.  This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1. Whether, viewing the evidence in the light most favorable to Viacom, there is at least a genuine dispute of fact about whether YouTube's practice of welcoming copyright infringement and its strategic use of piracy to achieve its business objectives place it outside the safe harbor of 17 U.S.C. § 512(c) because:

    a.  YouTube "receive[d] a financial benefit directly attributable to infringing activity" that it had "the right and ability to control"; *or*

    b.  YouTube had actual knowledge or awareness of specific infringing material on its site, or alternatively, willfully blinded itself to such material, and failed to remove it.

## STATEMENT OF THE CASE

Plaintiffs-Appellants (collectively, "Viacom") own the copyrights in thousands of popular movies and television shows that were uploaded, reproduced, displayed, performed, and distributed without authorization on the YouTube website operated by Defendants-Appellees Google, Inc., YouTube, Inc. and YouTube LLC (collectively, "YouTube" or "Defendants").  Viacom brought this copyright action in 2007 in the Southern District of New York (Stanton, J.).

YouTube asserted an affirmative defense under Section 512(c) of the DMCA.  After fact discovery, the parties cross-moved for summary judgment.  The district court granted YouTube's motion and entered judgment.  SPA30-32.[1]

Viacom appealed, and this Court affirmed in part, vacated in part, and remanded.  SPA66-67.  On remand, the district court granted YouTube's renewed

---

[1]  References to the "SPA" identify the page number where the cited material appears in the special appendix.

3

motion for summary judgment on its DMCA affirmative defense and again entered

judgment.  SPA96-98.

## I.    YouTube's Founders Build A Business Based On Infringement.

YouTube was founded in February 2005 by Chad Hurley, Steve Chen, and

Jawed Karim, who had worked together at Internet start-up PayPal before it was

sold to eBay for $1.5 billion.  JAXI-2520.[2]  YouTube's founders likewise aimed to

establish YouTube's popularity rapidly and cash in by selling it:  "[O]ur dirty little

secret . . . is that we actually just want to sell out quickly."  JAV-1355; JAXI-2542.

Accordingly, Chen urged his associates to "concentrate all of our efforts in build-

ing up our numbers as aggressively as we can through whatever tactics, however

evil."  JAV-1173; JAXI-2566.[3]

YouTube was to be a self-described "consumer media company" operating

over a website (www.youtube.com) and other distribution platforms.  JAXI-2521.

The content would come from users, who would be invited to upload videos so

---

[2]  References to the "JA" identify the volume and page number(s) where the cited
material appears in the 23-volume joint appendix filed by the parties.

[3]  Notably, almost none of these key internal communications were produced by
YouTube.  Hurley "lost" all of his YouTube e-mails for the crucial 18-month pe-
riod from YouTube's founding until its acquisition by Google, and all of Chen's
email for the same period also went missing.  JAVI-1483-84 (Hurley Dep.); DCt.
R. Dkt. No. 191 ¶¶ 263-265 (Hohengarten Decl.).  The emails produced from this
period are those that Karim, who left YouTube in 2006, preserved on his personal
computer.  *Id.*  ¶¶ 218-221, 263-265.

long as they granted YouTube an unrestricted "worldwide . . . license to use, re-
produce, distribute, . . . display, and perform the [video]." JAXI-2761. Uploaded
videos generally could be watched by anyone. The business model was to sell ad-
vertising seen by those using the site.

The goal, one of the co-founders observed, was to make YouTube "just like
TV," with users "who keep coming back," and advertisers who pay for access to
that audience. JAXI-2533. YouTube accordingly assumed complete editorial con-
trol over the site – for example, systematically removing videos that conflicted
with its business interests, such as videos that contained violence, sex, or hate
speech that could offend viewers and advertisers, and sometimes making videos
accessible only to users who satisfied age-verification requirements. JAXI-2554-
56, 2592-93, 2706-07; JAII-271-317.

From the outset, the founders knew users were uploading vast quantities of
infringing clips, including from Viacom-owned shows like *South Park* that they
identified by name. JAV-1314; JAXI-2528-51 (¶¶ 31-32, 37-39, 43, 45-48, 51, 53-
59). The founders also understood that this infringing material was critical to their
plan of "building up [their] numbers aggressively" by attracting users. JAXI-2566.
They therefore embraced the infringement and took concrete steps to facilitate it.
Indeed, the founders viewed notifications of infringement from copyright owners

as a badge of success – one co-founder told the others in response to a cease-and-desist letter, "haha, awesome!!!  a sign of our continuing success."  JAXII-2937.

Consistent with this plan to facilitate and profit from infringement, the founders also uploaded infringing videos themselves.  One email noted that Karim was "putting stolen videos on the site."  JAV-1328; JAXI-2537.  Chen recognized the company would have "a tough time defending the fact that we're not liable for the copyrighted material on the site because we didn't put it up when one of the co-founders is blatantly stealing content from other sites and trying to get everyone to see it."  *Id*.  Yet, on another occasion, Chen himself emailed about a video, saying "steal it!"  JAV-1335; JAXI-2539.  When Hurley expressed concern about "steal[ing] the movies," Chen countered, "we need to attract traffic. . . .  [T]he only reason why our traffic surged was due to a video of this type."  *Id*.[4]

When the Supreme Court decided *Metro-Goldwyn-Mayer Studios Inc. v. Grokster Ltd.*, 545 U.S. 913 (2005), condemning inducement of infringement over the Internet, Hurley recognized the threat to YouTube, telling his co-founders: "we need views, [but] I'm a little concerned with the recent Supreme Court ruling

---

[4] Similarly, when YouTube's Internet service provider complained that YouTube was violating its user agreement, Chen believed the violation was because "we're hosting copyrighted content."  JAV-1316; JAXI-2531.  His response:  "i'm not about to take down content because our ISP is giving us shit."  *Id*.

on copyrighted material." JAV-1326; JAXI-2535. Yet YouTube's reliance on in-
fringing videos trumped that concern.

Hence, throughout the summer of 2005, the founders searched for ways to
continue exploiting infringing videos while trying "to avoid the copyright bas-
tards," as they referred to copyright owners. JAV-1317; JAXI-2531. First, to
create an appearance of compliance, they removed some blatantly infringing vid-
eos while keeping many others – including "comedy clips," a Viacom specialty.
JAI-257; *see also* JAXI-2535-43. Hurley told the others: "save your meal money
for some lawsuits!" JAV-1321; JAXI-2535.

Then, in September 2005, the founders adopted a new policy that YouTube
followed until May 2008, even after Google purchased the site in October 2006.
They decided to keep substantially all infringing videos on YouTube unless and
until a copyright owner located a specific infringing clip and sent YouTube a "ta-
kedown notice" identifying the clip by URL, in which case YouTube would re-
move that specific clip – but no others of the same show.

This decision is reflected in a September 3, 2005, email exchange between
the founders with the subject-line "copyrighted material!!!" JAV-1323-25. Hurley
started the exchange with "aaahhh, the site is starting to get out of control with co-
pyrighted material." JAV-1325. Chen argued against removing the infringing vid-
eos because they were what attracted 80% of site traffic: "if you remove the poten-

tial copyright infringements . . . site traffic and virality will drop to maybe 20% of what it is." JAV-1324.  Karim proposed they "just remove the obviously copyright infringing stuff," but Chen insisted that even if they removed only that content, "we go from 100,000 views a day down to about 20,000 views or maybe even lower." JAV-1323.

To justify keeping the "obviously copyright infringing stuff," the founders embraced the pretense that the countless clips on YouTube stolen from popular movies and TV shows were actually owned by the uploading users.  Chen explained:  "the copyright infringement stuff I mean, we can presumably claim that we don't know who owns the rights to that video and by uploading, the user is claiming that they own that video." JAV-1323.[5]  Based on this avowed fiction, YouTube would keep all infringing videos until it got a takedown notice.  Using the example of a clip pirated from CNN, Chen outlined how this policy would ensure a supply of infringing clips, because the inevitable time-lag involved in takedown notices could never stem the floodtide of infringing uploads:

> i really don't see what will happen.  what?  someone from cnn sees it?
> he happens to be someone with power?  he happens to want to take it

---

[5] In fact, many of Viacom's clips-in-suit were uploaded with an accompanying description admitting they were pirated.  JAXII-2926. ("I don't care if my account [sic] get's closed for this, this episode was great, and this is the part everyone's laughing about.^^I did not create this material.  All contents are copyright of Comedy Central.").

> down right away.  he gets in touch with cnn legal.  2 weeks later, we
> get a cease & desist letter.  we take the video down.

JAV-1337.

This policy was reinforced by YouTube management's repeated and deliberate efforts to avoid learning which specific clips were infringing.  For example, YouTube maintains a "community flagging" feature that allows users to flag for YouTube's attention videos that violate YouTube's terms of use (*e.g.,* pornography, hate speech, etc.).  When this feature launched in September 2005, YouTube also included the capacity for users to flag a video as "copyrighted."  JAXI-2552-56.

However, the founders saw copyright flagging primarily as window-dressing, creating, as Chen put it, "the perception . . . that we are concerned about this type of material and we're actively monitoring it."  JAV-1340.  But, Chen continued, "the actual removal of this content will be in varying degrees."  *Id*.  Comparing YouTube to the flickr website, Chen emphasized that through this policy, "you can find truckloads of . . . copyrighted content" if you are "actively searching for it."  *Id*.

But even that window-dressing soon proved too much.  The founders quickly realized that copyright flagging put YouTube on notice of infringement, and within two weeks Hurley directed the discontinuation of copyright flagging "asap":

can we remove the flagging link for "copyrighted" today. . . . basically if we don't remove them we could be held liable for being served a notice. it's actually better if we don't have the link there at all because then the copyright holder is responsible for serving us notice of the material and not the users.

JAV-1341.

That decision not only kept the floodgates open for stolen content, but also sent the inviting message to YouTube users that the website was a safe place for infringement. Indeed, shutting off community flagging for copyright meant that even when *over three thousand* Viacom clips-in-suit were flagged and reviewed by YouTube for potential terms-of-use violations other than copyright, the clips were still "approved" to remain on YouTube despite being blatantly infringing. A "YouTube Content Policy Training" guide even highlighted Viacom's *Daily Show* as an example of content for YouTube's reviewers to "approve." JAXI-2557, 2780 (Wilkens Decl. ¶ 2(e)); JAXII-2800-2921.

In February 2006, Maryrose Dunton, YouTube's lead Product Manager, reported to Chen that she "did a little exercise on Friday and went through all the most viewed/most discussed/top favorites/top rated [videos on YouTube] to try and figure out what percentage is or has copyrighted material. it was over 70%." JAV-1198; JAXI-2574. Dunton joked that she had "flagged" the infringing videos for removal. *Id.* But pursuant to YouTube policy, the videos actually remained on the

10

site.  JAXI-2576.  A month later, Dunton again estimated "probably 75-80% of our views come from copyrighted material."  JAV-1211; JAXI-2579.

Around the same time, Dunton and a YouTube engineer discussed implementing an automated anti-infringement tool to alert copyright owners when suspected infringing content was uploaded, but even though implementation "[wa]sn't hard" and would only have "take[n] another day or w/e," Dunton killed the project because she "hate[d] making it easier for these a-holes" – referring to copyright owners.  JAV-1276; *see also* JAXI-2584-86..  YouTube also torpedoed other anti-infringement tools proposed by Brent Hurley, Chad Hurley's brother and YouTube's Director of Finance.  JAXI-2559-62, 2596-97.

The "blatantly illegal" infringement on YouTube – particularly of Viacom's copyrights – was starkly highlighted in a report that Karim distributed at YouTube's March 2006 board of directors meeting:

> As of today episodes and clips of the following well-known shows can still be found:  Family Guy, South Park, MTV Cribs, Daily Show, Reno 911, Dave [sic] Chapelle. . . . [W]e would benefit from preemptively removing content that is blatantly illegal and likely to attract criticism.  This will help to dispel YouTube's association with Napster (Newsweek:  "Is YouTube the Napster of Video?" . . . ).

JAV-1347.  Viacom owns the copyrights in *South Park*, *MTV Cribs*, *The Daily Show*, *Reno 911*, and *Dave Chappelle* – all but one of the "well-known shows" and "content that is blatantly illegal" on YouTube.  Hundreds of Viacom clips-in-suit from these five shows were on YouTube when Karim submitted the report and

11

were not removed until late 2006 or, in most cases, early 2007 when Viacom sent a large number of takedown notices.  Furthermore, in the two years following Karim's warning to the YouTube board (until May 2008) thousands more infringing clips-in-suit from these same Viacom programs were posted on YouTube.  JAXI-2779 (Wilkens Decl. ¶ 2(b)-(c)).

The founders' intentional facilitation of infringement is highlighted by their delayed, and later strategic, deployment of content-filtering technology, which enables a service provider to instantaneously and automatically compare the digital fingerprint of an uploaded clip to a database of digital fingerprints of copyrighted works provided by copyright holders and, in the event of a match, block the upload or flag it for review so that the infringing content never appears on the website.  JAXI-2717-29.  Only site operators like YouTube can prevent piracy by filtering out infringing content at upload, before it ever becomes public.  *Id.*; *see also* JAXIII-3081 (King Decl. ¶ 26).  Filtering technology was commercially available, reliable, and relatively inexpensive even before YouTube began operations, but was not integrated into YouTube's original design.  JAXI-2717-29, 2740-42.

In spring 2006, the Motion Picture Association of America ("MPAA"), on behalf of the major film studios including plaintiff Paramount Pictures, urged YouTube to implement filtering technology.  JAVIII-1973-81.  After initially seeming willing, YouTube backtracked, stating in a phone call involving Chen,

12

YouTube's general counsel, and an MPAA representative that YouTube would not implement filtering for most copyright owners because "the copyrighted content on YouTube was a major lure for their users."  JAXI-2678; JAVIII-1981.

## II.    YouTube's Infringement-Based Business Persists After Google Purchases YouTube.

Google's awareness of the large-scale infringement on YouTube began early in 2006 before it acquired the company, when Google surveyed the content on YouTube and regarded the site "as a 'rogue enabler' of content theft," and as "completely sustained by pirated content."  JAII-445, 455.  In contrast to You-Tube, Google's competing video-sharing site, Google Video, reviewed each video at upload and blocked those that blatantly infringed copyrights.  JAXI-2598-99.  But Google's copyright compliance put it at a serious competitive disadvantage, and Google understood that YouTube's success was the result of its "[l]iberal copyright policy."  JAXI-2610, 2620-21.

Hence, Google executives engaged in a "heated debate" in 2006 "about whether we should relax enforcement of our copyright policies in an effort to stimulate traffic growth."  JAII-528.  While some argued that Google Video should "beat YouTube" by "calling quits on our copyright compliance standards," JAXI-2612-13, and "play faster and looser and be aggressive until either a court says 'no' or a [licensing] deal gets struck," JAXI-2627, others, including Google co-founder Sergey Brin, questioned whether it was right for Google to "chang[e] policy [t]o

increase traffic knowing beforehand that we'll profit from illegal [d]ownloads."
JAXI-2629.

Unable to compete with YouTube's pirated content, Google decided to buy
YouTube for $1.65 billion in October 2006. Google's due diligence confirmed it
was buying a business built on infringement. Google's financial advisor Credit
Suisse told Google's board that 60 percent of YouTube's views were of "pre-
mium" copyrighted content, and that only 10 percent of that content was licensed.
JAVI-1417; JAXI-2636-37.

Google's priority then became to preserve YouTube's competitive advan-
tage and lock in its dominant video position. CEO Schmidt directed YouTube "to
grow playbacks to 1b/day." JAIII-581. With the focus still on rapid growth,
Google reversed its own prior copyright compliance policy and adopted You-
Tube's, ensuring that every infringing video would remain on YouTube unless and
until the copyright owner detected it and sent a takedown notice. JAXI-2648-49.
But Defendants' executives remained well aware of the vast infringement on You-
Tube. JAXI-2651-59. For example, an employee responsible for selecting videos
for prominent placement on the site reported that "we're running into issues find-
ing enough videos because they have so many copyright violations." JAXI-2652.

In January 2007, after Google's lawyers reviewed YouTube's practices, De-
fendants decided "for legal reasons" to stop placing ads on watch pages of videos

14

unless they had a content license from the real copyright owner, an implicit concession that they were previously extracting a direct financial benefit from infringing content.  JAIII-791.  However, Defendants continued to place ads on YouTube's home, search, and browse pages, and thereby continued to monetize infringing content and the userbase it attracted.  JAXI-2694-2705.

With infringement growing exponentially, the MPAA again pressed YouTube (and its new owners) to implement commercially available filtering technology to control infringement.  JAXI-2681-82.  Defendants eventually decided to implement filtering technology offered by an industry leader, Audible Magic, and offered it to many copyright owners, including Viacom, NBC, Disney, Fox, and others, but only if they would agree to license their content to YouTube.  JAXI-2725-29.  Thus, readily available technology that would have allowed YouTube to identify, block and remove illicit clips became a tool to force content owners into business deals.

At first, Defendants equivocated about whether they would also deploy Audible Magic to protect the works of content owners that declined to grant a license, but in February 2007, they told the MPAA and Viacom that they would not use Audible Magic to prevent copyright infringement without a licensing deal.  JAIX-2160.  Also in February, Viacom and NBC wrote to Google and offered complete cooperation to implement automated filtering technology.  JAV-1357-59; JAIX-

15

2314-19.  Google's General Counsel wrote back to both asserting that Google had no obligation to use even readily available Audible Magic filtering to protect their works from infringement on YouTube.  JAIX-2160.  Furthermore, Defendants' internal emails confirm their policy of offering filtering only to content owners who would agree to a licensing deal.  *See e.g.,* JAX-2486 (Google's Sales Engineer relaying "the final verdict" that filtering protection "should only be given to signed, non-music partners.  This is what legal has authorized").[6]

While they used Audible Magic filtering to prevent infringement of their content partners' works, Defendants also developed their own proprietary filtering system called "Content ID."  About a year later, with Schmidt's billion-view goal having been met and this lawsuit well underway, Defendants relented and decided to make Content ID available to all content owners even in the absence of a license agreement, and began using it to protect Viacom's works in May 2008.  JAXI-2675.

## III.   Viacom's Dealings With Defendants

As YouTube rocketed to prominence in 2006, Viacom hired an outside company, BayTSP, to investigate infringement of Viacom's copyrights on YouTube and send takedown notices.  Viacom initially prioritized its enforcement to

---

[6] The *New York Times* even quoted Hurley saying YouTube would discuss using filtering technology for "Viacom as part of a broader deal."  JAX-2508.

target the most egregious infringement, such as pre-release of first-run movies or "hot" content of certain minimum lengths, and subsequently revised its enforcement priorities as it learned more about the situation.  JAIX-2207-08.

In summer 2006, Viacom negotiated with YouTube about a possible content license, and YouTube offered to use automated filtering as part of the deal.  JAXI-2736-40.  Those talks did not progress far, but were revived when Google acquired YouTube.  Given the possibility of a licensing deal, Viacom temporarily suspended sending most takedown notices to YouTube, but demanded that any deal include compensation for pre-license uploads because they were infringing.  JAXI-2660-62; JAIX-2207.  After protracted discussions, Defendants offered Viacom a licensing deal they valued at a minimum of $590 million, which included use of filtering technology to block infringing uploads.  JAXI-2660.

Ultimately, the negotiations broke down, and in the absence of a licensing deal, Defendants refused to deploy filtering technology to protect Viacom's content.  JAXI-2664, 2666, 2670-71.  In February 2007, Viacom sent YouTube takedown notices for more than 100,000 infringing clips.  JAXI-2665.  YouTube took down the clips at the URLs specified in the takedown notices, but failed to prevent the continued upload of infringing clips from the very same shows.  JAXI-2672.  Viacom filed the present suit in March 2007.  JAI-30.

Both before and after filing suit, Viacom, through its own employees and through third-party marketing firms, authorized the upload of certain carefully selected trailers and other promotional clips with the knowledge and assistance of Defendants, and often at their urging. JAIX-2202-05, 2244. In the district court and in the prior appeal, Defendants argued that this promotional activity was stealthy and made it impossible for them to distinguish authorized from infringing clips, but the record shows that YouTube was well informed about these postings.[7] Moreover, even if Defendants did not know about every single authorized promotional clip, Viacom offered at the highest level to collaborate regarding "automated solutions to identify infringing content and also to electronically tag authorized content." JAV-1359.[8] Consistent with their policy of deliberately avoiding knowledge of specific infringing clips, Defendants refused all such cooperation. Tellingly, they have complained of no difficulty identifying authorized clips since they began using their Content ID technology to protect Viacom's works in 2008.

---

[7] Even in an extreme, one-time case that Defendants have highlighted, in which a Paramount employee appeared to go to lengths to hide the fact that the studio was uploading a particular promotional clip, Paramount informed YouTube the next day that the upload was authorized. JAIX-2242; *see also* JAIX-2240-41.

[8] *See also* JAVIII-1992-97; JAX-2497-98 (Garfield Tr. 43:13-53:7 (explaining MPAA's offer  to YouTube to assist in testing filtering software to recognize "whitelist" of approved studio content and "blacklist" of unlicensed content, and YouTube's eventual rejection of MPAA's offer.) )

## IV.    Procedural History

### A.    Original Summary Judgment Proceedings

After fact discovery, the parties cross-moved for summary judgment. Despite acknowledging that "a jury could find that the defendants not only were generally aware of, but welcomed, copyright-infringing material being placed on their website," the district court granted Defendants' motion and denied Viacom's, holding that the DMCA safe harbor immunized Defendants. SPA6, 30 (referred to hereafter as *Viacom I*).

Section 512(c)(1)(A) of the DMCA provides that a service provider loses the safe harbor for user-generated content stored on its site if it had "actual knowledge" of infringement or "aware[ness] of facts and circumstances" indicating infringing activity and failed to take action. 17 U.S.C. § 512(c)(1)(A). The district court held that both refer to "knowledge of specific and identifiable infringements." SPA15. Ignoring willful blindness, which Viacom had emphasized in its briefing, the district court found as a matter of law that Defendants never obtained such disqualifying knowledge, other than through takedown notices, to which – in the court's view – Defendants responded adequately. The district court also expressed the view that the takedown-notice regime in subsection 512(c)(3) provides an adequate remedy for copyright owners. SPA16.

Section 512(c)(1)(B) of the DMCA requires that to qualify for the safe harbor, a defendant must "not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity."  17 U.S.C. § 512(c)(1)(B).  As to this exception, the district court again imposed a specific-knowledge requirement, holding that Defendants could not control infringement on YouTube because they did not have "item-specific" knowledge of infringing clips.  SPA25-26.

## B.   First Appeal

Viacom appealed, and this Court reversed in part.  Although it agreed with the district court that "actual knowledge" and "aware[ness] of facts and circumstances" under Section 512(c)(1)(A) "apply only to specific instances of infringement," the Court vacated the grant of summary judgment because "a reasonable juror could conclude that YouTube had actual knowledge of specific infringing activity, or was at least aware of facts or circumstances from which specific infringing activity was apparent."  SPA49-50, 54 (referred to hereafter as *Viacom II*) (internal quotation marks omitted).  The Court also held that willful blindness constitutes knowledge under the DMCA, where a defendant is aware of a high probability of infringement but deliberately shields itself from learning of specific infringing clips.  Noting that the district court had failed to address willful blindness, the Court remanded for consideration "whether the defendants made a deliberate effort

20

to avoid guilty knowledge." SPA56 (internal quotation marks omitted). Furthermore, this Court "counsel[ed] in favor of explicit fact finding on the issue of willful blindness." SPA56 n.10.

This Court also reversed with respect to the "right and ability to control" under Section 512(c)(1)(B), holding that the district court "erred by importing a specific knowledge requirement" into that provision. SPA56-57 (internal quotation marks omitted). Explaining that "control" under the DMCA "requires something more than the ability to remove or block access to materials posted on a service provider's website," this Court gave two examples of "something more": (1) proof of "inducement of copyright infringement under *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005)," and (2) the type of control present in *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146 (C.D. Cal. 2002). SPA59-60 (internal quotation marks omitted). The Court remanded for a determination whether there are material disputes of fact under this standard. SPA60-61.

### C. Remand Summary Judgment Proceedings

On remand, Defendants again moved for summary judgment based on the DMCA, resting on the same factual record. The district court granted the motion. SPA96-97 (referred to hereafter as *Viacom III*).

With respect to knowledge or awareness under Section 512(c)(1)(A), the district court flipped the normal rule and held that the plaintiff copyright owner bears

the burden of proving that the service provider has specific disqualifying know-ledge, even though the DMCA safe harbor is an affirmative defense.  It cited the notice-and-takedown provision in subsection 512(c)(3), which it read as a determination by Congress that "the burden of identifying what must be taken down is to be on the copyright owner."  SPA79.  Thus, even though "the defendants were conscious that significant quantities of material on the YouTube website were infringing," SPA51-52 (*Viacom II*), the district court held that they had no burden to show that they lacked specific knowledge or awareness of any of Viacom's clips-in-suit.  And because YouTube's internal records would not allow Viacom to identify which specific clips Defendants' employees viewed, the district court concluded as a matter of law that Defendants should be deemed not to have had disqualifying knowledge.  SPA77-79.

The court also concluded that Viacom had failed to raise a triable issue of fact as to Defendants' willful blindness.  Instead of following this Court's instruction to consider "whether the defendants made a deliberate effort to avoid guilty knowledge," and its recommendation in favor of explicit factual findings, the district court did neither.  SPA56 & n.10 (internal quotation marks omitted).  It reasoned that the problem with the proffered willful blindness evidence was that it did not identify "[t]he specific locations of infringements," and "g[a]ve at most information that infringements were occurring with particular works, and occasional in-

dications of promising areas to locate and remove them." SPA82. Put differently, the court seemingly concluded that even if Defendants were assumed to have all the knowledge they willfully avoided, they still would have had to conduct some follow-up investigation to locate specific infringing clips. As a result, the district court held as a matter of law that Defendants could not be held liable on a willful-blindness theory. SPA83. But the district court discussed almost none of the actual willful-blindness evidence proffered by Viacom, including proof that filtering technology would have detected and blocked illegal clips automatically but You-Tube refused to apply it to Viacom's content. SPA80-83.

With respect to the right-and-ability-to-control exception, the district court did not apply the *Grokster* inducement standard as instructed by this Court. Instead, it held that control requires "participation in" or "coercion of" infringing activity of users, and that without such conduct a service provider's "motivation" to facilitate infringement is irrelevant. SPA91. In so doing, the district court ignored the actual holdings in *Grokster* and in the Ninth Circuit's recent decision in *Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020 (9th Cir. 2013), which Viacom emphasized. Applying its own strict standard, the district court concluded after a cursory review of the evidence that Defendants lacked control: while "[t]hat evidence proves that YouTube for business reasons placed much of the bur-

den on Viacom" continually to search the website for infringing clips, "[t]hat is where it lies under the safe harbor." SPA90 (internal quotation marks omitted).[9]

## SUMMARY OF ARGUMENT

To prevail on the Section 512(c) safe-harbor affirmative defense, a service provider must meet each of the following requirements: (1) it must not receive a financial benefit directly attributable to infringing activity that it has the right and ability to control; and (2) it must not obtain actual knowledge of infringement or awareness of facts or circumstances from which infringing activity is apparent, or if it does, it must act expeditiously to remove the infringing material. On remand, in adjudicating these requirements, the district court failed to follow this Court's instructions and failed to apply the correct legal standards. The grant of summary judgment must therefore be reversed.

First, YouTube profited from infringement it had the right and ability to control. In *Viacom II*, this Court held that the right and ability to control can be established through a showing of *Grokster* inducement or the types of control at issue in *Cybernet*. YouTube had the right and ability to control the massive infringement

---

[9] Viacom previously argued that Defendants' syndication of clips-in-suit to third parties fell outside the scope of the Section 512(c) safe harbor. This Court remanded that issue for further fact finding, SPA61-64, and the district court concluded that Defendants' syndication fell within the safe harbor. SPA96. Viacom is not appealing that portion of the district court's summary judgment ruling.

occurring on its site under both theories. The record shows that YouTube operated its service "with the object of promoting its use to infringe copyright." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936–37 (2005). YouTube purposefully (and successfully) built its business on infringement, attracting users and advertising revenue through the "major lure" of "blatantly illegal" clips of Viacom's highly popular television shows and movies. That is enough to constitute *Grokster* inducement. Nevertheless, the district court failed even to consider YouTube's *Grokster* intent, an issue seldom amenable to summary judgment. As for *Cybernet*, the record shows that YouTube *actively* designed and operated its service to take advantage of the fact that infringing uploads were drawing in viewers and advertising revenue. Only by misapplying this Court's instructions and largely disregarding the record could the district court conclude that YouTube lacked the right and ability to control infringement.

Second, YouTube had two types of disqualifying knowledge under the DMCA, either of which is enough to deny YouTube the safe harbor: actual knowledge or awareness of specific infringing clips, and knowledge of such clips imputed through willful blindness. As to the former, even in the face of extensive evidence of YouTube's review of infringing clips, including Viacom's clips-in-suit, the district court impermissibly shifted the burden of proof on YouTube's affirmative defense to Viacom to identify which specific clips-in-suit YouTube knew

about.  If the burden had been properly allocated, it would have been clear that YouTube has not met its burden of showing that it lacked knowledge or awareness of Viacom's clips-in-suit.  There is also at least a genuine dispute of material fact as to whether YouTube willfully blinded itself to infringement of Viacom's clips-in-suit through its awareness of a high probability of infringement coupled with its many deliberate efforts to avoid learning of specific instances of that infringement. These efforts most notably include YouTube's intentional refusal to deploy technologies that YouTube already was using for other select content owners.

## ARGUMENT

This Court "reviews an order granting summary judgment *de novo*, drawing all factual inferences in favor of the non-moving party."  SPA47 (*Viacom II*). "Summary judgment is inappropriate when the admissible materials in the record make it arguable that the claim has merit," or "[w]here an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility."  *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) (internal quotation marks omitted).

## I.   Defendants Profited Directly From Infringing Activity They Had The Right And Ability To Control.

Plaintiffs submitted strong evidence that Defendants earned a direct financial benefit from infringement that they had the right and ability to control, and therefore forfeited the safe harbor under Section 512(c)(1)(B).  Although the district

26

court did not address "financial benefit," it held that there was no evidence creating a genuine dispute about whether YouTube had the "right and ability to control" infringing activity. But the record shows just the opposite, and the district court's ruling rests on fundamental misunderstandings of the evidence, this Court's decision in *Viacom II*, and the DMCA itself. Because YouTube had the right and ability to control the infringing activity from which it profited—and because, at the very least, there are genuine disputes of fact as to this issue—this Court should vacate the grant of summary judgment.

### A.    YouTube Had The Ability To Control Infringing Activity That Pervaded Its Website.

In *Viacom II*, this Court provided significant guidance on the meaning of the DMCA's "right-and-ability-to-control" language. Explaining that "right and ability to control" requires "something more" than the mere ability to block certain materials or users, this Court provided two highly relevant examples. SPA60. This Court pointed to *Grokster*, and observed that "'purposeful, culpable expression and conduct'" aimed at inducing infringement might constitute the requisite "something more." And the Court cited *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146 (C.D. Cal. 2002), which held that a defendant exhibited "control" over websites using its age verification service where it "instituted a monitoring program," "forbade certain types of content," and "refused access to users who failed to comply with its instructions." SPA60. The Ninth Circuit subsequently

27

endorsed this Court's approach. *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, No. 09-55902, --- F.3d ---, 2013 WL 1092793, at \*19 (9th Cir. Mar. 14, 2013); *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1045–46 (9th Cir. 2013).

In *Grokster*, the Supreme Court determined that the defendants, who distributed peer-to-peer file sharing computer networking software with the intent to foster infringement, could be liable for the infringing acts of third parties using their software. The Court distinguished *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), which held that distribution of a commercial video tape recorder capable of substantial noninfringing uses could not give rise to contributory liability unless the distributor had actual knowledge of specific instances of infringement and failed to act on it. As *Grokster* explained, the earlier case involved "no evidence that Sony *had expressed an object* of bringing about taping in violation of copyright or had taken active steps to increase its profits from unlawful taping." *Grokster*, 545 U.S. at 931 (emphasis added). Thus, *Sony* did not "require[] courts to ignore evidence of intent if there is such evidence, and the case was never meant to foreclose rules of fault-based liability derived from the common law." *Id.* at 934–35. *Grokster* therefore makes intent central to the inducement analysis. "One who distributes a device *with the object of promoting its use to infringe copyright*, as shown by clear expression or other affirmative steps taken

to foster infringement, is liable for the resulting acts of infringement by third par-

ties." *Id.* at 936–37; *see also id.* at 935.

By invoking *Grokster* in *Viacom II*, this Court indicated that YouTube's op-

eration of its service with the intent to foster infringement might well remove it

from the safe-harbor provision.  That of course made perfect sense, as Congress

did not intend to immunize website hosts who operate with the hope and purpose

of profiting from infringement.  *See, e.g., ALS Scan, Inc. v. RemarQ Communities,*

*Inc.*, 239 F.3d 619, 625 (4th Cir. 2001) (noting that "[t]he DMCA's protection of

an innocent service provider disappears at the moment the service provider loses

its innocence").

The Ninth Circuit embraced this reasoning in *Fung*.  Citing this Court's *Via-*

*com II* decision, the Ninth Circuit affirmed summary judgment on a *Grokster* in-

ducement theory against a distributor of services and websites using a peer-to-peer

file-sharing protocol.  710 F.3d at 1045–46.  The court pointed to the defendant's

own statements manifesting his unlawful intent, his failure to develop filtering

tools to combat infringement, and his reliance on advertising revenue generated by

high-volume infringing use.  It found "more than enough unrebutted evidence in

the summary judgment record to prove that Fung offered his services with the ob-

ject of promoting their use to infringe copyrighted material."  *Id.* at 1035.  The

court then held that Fung had the right and ability to control infringing activity—

and thus was ineligible for the DMCA safe harbor—*because* he "engaged in culpable, inducing activity like that in *Grokster*."  *Id.* at 1046.

*Fung* rejected the notion that a service provider needed to expressly encourage infringing use of the service in order to forfeit the DMCA safe harbor as a *Grokster* inducer.  All that is required, it held, is intent to host and profit from infringement.  *Fung* also explained what evidence bears on a finding of *Grokster* intent:  As in *Grokster* itself, defendants' "explicit internal communication[s]" are "pertinent to proof of improper purpose," regardless of "[w]hether the messages were communicated [to customers]."  *Id.* at 1035 (quoting *Grokster*, 545 U.S. at 936–37 (final bracket added)).  That is because "[t]he function of the message in the theory of inducement is to prove by a defendant's own statements that his unlawful purpose disqualifies him from claiming protection."  *Id.* (quotation marks omitted).  And as noted above, *Fung*, again expressly following *Grokster*, found highly relevant the defendant's failure to develop filtering tools to diminish infringing activity, as well as his reliance on advertising sales, which in turn depend on high-volume infringing use.  *Id.* at 1035–36.

Finally, the *Fung* court "ha[d] no difficulty concluding that where the 512(c)(1)(B) safe harbor requirements are not met, the service provider loses protection with regard to *any infringing activity using the service*."  *Id.* at 1046 (emphasis added).  As the court explained, the right and ability to control (like com-

mon law vicarious liability) depends on "the overall relationship between the service provider and infringing users," rather than any item-specific knowledge of or ability to remove infringing material. *Id.*; *see Grokster*, 545 U.S. at 940 n.13 (inducement liability "goes beyond" cases in which a defendant "encourage[s] a particular consumer to infringe a copyright"; instead, "distribution of a product can itself give rise to liability where evidence shows that the distributor intended and encouraged the product to be used to infringe"); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 983-84 (C.D. Cal. 2006) ("*Grokster II*") ("liability may attach even if the defendant does not induce specific acts of infringement").

Applying these standards to the record here, a jury could reasonably conclude that YouTube operated its service with the intent that it be used to infringe. To start, "[w]hile infringing use by third parties is not by itself evidence of [YouTube's] intent, the staggering scale of infringement makes it more likely that [YouTube] condoned illegal use, and provides the backdrop against which all of [its] actions must be assessed." *Grokster II*, 454 F. Supp. 2d at 985. Moreover, as in *Grokster*, the YouTube founders intentionally adopted a business model that depended on infringement. *See supra* pp. 4-13. They made the conscious decision—revealed through their own words—to build their user base "as aggressively as we can through whatever tactics, however evil." JAV-1173. This effort included par-

31

ticipating in copyright infringement themselves, refusing to block even "the ob-viously copyright infringing stuff," disabling community flagging for infringe-ment, avoiding or eliminating simple engineering fixes that would have made it easier to detect and deter infringement, and refusing to deploy filtering technology that was already in use for preferred content owners who acquiesced to YouTube's licensing terms.  JAXI-2259-60, 2574-76, 2577, 2584-87; 2588-89; 2596-97, 2599.

The evidence showing the *Grokster* intent of Google as YouTube's purchas-er is equally powerful.  Aware that YouTube was a "'rogue enabler' of content theft" whose "business model is completely sustained by pirated content," Google nevertheless chose to buy it.  JAII-445, 455.  Indeed, Google's financial advisor, Credit Suisse, warned Google's board that 54% of YouTube's video views were of infringing content.  JAVI-1417 (explaining that 60% of total video streams were "Premium," and assuming that only 10% of that content was authorized); *see also* JAXI-2636-37.  And, post-acquisition, Google clearly intended to keep the ill-gotten profits coming: It abandoned the prior Google Video policy of reviewing each video at upload and blocking those that blatantly infringed copyrights and adopted YouTube's copyright policy to "increase traffic knowing beforehand that we'll profit from illegal [d]ownloads."  JAXI-2648-49; JAIII-575.  Given these statements—and others in the vast summary judgment record—a jury easily could

find that YouTube operated its website "with the object of promoting its use to infringe copyright." *Grokster*, 545 U.S. at 936–37.[10]

The district court discounted this evidence because it misunderstood *Grokster* and this Court's reliance on it in *Viacom II*. Although *Grokster* expressly held that "one who distributes a device with the object of promoting its use to infringe copyright…is liable for the resulting acts of infringement by third parties," 545 U.S. at 936-37, the district court plainly believed that intent and distribution were insufficient to remove Defendants from the safe harbor. Instead, the district court required that Viacom demonstrate YouTube's "participation in, []or coercion of, user infringement." SPA91. The district court's heightened standard, however, is contrary to this Court's citation to *Grokster*, which makes clear that "the distribution of a product can itself give rise to liability" even without evidence that the defendant "encourage[d] a particular consumer to infringe."[11] 545 U.S. at 940 n.13.

---

[10] Moreover, as this Court has explained, "summary judgment is generally inappropriate where questions of intent and state of mind are implicated." *Gelb v. Bd. of Elections*, 224 F.3d 149, 157 (2d Cir. 2000).

[11] The district court's heightened standard also reflects a misunderstanding of the role of item-specific knowledge under the safe harbor. In *Viacom II*, this Court held that the district court had "erred by importing a specific knowledge requirement into the control and benefit provision," and pointed to *Grokster* as an example of a case in which a service provider has the right and ability to control "without necessarily—or even frequently—acquiring knowledge of specific infringing activity." SPA56-57, 60. Yet on remand, the district court characterized *Viacom II*'s citation of *Grokster* as reaffirming that "the DMCA requires

[Footnote continued on next page]

And that mistaken standard caused the district court to ignore evidence that, like the defendants in *Grokster* and *Fung*, YouTube's founders clearly intended to build a business based on infringement, which Google knowingly opted to continue.[12]

In any event, the evidence in this case (and the district court's misunderstanding) is not limited to the Defendants' "bad hearts." The record also demonstrates that YouTube *acted* on its intentions, actively designing and operating its service to take advantage of the fact that infringing uploads would continue to draw viewers and advertising revenue. Like the defendant in *Cybernet*, YouTube prescribed detailed rules regarding acceptable content, which it enforced through a "monitoring program." 213 F. Supp. at 1173; *see also Fung*, 710 F.3d at 1046 (de-

---

[Footnote continued from previous page]

'actual knowledge or awareness of facts or circumstances that indicate specific and identifiable instances of infringement.'" SPA85 (citation omitted).

[12] The district court likened this case to *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, No. 09-55902, --- F.3d ---, 2013 WL 1092793, at *19 (9th Cir. Mar. 14, 2013), in which the same Ninth Circuit panel as in *Fung* held that a plaintiff failed to raise a triable issue of fact regarding control. SPA93-94. The summary judgment record there, however, was far less extensive than that at issue here: It established only that "(a) the allegedly infringing *material* resided on Veoh's system; (b) Veoh had the ability to remove such material; (c) Veoh could have implemented, and did implement, filtering systems; and (d) Veoh could have searched for infringing content." 2013 WL 1092793, at *19 (quotation marks omitted; emphasis in original). Not only did YouTube exercise far more editorial control than Veoh, *see infra* pp. 34-36*,* but there also was little evidence of Veoh's intent to induce infringement, in contrast to the overwhelming evidence of intent here. *See supra* pp. 31-32.

fendant "personally removed 'fake[], infected, or otherwise bad or abusive torrents' in order to 'protect[] the integrity of [his websites'] search index[es]'" (internal quotation marks omitted; alterations in original)).  YouTube's terms of service give it the discretion to block or remove any video, or to deem content "racy" and restrict its availability to users who satisfy age-verification requirements.  JAXI-2706-07; JAII-285.  The founders themselves extensively monitored the website initially and removed videos that ran afoul of their editorial preferences, while maintaining infringing content because it provided a "major lure" to users.  JAXI-2526-28, 2533-51; JAVIII-1981.

When greater volume made it more difficult to review every upload, YouTube implemented a community flagging program in which users "flagged" videos for review by YouTube employees.  JAXI-2552-54.  After a few weeks, YouTube disabled the program with respect to copyright infringement but maintained it for pornography, hate speech, and other content YouTube found objectionable.  JAXI-2554-56.  A jury easily could infer that YouTube took this action to foster infringement, and that its selective use of community flagging sent a message to YouTube users that the website was a safe place for infringement, thereby encouraging such activity.

YouTube also shaped the content on its website through its discriminatory deployment of filtering software.  Only site operators like YouTube can prevent

piracy by filtering out infringing content at upload, before it ever becomes public. That is why content owners like Viacom, the MPAA, and many others demanded that YouTube adopt readily-available filtering software.  At various times relevant to the infringement of the clips-in-suit, YouTube used Audible Magic software to screen out videos at upload for the benefit of YouTube's licensing partners.  JAXI-2670-71, 2725-42.  Indeed, the filtering tools were so well developed that Defendants committed to their licensing partners that they would swiftly identify and remove upwards of 95% of their infringing content.  *E.g.*, JAIV-890.  But because Viacom had not licensed its content to YouTube, Defendants refused to use that very same tool to prevent infringement of Viacom's works, even though doing so would be almost costless.  JAXI-2725-29.  Defendants' selective use of Audible Magic as leverage in negotiating licensing deals further demonstrates that Defendants actively exercised editorial control directly related to the infringing content on YouTube.  JAXI-2730-40; JAIV-890; JAV-1152.[13]

---

[13] YouTube also engages in extensive efforts, including employee-"editor" reviews and automated algorithms, to organize videos on the site by subject matter and popularity, and to steer viewers towards videos that YouTube believes will enhance viewers' entertainment experience.  JAXI-2752-53, 2754-57, 2758-60.  In this way, YouTube "ma[kes] it easier for users to share" and find "copyrighted content."  *Grokster II*, 454 F. Supp. 2d at 987-88.  The district court, however, ignored evidence of "editor" reviews, and discounted evidence that YouTube's "automated system"—which of course, was initially designed by YouTube employees—helps users locate infringing works.  SPA91-92.

To the extent the district court even considered record evidence of You-Tube's editorial control at all, it improperly discounted it because the court once again misunderstood the DMCA and *Viacom II*.  The court placed heavy emphasis on Section 512(m), which provides that safe-harbor protection shall not be conditioned on "a service provider monitoring its service or affirmatively seeking facts indicating infringing activity."  17 U.S.C § 512(m).  On the court's view, Section 512(m) makes all decisions regarding monitoring irrelevant to the right-and-ability-to-control analysis, regardless of whether the defendant chooses to monitor or filter for some offensive or infringing content, and "regardless of the[] motivation" behind the defendant's policies.  SPA91.[14]

Section 512(m) does not have such an all-encompassing reach.  It states only that service providers need not affirmatively adopt monitoring systems to enjoy the protection of the DMCA's safe harbor; it does not prevent a court from considering, as part of the Section 512(c)(1)(B) analysis, a defendant's *actual* exercise of control over its service, including its decisions to exclude some objectionable content while allowing, and thus encouraging, copyright infringement.  Even in the absence of an affirmative duty to monitor, a party that curates the content on its web-

---

[14] In reaching this conclusion, the district court relied on a portion of *Viacom II* that did not consider the right and ability to control, but instead interpreted a different part of the statute—§ 512(i)—that is not at issue here.

37

site may be held liable for "welcoming" infringing activity.  This is particularly so given that YouTube's monitoring efforts like community flagging were visible to the public, and their selective use sent a clear, encouraging message to would-be infringers.  Moreover, nothing in Section 512(m) suggests that it protects a service provider's decision to implement a monitoring program selectively so as to extract favorable licensing deals from content owners.

In light of the factual record showing YouTube's clear intent that its website be used for infringement, and its actions to encourage that infringement, YouTube was not entitled to summary judgment regarding its "right and ability to control" the infringement that pervaded its website.

### B.    YouTube Received Enormous Financial Benefits Directly Attributable To The Infringing Activity.

YouTube also satisfies the other half of the Section 512(c)(1)(B) exception because it received a "financial benefit directly attributable to infringing activity." There can be no serious doubt that a service provider derives a financial benefit directly from infringing activity where, as here, its revenue depends on advertising sales stoked by the amount and popularity of infringement on its website.

Several cases have held that the "direct financial benefit" standard "should be interpreted consistent with the similarly-worded common law standard for vicarious copyright liability." *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1107 (9th Cir. 2007); *see UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F. Supp. 2d

1099, 1116 (C.D. Cal. 2009), *aff'd in part sub nom. UMG Recordings, Inc. v. Shelter Capital Partners LLC*, No. 09-55902, --- F.3d ---, 2013 WL 1092793 (9th Cir. Mar. 14, 2013). As those cases explain, the DMCA standard, like its common-law counterpart, is satisfied if infringing material "draw[s]" customers from whom the defendant derives revenue. *See CCBill*, 488 F.3d at 1117 ("relevant inquiry" under the DMCA is "whether the infringing activity constitutes a draw for subscribers" (internal quotation marks omitted)); *Cybernet*, 213 F. Supp. 2d at 1171, 1181 (finding direct financial benefit "from the draw posed by the existence of these [infringing] works"); *see also, e.g.*, *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963) (under common law, dancehall operators liable for infringing performances by bands because infringement provided "proprietor with a source of customers and enhanced income").

Where a service provider funds its activities through advertising rather than charging its users a fee, the provider obtains a financial benefit directly attributable to infringement if the infringement draws users, who in turn attract advertisers. The Ninth Circuit's decision in *Fung* drives the point home. Although the court explained that its prior opinions applying the "draw" standard had arisen "in the context of service providers who charge [subscribers] for their services," it found that the defendant received a direct financial benefit by "selling advertising space on his websites," which "depended on the number of users who viewed and then

clicked on the advertisements." 710 F.3d at 1044-45. As the Ninth Circuit noted, the "vast amount of infringing materials on [the defendant's] websites … support[ed] an inference that [his] revenue stream [w]as predicated on the broad availability of infringing materials for his users." *Id.* at 1045; *Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398, 435 (S.D.N.Y. 2011) (finding common-law direct financial interest where Internet file-sharing service "profited from its ability to attract infringing users, including through increased advertising revenue").

YouTube clearly received a "direct financial benefit" from infringement. Its own founders realized that infringement was the primary driver of traffic to the website. And it was this large user base that attracted advertisers and made YouTube the most valuable video-sharing website, causing Google to purchase the company for $1.65 billion a mere year and a half after the site was founded. *See* JAXI-2639-44. Moreover, until January 2007, YouTube obtained additional financial benefits from copyright infringement by placing ads on the very pages where users viewed infringing clips ("watch pages"). JAXI-2689, 2691-92, 2694. Even after Google's lawyers abruptly stopped this practice for "legal reasons," JAIII-791, YouTube continued to profit from users drawn to the site by infringing material through its sales of ads on YouTube's home, search, browse, and upload pages. JAXI-2694-96. By increasing the traffic on these pages—and thus allowing YouTube to reap greater profits from advertising—the infringing material pro-

40

vided a direct financial benefit. *See Fung*, 710 F.3d at 1045; *Cybernet*, 213 F. Supp. 2d at 1181; *Lime Group*, 784 F. Supp. 2d at 435.

In sum, the record demonstrates that YouTube had the right and ability to control infringing activity from which it received a direct financial benefit—but instead strategically exercised its control to encourage infringement in order to grow the site as quickly as possible and sell it at a huge profit. At the very least, the evidence is sufficient to create a question of fact as to whether YouTube is excluded from the safe harbor under Section 512(c)(1)(B).

## II.   Defendants Had Actual Knowledge And Awareness Of Rampant Infringement Of Viacom's Clips-In-Suit.

*Viacom II* clarified that the actual knowledge and awareness provisions of Section 512(c)(1)(A) apply only to specific instances of infringement and that a service provider can obtain such knowledge or awareness in two ways: (1) through actual knowledge of specific infringements or subjective awareness of facts that make specific instances of infringement objectively obvious to a reasonable person; or (2) through willful blindness, where the defendant is aware of a high probability of infringement of the plaintiff's works but deliberately avoids knowledge of the specific infringing clips. SPA49-51, 55-56.

On remand, the district court erred in multiple respects in addressing the knowledge prong of the DMCA. Although the DMCA is an affirmative defense, the district court shifted the burden of proof to Viacom to identify which specific

41

clips-in-suit Defendants were aware of, even in the face of extensive evidence that Defendants had viewed countless clips-in-suit. The district court also misapplied the willful-blindness doctrine by effectively limiting it to circumstances where a service provider is already aware of the location (i.e. URL) of specific infringing clips but chooses to ignore those clips.

### A. Defendants Failed To Satisfy Their Burden Of Showing That They Lacked Actual Knowledge Or Awareness Of Viacom's Clips-In-Suit.

Although the record is replete with evidence that Defendants viewed countless infringing clips, including Viacom clips-in-suit, the district court granted summary judgment to Defendants because Viacom could not identify *which* specific clips-in-suit Defendants knew about. This result is premised on a fundamental misunderstanding of the DMCA affirmative defense and the applicable burden of proof.

Viacom's affirmative claims for direct infringement, *Grokster* inducement, and vicarious liability do not require proof that YouTube had knowledge of specific infringements. *See Arista Records LLC v. Doe 3*, 604 F.3d 110, 117-18 (2d Cir. 2010) (direct infringement); *Grokster*, 545 U.S. at 940 (*Grokster* inducement); *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971) (vicarious liability). However, in order "to meet the eligibility requirements of the 17 U.S.C. § 512(c) 'safe harbor' provision," YouTube "must show,

42

*inter alia*, that it did not have actual knowledge that the material or an activity using the material on the system or network is infringing and was not aware of facts or circumstances from which infringing activity is apparent." *Wolk v. Kodak Imaging Network, Inc*., 840 F. Supp. 2d 724, 746 (S.D.N.Y. 2012); *see also ALS Scan*, 239 F.3d at 625 ("This immunity, however, is not presumptive, but granted only to 'innocent' service providers who can prove they do not have actual or constructive knowledge of the infringement, as defined under any of the three prongs of 17 U.S.C. § 512(c)(1)."). The burden of proof is on the service provider because the DMCA is an affirmative defense. *E.g., Fung*, 710 F.3d at 1039 ("Because the DMCA safe harbors are affirmative defenses, Fung has the burden of establishing that he meets the statutory requirements.").

To be sure, the situation here is an uncommon one. In the ordinary case, where evidence of *Grokster* intent and extensive awareness of infringement is absent, a service provider will readily be able to meet its burden of showing that it lacked disqualifying knowledge. It can simply demonstrate, for example, that it had no ability or no occasion to monitor its site. But where, as here, the record reflects that defendants had extensive knowledge of the infringement of Viacom content on YouTube and even viewed many "blatantly illegal" Viacom clips themselves (though defendants' records do not establish precisely which ones), the

43

proper outcome is to hold that the *defendants* have failed to carry their burden of showing lack of knowledge with regard to the clips-in-suit.

The district court, however, held that the DMCA reverses the normal rule that the party asserting an affirmative defense must prove its elements. It reasoned that because the DMCA "places the burden of notifying [] service providers of infringements upon the copyright owner or his agent" when a copyright owner invokes the takedown procedure in Section 512(c)(3), "the burden of showing that YouTube knew or was aware of the specific infringements of the works in suit cannot be shifted to YouTube to disprove" under Section 512(c)(1)(A). SPA79.

Nothing in the text, structure, or the legislative history of the DMCA supports this conclusion. That a copyright owner must identify infringing works with specificity in a takedown notice is irrelevant to the burden of proof under Section 512(c)(1)(A). As this Court explained in *Viacom II*, a service provider's duty to respond to a takedown notice is distinct from its duty to remove infringing content of which it becomes aware absent such a notice: "actual knowledge of infringing material, awareness of facts or circumstances that make infringing activity apparent, *or* receipt of a takedown notice *will each* trigger an obligation to expeditiously remove the infringing material." SPA43 (emphasis added). The takedown notice regime thus cannot be read to reverse the burden of proof.

The DMCA is an affirmative defense to copyright infringement, and nothing in the statute suggests a departure from the "longstanding convention" that a defendant asserting an affirmative defense bears the burden of proof. *E.g.*, *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 91-92 (2008) (explaining that "Congress writes laws" against the "backdrop" of this "longstanding convention" and that the Supreme Court respects it absent "compelling reasons to think that Congress meant to put the burden of persuasion on the other side."). Furthermore, both the legislative history and case law confirm that the service provider asserting the DMCA safe harbor bears the burden of establishing eligibility. H.R. Rep. No. 105-551(I), at 26 (1998) ("a defendant asserting this exemption or limitation [codified at § 512(c)] as an affirmative defense in such a suit bears the burden of establishing its entitlement"); *e.g.*, *Fung*, 710 F.3d at 1038; *Wolk*, 840 F. Supp. 2d at 746; *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 142 (S.D.N.Y. 2009).[15]

---

[15] That the DMCA affirmative defense requires a service provider to prove a negative – lack of knowledge – does not alter the allocation of the burden of proof. Such requirements are commonplace in statutory affirmative defenses. *E.g., United States v. 15 Bosworth St.*, 236 F.3d 50, 54-55 (1st Cir. 2001) (defendant in civil forfeiture case "bears the burden of proving the absence of knowledge or consent," and "[e]ven when the burden is to prove a negative [–] here, the lack of knowledge or consent [–] the absence of evidence on the issue redounds to the detriment of the burden-holder"); *In re Bay Runner Rentals, Inc.*, 113 F. Supp. 2d 795, 805 (D. Md. 2000) (defendant in admiralty law case "must prove the negative proposition of the absence or lack of its privity or knowledge"); *Terracciano v. McAlinden Const. Co.*, 485 F.2d 304, 307 (2d Cir. 1973) (same).

As this Court itself observed, the record in this action includes examples from which "a reasonable juror could conclude that YouTube had actual knowledge of specific infringing activity, or was at least aware of facts or circumstances from which specific infringing activity was apparent."  SPA54.  One example this Court pointed to is the Karim report presented to YouTube's board of directors in March 2006, which identified specific Viacom programs and stated that "blatantly illegal" clips of those programs "can still be found" on YouTube "as of today." SPA52-53.  Based on the report, this Court found that "[a] reasonable juror could conclude" that "Karim knew of the presence of Viacom-owned material on YouTube, since he presumably located specific clips of the shows in question," that "Karim believed the clips he located to be infringing," and that YouTube did not remove the clips "until conducting 'a more thorough analysis,' thus exposing the company to liability in the interim."  SPA53.

On remand, Viacom proffered additional evidence that hundreds of Viacom's clips-in-suit from the programs Karim named were on YouTube when Karim submitted his report, and that YouTube did not remove them until many months later.  JAXI-2581-83, 2779.  Placing the burden of proof on the wrong party, the district court faulted Viacom for its inability to identify which of those hundreds of clips Karim (or others at YouTube) actually viewed – a result that was all the more improper given that YouTube alone controls that evidence and has stead-

fastly refused to produce Karim's YouTube viewing records for the months leading up to his report.  JAIX-2439; *see also Smith v. United States*, 133 S. Ct. 714, 720 (2013) ("where the facts with regard to an issue lie peculiarly in the knowledge of a party, that party is best situated to bear the burden of proof" (internal quotation marks omitted)).

In yet another example, Viacom proffered evidence on remand that You-Tube employees actually viewed over 3,000 specific clips-in-suit that had been flagged for potential terms-of-use violations (other than copyright), and those employees had "approved" them to remain on YouTube.  JAXI-2780 (Wilkens Decl. ¶ 2(e)); JAXII-2800-2921.  A reasonable jury could conclude that YouTube employees were aware of these specific clips, given that they reviewed and approved them.  And yet the district court entirely disregarded this evidence of YouTube's disqualifying knowledge.

Although Viacom can prove YouTube's awareness of some of the specific clips-in-suit, Viacom conceded on remand that, given the limitations of the records maintained and produced by YouTube, Viacom cannot identify all or even most of

the specific clips of which YouTube was aware.  SPA75-77.[16]  But Viacom does not bear the burden of making that showing.

## B. Defendants Were Willfully Blind To Their Users' Acts Of Infringement.

This Court held that willful blindness is knowledge under the DMCA, and squarely rejected YouTube's argument that Section 512(m) abrogates the willful-blindness doctrine.  SPA55-56.  In remanding the case, this Court instructed the district court to conduct an inquiry into whether Defendants "made a deliberate effort to avoid guilty *knowledge*," and cautioned that such an inquiry often requires explicit fact finding at trial.  SPA56 & n.10 (internal quotation marks omitted).

The decision below acknowledged the record evidence that YouTube had "information that infringements were occurring with particular works" belonging to Viacom, and also had "indications of promising areas to locate and remove" those infringements.  SPA82.  However, the court held that because Viacom's evidence did not identify the precise locations of specific infringing clips, there had been "no showing of willful blindness."  SPA83.  The district court apparently believed that even if Defendants had opened their eyes to Viacom's evidence, Defendants would not immediately have had knowledge of specific infringing clips, but

---

[16] As noted earlier, YouTube failed to retain and produce the co-founders' emails for the critical 18-month period from YouTube's founding until its acquisition by Google.  *See supra* p. 4 n.3.

rather would have had to take some additional measures to locate those clips – something the district court believed Defendants were not required to do. Thus, under the district court's interpretation, a service provider cannot be willfully blind unless it already has information identifying the "[t]he specific locations of infringements" and *then* chooses to disregard that information. SPA82. To illustrate the point, if a service provider knows that *The Daily Show* is being repeatedly infringed on its service, but the service provider deliberately avoids learning the location of specific infringing *Daily Show* clips, then under the district court's reading the service provider is not willfully blind. It can rest assured in its deliberate ignorance and has no duty to take any action to locate the infringing clips of *The Daily Show* that it knows are there.

The district court's approach is perverse, squarely at odds with this Court's instructions in the previous appeal, and contrary to the law of willful blindness more generally. It is also based on a fundamental misunderstanding of the summary judgment record, which the court virtually ignored.

First, the district court's interpretation renders the willful-blindness doctrine superfluous, because a defendant who is aware of the specific location of infringing clips but deliberately ignores them already has disqualifying knowledge or awareness under Section 512(c)(1)(A). Worse still, the district court's interpretation actually *encourages* defendants to engage in willful blindness as that doctrine

49

has been defined by this Court: defendants who are aware of a high probability of infringement of a plaintiffs' works on their service can escape liability simply by deliberately taking steps to avoid learning of the specific location of the infringements.

This Court's previous decision makes clear that the willful-blindness doctrine applies to a defendant who has "reason to suspect that users of its service" are infringing a plaintiff's copyrights, but "shield[s] itself from learning of the particular infringing transactions by looking the other way." SPA55 (quoting *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 109 (2d Cir. 2010) (quotation marks omitted)). *Tiffany* itself underscores the district court's error, explaining that willful blindness may be used to charge a service provider with knowledge of specific infringements where it "had reason to suspect that [infringing items] were being sold through its website, *and intentionally shielded itself from discovering the offending listings or the identity of the sellers behind them*." 600 F.3d at 109 (emphasis added).

The district court mistakenly believed that Section 512(m) "excuses YouTube" from engaging in any investigation to identify specific infringing clips, even if YouTube is aware of a high probability that the infringement is occurring. SPA83. This Court, however, has already explicitly rejected that overbroad reading of Section 512(m), explaining "willful blindness cannot be defined as an affirmative duty to monitor," because willful blindness necessarily involves

50

"aware[ness] of a high probability of the fact in dispute and consciously avoid[ing] confirming that fact." *Id.* at 80-81 (internal quotation marks omitted). Under the doctrine of willful blindness, if a service provider is aware of a high probability of infringement occurring on its service, the service provider cannot bury its head in the sand in order to avoid learning of specific infringing clips, such as by deliberately refusing to conduct a reasonable follow-up inquiry, or deliberately turning off or selectively deploying anti-infringement tools.[17]

Thus in *Tiffany*, this Court quoted with approval the Seventh Circuit's statement that "[t]o be willfully blind, a person must suspect wrongdoing *and deliberately fail to investigate*." *Tiffany*, 600 F.3d at 109 (quoting *Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1148 (7th Cir. 1992) (emphasis added)). And in *Viacom II*, this Court quoted with approval its holding in *United States v. Aina-Marshall*, 336 F.3d 167, 170 (2d Cir. 2003), that a person is willfully blind where he "was aware of a high probability of the fact in dispute and consciously avoided *confirming that fact*." (emphasis added; quotation marks

---

[17] The district court also cited *Shelter Capital* in support of its mangled interpretation of willful blindness, SPA82, but *Shelter Capital* contradicts the district court's interpretation. 2013 WL 1092793, at *12. The Ninth Circuit made clear, citing *Viacom II*, that "a service provider cannot willfully bury its head in the sand *to avoid obtaining . . . specific knowledge*," and, in contrast to the record here, found "*no evidence* that Veoh acted in such a manner." *Id.* (emphasis added).

omitted).  These and other appellate cases make clear that deliberately avoiding guilty knowledge includes consciously refusing to take "basic investigatory steps" or "make further inquiries" when faced with a high likelihood of wrongdoing. *E.g., United States v. Appolon*, 695 F.3d 44, 57 (1st Cir. 2012); *United States v. Butler*, 646 F.3d 1038, 1041 (8th Cir. 2011).  In short, this Court's articulation of willful blindness in *Viacom II* and *Tiffany* cannot be squared with the district court's rejection of its application whenever the defendant would have to engage in some additional inquiry to learn the location of specific infringing clips.

The district court compounded its legal error by ignoring or misinterpreting extensive evidence that Defendants made a "deliberate effort to avoid guilty knowledge."  SPA56 (quotation marks omitted).  First, there is no real dispute that Defendants were aware of the "high probability" of the infringement of countless Viacom works on their system.  The record is replete with evidence that Defendants were aware of the widespread infringement of Viacom's works in particular: (a) YouTube's founders and key employees reviewed countless clips and recognized many of them, including "comedy clips," a Viacom specialty, as blatantly infringing – clips accounting for 75% - 80% of YouTube's site traffic by Chen's and Dunton's estimates; (b) Jawed Karim's report to YouTube's board called out many Viacom programs by name – "South Park, MTV Cribs, Daily Show, Reno 911, [and] Dave Chappelle" – and identified the clips of those shows as "blatantly

52

illegal;"  (c) Google's review of YouTube before acquiring it showed that You-Tube was "a 'rogue enabler' of content theft," "completely sustained by pirated content," such that 54% of YouTube's video views were of infringing content; and (d) in licensing negotiations, Defendants offered Viacom a package worth more than $590 million, precisely because they recognized that the Viacom content on YouTube was an enormous draw to users.  *See supra* pp. 5-14, 17.  YouTube not only "ha[d] reason to suspect that users of its service [were] infringing" Viacom's works *en masse*, but the record also establishes that YouTube knew this was occurring to the point of certainty.  SPA55 (quotation marks omitted).

Second, Viacom also presented extensive evidence from which a jury could readily conclude that YouTube had "intentionally shielded itself from discovering the offending [videos]…." *Tiffany*, 600 F.3d at 109 (emphasis added), and "consciously avoided confirming" the specific infringements of Viacom's works. SPA56 (quotation marks omitted).  While knowing of the high probability of the rampant infringement of Viacom's works, Defendants reviewed more than 3,000 Viacom clips-in-suit for potential terms of use violations other than copyright, and "approved" those clips to remain on YouTube. *See supra* p. 10.  Accordingly, the district court was simply wrong in concluding that Viacom's evidence did not identify any specific clips.  More importantly, the evidence shows that in order to avoid guilty knowledge, Defendants deliberately disabled or withheld numerous

53

anti-infringement tools that were designed to and would have identified specific infringing clips *without any need for Defendants to find them*.  Thus, the district court was also wrong in claiming that under the evidence proffered by Viacom, "YouTube is left to find the infringing clip[s]."  SPA82.

Notably, as discussed above, YouTube disabled "community flagging" for copyright infringement just two weeks after it was implemented, *for the express purpose of avoiding notice of specific infringements*, and YouTube also cancelled the imminent implementation of an automated anti-infringement tool that would have alerted copyright owners, like Viacom, when suspected infringing content was uploaded, because YouTube "hate[d] making it easier for these a-holes [copyright owners]" to prevent infringement.  *See supra* pp. 9-11.  When YouTube initially decided not to test or adopt filtering technology, YouTube's general counsel admitted that YouTube's refusal stemmed from its awareness that "copyrighted content on YouTube [is] a major lure for [YouTube's] users."  *See supra* pp. 12-13.  And when YouTube eventually did implement Audible Magic filtering to identify and remove specific infringing clips, it carefully gerrymandered the system to ensure that it would never provide YouTube with knowledge of infringing clips belonging to copyright owners, like Viacom, that had declined to license their

content to YouTube.  *See supra* pp. 15-16.[18]  All of these tools were designed to identify specific infringing clips through automated processes, obviating the need for YouTube to search for such clips.

Last but not least, the Karim report to YouTube's board underscores YouTube's willful blindness.  It is undisputed that hundreds of Viacom clips-in-suit of the shows referenced in the Karim report were on YouTube when Karim submitted the memo, and that YouTube took no action to remove those clips until many months later.  *See supra* pp. 11-12.  A jury could reasonably infer that the board's failure to take any action in response to the Karim memo was a deliberate effort to avoid guilty knowledge.

The stark contrast between the record of YouTube's conduct in this case and the record of eBay's conduct in *Tiffany* is instructive.  The district court found in *Tiffany*, after fully weighing the evidence as the trier of fact, that eBay engaged in numerous anti-infringement efforts indicating that it did not deliberately turn a blind eye to infringement, including "invest[ing] as much as $20 million each year on tools to promote trust and safety on its website," assigning more than 200 individuals "exclusively on combating infringement," and spending over $5 million

---

[18] YouTube also rejected offers from Viacom and the MPAA to have their technology experts assist YouTube in using technical means to identify and block unauthorized content from the site, and to distinguish "whitelists" of approved studio content from "blacklists" of unlicensed studio content.  *See supra* p. 18 & n.8.

per year "in maintaining and enhancing its fraud engine . . . ." *Tiffany (NJ) Inc. v. eBay, Inc.,* 576 F. Supp. 2d 463, 476-77 (S.D.N.Y. 2008), *aff'd in part, rev'd in part*, 600 F.3d 93 (2d Cir. 2010). The district court found that eBay implemented anti-fraud measures "as soon as it was reasonably and technologically capable of doing so." *Id.* at 514. Here YouTube did the reverse. Unlike eBay, YouTube disabled community flagging for copyright, denied existing Audible Magic filtering to Viacom and other content owners who would not agree to YouTube's licensing terms, killed other anti-infringement tools, and even in late 2006 had only 3-5 personnel working on copyright-related issues. *See supra* pp. 9-11; JAXI-2580, 2584-86; JAXVI-4145 (Gillette Tr. at 35:4-37:18).

There is no doubt that if YouTube had not taken these many deliberate actions to avoid knowledge of specific instances of infringement, YouTube would have identified and blocked Viacom's clips-in-suit. For example, YouTube would have followed up on the Karim memo (*e.g.*, by asking Karim which "blatantly illegal" videos he saw, or by running the same simple searches for "Daily Show," "Colbert," and "South Park" that Karim no doubt used); YouTube would have continued community flagging for copyright and used its "army" of content reviewers to review and remove clips for copyright infringement (instead of only for other terms of use violations); YouTube would have implemented the other simple anti-infringement tools that it cancelled; and most importantly YouTube would have

56

employed Audible Magic filtering for Viacom (instead of reserving it for You-Tube's licensing partners), which would have automatically and instantaneously identified and blocked infringing clips once Viacom's reference fingerprints were loaded into the filter.

The district court did not analyze or even mention *any* of the extensive evidence of YouTube's willful blindness, save for the Karim memo. Instead, the district court ignored all of it on the erroneous view that Defendants were under no obligation "to find the infringing clip[s]," notwithstanding their awareness of a high probability that Viacom's television shows and movies were being infringed on a massive scale. SPA82 & n.3.[19] Under the proper willful-blindness standard articulated by this Court, summary judgment must be reversed.

## III.  This Court Should Exercise Its Discretion To Remand The Case To A Different District Court Judge.

Given the protracted nature of this litigation (the case is now well into its seventh year) and the evident firmness of the district court's erroneous views regarding the DMCA, this Court should exercise its discretion to remand the case to a different judge "to preserve the appearance of justice." *E.g., United States v. Rob-*

---

[19] This holding, again, mistakes this Court's discussion of YouTube's content recognition tools in the context of 512(i) with a holding that those tools must be excluded from consideration in determining whether YouTube satisfies the requirements of 512(c). The Court reached no such holding. *See supra* note 14.

*in*, 553 F.2d 8, 10 (2d Cir. 1977).  Reassignment would "not imply any personal criticism of the . . . judge," nor would it "create disproportionate waste or duplication of effort," given that the case has yet to go to trial.  *Scott v. Perkins*, 150 F. App'x 30, 34 (2d Cir. 2005) (quotation marks omitted).

## CONCLUSION

Because YouTube cannot satisfy either of two required elements for application of the DMCA safe harbor, the district court erred in again granting summary judgment to YouTube.  Accordingly, this Court should reverse the judgment below and remand the case to a different district court judge for trial.

July 26, 2013                                        Respectfully Submitted,

                                        /s/  Paul M. Smith
                                              Paul M. Smith


Stuart J. Baskin                                Paul M. Smith
SHEARMAN & STERLING LLP              Scott B. Wilkens
599 Lexington Avenue                       Luke C. Platzer
New York, NY 10022                        JENNER & BLOCK LLP
(212) 848-4000                               1099 New York Avenue, NW
                                                    Washington, DC 20001
                                                    (202) 639-6000


Matthew D. McGill                           Susan J. Kohlmann
GIBSON, DUNN & CRUTCHER LLP        JENNER & BLOCK LLP
1050 Connecticut Avenue, NW            919 Third Avenue
Washington, DC 20036                      New York, NY 10022
(202) 955-8500                               (212) 891-1600

# FEDERAL RULE OF APPELLATE PROCEDURE FORM 6.
## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements and Type-Style Requirements

1.   This brief complies with the type-volume limitation of Fed. R. App. P.
32(a)(7)(B) because this brief contains 13,409 words, excluding the
parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P.
32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6)
because this brief has been prepared in a proportionately spaced type-
face using **Microsoft Word 2007** in **14 point Times New Roman**.

Dated:        July 26, 2013            By:    /s/  Scott B. Wilkens
                                              Scott B. Wilkens

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 26, 2013, a true and correct copy of the

foregoing Opening Brief for Plaintiffs-Appellants was served on all counsel of

record in this appeal via CM/ECF pursuant to Local Rule 25.1(h).


Dated:        July 26, 2013              By:    /s/  Scott B. Wilkens_____
                                                 Scott B. Wilkens