# 13-1720-cv

## United States Court of Appeals

*for the*

## Second Circuit

VIACOM INTERNATIONAL, INC., COMEDY PARTNERS, COUNTRY
MUSIC TELEVISION, INC., PARAMOUNT PICTURES CORPORATION,
BLACK ENTERTAINMENT TELEVISION, LLC,

*Plaintiffs-Appellants,*

– v. –

YOUTUBE, INC., YOUTUBE, LLC, GOOGLE, INC.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF *AMICI CURIAE* THE COPYRIGHT ALLIANCE, MINORITY MEDIA & TELECOMMUNICATIONS COUNCIL, INC. AND THE MEDIA INSTITUTE IN SUPPORT OF APPELLANTS

SANDRA AISTARS
Executive Director
COPYRIGHT ALLIANCE
1224 M Street, NW, Suite 101
Washington, DC 20005
(202) 540-2247

ELEANOR M. LACKMAN
MARY E. RASENBERGER
NANCY E. WOLFF
SCOTT J. SHOLDER
COWAN, DEBAETS, ABRAHAMS
  & SHEPPARD LLP
41 Madison Avenue, 34th Floor
New York, New York 10010
(212) 974-7474

*Attorneys for Amici Curiae The Copyright Alliance, Minority Media &
Telecommunications Council, Inc. and The Media Institute
in Support of Appellants*

# CORPORATE DISCLOSURE STATEMENTS PURSUANT TO FEDERAL RULE OF APPELLATE PROCEDURE 26.1

## THE COPYRIGHT ALLIANCE

The Copyright Alliance states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more of its stock.

## THE MEDIA INSTITUTE

The Media Institute certifies that it is a nonprofit, non-stock corporation organized under Section 501(c)(3) of the Internal Revenue Code. The Media Institute has no parent entity and no publicly held company owns stock in The Media Institute.

## MINORITY MEDIA & TELECOMMUNICATIONS COUNCIL, INC.

The Minority Media & Telecommunications Council, Inc. certifies that it is a nonprofit, non-stock corporation organized under Section 501(c)(3) of the Internal Revenue Code. MMTC has no parent corporation and no publicly held company owns stock in MMTC.

# **TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENTS ............................................... C-1

TABLE OF CONTENTS ...................................................................... i

TABLE OF AUTHORITIES ................................................................ ii

INTEREST OF *AMICI* ..................................................................... 1

SUMMARY OF THE ARGUMENT ...................................................... 4

ARGUMENT ................................................................................... 8

    I.    THE LAW CANNOT BE READ TO PERMIT
           ONLINE SERVICE PROVIDERS THAT
           WELCOME INFRINGEMENT TO AVOID
           LIABILITY SOLELY BECAUSE THEY HAVE
           INSTITUED A NOTICE-AND-TAKEDOWN
           SYSTEM .................................................................. 8

           A.  The "Governing Principle" of the DMCA Was
               That Copyright Owners Should be Protected
               Against Rampant Online Infringement ....................... 9

           B.  "Notice and Takedown" Does Not Supplant The
               Law .................................................................. 14

    II.   IF THE COURT CONTINUES TO READ THE
           LAW ERRONEOUSLY, IT WILL RENDER
           COPYRIGHT LAW PROTECTIONS
           INEFFECTIVE ..................................................... 21

CONCLUSION ................................................................................ 30

i

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*A&M Records, Inc. v. Napster, Inc.,*
No. C 99-05183 MHP, C 00-1369 MHP, 2001 WL 227083 (C.D. Cal. Mar. 5, 2001) .................................................................................................................. 19

*ALS Scan, Inc. v. RemarQ Comm., Inc.,*
239 F.3d 619 (4th Cir. 2001) ............................................................ 12, 13, 16

*Citizens Bank v. Strumpf,*
516 U.S. 16 (1995) ..................................................................................... 14

*Columbia Pictures Indus. v. Fung,*
710 F.3d 1020 (9th Cir. 2013) ................................................................... 10

*CoStar Group Inc. v. LoopNet, Inc.,*
164 F. Supp. 2d 688 (D. Md. 2001) ............................................................ 15

*Holy Trinity Church v. United States,*
143 U.S. 457 (1892) ...................................................................................... 7

*Inwood Labs., Inc. v. Ives Labs., Inc.,*
456 U.S. 844 (1982) ..................................................................................... 13

*Perfect 10, Inc. v. Cybernet Ventures, Inc.,*
213 F. Supp. 2d 1146 (C.D. Cal. 2002) ...................................................... 16

*Religious Tech. Ctr. v. Netcom On-Line Commc'ns Servs., Inc.,*
907 F. Supp. 1361 (N.D. Cal. 1995) ........................................................... 19

*Shapiro, Bernstein & Co. v. H.L. Green Co.,*
316 F.2d 304 (2d Cir. 1963) ........................................................................ 17

*Tiffany (NJ) Inc. v. eBay, Inc.,*
576 F. Supp. 2d 463 (S.D.N.Y. 2008) ........................................................ 17

*Tiffany (NJ) Inc. v. eBay Inc.,*
600 F.3d 93 (2d Cir. 2010) .......................................................................... 17

*United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.,*
484 U.S. 365 (1988) ..................................................................................... 14

ii

*Viacom Int'l, Inc. v. YouTube, Inc.*,
    676 F.3d 19 (2d Cir. 2012) ................................................................ 16

*Viacom Int'l, Inc. v. YouTube, Inc.*,
    No 13-cv-1720 (S.D.N.Y.) ................................................................... 5

*Virtual Works, Inc. v. Volkswagen of Am., Inc.*,
    238 F.3d 264 (4th Cir. 2001) ............................................................ 13

**Rules**

Fed. R. App. P. 32(a)(5) ....................................................................... 31

Fed. R. App. P. 32(a)(6) ....................................................................... 31

Fed. R. App. P. 32(a)(7)(B) ................................................................. 31

Fed. R. App. P. 32(a)(7)(B)(iii) .......................................................... 31

Fed. R. App. P. 29(b) ............................................................................. 1

Fed. R. App. P. 29(c)(5) ......................................................................... 1

**Other Authorities**

U.S. Const. art I, § 8, cl. 8 .................................................................. 29

H.R. Rep. No. 105-551, pt. 1 (1998) ............................................... 9, 10

H.R. Rep. No. 105-551, pt. 2 (1998) ........................................... *passim*

S. Rep. No. 105-190 (1998) ......................................................... *passim*

144 Cong. Rec. 9242 ............................................................................ 9

144 Cong. Rec. 18770-71 (1998) ......................................................... 9

150 Cong. Rec. S.7178-01 (2004). .................................................... 11

*Honorable Patrick Leahy*, UNITED STATES SENATE COMMITTEE ON THE
    JUDICIARY (Mar. 14, 2002) ......................................................... 15, 20

*Innovation in America: The Role of Copyrights: Hearing Before the Subcomm.*
    *on Intellectual Proper., Competition, and the Internet of the H. Comm. on the*
    *Judiciary*, 113th Cong. 6 (2013) ..................................................... 25

*Promoting Investment and Protecting Commerce Online: Legitimate Sites v. Parasite, Part I: Hearing Before the Subcomm. on Intellectual Prop., Competition, and the Internet of the H. Comm. on the Judiciary*, 112th Cong. 2 (2011) ..................................................................... 24

*Protecting Legitimate Commerce Online: The ART Act, the NET Act and Illegal Streaming*: *Hearing Before the Subcomm. on Intellectual Prop., Competition, and the Internet of the H. Comm. on the Judiciary*, 112th Cong. 4 (2011) ... 23

*The Register's Call for Updates to U.S. Copyright Law: Hearing Before the Subcomm. on Courts, Intellectual Prop., and the Internet of the H. Comm. on the Judiciary*, 113th Cong. 3 (2013) ................................................................. 4

*Transparency Report*, GOOGLE.COM ................................................................. 21

Christopher S. Stewart, As Pirates Run Rampant, TV Studios Dial Up, THE WALL STREET JOURNAL (Mar. 3, 2013) .................................................. 22

David Nimmer, Appreciating Legislative History: The Sweet and Sour Spots of the DMCA's Commentary, 23 CARDOZO L. REV. 909, 917 (Feb. 2002) ............................................................................................. 11, 12

Sam Castree, *Cyber-Plagiarism for Sale! The Growing Problem of Blatant Copyright Infringement in Online Digital Media Stores* ............................. 20

*Viacom v. YouTube* Docket No. 225-16 ........................................................... 22

Pursuant to Federal Rule of Appellate Procedure 29(b), *amici curiae* the Copyright Alliance, the Media Institute, and the Minority Media & Telecommunications Council, Inc. (collectively, "*Amici*") respectfully submit this brief in support of appellants Viacom International, Inc., Comedy Partners, Country Music Television, Inc., Paramount Pictures Corporation, and Black Entertainment Television, LLC (collectively, "Appellants"). This brief is submitted with consent of all parties.[1]

## INTEREST OF *AMICI*

The Copyright Alliance is a nonprofit, nonpartisan 501(c)(4) membership organization dedicated to promoting and protecting the ability of creative professionals to earn a living from their creativity. It represents the interests of individual authors from a diverse range of creative industries – including, for example, writers, musical composers and recording artists, journalists, documentarians and filmmakers, graphic and visual artists, photographers and software developers – and the small businesses that are affected by the unauthorized use of their works. The Copyright Alliance's

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(c)(5), no counsel for any party authored this brief in whole or in part, and no party or counsel for any party made a monetary contribution intended to fund the preparation or submission of this brief. Only *amici curiae* made such a monetary contribution. Some Copyright Alliance members are, or are affiliates of, Appellants in this matter. Some may join other *amicus* briefs in support of Appellants.

membership encompasses these individual artists and creators, creative union workers, and small businesses in the creative industries, as well as the organizations and corporations that support and invest in them.

In short, the Copyright Alliance speaks with the voice of all creators – including those who have softer voices than the titans of media – and wishes to provide the Court with their perspective because, as the Court is aware, this case is not just about Viacom and YouTube. This case's reach is much broader, touching Copyright Alliance members ranging from independent filmmakers who borrow against their retirement income to capture unique voices, to tens of thousands of entrepreneurial professional photographers and videographers, to myriad "below the line" craftspeople who are behind every television show and motion picture we enjoy daily.

This case has legal ramifications symptomatic of a much greater problem than the specific dispute at hand. If the court upholds this decision, the burden of ensuring a safe and legal Internet ecosystem will shift almost exclusively onto the shoulders of authors, practically absolving other stakeholders from being in any way responsible for the activities that occur on their websites. Such a decision would be contrary to the text, legislative history, and spirit of the Digital Millennium Copyright Act ("DMCA"). The legal standards under the DMCA, as interpreted by the courts, should not

2

disincentivize honest Internet businesses from discouraging copyright infringement or, conversely, incentivize ill-intending website operators to launch platforms that welcome copyright infringement.

To bless the lower court's erroneous application of the DMCA safe harbor would lead to ruinous results for authors, including the inevitable cannibalization of legitimate outlets for new works. Not only would such a result do violence to the DMCA, but it would fly in the face of the Copyright Clause of the United States Constitution, the core purpose of which is to "promote the Progress of Science and useful Arts."

The Copyright Alliance and its members embrace all of the new technologies that enable their works to be seen and heard by the public in novel ways, including those birthed on the Internet that "disrupt" traditional business models. The Copyright Alliance submits this brief to help the Court appreciate how Judge Stanton's decision is inconsistent with the DMCA and to help the Court understand the negative impacts of affirmance to all of those who rely on the DMCA to build vibrant and thriving legal outlets for creative endeavors.

The Media Institute ("Institute") is an independent 501(c)(3) nonprofit research organization located in Arlington, Virginia. Through conferences, publications, and filings with courts and regulatory bodies, the Institute

promotes a strong First Amendment, a competitive communications industry, and journalistic excellence.

The Minority Media & Telecommunications Council, Inc. ("MMTC") is a nonprofit 501(c)(3) corporation dedicated to promoting and preserving equal opportunity and civil rights in the mass media, telecommunications, and broadband industries, and to closing the digital divide. MMTC is generally recognized as the nation's leading advocate for minority advancement in communications.

The Institute and MMTC join for reasons similar to those of the Copyright Alliance: to ensure that their members' copyright interests are protected in the online space as the law in this area continues to evolve, and to encourage this Court to follow the policies and objectives of this country's copyright law and reverse the decision below accordingly.

## SUMMARY OF THE ARGUMENT

"Congress has a duty to keep authors in its mind's eye, including songwriters, book authors, filmmakers, photographers, and visual artists. A law that does not provide for authors would be illogical – hardly a copyright law at all." *The Register's Call for Updates to U.S. Copyright Law: Hearing Before the Subcomm. on Courts, Intellectual Prop., and the Internet of the H. Comm. on the Judiciary*, 113th Cong. 3 (2013) (statement of Maria A.

4

Pallante, Register of Copyrights of the United States). Forsaking this obligation, the District Court, in its latest ruling in *Viacom Int'l, Inc. v. YouTube, Inc.*, No 13-cv-1720 (S.D.N.Y.), continues to interpret the DMCA "safe harbor" provision in an unbalanced way that does violence to Congress's intent behind enacting the DMCA, and does not respect and encourage the work of authors.

The district court, in again holding that YouTube qualified for DMCA safe harbor protection despite welcoming infringements on its site because it did not have "knowledge or awareness of any specific infringements" and did not "willfully blind[] itself to specific infringements," ignored the guidance and instruction of this Court, and continued to equate the "actual knowledge" standard with the "red flags knowledge" standard set forth in DMCA Section 512(c)(1)(A). This holding significantly enlarged the scope of the safe harbor for any hosting provider complying with the "notice-and-takedown" requirements of Section 512(c)(1)(C), regardless of such provider's encouragement, facilitation, or willful ignorance of infringement. While Appellants and certain of their other allies will vigorously address the legal repercussions of the district court's ruling, *Amici* herein will highlight for the Court the broader context in which the notice-and-takedown provisions were intended to apply, and the practical implications for the

5

individual authors whose livelihoods depend upon effectively monetizing the works they create and shielding them from widespread, uncontainable piracy.

The DMCA was enacted with the dual understanding that (1) it would be beneficial to the growth of the Internet to provide legitimate Internet service providers and other Internet stakeholders with a greater degree of certainty concerning their potential exposure to liability for activities beyond their control or knowledge occurring on the platforms they operate, and (2) the proliferation of services allowing users to post content themselves would facilitate widespread piracy. In drafting the safe harbors to protect the innocent Internet providers from secondary liability for the acts of their users of which they had no knowledge or control, and from which they did not profit, Congress made clear that principles of secondary liability would be applied online and could be invoked by copyright owners to enforce their rights against infringers and those who induced, knowingly provided a material contribution to, or supervised and profited from infringement.

The DMCA safe harbor provision was meant to insulate online service providers from liability, but only in appropriate circumstances where protections are afforded to copyright owners. But it does so by juxtaposing a negotiated "notice and takedown" procedure, which exists to give certainty

as to liability, with the requirement that the online service provider does not otherwise abuse the provision – for example, by engaging in culpable conduct under basic doctrines of secondary liability. Under a proper reading of the DMCA, principles of secondary liability are alive, well, and enforceable. But under the district court's reading, they are a dead letter – snuffed out entirely by the "notice and takedown" mechanism in the safe harbor of Section 512(c) of the DMCA.

The lower court's focus solely on the "notice and takedown" provisions overlooks the goal of the DMCA to minimize infringement while ensuring that good Internet citizens would not be penalized for inadvertent infringements about which they were genuinely unaware. Congress did not anticipate or invite gamesmanship from service providers or intend to give a "free pass" to those who knowingly profit from infringement on their platforms. Such a result would be absurd, and it cannot be reconciled with the spirit or the letter of the law. *Holy Trinity Church v. United States*, 143 U.S. 457, 460 (1892) (statutes are to be "construed [so] as to avoid . . . absurdity").

The district court's opinion has led some to conclude that the DMCA safe harbor is effectively a license to operate services free from any obligation to take even the most modest preventative measures against

7

infringement, and has placed an untenable burden on individual authors and small businesses, including independent film producers, publishers, record labels, and individual songwriters, musicians, artists, photographers, filmmakers, and performers (hereinafter generally referred to as "independent authors"). These independent authors already lack the time and resources to effectively defend their livelihoods against widespread international piracy, which would require continuous monitoring of literally millions of sites. Reversal here would help remind bad-faith operators that the law never intended them to reap the benefit of the safe harbor.

## **ARGUMENT**

### I.    THE LAW CANNOT BE READ TO PERMIT ONLINE SERVICE PROVIDERS THAT WELCOME INFRINGEMENT TO AVOID LIABILITY SOLELY BECAUSE THEY HAVE INSTITUED A NOTICE-AND-TAKEDOWN SYSTEM

In the decision below, Judge Stanton opined that the "governing principle" behind the DMCA's safe harbor is that "knowledge of the prevalence of infringing activity, *and welcoming it*, does not itself forfeit the safe harbor." Op. at 13 (emphasis added). This observation reflects a fundamental misunderstanding of the premise behind the DMCA, and of the requirements of the safe harbor provided within the DMCA. As a result of these errors, the ruling below embraces a perverse result: granting a type of blanket license for infringement. That is manifest error.

8

## A. The "Governing Principle" of the DMCA Was That Copyright Owners Should Be Protected Against Rampant Online Infringement

The district court's interpretation of the DMCA assumes that copyright infringement on any given site may be ubiquitous and even welcomed by the site operator without disqualifying that site operator from the safe harbor. But this assumption describes the exact scenario that Congress feared, and one that the DMCA was expressly designed to prevent.

The DMCA was enacted in to implement two World Intellectual Property Organization treaties, which aimed to ensure global standards for intellectual property protection in the digital era. S. Rep. No. 105-190, at 4-5 (1998). At that time, Congress recognized the novel and formidable challenges facing copyright owners as piracy moved from street corners to the World Wide Web, observing that "[t]he digital environment now allows users of electronic media to send and retrieve perfect reproductions of copyrighted material easily and nearly instantaneously, to or from locations around the world." H.R. Rep. No. 105-551, pt. 1 (1998). *See also* 144 Cong. Rec. 18770-71 (1998) (Rep. Coble) ("While digital dissemination of copies will benefit owners and consumers, it will unfortunately also facilitate pirates who aim to destroy the value of American intellectual property."); 144 Cong. Rec. 9242 (Sen. Thompson) ("Unscrupulous copyright violators

9

can use the Internet to more widely distribute copyrighted material without permission."). Congress recognized that, "[w]ith this evolution in technology, the law must adapt in order to make digital networks safe places to disseminate and exploit copyrighted works." H.R. Rep. No. 105-551, pt. 1 (1998).

Cooperation from providers of digital networks was considered integral to fight widespread digital piracy. Accordingly, Congress drafted the statute in order to reach a balance that "preserves strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment." S. Rep. No. 105-190 at 20; H.R. Rep. No. 105-551, pt. 2, at 49 (1998). This included allowing principles of contributory liability to remain in the digital environment. *See* S. Rep. No. 105-90, at 19 ("Rather than embarking on a wholesale clarification of these doctrines, the Committee decided to leave current law in its evolving state . . . ."); *Columbia Pictures Indus. v. Fung*, 710 F.3d 1020, 1039-40 (9th Cir. 2013) (noting that "the DMCA's legislative history confirms that Congress intended to provide protection for at least some vicarious and contributory infringement," and explaining that the inquiries into contributory copyright

infringement and the prerequisites for one or more of the DMCA safe harbors should be conducted independently).[2]

As part of finding the right balance, the DMCA focused in part on "the 'controversial [and] complex' issue of securing safeguards to online service providers complementary to the protection afforded to copyright owners." *See* David Nimmer, *Appreciating Legislative History: The Sweet and Sour Spots of the DMCA's Commentary*, 23 CARDOZO L. REV. 909, 917 (Feb. 2002) (quoting Report of the House Commerce Comm., H.R. Rep. No. 105-551, pt. 2, at 49). In particular, given the strict liability nature of copyright infringement, service providers were concerned about the possibility that they could be subject to lawsuits over isolated acts of infringement even if they were otherwise cooperative in remedying the infringement as soon as they were put on notice. *See* S. Rep. No. 105-190,

---

[2] This principle has been reaffirmed since the passage of the DMCA. *See, e.g.*, 150 Cong. Rec. S.7178-01 (2004) (Sen. Hatch) ("Though secondary liability is nearly ubiquitous, it has almost always remained as a judge-made, common-law doctrine-and for a good reason. Secondary liability prevents the use of indirect means to achieve illegal ends. Consequently, the scope of secondary liability must be flexible-*otherwise, it would just instruct wrongdoers on how to legally encourage or manipulate others into breaking the law*. The common-law judicial process is ideally suited to evolve flexible secondary-liability rules from the results of many individual cases.") (emphases added); *see also id.* ("Congress rarely codifies secondary liability. . . . . In the Digital Millennium Copyright Act, Congress codified a complex balance between opposed interests that expanded one type of secondary liability and narrowed another.").

at 2. In exchange for the service providers' cooperation, Congress took steps to minimize the possibility that fear of liability would arrest technological innovation on the Internet by creating "safe harbors" in the bill. The inclusion of these safe harbors, along with the other provisions in the bill, allowed the DMCA to "provide[] greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities." S. Rep. No. 105-190, at 20; H.R. Rep. No. 105-551, pt. 2, at 49-50. Nowhere in the legislative history is there any notion that the safe harbors allowed online service providers to engage in willful, reckless or otherwise inappropriate disregard for copyright law.[3]

The idea that the DMCA's "certainty" was intended to give sanctity to service providers in order to provide havens for infringing activity is belied by the narrow context in which the safe harbors apply. As the Fourth Circuit observed in *ALS Scan, Inc. v. RemarQ Comm., Inc.*, 239 F.3d 619 (4th Cir. 2001):

> The DMCA was enacted both to preserve copyright enforcement on the Internet and to provide immunity to service providers from copyright infringement liability for 'passive,' 'automatic' actions in which a service provider's system

---

[3] It is telling here that had the limitations on liability been so broad, the DMCA never would have received the "virtually unanimous support" that copyright and technology industries gave to the final bill. *See* Nimmer, *Appreciating Legislative History*, 23 CARDOZO L. REV. at 927.

12

> engaged through a technological process initiated by another
> without the knowledge of the service provider.

*Id.* at 625 (citing H.R. Conf. Rep. No. 105-796, at 72 (1998), *reprinted in* 1998 U.S.C.C.A.N. 649). The district court's observation, in contrast, suggesting that a service provider can go so far as to welcome infringement, runs counter to fundamental principles of contributory liability, a doctrine that frowns upon the encouragement of infringement. Judge Stanton's decision cannot be reconciled with the law. *See ALS Scan*, 239 F.3d at 625 ("The DMCA's protection of an innocent service provider disappears at the moment the service provider loses its innocence, i.e., at the moment it becomes aware that a third party is using its system to infringe."); *see also Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 270 (4th Cir. 2001) ("We do not think Congress intended the safe harbor [under the Anticybersquatting Consumer Protection Act] to protect defendants operating, at least in part, with unlawful intent."). *Cf. Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851, 860 (1982) (approving Second Circuit's finding that liability for contributory trademark infringement could be imposed on a manufacturer who made a suggestion, "even if only by implication," that a retailer use the manufacturer's goods to infringe the trademark of another).

13

As explained above, the DMCA is written expressly to withhold from the safe harbor those who place infringing content on a system, encourage others to do so, are aware that specific copyrighted material on a system bears all the hallmarks of infringement, or refuse to institute or respect reasonable and feasible measures suited to help prevent further infringement from occurring. Expanding the safe harbor beyond its express limits – as the district court's opinion does – would create a special class of online service providers that could avoid well-established principles of copyright law that Congress expressly intended to remain intact as to all actors. Therefore, affirmance of the district court's decision would reinforce a marked misreading of the copyright laws. *See Citizens Bank v. Strumpf*, 516 U.S. 16, 20 (1995) ("It is an elementary rule of construction that '[an] act cannot be held to destroy itself.'") (quoting *Tex. & Pac. Ty. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 446 (1907)); *see also United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) ("[S]tatutory construction . . . is a holistic endeavor.").

## B. "Notice and Takedown" Does Not Supplant The Law

The district court's ruling incorrectly presumes that the safe harbor applies unless and until the copyright owner notifies the service provider that a specific link or URL contains infringing material – in other words,

14

according to the lower court, the burden of policing the entire Internet is on the copyright owner.  Indeed, the court stated: "The Act places the burden of notifying such service providers of infringements upon the copyright owner or his agent."  Op. at 9.  But the statute does not say that.  Rather, it provides that, as one of several qualifying criteria a service provider must meet, it must comply with notice and takedown.

Interpreting the statute as severely as the lower court did would be error, for several reasons.  First, it would, erroneously and contrary to longstanding law, read constructive knowledge out of the statute.  *See* H.R. Rep. No. 105-551, pt. 2 ("[C]opyright owners are not obligated to give notification of claimed infringement in order to enforce their rights."); *see also CoStar Group Inc. v. LoopNet, Inc.*, 164 F. Supp. 2d 688, 700 (D. Md. 2001) ("The DMCA seeks to strike a balance by shielding online service providers from liability in damages as long as they remove *or prevent access to* infringing material.") (emphasis added), *aff'd*, 373 F.3d 544 (4th Cir. 2004).  The district court's interpretation changes the safe harbor into solely a notice-and-takedown provision.

Second, it would upset the "careful balance among the rights and interests of consumers, creators and innovators" necessary to protect intellectual property. *See Testimony of the Honorable Patrick Leahy*,

15

UNITED STATES SENATE COMMITTEE ON THE JUDICIARY (Mar. 14, 2002), *available at* http://www.judiciary.senate.gov/hearings/testimony.cfm?id =4f1e0899533f7680e78d03281fdd5744&wit_id=4f1e0899    533f7680e78d0 3281fdd5744-0-1.   A proper interpretation of the DMCA recognizes that multiple parties have a stake in encouraging a safe and vibrant Internet ecosystem and that the burden of ensuring such an environment is not to be borne solely by one set of stakeholders.  *See ALS Scan*, 239 F.3d at 625 (opining that "the requirements are written so as to reduce the burden of holders of multiple copyrights who face extensive infringement of their works"); *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1180 (C.D. Cal. 2002) (rejecting the notion that Congress apportioned the entire burden between the copyright holder and service provider to the copyright holder).

Third, it would ignore the application of longstanding legal principles of secondary liability to the Internet.  This Court has already held that common law secondary liability applies here.  *See Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 35 (2d Cir. 2012).  Thus, those parties (including YouTube at the time of the events at issue in this suit) that are aware of widespread infringement on their sites and have developed filters but do not use them, for fear of what they might find, are engaged in classic

16

willful blindness. *See Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 463, 515 (S.D.N.Y. 2008), *aff'd in part, rev'd in part on other grounds*, 600 F.3d 93 (2d Cir. 2010) ("Willful blindness requires 'more than mere negligence or mistake' and does not lie unless the defendant knew of a high probability of illegal conduct and purposefully contrived to avoid learning of it, for example, by failing to inquire further out of fear of the result of the inquiry."); *see also Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963) ("When the right and ability to supervise coalesce with an obvious and direct financial interest in the exploitation of copyrighted materials – even in the absence of actual knowledge that the copyright monopoly is being impaired . . . – the purposes of copyright law may be best effectuated by the imposition of liability upon the beneficiary of that exploitation."). Yet, under the district court's formulation, this willful blindness is irrelevant.

Finally, it creates a disincentive against taking reasonable efforts to curtail obvious, recurring and rampant infringement. The case of *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93 (2d Cir. 2010), demonstrates that stakeholders can and do develop private solutions aimed at reducing infringements without fear of being held liable for contributory infringement even in the absence of a DMCA-like "safe harbor." In that case, eBay took

17

efforts to minimize infringement well beyond instituting a "notice and takedown"-type system – which it also had in place. *Id.* at 99. Voluntarily (and without requiring any *quid pro quo* from the parties protected by eBay's measures), eBay spent as much as $20 million each year to promote trust and safety on its website; set up a "trust and safety" department with 4000 employees, over 200 of which were dedicated solely to deterring infringement; implemented a "fraud engine" as early as 2002 in order to ferret out illegal listings, including incorporating general filters and "Tiffany-specific filters"; periodically conducted manual reviews of listings to remove counterfeit goods; sent warning messages to those offering Tiffany items for sale; and canceled certain transactions. By late 2006, approximately two years after Tiffany filed its action for contributory trademark infringement against eBay, eBay implemented additional measures including delaying the ability of buyers to view listings of certain brand names. *Id.* at 98-100. In large part due to those proactive measures, this Court affirmed a lower court's holding that eBay was not liable as a contributory trademark infringer. *Id.* All the while, eBay remained and still is a thriving Internet business notwithstanding the proactive measures it took to help ensure that infringement on its site was reduced. While we do not suggest that every site operator must institute systems as comprehensive as

18

eBay's, neither should the Court allow site operators who are aware of and welcome infringement on their sites to hide behind a singular provision of the DMCA.[4]

Decisions like the one below effectively designate notice-and-takedown as the "be-all and end-all" of copyright protection on the Internet. This was not the goal that Congress had in mind when enacting the DMCA. The legislative history shows that notice-and-takedown itself started out as a voluntary measure. *See* H.R. Rep. No. 105-551, pt. 2, at 54 ("This 'notice and take-down' procedure is a formalization and refinement of a cooperative process that has been employed to deal efficiently with network-based copyright infringement."). However, it was never designed to supplant other

---

[4] No reason exists to suggest that service providers could not easily take other reasonable measures to help detect and deter infringement. *See A&M Records, Inc. v. Napster, Inc.*, No. C 99-05183 MHP, C 00-1369 MHP, 2001 WL 227083, at *1 (C.D. Cal. Mar. 5, 2001) (in addition to enjoining facilitation of distribution of identifiable copyrighted works, requiring as part of injunction that "[a]ll parties shall use reasonable measures in identifying variations of the filename(s), or of the spelling of the titles or artists' names, of the works identified by plaintiffs," and, if it is reasonable to believe that a file is a variation on a copyrighted work, to take down such file); *Religious Tech. Ctr. v. Netcom On-Line Commc'ns Servs., Inc.* 907 F. Supp. 1361, 1375 (N.D. Cal. 1995) (finding it fair to hold defendant liable for contributory infringement if defendant could, but did not, take reasonable measures to prevent further damage to plaintiffs' copyrighted works).

19

possible measures that may be appropriate to implement under the specific circumstances of the case.[5]

Implementing appropriate technologies to guard against infringement when a site operator is aware that infringement is occurring or is likely to occur on its site will not bar the site operator from the safe harbor nor is it incompatible at all with the "Protection of Privacy" provisions of Section 512(m).  It is simply the type of good citizenship that the law directs whether the site at issue is online or off-line.   As an example, a site's provider ordinarily can, in advance of an unauthorized posting, easily flag or block the content before it is released to the public through that provider's site. *See* Sam Castree, *Cyber-Plagiarism for Sale!   The Growing Problem of Blatant Copyright Infringement in Online Digital Media Stores*, 14 TEX. REV. ENT. & SPORTS L.J. 25, 41 (Fall 2012) ("[S]tore operators are able to 'perform more cost-effectively the activities that are currently performed by multiple [authors]'") (citation omitted).[6]

---

[5] As Senator Leahy has aptly pointed out, "[g]overnment regulators are simply not close enough to the marketplace to be in the best position to craft the kinds of robust standards that will protect the vital and vibrant asset that is given to consumers around the globe by America's entertainment and copyright industries." *Testimony of the Honorable Patrick Leahy*, *supra*.

[6] *Amici* herein expect Appellees and/or their respective *amici* to argue that Section 512(m) absolves ISPs from monitoring their websites, and is not a pre-condition to the DMCA safe harbor.  This would be wrong.  Taking reasonable remedial steps (such as filtering) to address a problem, or

These types of solutions should be the focus of the parties. They are the expected acts under traditional principles of secondary copyright infringement law, and they are the expected responses under the meaning of Section 512(c) and the overall DMCA. The lower court's decision ensures a very different outcome: Internet service providers will seek to do nothing more than identify an agent to receive takedown notices from rights holders, and rights holders will be left searching the Internet for countless individual links and sending the site operator millions of infringement notices.[7] This is neither practical for the site operators or authors, nor consistent with the intent, purpose and language of the DMCA.

## II. IF THE COURT CONTINUES TO READ THE LAW ERRONEOUSLY, IT WILL RENDER COPYRIGHT LAW PROTECTIONS INEFFECTIVE

For creators of all stripes, copyright enforcement online is a difficult and persistent battle. To keep up with policing the nearly instantaneous pace at which works are copied and illegally distributed online, Appellants and

---

inferring willful blindness for failure to implement such measures, is not equivalent to being compelled to affirmatively monitor online content in the absence of knowledge as a condition for safe harbor protection. *See* S. Rep. No. 105-190, at 52.

[7] The RIAA for instance recently announced that it had sent 26 million takedown notices to one service provider alone – Google. In its transparency reports, Google acknowledged receiving more than 100 million takedown notices from authors. *See Transparency Report*, GOOGLE.COM, *available at* http://www.google.com/transparencyreport/removals/copyright.

other copyright owners who are well-capitalized engage and rely upon extensive in-house teams and outside vendors to search for and send takedown notices. These companies also hire outside counsel to litigate actions against individuals and service providers that fail to play by the DMCA rules – all at great cost. Still, as this current litigation demonstrates, even extensive resources have not been sufficient to stem the tide of infringement on the Internet. Viacom, itself, identified many new infringing videos on YouTube shortly after it notified YouTube – and YouTube removed – 100,000 infringing videos from its site. (*See Viacom v. YouTube*, Docket No. 225-16.)

For the hundreds of thousands of independent authors, the situation is even more dire, making any hope of even marginally effective notice-and-takedown enforcement a pipe dream. These entrepreneurs could never have the resources that are required to approach the robust enforcement programs that larger companies can afford. Take, for example, Kathy Wolfe, owner of a small independent U.S. film-distribution company called Wolfe Video. Last year she "found more than 903,000 links to unauthorized versions of her films" – this corresponds to an estimated loss of over $3 million in revenue in 2012 from her top 15 titles alone. Christopher S. Stewart, *As Pirates Run Rampant, TV Studios Dial Up*, THE WALL STREET JOURNAL

(Mar. 3, 2013).  In addition to her lost revenues, Ms. Wolfe "spends over $30,000 a year – about half her profit – just to send out takedown notices for her titles."  *Id.*  This "very damaging trend" has forced her to halve her marketing budget, cut her employees' pay, and discontinue her own salary. *Id.* As discussed further, below, Ms. Wolfe's story is not an uncommon one.

Not having the same type of resources that larger companies do, "digital theft . . . has an outsized impact on independent artists and creators." *Protecting Legitimate Commerce Online: The ART Act, the NET Act and Illegal Streaming*: *Hearing Before the Subcomm. on Intellectual Prop., Competition, and the Internet of the H. Comm. on the Judiciary*,  112th Cong. 4 (2011) (statement of Sandra Aistars, Executive Director, Copyright Alliance).  Copyright infringement "takes a direct economic toll on these small business owners, who must shoulder the burden of policing infringements while at the same time" running their businesses, and the "losses due to infringement have been devastating."  Comments of the National Press Photographers Association, from Mickey H. Osterreicher, General Counsel, to U.S. Copyright Office, at 2 (Jan. 6, 2012) (on file with U.S. Copyright Office) (submitted in response to solicitation from U.S. Copyright Office re copyright small claims).  Moreover, while "the vast majority of copyright enforcement cases are brought by copyright owners

23

themselves . . . fewer and fewer small copyright owners can afford the costs of litigation." *Promoting Investment and Protecting Commerce Online: Legitimate Sites v. Parasite, Part I: Hearing Before the Subcomm. on Intellectual Prop., Competition, and the Internet of the H. Comm. on the Judiciary*, 112th Cong. 2 (2011) (statement of Maria A. Pallante, Acting Register of Copyrights).

Tor Hansen, co-president and co-founder of YepRoc Records/Redeye Distribution and board member of the American Association of Independent Music ("A2IM"),[8] pointedly summarized this predicament for the Judiciary Committee in the context of independent record labels:

> Unfortunately due to the ever-shrinking overall music market revenue base, [independent] music labels like mine as [small- and medium-sized music enterprises] simply do not have the financial means or resources to engage in widespread copyright monitoring on the Internet. The time and capital investment required for our community of like-minded, but proudly Independent small business people to monitor the web for usage and take subsequent legal action simply does not exist. [Independent] music labels do not have the financial means or resources to house a stable of systems people and lawyers to monitor the Internet and bombard users with DMCA takedown notices for seemingly endless illegal links to our musical copyrights. [We] have limited budgets and whatever revenues and profits [we] can eke out are directed toward [our] primary goals, music creation by their music label's artists and then the marketing and promotion of this music to the American public so they are able to continue this creation process.

---

[8] A2IM is the not-for-profit organization that represents the independent music label community. A2IM is a member of the Copyright Alliance.

*Innovation in America: The Role of Copyrights: Hearing Before the Subcomm. on Intellectual Proper., Competition, and the Internet of the H. Comm. on the Judiciary*, 113th Cong. 6 (2013) (statement of Tor Hansen, Co-President/Co-Founder YepRoc Records/Redeye Distribution).

The situation is even worse for individual authors and artists. Any time spent fighting infringement of their works takes away from the time they would spend on creating new works for the public to enjoy, and the money needed to enforce must come out of their personal income or savings. As artist Lorene Leftwich Sisk described, in order to prevent online infringements of her work, she either stops selling her art on the Internet, or she ends up sending 50 DMCA takedown notices per year; and in her words, "[I] don't have time to waste [on] all these infringements." Letter from Lorene Leftwich Sisk, to U.S. Copyright Office (2012) (on file with U.S. Copyright Office) (submitted in response to solicitation from U.S. Copyright Office re copyright small claims). Indeed, the time and resource spent fighting online infringement can potentially skyrocket because "even if a copyright owner targets a domestic website, there may still be the same problem as faced abroad that the website may simply – and quickly – reappear at another domain name." 2011 Pallante Statement, *supra*, at 4.

25

Relying purely on the notice-and-takedown system, for independent authors – ranging from start-up web publications to small publishers to minority media companies – is tantamount to being handed an umbrella in a tsunami. Any effective takedown is cold comfort when it is done after the work is made available without authorization, given the rapid rate of further dissemination on the Internet. Once a copyrighted file is posted somewhere, it is essentially too late to rein in (particularly if the work has gone "viral"). This is clearly not the result the drafters of the DMCA intended, but it is the only possible outcome of court decisions like Judge Stanton's, which eviscerate the protections of the DMCA for authors.

The situation faced by independent authors is exemplified by the story of Ellen Seidler. Ms. Seidler is an independent filmmaker who created and directed the critically acclaimed film "And Then Came Lola." She and her co-director "financed the film by taking loans from their families, putting liens on their homes, and borrowing against their retirement savings" to the tune of $250,000. Aistars Statement, *supra*, at 4. Ms. Seidler expected to break even, relying like many independent filmmakers, on "back end distribution" – DVD sales and domestic and international online purchases through Amazon, Netflix, and iTunes. *Id.* at 5.

26

The film was a success, but "[w]ithin days illegal copies began circulating on line. Within a couple of months, Ms. Seidler had counted 35,000 illegal streams and downloads. At that point, overwhelmed, she stopped counting." *Id*. The film soon began popping up on illegal streaming and downloading sites throughout the world. For example, Ms. Seidler found her film streaming on a Chinese website, boasting 300,000 views, and on a Spanish website showing over 60,000 views, and on other sites streaming and offering downloads of her film supported by paid advertisements. *Id*. She contacted the website operators and advertising networks, but was largely dismissed. *Id*. One Russian site told her that the law did not apply to them, and even Google refused to remove an illegal website from its AdSense program. *Id*. "Despite the diligent efforts of creators like Ms. Seidler to police against the illegal streaming of their works, the problem is only growing, in part because the risk to the operators of such sites is so low." *Id*.

This problem is not simply limited to foreign operators outside the reach of the DMCA. Independent authors "often find themselves in a never-ending battle with unscrupulous website operators who pay mere lip-service to obligations of the DMCA while enjoying its safe harbors." Letter from Copyright Alliance, to Library of Congress Copyright Office, at 2 (Jan. 17,

2012) (on file with U.S. Copyright Office) (submitted in response to solicitation from U.S. Copyright Office re copyright small claims).

Author and publisher Morris Rosenthal agrees, opining that file-sharing networks "hide behind DMCA and links to pirated books are often reposted on the same site within hours of processing a DMCA complaint." Letter from Morris Rosenthal, to U.S. Copyright Office, at 2 (2012) (on file with U.S. Copyright Office) (submitted in response to solicitation from U.S. Copyright Office re copyright small claims). He observed that "content farm" websites that post stolen content claim DMCA safe harbor protection while at the same time "syndicate the plagiarized material to hundreds or thousands of other sites, all of whom claim DMCA protection, making it impossible for an author to have all of the infringements removed." *Id.* at 3. In one instance, he "found [his] book . . . [online illegally] within a day of it being posted [for sale], and not only were there already a thousand downloads, there were over fifty comments posted by different people thanking the individual who posted the file." *Id.* at 2. Mr. Rosenthal told the Copyright Office that, as a result of the efforts required to fight the tsunami, he has "dropped all attempts at writing new books in an attempt to fight copyright infringements and preserve the core of my publishing business." *Id.* at 1.

Mr. Rosenthal's statement indicates that with respect to him, and likely countless other creators, the problem goes beyond many service providers' insistence that the DMCA safe harbor need not reflect any semblance of balance. Over the past 15 years, due to gamesmanship and insufficient cooperation on the part of certain mal-intentioned service providers, the Internet environment has effectively started to chip away at the goal of the Framers in adopting copyright law in the Constitution: to promote the Progress of Science and useful Arts by providing protections to authors. U.S. Const. art I, § 8, cl. 8.

Decisions like the one below perpetuate the message that certain online service providers can use "notice-and-takedown" as window dressing and continue to block copyright owners from being able to see behind the curtains. In essence, it says that these providers can pay lip service to the DMCA and rest assured that they will be otherwise protected. If the decision below is not reversed, we can expect to see more service providers eschew efforts to take voluntary measures to operate honestly, in favor of capitalizing on infringement.

29

## CONCLUSION

For the reasons set forth above, and for those set forth in Appellants'

brief, *amici curiae* respectfully request that the decision below be reversed.

Dated:        New York, New York
              August 2, 2013

                       s/ Eleanor M. Lackman
                       Eleanor M. Lackman
                       Mary E. Rasenberger
                       Nancy E. Wolff
                       Scott J. Sholder
                       COWAN DEBAETS ABRAHAMS &
                       SHEPPARD LLP
                       41 Madison Avenue, 34th Floor
                       New York, New York 10010
                       Tel: (212) 974-7474

                       Sandra Aistars
                       Executive Director
                       COPYRIGHT ALLIANCE
                       1224 M Street, NW, Suite 101
                       Washington, DC  20005
                       Tel: (202) 540-2247

                       *Attorneys for Amici Curiae*

30

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6527 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), as counted by Microsoft® Word 2007, the word processing software used to prepare this brief.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft® Word 2007, Times New Roman, 14 point.

s/ Eleanor M. Lackman

Eleanor M. Lackman
*Attorneys for Amici Curiae*
Dated:        August 2, 2013
