# 13-1720-CV

IN THE

## UNITED STATES DISTRICT COURT OF APPEALS

### FOR THE SECOND CIRCUIT

VIACOM INTERNATIONAL INC., COMEDY PARTNERS, COUNTRY MUSIC TELEVISION, INC., PARAMOUNT PICTURES CORPORATION, BLACK ENTERTAINMENT TELEVISION LLC,

*Plaintiffs-Appellants,*

—against—

YOUTUBE, INC., YOUTUBE, LLC, GOOGLE INC.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

BRIEF OF *AMICI CURIAE* AMERICAN FEDERATION OF MUSICIANS, DIRECTORS GUILD OF AMERICA, INC., INTERNATIONAL ALLIANCE OF THEATRICAL STAGE EMPLOYEES, SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, AND STUDIO TRANSPORTATION DRIVERS, LOCAL 399, INTERNATIONAL BROTHERHOOD OF TEAMSTERS IN SUPPORT OF PLAINTIFFS-APPELLANTS AND IN SUPPORT OF REVERSAL

Peter D. DeChiara
Joseph J. Vitale
COHEN, WEISS AND SIMON LLP
330 West 42nd Street
New York, New York 10036-6976
(212) 563-4100
Attorneys for *Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

The Directors Guild of America, Inc. ("DGA"), the American Federation of Musicians of the United States and Canada ("AFM") and Screen Actors Guild-American Federation of Television and Radio Artists ("SAG-AFTRA") are the only *Amici* that are corporations. The DGA, the AFM and SAG-AFTRA hereby certify that they have no parent corporation and that no publicly held corporation owns 10% or more of their stock.

i

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ............................................................ i

TABLE OF CONTENTS ......................................................................................... ii

TABLE OF AUTHORITIES ................................................................................... iii

STATEMENT OF IDENTITY, INTEREST AND AUTHORITY TO FILE ............ 1

ARGUMENT .......................................................................................................... 5

I.      INTRODUCTION ........................................................................................... 5

II.      THE SYSTEMATIC INFRINGEMENT OF COPYRIGHTED
WORKS BY ENTITIES SUCH AS YOUTUBE JEOPARDIZES
THE UNIONS' AND GUILDS' MEMBERS' EARNINGS,
BENEFITS AND JOBS, AND THE NATION'S MOTION
PICTURE AND SOUND RECORDING INDUSTRIES ................................ 7

     A.      On-line Theft Threatens the Unions'
and Guilds' Members' Jobs .................................................................. 8

     B.      On-line Theft Directly Impacts the Unions'
and Guilds' Members' Earnings and Benefits ..................................... 12

     C.      On-line Theft Poses a Serious Threat
to America's Creative Output .............................................................. 17

CONCLUSION ...................................................................................................... 18

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) ...................................... 21

CERTIFICATE OF SERVICE ............................................................................... 22

# TABLE OF AUTHORITIES

Page

## Statutes

Article I, Section 8, Clause 8 of the United States Constitution ...............................5

Statute of Anne, 1710, 8 Anne C. 19 (Eng.) ..............................................................5


## Other Authorities

Andrew Stewart, *Global Box Office Hits Record in 2012 as Hispanic Attendance Grows in U.S.,* Variety, Mar. 21, 2013, *available at*: http://variety.com/2013/film/news/global-box-office-hits-record-in-2012-as-hispanic-attendance-grows-1200327049/ .....................................................16

Bono, Op-Ed., *Ten for the Next Ten*, N.Y. TIMES, Jan. 3, 2010 ..............................11

Brent Lang, *Entertainment Groups Praise Capitol Confab with Biden,* THE WRAP (Dec. 15, 2009), *available at*: http://www.thewrap.com/ind-column/entertainment-groups-praise-capitol-confab-biden-11831......................8

Daniel B. Wood, *The YouTube world opens an untamed frontier for copyright law*, The Christian Science Monitor, Dec. 18, 2006, *available at*: http://www.csmonitor.com/2006/1218/p01s03-usju.html ............................18

Directors Guild of America, *Guilds, Unions Meet with White House Intellectual Property Official*, November 8, 2011, *available at*: http://www.dga.org/News/Guild-News/2011/December/DGA-meets-with-Espinel.aspx................................................................................7

Directors Guild of America, *Taylor Hackford Elected DGA President*, DGA MONTHLY, at 4 (Sept. 2009)........................................................................8

Eric D. Snider, *The Incredible Shrinking DVD Sales,* Film.com, May 6, 2009, *available at*: http://www.film.com/features/story/the-incredible-shrinking-dvd-sales/27993283 .........................................................16

IATSE Quadrennial Convention Resolution No. 9, adopted July 28, 2009..............8

International Association of Theatrical Stage Employees, *IATSE Convention Re-elects Matthew D. Loeb International President*, Press Release (July 31, 2009) *available at*: http://www.iatse-intl.org/news/pr_073109.html .............8

Interview of IATSE President Matthew Loeb, DGA QUARTERLY (Winter 2012), *available at*: http://www.dga.org/Craft/DGAQ/All-Articles/1201-Winter-2012/10-Questions-Matt-Loeb.aspx........................................................7

Joint statement of AFM, AFTRA, DGA, IATSE, IBT, and SAG commending passage of S. 978, Commercial Felony Streaming Act, June 16, 2011, *available at*: http://www.afm.org/news/joint-statement-commending-passage-of-s-978...........................................................7

Joint letter of AFM, AFTRA, DGA, IATSE and SAG to United States Intellectual Property Enforcement Coordinator regarding the development of a federal effort against intellectual property infringement, March 24, 2010, *available at*: http://www.afm.org/uploads/file/Entertainment%20Guilds%20and%20Unions%20Submission%20on%20IPEC%20-%20FINAL%20-%203-24-10-3%2025pmEST%20(2).pdf ...........................................................7

Jonathan Handel, Unions Speak Out Against Piracy, THE HOLLYWOOD REPORTER, April 4, 2011 ........................................7

Michael Hiltzik, *Casual Purchase of a Counterfeit DVD Shines Light on Piracy*, L.A. TIMES, Jan. 4, 2010, *available at*: http://www.latimes.com/business/la-fi-hiltzik4-2010jan04,0,3438848.column .............................................................11

Music Community Calls for Swift Action To Enhance Global IP Protection As Part of Special 301 Process (press release, February 17, 2009), *available at*: http://www.afm.org/news/music-community-calls-for-swift-action-to-enhance-global-ip-protection-as-part-of-special-301-process..............8

Screen Actors Guild, *SAG Advocates for Actors Against Digital Theft*, *available at*: http://www.sagaftra.org/sag-advocates-actors-against-digital-theft-0 .................8

iv

## STATEMENT OF IDENTITY, INTEREST AND AUTHORITY TO FILE

*Amici* (collectively, the "Guilds and Unions") are labor unions that represent artists in the theatrical motion picture, television, commercial and new media industries.[1]

*Amicus* Directors Guild of America, Inc. ("DGA") was founded in 1936 to protect the economic and creative rights of Directors. Over the years, its membership has expanded to include the entire directorial team, including Unit Production Managers, Assistant Directors, Associate Directors, Stage Managers, and Production Associates. DGA's over 15,000 members live and work throughout the United States and abroad, and are vital contributors to the production of feature films, television programs, documentaries, news and sports programs, commercials, and content made for the Internet and other new media. DGA seeks to protect the legal, economic, and artistic rights of directorial teams, and advocates for their creative freedom.

*Amicus* International Alliance of Theatrical Stage Employees ("IATSE") is the labor union that represents technicians, artisans and craftspersons

---

[1] *Amici* hereby state pursuant to Rule 29.1 of the Rules of this Court that none of the parties to either of these cases (*i.e.*, Plaintiffs-Appellants or Respondents-Defendants) nor their counsel authored this brief in whole or in part; nor did any party or any party's counsel contribute money intended to fund preparing or submitting the brief; nor did anyone else other than *Amici* and their counsel contribute money that was intended to fund preparing or submitting this brief.

1

in the entertainment industry, including live theater, motion picture and television production, and trade shows.  IATSE was formed in 1893 and has over 110,000 members in the United States, U.S. territories, and Canada.  Through its international organization and its autonomous local unions, IATSE seeks to represent every worker employed in its crafts and to help them obtain the kind of wages, benefits, and working conditions they need for themselves and their families.

*Amicus* Screen Actors Guild-American Federation of Television and Radio Artists ("SAG-AFTRA") is the nation's largest labor union representing working actors and represents more than 165,000 actors, announcers, broadcasters, journalists, dancers, DJs, news writers, news editors, program hosts, puppeteers, recording artists, singers, stunt performers, voiceover artists and other media professionals.  With national offices in Los Angeles and New York, and local offices nationwide, SAG-AFTRA members work together to secure the strongest protections for media artists into the 21st century and beyond.

*Amicus* American Federation of Musicians of the United States and Canada ("AFM") is the largest union in the world representing professional musicians, with over 80,000 members in the United States and Canada.  Musicians represented by the AFM record music for sound recordings, movie sound tracks, commercials, and television and radio programming under industry-wide collective

2

bargaining agreements.  The AFM works to ensure that musicians not only receive fair wages and benefits, but also participate in the proceeds from the sale or other exploitation of their recorded performances in physical or digital formats, and have a voice in cultural and policy debates that affect them at home and abroad.

*Amicus* Studio Transportation Drivers, Local 399, International Brotherhood of Teamsters ("Teamsters Local 399") represents approximately 5,000 Drivers, Location Managers, Casting Directors, Dispatchers, Mechanics, Animal Handlers, Office Workers, Couriers, Tour Employees and Prop House Workers in the motion picture, television, cable and commercial industries. Teamsters Local 399 was originally chartered in April 1930 and represents members working throughout the United States.  Teamsters Local 399 negotiates contracts with hundreds of producers to obtain the substantial wages, hours and working conditions its members enjoy.

The Guilds and Unions have collective bargaining agreements with all of the major motion picture and television production companies, television networks, and commercial producers.  These collective bargaining agreements govern the wages, hours and working conditions of the Unions' and Guilds' members.

The Guilds' and Unions' members, and their pension and health plans, rely on residuals – deferred compensation based on the continuing use of the

3

creative works on which they were employed – as an important source of income. As the revenues generated by these works in certain markets are diminished or eliminated, so too are the incomes, benefits and jobs of the Guilds' and Unions' members.  Accordingly, the Guilds and Unions and their members have a significant interest in the outcome of this litigation.

The authority of *Amici* to file this brief is based on the consent of all parties.

## ARGUMENT

I.   **INTRODUCTION**

The opening sentence of the Statute of Anne, which was enacted in the United Kingdom in 1710 and is the predecessor to Article I, Section 8, Clause 8 of the United States Constitution, premises the establishment of copyright on the following statement:

> Whereas Printers, Booksellers, and others have of late frequently taken the Liberty of Printing, Reprinting, and Publishing, or causing to be Printed, Reprinted, and Published Books, and other Writings, without the Consent of the Authors or Proprietors of such Books and Writings, to their very great Detriment, and too often to the Ruin of them and their families: For preventing therefore such practices for the future, and for the Encouragement of Learned Men to Compose and Write Useful Books....[2]

The technology may be different, but the story remains the same. Although over three hundred years have passed since the enactment of the Statute of Anne, the law should not stray from this fundamental principle: those who take or facilitate the taking of the creative works of others without consent cause detriment and ruin to the families that rely on the revenues derived from those works and undermine the economic incentive for the creation of new works.

The Guilds and Unions represent over 300,000 workers who rely on the revenues generated by copyrighted works to earn their livings and support their

---

[2] Statute of Anne, 1710, 8 Anne C. 19 (Eng.).

families and communities. The Unions' and Guilds' members play a vital role in creating audiovisual works and sound recordings that are in demand both in the United States and around the world. Contrary to popular misconception, the Unions' and Guilds' members are overwhelmingly middle-class workers whose careers are characterized by intermittent and unpredictable employment and who therefore rely on downstream revenues and royalties to provide them with an on-going flow of compensation and health and pension benefits that keep their families afloat and secure.

As with the Guilds' and Unions' prior amicus brief filed with the Court in these actions, this brief aims to provide the Court with some insight into how the entertainment business works to help it better understand some of the broader implications of allowing YouTube's systematic theft and facilitation of theft of copyrighted works to go unpunished. In the three years since the Guilds' and Unions' last brief, on-line theft has grown to pose an even greater threat to the motion picture and television industries. On-line theft has already decimated the record business and threatens to seriously impact the production of audio-visual content as well.

6

II.   **THE SYSTEMATIC INFRINGEMENT OF COPYRIGHTED WORKS BY ENTITIES SUCH AS YOUTUBE JEOPARDIZES THE UNIONS' AND GUILDS' MEMBERS' EARNINGS, BENEFITS AND JOBS, AND THE NATION'S MOTION PICTURE AND SOUND RECORDING INDUSTRIES**

On-line theft threatens grave harm to the output of the United States' creative industries, and to the artists and craftspeople who make up the Guilds' and Unions' memberships. The Unions' and Guilds' members' earnings, benefits and jobs are reliant on the preservation and proper enforcement of this country's intellectual property laws. That is why the Guilds and Unions have each made the fight against on-line theft a top priority.[3] The Unions' and Guilds' members'

---

[3] *See, e.g.*, Interview of IATSE President Matthew Loeb, DGA QUARTERLY (Winter 2012), *available at*: http://www.dga.org/Craft/DGAQ/All-Articles/1201-Winter-2012/10-Questions-Matt-Loeb.aspx (explaining the effects of internet theft on union members and efforts of guilds and unions to combat internet theft); Joint statement of AFM, AFTRA, DGA, IATSE, IBT, and SAG commending passage of S. 978, Commercial Felony Streaming Act, June 16, 2011, *available at*: http://www.afm.org/news/joint-statement-commending-passage-of-s-978; Directors Guild of America, *Guilds, Unions Meet with White House Intellectual Property Official*, November 8, 2011, *available at*: http://www.dga.org/News/Guild-News/2011/December/DGA-meets-with-Espinel.aspx (stating AFM, AFTRA, SAG, IATSE, DGA, and others met with U.S. Intellectual Property Enforcement Coordinator Victoria Espinel to discuss, among other topics, the fight against internet theft); Jonathan Handel, Unions Speak Out Against Piracy, THE HOLLYWOOD REPORTER, April 4, 2011, (reporting on a press conference where Congressional leaders were joined by representatives of the DGA, AFTRA, IATSE and SAG to discuss internet theft); Joint letter of AFM, AFTRA, DGA, IATSE and SAG to United States Intellectual Property Enforcement Coordinator regarding the development of a federal effort against intellectual property infringement, March 24, 2010, *available at*: http://www.afm.org/uploads/file/Entertainment%20Guilds%20and%20Unions%20Submission%20on%20IPEC%20-%20FINAL%20-%203-24-10-

ability to support their families and their contributions to American culture are at

stake.

### A.    On-line Theft Threatens the Unions' and Guilds' Members' Jobs

On-line theft is not a "victimless" crime — theft costs jobs.  The

creative process that produces the audiovisual works and sound recordings the

Unions' and Guilds' members create is significantly and negatively impacted by

---

3%2025pmEST%20(2).pdf; Brent Lang, *Entertainment Groups Praise Capitol
Confab with Biden*, THE WRAP (Dec. 15, 2009), *available at*:
http://www.thewrap.com/ind-column/entertainment-groups-praise-capitol-confab-
biden-11831 (reporting on a recent meeting among representatives of the Guilds
and Unions and top U.S. Executive Branch officials, including Vice President
Biden, and noting the high priority placed on combating piracy); Directors Guild of
America, *Taylor Hackford Elected DGA President*, DGA MONTHLY, at 4 (Sept.
2009) (reporting that Mr. Hackford's top legislative priority for the Guild would be
protecting the work of its members in the new digital age from "Internet theft");
International Association of Theatrical Stage Employees*, IATSE Convention Re-
elects Matthew D. Loeb International President*, Press Release (July 31, 2009)
*available at*: http://www.iatse-intl.org/news/pr_073109.html (IATSE President
Loeb stressed that digital piracy is one of the two top issues for the union); IATSE
Quadrennial Convention Resolution No. 9, adopted July 28, 2009 (on file with
IATSE) (resolving to "take measures to lobby government, promote legislative and
regulatory safeguards and partner with the industry at large in securing the motion
picture business from piracy"); Screen Actors Guild, *SAG Advocates for Actors
Against Digital Theft, available at*: http://www.sagaftra.org/sag-advocates-actors-
against-digital-theft-0 (providing examples of activity SAG has undertaken to
combat online theft of copyrighted works); Music Community Calls for Swift
Action To Enhance Global IP Protection As Part of Special 301 Process (press
release, February 17, 2009), *available at*: http://www.afm.org/news/music-
community-calls-for-swift-action-to-enhance-global-ip-protection-as-part-of-
special-301-process.

on-line theft of those works.  One of the tangible consequences of on-line theft is a reduction in employment opportunities for Union and Guild members.

The financiers and producers of creative content make decisions regarding what projects to "greenlight" based on settled understandings about various markets and the revenues that can be generated from them.  In making these decisions, potential financiers and producers calculate a project's value based on projections of the estimated revenues that will be derived from a series of discrete exploitation windows.  For example, the typical life cycle of a motion picture would include windows for the initial theatrical release, followed by a release to the home video market and pay-per-view, then pay television (including video-on-demand), and finally broadcast and basic cable television; the foregoing all occur in both domestic and foreign markets.[4]  Many films are also made available for licensed, legal paid download and streaming on the Internet and mobile devices, concurrent to or overlapping with other distribution windows.

---

[4] A typical television series will run first on a television or cable network and might re-run multiple times within that same season. A recent practice is for episodes of the series to be available for viewing on the Internet and mobile devices – either via ad-supported streaming, a subscription-based service, or through paid downloads – as early as the next day following its first run. Frequently, successful television series are released to DVD after one season ends and before the next one begins.  A successful series will eventually be syndicated to other broadcast or basic cable channels.

These distribution windows recur, so projects generate revenues for many years, sometimes even for the duration of copyright.

The motion picture and television industry's financial models and well-being, and that of the employees represented by the Guilds and Unions, heavily rely on "downstream" revenue, or revenue from the exploitation of its products subsequent to the theatrical release or first television run.[5] This was never truer than it is today — 75% of a typical motion picture's revenues derive from exploitation after the initial theatrical release, as do more than 50% of a television program's revenues after the initial television run. Internet exhibition and distribution, in particular, is one area of potential downstream revenue that is continuing to develop, evolve and expand as technology advances.

Given the significant importance of downstream revenues to the financial success of films and television programs, if these markets experience a decrease in revenues, financiers and producers will invest in fewer new works, resulting in fewer jobs in the audiovisual arts. As the prospects for downstream revenues have diminished, motion picture investors have become more likely to fund only "blockbuster" movies with a high likelihood of success in their initial theatrical release. Financing has become more constrained for more diverse films

---

[5] Downstream revenue sources include home video (*e.g.*, DVD) sales, repeat airings on broadcast and basic cable television and premium pay television, new media (*e.g.*, paid Internet downloads) and others, both domestic and foreign.

that typically draw a greater percentage of their revenues from post-theatrical distribution, thus impacting the number of jobs available to the Unions' and Guilds' members.[6]

Any unauthorized use of a copyrighted work upsets the economic foundation of the entertainment industry's commercial structure. This is true when pirated DVDs are sold at swap meets. It is also true when new technologies emerge offering millions of Internet users around the world illicit alternatives that contravene the legal rights of copyright owners. And it is particularly destabilizing when a new technology bears a patina of legitimacy, while underneath that shiny surface it threatens to supplant existing, lawfully licensed windows of exploitation. YouTube's longstanding policy of displaying and distributing works in

---

[6] *See, e.g.,* Michael Hiltzik, *Casual Purchase of a Counterfeit DVD Shines Light on Piracy*, L.A. TIMES, Jan. 4, 2010, *available at*: http://www.latimes.com/business/la-fi-hiltzik4-2010jan04,0,3438848.column (noting that the cost of piracy of motion pictures is greatest for independent film producers, who rely more heavily on foreign distribution than the large U.S. studios, and who have been getting only "a fraction of what they used to" from foreign distributors because piracy has dramatically diminished their own revenue expectations).

This trend has the potential not only to erode jobs and earnings in our industry, but also to deprive consumers of high-quality content that reflects a diversity of viewpoints. One need only look to the music industry to understand how a successful content-based business model can be substantially eroded by a failure to effectively regulate or combat on-line theft. *See, e.g.,* Bono, Op-Ed., *Ten for the Next Ten*, N.Y. TIMES, Jan. 3, 2010, at WK10.

11

contravention of copyright constitutes precisely such a destabilizing and illegitimate use of new technology.

**B.    On-line Theft Directly Impacts the Unions'
and Guilds' Members' Earnings and Benefits**

Not only are the number of jobs available to the Unions' and Guilds' members impacted by on-line theft, but their earnings and benefits are also directly impacted by it.  The freelance nature of employment in the motion picture and television businesses, and the integral contributions of the Unions' and Guilds' members who work in them, have been a way of life for over 60 years.  Similarly, in sound recordings, many artists struggle for years before they are able to support themselves by making music.  As an acknowledgement of these realities, the Unions' and Guilds' members share directly in the revenue that their work generates long after its initial release by way of a long-standing system of additional compensation known as "residuals."

The Guilds and Unions and copyright owners/holders have collectively bargained residuals formulas for over six decades.  Some residuals, particularly for the home video, basic cable and pay television markets, are based on a percentage of the revenues received by the work's producer (which is typically the copyright owner or holder) or its distributor for licensing the work in

12

that market.[7]  As a result, any reduction in the revenue received by the legal licensors of the work from lawful exploitation directly affects the residuals received by the Unions' and Guilds' members and their pension and health plans.

These residuals formulas have frequently been the subject of heated negotiations and, on more than one occasion, strikes.  Over the last several years, residuals formulas for re-use in new media, such as distribution via the Internet, mobile phones, and other forms of emerging technology, have been the subject of considerable effort in the Guilds' negotiations for their television and theatrical contracts.  In fact, residuals were at the forefront of the Writers Guild of America

---

[7] For example, Section 5.2.A. of the Producer-SAG Codified Basic Agreement of 2011 provides that, "Producer agrees to pay to [SAG], for rateable distribution to the performers appearing in said pictures, deferred compensation equal to... (2) From the distribution of such pictures on 'cassettes,' as defined herein, four and five-tenths percent (4.5%) of the first one million dollars ($1,000,000) of 'Distributor's gross receipts,' and five and four-tenths percent (5.4%) of 'Distributor's gross receipts,' thereafter."  "Cassettes" includes DVDs.

The 2011 DGA Basic Agreement, Paragraph 18-104 provides that for, "distribution in Supplemental Markets ... by mean of cassettes ... Employer shall pay additional compensation of one and five tenths percent (1.5%) of 'Employer's Gross' [up to $1,000,000] ... [and] one and eight-tenths percent (1.8%) ... in excess of $1,000,000."

Similarly, the AFM Basic Television Film Agreement, the AFM Basic Theatrical Motion Picture Agreement, and their accompanying Film Musicians Secondary Market Fund Agreement require producers to pay a percentage of gross revenue from secondary market exploitation of covered television films and motion pictures to the Film Musicians Secondary Market Fund for distribution to the musicians who participated in the preparation or recording of the sound tracks of those films and motion pictures.

strike in 2008 and in SAG's extended negotiations with motion picture and television studios that concluded in 2009.[8]  Due to these collective bargaining efforts, the Guilds' and Unions' members are entitled to residuals for new media distribution and exhibition of the content they create, a market directly and negatively impacted by the unauthorized and unlawful content on YouTube.

Income from residuals typically takes two forms.  First, a film, television or recording artist derives compensation from residuals or royalties. Because residual compensation is paid throughout the lifetime of a project as it is released in a succession of exploitation windows, it can provide a critical steady flow of income to the Guilds' and Unions' members whose employment is intermittent and unpredictable given the nature of the entertainment industry.

In 2011:

- For AFTRA recording artists, 90% of income derived from sound recordings was directly linked to royalties from physical CD sales and lawful paid digital downloads;

---

[8] The Writers Guild of America's negotiations with the motion picture and television studios concluded with members ratifying an agreement on February 25, 2008 after a 100-day strike.  SAG's negotiations with the motion picture and television studios lasted a full year, ending with ratification of its agreement on June 9, 2009.  Certain residuals, particularly residuals for content distributed in new media and on DVD, were among the key points of discussion between the parties.

- DGA members derived 19% of their compensation from residual payments;[9]

- SAG members who worked under the feature film and television contract derived 43% of their compensation from residuals;[10]

- For AFM film musicians who have been active under the AFM agreements for at least eight to ten years, payments from the Film Musicians Secondary Market Fund can account for 50% to 60% of their income throughout the life of their career and remain a significant part of their income post-retirement;

- AFM sound recording musicians receive a significant portion of their income from Special Payment Fund payments mandated by the AFM Sound Recording Labor Agreement, through which they share in the sales revenue from physical and digital sales.

Second, residuals and royalties also play a significant role in funding the pension and health plans that benefit the Unions' and Guilds' members. These benefits provide a guaranteed safety net for the members and their families, and are a fundamental part of the entertainment industry's long-established collectively bargained agreements.

---

[9] Reported initial compensation earnings are subject to caps.

[10] Reported initial compensation earnings are subject to caps.

15

In 2011, residuals derived from the sale of features films to free television and features films and free television programs to "supplemental markets" (pay television, home video (*e.g.*, DVD), etc.) funded:

- 70% of DGA's Basic Pension Plan

- 65% of the MPI Health Plan (for IATSE and Teamsters Local 399 members)

- 36% of SAG's Health and Pension Plan.

The distribution of infringing audiovisual works and sound recordings by entities such as YouTube reduces the revenues generated by these works. For audiovisual works, this illegal distribution primarily affects downstream revenues, the ones that give rise to the Unions' and Guilds' members' residuals payments. The media pays great attention to the growth of theatrical or box office revenues,[11] but it is revenues from the shrinking DVD market[12] and other downstream markets, including the legal new media market, that generate residuals that compensate the Unions' and Guilds' members and finance their health and pension plans. When

---

[11] *See, e.g.*, Andrew Stewart, *Global Box Office Hits Record in 2012 as Hispanic Attendance Grows in U.S.,* Variety, Mar. 21, 2013, *available at*: http://variety.com/2013/film/news/global-box-office-hits-record-in-2012-as-hispanic-attendance-grows-1200327049/.

[12] *See* Eric D. Snider, *The Incredible Shrinking DVD Sales,* Film.com, May 6, 2009, *available at*: http://www.film.com/features/story/the-incredible-shrinking-dvd-sales/27993283.

an entity such as YouTube distributes, or even aids in the distribution of, content

on-line with a disregard for copyright laws and licensed distribution models, its

distribution of infringing content directly and materially impacts the Unions' and

Guilds' members by depriving them of both compensation and pension and health

benefits that are funded by residuals. This is particularly true when the distributor

of the infringing content blatantly usurps an existing market for which residuals

and pension and health contributions otherwise would be paid.

### C.    On-line Theft Poses a Serious Threat to America's Creative Output

In addition to jeopardizing the Unions' and Guilds' members' jobs

and livelihoods, the Court also should be concerned with the serious threat that on-

line theft poses to the future creative output of this country. As previously

discussed, preventing on-line theft is essential to promoting the robust availability

to consumers of diverse and high-quality content. When an entity such as

YouTube knowingly engages in the distribution of infringing content on a

systematic, institution-wide basis, its actions have broad repercussions.

YouTube was one of the initial distributors of infringing content via

streaming technology, and is arguably the most famous. Its influence on the

proliferation of this technology and the societal effects of its conscious provision

of a platform that allowed its early users to exhibit a "rampant disregard for

copyright law"[13] cannot be overlooked.  YouTube has been more than a widespread infringer of copyrights; it was a catalyst and engine for copyright infringement on a global scale, unleashing a Pandora's box of illegal activity that will continue to threaten the output of America's creative industries for years to come.

## CONCLUSION

YouTube's role in the rampant, systematic distribution of content in violation of the exclusive rights of copyright holders caused and continues to cause harm to the entertainment industries and the members of the Guilds and Unions working in those industries.  We urge the Court to consider the full ramifications of YouTube's actions, and request that the Court reverse the lower court's decision.

Dated:        August 2, 2013

Respectfully submitted,

/s/ Joseph J. Vitale
Peter D. DeChiara
Joseph J. Vitale
COHEN, WEISS AND SIMON LLP
330 West 42nd Street
New York, New York 10036-6979
Tel:  (212) 563-4100

---

[13] Daniel B. Wood, *The YouTube world opens an untamed frontier for copyright law*, The Christian Science Monitor, Dec. 18, 2006, *available at*: http://www.csmonitor.com/2006/1218/p01s03-usju.html.

Of Counsel:

David B. Dreyfus
Directors Guild of America, Inc.
7920 Sunset Boulevard
Los Angeles, California 90036-0800
Tel:  (310) 289-2000

Dale W. Short
Short Shepherd & Stanton
24461 Detroit Road, Suite 340
Westlake, Ohio 44145
Counsel for International Association
of Theatrical and Stage Employees
Tel:  (440) 899-9990

Duncan Crabtree-Ireland
Danielle Van Lier
Screen Actors Guild-American
Federation of Television and Radio
Artists
5757 Wilshire Boulevard, 7th Floor
Los Angeles, California 90036
Tel:  (323) 549-6627

Patricia Polach
Bredhoff & Kaiser PLLC
805 15th Street, N.W., Suite 1000
Washington, D.C. 20005
Counsel for American Federation
of Musicians of the United States
and Canada
Tel: (202) 842-2600

Joseph J. Kaplon
Wohlner Kaplon Phillips
Young & Cutler
16501 Ventura Boulevard, Suite 304
Encino, California 91436
Counsel for Studio Transportation
Drivers, Local 399, International
Brotherhood of Teamsters
Tel: (818) 501-8030 Ext. 320

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.   This brief complies with the type-volume limitation of Fed. R. App. P.
     32(a)(7)(B) because:

     X    this brief contains 2,816 words, excluding the parts of the brief
          exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

     _    this brief uses a monospaced typeface and contains [state the number
          of] lines of text, excluding the parts of the brief exempted by Fed. R.
          App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P.
     32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

     X    this brief has been prepared in a proportionally spaced typeface using
          Microsoft Word 2010 with Times New Roman in 14 point, or

     _    this brief has been prepared in a monospaced typeface using [state
          name and version of word processing program] with [state number of
          characters per inch and name of type style].

Dated: August 2, 2013

                                        /s/ Joseph J. Vitale
                                        Joseph J. Vitale
                                        COHEN, WEISS AND SIMON LLP
                                        330 West 42nd Street
                                        New York, New York 10036-6979
                                        Tel:  (212) 563-4100

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of August 2013, a true and correct copy of the foregoing Brief of *Amici Curiae* was served on the following counsel of record in these appeals via CM/ECF pursuant to Local Rule 25.1:

Paul M. Smith
William H. Hohengarten
Scott B. Wilkins
Jenner & Block LLP
1099 New York Avenue, N.W.
Washington, D.C. 20001
(202) 639-6000

Charles S. Sims
Proskauer Rose LLP
1585 Broadway
New York, New York 10036
(212) 969-3000

Theodore B. Olson
Matthew D. McGill
Gibson Dunn
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8668

David H. Kramer
Bart E. Volkmer
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, California 94304
(650) 493-9300

Stuart J. Baskin
John Guelli
Kirsten Nelson Cunha
Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10023
(212) 849-4000

Susan J. Kohlmann
Jenner & Block LLP
919 Third Avenue
New York, New York 10022
(212) 891-1690

John C. Browne
Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 540-1400

Patrick J. Coyne
Finnegan Henderson Farabow Garrett & Dunner, LLP
901 New York Avenue, NW
Washington, D.C. 20001
(202) 408-4000

Andrew H. Schapiro
A. John P. Mancini
Brian M. Willen
Mayer Brown LLP
1675 Broadway
New York, New York 10019
(212) 506-2500

/s/ Joseph J. Vitale
Joseph J. Vitale
COHEN, WEISS AND SIMON LLP
330 West 42nd Street
New York, New York 10036-6979
Tel: (212) 563-4100