# 13-1720

## United States Court of Appeals

*for the*

## Second Circuit

VIACOM INTERNATIONAL INC., COMEDY PARTNERS, COUNTRY
MUSIC TELEVISION, INC., PARAMOUNT PICTURES
CORPORATION, and BLACK ENTERTAINMENT TELEVISION LLC,

*Plaintiffs-Appellants*,

*- v. -*

YOUTUBE, INC., YOUTUBE, LLC, and GOOGLE, INC.,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF FOR MOTION PICTURE ASSOCIATION OF AMERICA,
INC. AND INDEPENDENT FILM & TELEVISION ALLIANCE AS
*AMICI CURIAE* SUPPORTING APPELLANTS**

SUSAN CLEARY
Vice President & General Counsel
INDEPENDENT FILM & TELEVISION
ALLIANCE
10850 Wilshire Boulevard, 9th Floor
Los Angeles, California  90024
(310) 446-1003

*Counsel for Amicus* IFTA

KELLY M. KLAUS
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071
(213) 683-9100

*Counsel for Amicus* MPAA

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(c)(1) of the Federal Rules of Appellate Procedure:

The Motion Picture Association of America, Inc. certifies that it has no parent or subsidiary corporations and that no publicly held company owns 10% or more of its stock.

The Independent Film & Television Alliance® certifies that it has no parent or subsidiary corporations and that no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICI CURIAE* .................................................................... 1

SUMMARY OF ARGUMENT ...................................................................... 2

ARGUMENT ................................................................................................ 6

I.     The District Court's Interpretation Of The DMCA Threatens To Extend Safe Harbor Protection To Service Providers Congress Never Intended To Protect ....................... 6

II.     The District Court Erred In Interpreting The "Right And Ability To Control" Under § 512(c)(1)(B) ............................. 10

      A.     This Court Held That "Inducement Of Copyright Infringement Under" *Grokster* Could Establish The "Right And Ability To Control" Under § 512(c)(1)(B) ................................................................ 10

      B.     The District Court Erroneously Limited The "Right And Ability To Control" To "Participation In, [Or] Coercion Of, User Infringement Activity" ...... 12

           1.     The "Right And Ability To Control" Does Not Require "Participation In" The Infringing Conduct ............................................. 13

           2.     The "Right And Ability To Control" Does Not Require That Service Providers "Coerce" Their Users' Infringing Conduct ........ 16

      C.     The District Court's "Participation Or Coercion" Test Threatens To Give *Grokster* Inducers An Unjustified Argument That They Lack "The Right And Ability To Control" Infringement For Purposes Of § 512(c)(1)(B) ......................................... 18

III.     The District Court Erred In Interpreting Willful Blindness Under § 512(c)(1)(A) ............................................ 21

      A.     This Court Held That Willful Blindness Could Appropriately "Demonstrate Knowledge Or Awareness Of Specific Instances Of Infringement" Under § 512(c)(1)(A).................................................... 21

**TABLE OF CONTENTS**
(continued)

**Page**

B.  The District Court Rendered "Willful Blindness" A Nullity Under The DMCA By Requiring Proof That The Defendant Actually Knew The Specific Fact To Which It Tried To Blind Itself.........................24

C.  The District Court's Willful Blindness Standard Threatens To Extend Safe Harbor Protection To Undeserving Service Providers....................................26

CONCLUSION............................................................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*A&M Records, Inc. v. Napster, Inc.*,
   239 F.3d 1004 (9th Cir. 2001) ................................................................8

*Arista Records LLC v. Lime Group LLC*,
   784 F. Supp. 2d 398 (S.D.N.Y. 2011) .................................................9, 20

*Arista Records LLC v. Usenet.com*,
   633 F. Supp. 2d 124 (S.D.N.Y. 2009) ............................................9, 20, 22

*Capitol Records, Inc. v. MP3Tunes, LLC*,
   No. 07 Civ. 9931 (WHP), 2013 WL 1987225
   (S.D.N.Y. May 14, 2013) ......................................................................23

*Columbia Pictures Indus., Inc. v. Fung*,
   710 F.3d 1020 (9th Cir. 2013) ...........................................................9, 12

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
   76 F.3d 259 (9th Cir. 1996) .................................................................16

*Global-Tech Appliances, Inc. v. SEB S.A.*,
   ___ U.S. ___, 131 S. Ct. 2060 (2011) ...........................................5, 22, 24

*In re Aimster Copyright Litig.*,
   334 F.3d 643 (7th Cir. 2003) .........................................................5, 22, 26

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
   454 F. Supp. 2d 966 (C.D. Cal. 2006) .....................................................8

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
   545 U.S. 913 (2005).......................................................................*passim*

*Pearson Educ., Inc. v. Kumar*,
   721 F. Supp. 2d 166 (S.D.N.Y. 2010) ....................................................14

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
   213 F. Supp. 2d 1146 (C.D. Cal. 2002)............................................12, 15

*Screen Gems-Columbia Music, Inc. v. Metlis & Lebow Corp.*,
   453 F.2d 552 (2d Cir. 1972) ...............................................................3, 14

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Shapiro, Bernstein & Co. v. H.L. Green Co.*,
 316 F.2d 304 (2d Cir. 1963) ..................................................4, 11, 14, 15

*Tiffany (NJ) Inc. v. eBay Inc.*,
 600 F.3d 93 (2d Cir. 2010) ........................................................22, 23, 26

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
 ___ F.3d ___, 2013 WL 1092793 (9th Cir. Mar. 14, 2013) ..................12

*Viacom Int'l Inc. v. YouTube, Inc.*,
 676 F.3d 19 (2d Cir. 2012) .............................................................*passim*

*Viacom Int'l Inc. v. YouTube, Inc.*,
 718 F. Supp. 2d 514 (S.D.N.Y. 2010) .......................................3, 7, 9, 10

*Viacom Int'l Inc. v. YouTube, Inc.*,
 ___ F. Supp. 2d ___, 2013 WL 1689071
 (S.D.N.Y. Apr. 18, 2013) ...............................................................*passim*

## FEDERAL STATUTES

17 U.S.C. § 101 ..................................................................................2

17 U.S.C. § 512(c) ...................................................................*passim*

17 U.S.C. § 512(d) ..............................................................................7

17 U.S.C. § 512(m) ....................................................................21, 25

## LEGISLATIVE MATERIALS

144 Cong. Rec. 9242 (1998) ..........................................................6

H.R. Rep. No. 105-551, pt. 2 (1998) ....................................23, 24

S. Rep. No. 105-190 (1998) .............................................7, 23, 24

## OTHER AUTHORITIES

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*
 § 12B.04[A][1][b][iii] (Matthew Bender, Rev. Ed.) ..............................26

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

MarkMonitor®, *Traffic Report: Online Piracy and Counterfeiting*
(Jan. 2011), *available at*
https://www.markmonitor.com/download/report/MarkMonitor_-
_Traffic_Report_110111.pdf ...................................................................7

## INTEREST OF *AMICI CURIAE*

*Amici curiae* the Motion Picture Association of America, Inc. ("MPAA") and the Independent Film & Television Alliance® (IFTA®) respectfully submit this brief with the consent of all parties.[1]  *See* Fed. R. App. P. 29(a).

Founded in 1922, the MPAA is a trade association that serves as the advocate for the domestic motion picture, home video and television industries.  The MPAA's members and their affiliates include the largest producers and distributors of motion pictures and television programs in the United States.  The MPAA members responsible for this brief are not parties to this case or affiliates of those parties.[2]

IFTA is the trade association for the independent film and television industry worldwide, representing over 140 independent production and distribution companies, as well as affiliated financial institutions that

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(c)(5) and Second Circuit Rule 29.1(b), *amici* state that no counsel for a party has written this brief in whole or in part; and that no person or entity, other than the *amici* or their members (not including appellant Paramount Pictures Corporation or any of its affiliates) has made a monetary contribution that was intended to fund the preparation or submission of this brief.

[2] The members of the MPAA are, in addition to Paramount, Sony Pictures Entertainment Inc., Twentieth Century Fox Film Corporation, Universal City Studios LLC, Walt Disney Studios Motion Pictures and Warner Bros. Entertainment Inc.

provide funding for independent production. IFTA also is the owner of the American Film Market®, the largest commercial film market in the world. IFTA members have produced, financed and/or distributed such critically and commercially successful films as *The Hurt Locker, Crash, Slumdog Millionaire, The Departed, Million Dollar Baby* and *Lord of the Rings*. Since 1984, IFTA member films have won over 60% of the Best Picture Academy Awards®.

*Amici's* members depend upon effective copyright protection in order to protect the motion picture and television content that they invest in, create and distribute. *Amici* and their members therefore have a significant interest in the important questions that this case presents concerning the interpretation of the Copyright Act, 17 U.S.C. §§ 101 *et seq.*, and in particular the Digital Millennium Copyright Act provisions codified at § 512 (the "DMCA").

## SUMMARY OF ARGUMENT

The district court's remand summary judgment decision, *Viacom Int'l Inc. v. YouTube, Inc.*, ___ F. Supp. 2d ___, 2013 WL 1689071 (S.D.N.Y. Apr. 18, 2013) ("*Viacom III*"), announces legal standards that misconstrue the DMCA's "safe harbor" provisions and misread this Court's controlling opinion in *Viacom Int'l Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012)

2

("*Viacom II*").  The district court's errors threaten significant harms beyond the outcome in this particular case.  The DMCA limits the copyright liability only of those service providers who are innocent concerning infringing activity that as a technical matter occurs on or through their sites.  Like its initial decision, *Viacom Int'l Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514 (S.D.N.Y. 2010) ("*Viacom I*"), the district court's remand decision upends the balance that Congress codified in the DMCA.  If adopted as the law of this Circuit, the district court's standards threaten to extend the DMCA's protections to service providers undeserving of protection, whose liability Congress did not intend to limit.

*Amici* respectfully submit that this Court should decline to follow the district court's analysis, and reverse the grant of summary judgment, for two principal reasons:

*First*, the district court erred in holding that a service provider does not have the type of "right and ability to control" infringing activity that this Court has said is required to trigger 17 U.S.C. § 512(c)(1)(B), unless the provider has "participat[ed] in" or "coerc[ed]" the infringing activity. *Viacom III*, 2013 WL 1689071, at *8.  Participating in infringement makes a defendant *directly* liable.  *Screen Gems-Columbia Music, Inc. v. Metlis & Lebow Corp.*, 453 F.2d 552, 554 (2d Cir. 1972).  The "right and ability to

3

control" standard in § 512, however, is drawn from the common law of secondary liability, namely, vicarious liability. *See Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963). While this Court held that the "right and ability to control" codified in § 512(c)(1)(B) requires "something more" than just "the ability to remove or block access to materials posted on the service provider's website," *Viacom II*, 676 F.3d at 38 (internal quotations omitted), nothing in the Court's opinion or in the language or history of the DMCA suggests that only conduct amounting to direct infringement meets the statutory standard. Rather, this Court held that "inducement of copyright infringement under *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005), which 'premises liability on purposeful, culpable expression and conduct'"—*not* on participation in or coercion of end-user infringement—"might … rise to the level of control under § 512(c)(1)(B)." *Viacom II*, 676 F.3d at 38 (quoting *Grokster*, 545 U.S. at 937). The district court erred by failing to follow the *Grokster* standard.

*Second*, the district court effectively nullified the application of "willful blindness" under the DMCA. This Court held "that the willful blindness doctrine may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of specific instances of infringement"

4

under 17 U.S.C. § 512(c)(1)(A).  *Viacom II*, 676 F.3d at 35.  The district court, in contrast, held that "willful blindness" under that section could be shown only if the defendant knew the specific fact it was trying to avoid—in this case, "[t]he specific locations of infringements."  *Viacom III*, 2013 WL 1689071, at *4.  That cannot be the law.  The entire point of the willful blindness doctrine is that "one who takes *deliberate actions to avoid confirming* a high probability of wrongdoing … can almost be said to have *actually known* the critical facts."  *Global-Tech Appliances, Inc. v. SEB S.A.*, ___ U.S. ___, 131 S. Ct. 2060, 2070-71 (2011) (emphasis added)*; see In re Aimster Copyright Litig.*, 334 F.3d 643, 650 (7th Cir. 2003) ("Willful blindness is knowledge, in copyright law … as it is in the law generally."). By requiring proof that the defendant actually knew the facts it deliberately tried to avoid, the district court rendered willful blindness meaningless under § 512(c)(1)(A).  The district court's holding cannot be reconciled with the decisions of the Supreme Court, this Court (including in this case), or other courts—or with sound policy or common sense.

5

# ARGUMENT

## I.    The District Court's Interpretation Of The DMCA Threatens To Extend Safe Harbor Protection To Service Providers Congress Never Intended To Protect

The district court's grounds for deciding this case, if not corrected on appeal, threaten to wreak havoc beyond the resolution of this long-running dispute.  The proper interpretation of the DMCA's safe harbors is a matter of great significance to copyright owners and all who depend upon just remuneration for the works they invest in and create.  When it enacted the DMCA, Congress knew that the internet had the potential to facilitate copyright infringement on an unprecedented scale.  *See, e.g.,* 144 Cong. Rec. 9242 (1998) (statement of Sen. Thompson) ("Unscrupulous copyright violators can use the Internet to more widely distribute copyrighted material without permission.  To maintain fair compensation to the owners of intellectual property, a regime for copyright protection in the digital age must be created.").  Congress intended the DMCA to ensure shared cooperation between copyright owners and service providers to deal with the unique problems of infringement in the online context.  Among other things, Congress intended for the DMCA to preserve "strong incentives" for service providers and copyright owners "to cooperate to detect and deal with copyright infringements that take place in the digital networked

6

environment." S. Rep. No. 105-190, at 20 (1998) ("Senate Report"). As particularly relevant here, Congress conditioned the § 512(c) and § 512(d) safe harbors on service providers' removing or blocking access to infringing material or activity expeditiously upon (i) obtaining actual or "red flag" knowledge of such infringing material or activity, or (ii) receiving "a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity." 17 U.S.C. §§ 512(c)(1)(A)-(B), 512(d)(1)-(2).

As Congress anticipated (and tried to forestall), the amount of infringing content uploaded, downloaded and streamed through internet sites continues to proliferate at staggering rates.[3] And, regrettably, many service providers are not opposed or even just agnostic to such infringing activity, but instead have "welcomed" it, as the district court once characterized appellees' intent and conduct. *Viacom I*, 718 F. Supp. 2d at 518. Service

---

[3] A January 2011 report on the prevalence of online piracy by MarkMonitor®, now part of Thomson Reuters, found that traffic on "digital piracy" sites it studied in 2010 "was more than 146 million visits per day, representing more than 53 billion visits per year." MarkMonitor®, *Traffic Report: Online Piracy and Counterfeiting*, at 7 (Jan. 2011), *available at* https://www.markmonitor.com/download/report/MarkMonitor_-_Traffic_Report_110111.pdf (last visited Aug. 1, 2013). The same report noted that annual visits to the 10 *least*-visited "digital piracy" sites that MarkMonitor® studied "total[ed] more than 781 million per year, demonstrating that even the lesser-trafficked sites in this category drive significant traffic." *Id*.

providers who welcome infringing activity do so because it redounds to their considerable financial benefit. Access to copyrighted works can lure users who do not want to pay for that content. And the corresponding increase in the base of users so attracted to a site that hosts or links to free content increases the value of the provider's internet business. *See Grokster*, 545 U.S. at 940 ("high-volume" infringing use can drive "the commercial sense of [an] enterprise" and be powerful corroborating evidence of a defendant's intent to induce infringing conduct); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001) ("Napster's future revenue is directly dependent upon increases in userbase. More users register with the Napster system as the quality and quantity of available music increases.") (internal quotations omitted); *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 981 (C.D. Cal. 2006) (granting plaintiffs' summary judgment motion on remand and finding that "the flow of advertising revenue" to defendant StreamCast depended on its "ability to attract a large number of users, which in turn depended on the amount of music available" for free download). It subverts the DMCA to interpret the statute to provide safe harbor protection to providers who intend to reap the benefits of widespread infringing activity but who deliberately blind themselves to the facts that otherwise would trigger their obligations to act under the statute.

The district court described *Grokster* as an "extreme" case and said that it was generally inapposite to the proper interpretation of the safe harbor provisions. *Viacom III*, 2013 WL 1689071, at \*6. The district court's dismissal of *Grokster's* relevance here resembles the court's statements in its first decision that *Grokster* had at most a "strained" application in the DMCA context. *Viacom I*, 718 F. Supp. 2d at 526. The district court's assessments of *Grokster*'s relevance were wrong. *Grokster* has been found directly applicable in numerous cases in which other defendants have tried to build a business based on the mass infringement of copyrighted content. *See, e.g., Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1031-39 (9th Cir. 2013); *Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398, 424-31 (S.D.N.Y. 2011); *Arista Records LLC v. Usenet.com*, 633 F. Supp. 2d 124, 151-54 (S.D.N.Y. 2009). This Court's discussion of *Grokster* in the context of § 512(c)(1)(B) shows that *Grokster* and the concerns that the Supreme Court articulated in that case have great significance for the proper interpretation of the DMCA.

As we demonstrate below, the district court's decision threatens to provide a road map for culpable service providers to argue for safe harbor protection, notwithstanding their unlawful purpose and conduct. While such providers could be ineligible for safe harbor protection for reasons other than

9

those involved in the district court's decision, the fact that the district court's

interpretation could aid such defendants in searching for a § 512 safe harbor

is powerful practical evidence that the court misconstrued the statute and this

Court's *Viacom II* decision.

## II.    The District Court Erred In Interpreting The "Right And Ability To Control" Under § 512(c)(1)(B)

### A.    This Court Held That "Inducement Of Copyright Infringement Under" *Grokster* Could Establish The "Right And Ability To Control" Under § 512(c)(1)(B)

Section 512(c)(1)(B) provides that a service provider seeking safe

harbor protection must demonstrate that it

> does not receive a financial benefit directly attributable to the infringing activity, *in a case in which the service provider has the right and ability to control such activity.*

17 U.S.C. § 512(c)(1)(B) (emphasis added).

The district court's initial grant of summary judgment held that

appellees could not have "the right and ability to control" infringing activity

unless they had particularized knowledge of specific "cases" of

infringement.  The district court said that "the provider must know of the

particular case before he can control it."  *Viacom I*, 718 F. Supp. 2d at 527.

This Court "reject[ed]" the district court's construction on the ground

that it rendered § 512(c)(1)(B) "superfluous."  *Viacom II*, 676 F.3d at 36.

Any defendant with knowledge of particular instances of infringement

10

already would be subject to § 512(c)(1)(A).  This Court held that the "right and ability to control" standard, while modeled on the traditional common law requirement for vicarious copyright liability, was not precisely the same as the common law standard.  *Id*. at 36-38 (citing *Shapiro, Bernstein & Co.*, 316 F.2d at 307).  Specifically, this Court reasoned that the statute presupposes the possibility of safe harbor protection for a service provider who has no more than "the ability to block infringers' access to a particular environment for any reason whatsoever."  *Id*. at 37 (citation and internal quotations omitted).  The Court therefore held "that the 'right and ability to control' infringing activity under § 512(c)(1)(B)"—as opposed to the common law—"requires *something more than the ability to remove or block access* to materials posted on a service provider's website."  *Id*. at 38 (emphasis added) (citations and internal quotations omitted).

The Court did not purport to define everything that could constitute "something more" for purposes of § 512(c)(1)(B).  But the Court did offer two examples of what might establish this "something more."  Notably, the Court said that "inducement of copyright infringement under [*Grokster*], which 'premises liability on purposeful, culpable expression and conduct,' might … rise to the level of control under § 512(c)(1)(B)."  *Id*. at 38 (quoting *Grokster*, 545 U.S. at 937).  The court also cited the example of

11

Cybernet, which had been denied the safe harbor because of its extensive supervision of user content. *Id*. (discussing *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1173 (C.D. Cal. 2002)).

"[P]urposeful, culpable expression and conduct," as in *Grokster*, and the monitoring described in *Cybernet*, this Court explained, were examples of service providers "exerting *substantial influence* on the activities of users, *without necessarily—or even frequently—acquiring knowledge of specific infringing activity*." *Id*. (emphasis added).[4]

### B. The District Court Erroneously Limited The "Right And Ability To Control" To "Participation In, [Or] Coercion Of, User Infringement Activity"

The district court read this Court's discussion of the "something more" cases (*Grokster* and *Cybernet*) to mean that the requisite "right and ability to control" for purposes of § 512(c)(1)(B) exists only where the evidence shows the service provider's "participation in, [or] coercion of, user infringement activity." *Viacom III*, 2013 WL 1689071, at *8. The district court's standard has no basis in, and is in disregard of, this Court's

---

[4] The Ninth Circuit, which originally adopted the same particularized knowledge requirement as the district court, amended its opinion to adopt this Court's "something more" construction of § 512(c)(1)(B). *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, ___ F.3d ___, 2013 WL 1092793, at *19 (9th Cir. Mar. 14, 2013) ("*Veoh*"). The Ninth Circuit made it clear that "something more" could "include purposeful conduct, as in *Grokster*." *Id*.; *see also Fung*, 710 F.3d at 1045.

opinion. This Court's decision makes it clear that *Grokster*-style inducement of infringement can establish the requisite "right and ability to control." That standard requires neither participation nor coercion.

## 1. The "Right And Ability To Control" Does Not Require "Participation In" The Infringing Conduct

The district court said that a provider's "participation in" its users' infringing activity was the primary test for establishing "right and ability to control" under § 512(c)(1)(B). Several statements in the district court's discussion, in fact, suggest that the court viewed participation as the *only* way that a provider could have the "right and ability to control" under that statute. *See Viacom III*, 2013 WL 1689071, at *6 (absent "prescreening content, rendering extensive advice … and editing user content," or active involvement in sale of content, service provider's "*influence on users is not participation in their infringing activity*, and does not amount to the required 'control' beyond the normal ability of every service provider to decide what appears on its platform") (emphasis added); *id*. at *8 ("No reasonable jury could conclude from that evidence that YouTube participated in its users' infringing activity by exercising its editorial control over the site."); *id*. at *9 (court's summary of appellants' evidence and conclusion that none of the evidence showed that YouTube "interacted with infringing users to a point

13

where it might be said *to have participated in their infringing activity*")
(emphasis added).

Nothing in this Court's decision says that a service provider lacks the
"right and ability to control" infringement for purposes of § 512(c)(1)(B)
unless the provider participates in that activity.  Nor does such a requirement
accord with the statute's language, history or structure.  As this Court's
opinion shows, the "right and ability to control" language in § 512(c)(1)(B)
is drawn from the common law test for vicarious liability, one of the
principal tests for establishing secondary copyright liability.  *See Viacom II*,
676 F.3d at 36 (citing *Shapiro, Bernstein & Co.*, 316 F.2d at 307 ("When the
right and ability to supervise coalesce with an obvious and direct financial
interest in the exploitation of copyrighted materials … the purposes of
copyright law may be best effectuated by the imposition of liability upon the
beneficiary of that exploitation.") (citation omitted)).  If a service provider
actively "participates in" infringing activity, then the provider is directly
liable.  *See Screen Gems–Columbia Music, Inc.*, 453 F.2d at 554
("Copyright infringement is in the nature of a tort, for *which all who
participate in the infringement* are jointly and severally liable.") (emphasis
added); *Pearson Educ., Inc. v. Kumar*, 721 F. Supp. 2d 166, 179 (S.D.N.Y.
2010) (defendants "jointly and severally liable" since "[b]oth participated in

14

the sale and/or distribution of the infringing" products).  It would make little

sense for Congress to adopt a standard based on secondary liability in

§ 512(c)(1)(B) if the only service providers who would meet this standard

(and thus be ineligible for the safe harbor defense) would be directly liable.

　　　This Court's opinion did not suggest such a limited reading of

§ 512(c)(1)(B).  The Court's concern instead was that the "right and ability

to control" required to satisfy § 512(c)(1)(B) include "something more" than

the ability to block or remove certain content.  *Viacom II*, 676 F.3d at 37.  It

is a unjustified leap, however, to read that limitation to require that a

defendant participate in, and thus be directly liable for, the underlying

infringement.[5]  Published vicarious liability cases have found the "right and

ability to control" on the part of defendants who had more than just the right

to block infringing activity, but who did something other than participate

directly in that activity.  *See, e.g., Shapiro, Bernstein & Co.*, 316 F.2d at 307

---

[5] The district court opined that its "participation in" standard could be
derived from this Court's discussion of *Cybernet*.  According to the district
court here, the *Cybernet* court held that the provider there "participated in its
users' infringing activity, and exercised the requisite 'something more.'"
*Viacom III*, 2013 WL 1689071, at *6 (citing *Cybernet*, 213 F. Supp. 2d at
1170, 1173, 1181-82).  That is not what the *Cybernet* court said.  The
*Cybernet* court found "little likelihood" that the plaintiff would prevail on its
claim for direct infringement, because Cybernet did not "*actively* engage in
one of the activities recognized in the Copyright Act."  *Cybernet*, 213 F.
Supp. 2d at 1168-69.  *Cybernet* does not support the district court's
"participation in" standard.

(holding the relationship between department store owner and concessionaire within store more analogous to "dance hall" cases, justifying vicarious liability); *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 262-63 (9th Cir. 1996) (swap meet owner could be sued for vicarious liability for vendors' infringing conduct where complaint alleged the owner "controlled and patrolled" the premises, "promoted the swap meet and controlled the access of customers to the swap meet area"). Nothing in the DMCA shows that Congress intended that such indicia of control would be irrelevant to the "right and ability to control" analysis under § 512(c)(1)(B). The district court's "participation in" standard cannot be sustained.

## 2. The "Right And Ability To Control" Does Not Require That Service Providers "Coerce" Their Users' Infringing Conduct

This Court held that "purposeful, culpable expression and conduct" giving rise to *Grokster* inducement liability might show the right and ability to control under § 512(c)(1)(B). *Viacom II*, 676 F.3d at 38. The district court, in contrast, rejected the claim that such inducement liability was sufficient to show the statutory right and ability to control. The court described *Grokster* as "extreme," and said that this Court's citation of it "kept intact" this Court's "'first and most important' determination that the DMCA requires 'actual knowledge or awareness of facts or circumstances

that indicate specific and identifiable instances of infringement' before disqualifying a service provider from the safe harbor."  *Viacom III*, 2013 WL 1689071, at *6 (quoting *Viacom II*, 676 F.3d at 30, 32).  According to the district court, "inducement" meant "coercion of" "infringement activity," or "extensive advice to users regarding content," which the court said was absent from the record.  *Id*. at *6, 8-9.

The district court's apparent equation of inducement with directly "coercing" or coaching users misreads *Grokster*.  The key element of *Grokster* liability is that the defendant have "the *object* of promoting" the use of a device or service for infringement, "as shown by clear expression or other affirmative steps taken to foster infringement."  *Grokster*, 545 U.S. at 919 (emphasis added).  There is no requirement of coercion or coaching—or even of direct contact between a service provider and end-user.  As the Supreme Court explained:

> *Whether the messages were communicated is not to the point on this record*.  The function of the message in the theory of inducement is to prove by a defendant's own statements that his unlawful purpose disqualifies him from claiming protection (and incidentally to point to actual violators likely to be found among those who hear or read the message).  *Proving that a message was sent out, then, is the preeminent but not exclusive way of showing that active steps were taken with the purpose of bringing about infringing acts*, and of showing that infringing acts took place by using the device distributed.

*Id*. at 938 (emphasis added) (citation omitted).

17

The Supreme Court focused on three "particularly notable" pieces of evidence that provided "unmistakable" proof of the *Grokster* defendants' "unlawful objective":  (1) their "aiming to satisfy a known source of demand for copyright infringement"; (2) their failure "to develop filtering tools or other mechanisms to diminish the infringing activity using their software"; and (3) the fact that "the commercial sense of their enterprise turns on high-volume use, which the record shows is infringing."  *Id*. at 939-40.  None of these elements required coercing, coaching or directly urging end-users to infringe.

### C.   The District Court's "Participation Or Coercion" Test Threatens To Give *Grokster* Inducers An Unjustified Argument That They Lack "The Right And Ability To Control" Infringement For Purposes Of § 512(c)(1)(B)

If applied broadly, the district court's interpretation of the "right and ability to control" prong of 17 U.S.C. § 512(c)(1)(B) threatens to extend arguments for safe harbor liability limitations to service providers whom Congress never intended to protect.

For example, the district court's "right and ability to control" reasoning analysis would have provided an argument for safe harbor protection to some of the defendants in the very case whose evidence this Court said might show the "right and ability" required under § 512—the *Grokster* defendants.  *Viacom II*, 676 F.3d at 38.  The *Grokster* defendants

18

did not "coerce" their users to infringe copyrighted works or actively "participate in" their users' mass infringements.  On the contrary, the *Grokster* defendants deliberately structured their services to operate in a decentralized manner, so that the actual infringing reproductions would take place through the end-users' computers, thereby aiding the defendants' façade that they lacked control over their users' infringing actions.  *See Grokster*, 545 U.S. at 924-25.

Under the Supreme Court's decision, the fact that the defendants did not send or receive infringing files was not determinative; nor was the absence of messages to users urging them to infringe.  *See Grokster*, 545 U.S. at 938.  The district court's reasoning in this case, in contrast, would have made such factors controlling on the defendants' "right and ability to control" under § 512.

The *Grokster* defendants were not unique in trying to evade copyright liability by avoiding direct participation in their users' infringing acts.  The defendants in *Arista Records v. Lime Group* desired to capture the large base of infringing Napster users (as did the *Grokster* defendants), relied on infringing conduct to grow their business, optimized the LimeWire service to appeal to users who wanted to infringe, and failed to implement meaningful mechanisms to deter infringing conduct.  *See* 784 F. Supp. 2d at

19

426-31.  The district court in that case found overwhelming, undisputed evidence that the Lime Wire defendants "engaged in purposeful conduct that fostered infringement, with the intent to foster such infringement."  *Id*. at 431.  Although the court's opinion also described evidence of "several online communications" involving Lime Wire's technical employees assisting some users in infringing, by "offer[ing] technical information about the system's functionality," *id*. at 428, that assistance was not the *sine qua non* of inducement liability under the district court's application of *Grokster* in that case.  The contacts instead simply provided additional corroborating proof of the Lime Wire defendants' unlawful objectives.

Similar to the defendants in *Grokster* and *Lime Group*, the defendants in *Arista Records v. Usenet.com*, engaged in purposeful, expressive conduct to ensure the use of their services by known infringers.  *See* 633 F. Supp. 2d at 152-53.  The *Usenet* defendants did even more than refrain from developing filters to limit the infringing conduct they desired to occur: "Defendants had developed such tools, but declined to use them when to do so would have harmed their business model and customer base."  *Id*. at 153.  In *Usenet*, this selective deployment of filtering technology provided powerful corroborating evidence of intentional inducement.  Under the district court's reasoning in this case, a defendant's decision to selectively

20

filter "do[es] not exclude it from the safe harbor, regardless of [its] motivation." *Viacom III*, 2013 WL 1689071, at *8.

In sum, the district court's interpretation of § 512(c)(1)(B) cannot be squared with this Court's decision citing *Grokster*, with *Grokster* itself, or with other cases following *Grokster*.

## III. The District Court Erred In Interpreting Willful Blindness Under § 512(c)(1)(A)

### A. This Court Held That Willful Blindness Could Appropriately "Demonstrate Knowledge Or Awareness Of Specific Instances Of Infringement" Under § 512(c)(1)(A)

This Court held that "the willful blindness doctrine may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of specific instances of infringement under the DMCA." *Viacom II*, 676 F.3d at 35. The Court said that § 512(m)(1)—which provides that the safe harbors are not conditioned on the "service provider monitoring its service or affirmatively seeking facts indicating infringing activity"—"is incompatible with a broad common law duty to monitor." *Id*. (quoting 17 U.S.C. § 512(m)(1)). But the Court was clear that "willful blindness cannot be defined as an affirmative duty to monitor," and hence that § 512(m)(1) does not render willful blindness a nullity under the DMCA. *Id*.

This Court's holding that willful blindness may appropriately be equated with actual knowledge of specific infringements is consistent with

long-standing authority. In *Global-Tech*, the Supreme Court explained that willful blindness—whereby "persons who know enough to blind themselves to direct proof of critical facts in effect have actual knowledge of those facts"—has deep roots in the law. *Global-Tech*, 131 S. Ct. at 2069. The Court held that willful blindness was tantamount to knowledge for purposes of a claim for inducing patent infringement. *Id*. In so doing, the Court specifically rejected the argument that equating willful blindness with knowledge was inconsistent with the *Grokster* decision. *Id*. at 2070. Likewise, in one of the earliest cases involving secondary liability for websites that intentionally support infringing conduct, Judge Posner wrote that "a deliberate effort to avoid guilty knowledge is all that the law requires to establish a guilty state of mind," and "[w]illful blindness is knowledge, in copyright law … as it is in the law generally." *Aimster*, 334 F.3d at 650. The Seventh Circuit rejected Aimster's DMCA defense, because, *inter alia*, Aimster employed encryption technology so as to disable itself "from doing anything to prevent infringement." *Id*. at 655*; see also, e.g.*, *Usenet*, 633 F. Supp. 2d at 154 ("Turning a 'blind eye' to infringement has also been found to be the equivalent of knowledge.") (citing *Aimster*). And this Court, in *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93 (2d Cir. 2010), held that "[t]he principle that willful blindness is tantamount to knowledge is hardly novel";

22

this Court held that a service provider who willfully blinded itself to
counterfeit goods on its website would have the requisite knowledge for
indirect liability for trademark infringement. *Id*. at 109-10 n.16; *see also
Capitol Records, Inc. v. MP3Tunes, LLC*, No. 07 Civ. 9931 (WHP), 2013
WL 1987225, at *2-3 (S.D.N.Y. May 14, 2013) (reconsidering, in light of
*Viacom II*, district court's prior summary judgment ruling that defendants
were not willfully blind; and holding that evidence was sufficient to show
that "MP3tunes 'engaged in a deliberate effort to avoid guilty knowledge'"
of infringements of specific content) (quoting *Viacom II*, 676 F.3d at 35).

This Court's willful blindness holding in *Viacom II* furthers
Congress's intent behind the safe harbor provisions. The legislative history
confirms that Congress intended for § 512(c)(1)(A)(ii) to create a "red flag"
test: "[I]f the service provider becomes aware of a 'red flag' from which
infringing activity is apparent, it will lose the limitation of liability if it takes
no action." Senate Report at 44; H.R. Rep. No. 105-551, pt. 2, at 53 (1998)
("House Report"). The legislative history shows that a service provider can
acquire "red flag" knowledge regardless of whether the copyright owner has
notified the provider of the infringing material:

> A service provider wishing to benefit from the limitation on
> liability under subsection (c) must "take down" or disable
> access to infringing material residing on its system or network
> of which it has actual knowledge or that meets the "red flag"

23

test, *even if the copyright owner or its agent does not notify it of a claimed infringement.*

Senate Report at 45 (emphasis added); House Report at 54 (same).

In sum, the willful blindness doctrine has significant vitality for furthering Congress's clear intent in the safe harbor provisions.

> **B.    The District Court Rendered "Willful Blindness" A Nullity Under The DMCA By Requiring Proof That The Defendant Actually Knew The Specific Fact To Which It Tried To Blind Itself**

The district court held that appellants' evidence did not create a triable issue on "willful blindness" because appellees "at most" had "information that infringements were occurring with particular works, and occasional indications of promising areas to locate and remove them." *Viacom III*, 2013 WL 1689071, at *4. Such evidence was insufficient, the district court held, because "[t]he specific locations of infringements [were] not supplied" to appellees. *Id.*

The district court's analysis effectively nullifies willful blindness under the DMCA. As the Supreme Court has explained, the crux of the willful blindness inquiry is the defendant's "subjective[] belie[f]" of a "high probability that a fact exists," and the defendant's taking "deliberate actions to avoid learning of that fact." *Global-Tech*, 131 S. Ct. at 2070. For purposes of the DMCA § 512(c) safe harbor, one important fact is the

24

specific location of infringing material; when a service provider knows that

fact, the provider must act expeditiously to remove that material in order to

be eligible for the safe harbor.  17 U.S.C. § 512(c)(1)(A)(iii).  If the service

provider knows where infringing material is located, then the provider

already has actual knowledge under § 512(c)(1)(A)(i).  In other words, for

purposes of the knowledge element at issue here—knowledge of the specific

location of infringing material—the information the district court required

the provider to have was the same information that the provider deliberately

tried to avoid.  In a different case, a provider might try to avoid obtaining a

different piece of information important to its liability, but the error of the

district court's logic is the same in either case:  requiring actual knowledge

of the fact to be avoided renders willful blindness a nullity.  The district

court's holding cannot be the law.

The district court said that its willful blindness holding was compelled

by the fact that 17 U.S.C. § 512(m) does not make affirmative monitoring a

condition of safe harbor protection.  *Viacom III*, 2013 WL 1689071, at *8.

The district court misread § 512(m).  As the leading copyright commentator

(quoting this Court's holdings) has explained, § 512(m) "only relieves

[service providers] of affirmative obligations"—the statute does not shield

service providers from acquiring knowledge "'of the particular [infringing]

25

transaction[s] by looking the other way.'"  4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12B.04[A][1][b][iii], at 12B-64-65 (Matthew Bender, Rev. Ed.) (quoting *Viacom II*, 696 F.3d at 35 (in turn quoting *Tiffany*, 600 F.3d at 109)).

### C.    The District Court's Willful Blindness Standard Threatens To Extend Safe Harbor Protection To Undeserving Service Providers

Like its reading of § 512(c)(1)(B), the district court's interpretation of willful blindness threatens to arm service providers whom Congress did not intend to protect with arguments for safe harbor protection.  The district court's standard is irreconcilable with cases that have found safe harbors inapplicable to service providers who deliberately have taken steps to avoid confirmatory knowledge of facts they strongly believe to exist.

In *Aimster*, for example, the defendant's software encrypted user communications so the defendant would not know what files his users were copying.  The Seventh Circuit held that the defendant could not rely on the ignorance it claimed as a result of the encrypted communications "to prevent himself from learning what surely he strongly suspects to be the case." *Aimster*, 334 F.3d at 650.  The defendant's deliberate decision to take away the ability to "do[] anything to prevent infringement" made the defendant ineligible for the DMCA's safe harbor.  *Id.* at 655.

26

Under the district court's reasoning, however, a defendant's ignoring or evading strong evidence indicating user infringement of "particular works" and "promising areas to locate and remove" those infringements cannot rise to the level of willful blindness under the DMCA. *Viacom III*, 2013 WL 1689071, at *4. That decision, too, is inconsistent with precedent and makes no policy sense.

## CONCLUSION

*Amici* respectfully submit that this Court should reverse the district court's judgment.

DATED:  August 2, 2013                    Respectfully submitted,

                                          */s/ Kelly M. Klaus*
                                          KELLY M. KLAUS

Susan Cleary                              Kelly M. Klaus
Vice President & General Counsel          Munger, Tolles & Olson LLP
Independent Film & Television Alliance    355 South Grand Avenue, 35th Floor
10850 Wilshire Boulevard                  Los Angeles, California 90071
Los Angeles, California  90024            (213) 683-9100
(310) 446-1003

Counsel for *Amicus* IFTA                 Counsel for *Amicus* MPAA

27

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32

Pursuant to Rule 32 of the Federal Rules of Appellate Procedure, I certify that:

1.      This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains 5,916 words (based on the Microsoft Word word-count function), excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii); and

2.      This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in 14 point Times New Roman type.


Dated:  August 2, 2013

                                         */s/ Kelly M. Klaus*
                                         KELLY M. KLAUS

# CERTIFICATE OF SERVICE

I hereby certify that on this second day of August, 2013, a true and correct copy of the foregoing Brief for Motion Picture Association of America, Inc. and Independent Film & Television Alliance as *Amici Curiae* Supporting Appellants was served on all counsel of record in this appeal via CM/ECF pursuant to Second Circuit Rule 25.1(h)(1)-(2).

Dated:  August 2, 2013

/s/  Kelly M. Klaus
KELLY M. KLAUS