# 13-1720-cv

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

VIACOM INTERNATIONAL, INC., COMEDY PARTNERS, COUNTRY MUSIC TELEVISION, INC., PARAMOUNT PICTURES CORPORATION, AND BLACK ENTERTAINMENT TELEVISION, LLC

*Plaintiffs-Appellants,*

v.

YOUTUBE, INC., YOUTUBE, LLC, AND GOOGLE, INC.

*Defendants- Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF OF *AMICI CURIAE* AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS, BROADCAST MUSIC, INC., THE RECORDING INDUSTRY ASSOCIATION OF AMERICA, AND SESAC, INC. IN SUPPORT OF APPELLANTS AND REVERSAL**

MITCHELL SILBERBERG & KNUPP LLP

RUSSELL J. FRACKMAN
11377 West Olympic Boulevard
Los Angeles, California 90064
Telephone: (310) 312-2000

J. MATTHEW WILLIAMS
1818 N Street, N.W., 8th Floor
Washington, D.C. 20036
Telephone: (202) 355-7900

*Attorneys for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, to enable judges and magistrates of the Court to evaluate possible disqualification or recusal, the undersigned attorney of record for *Amici Curiae* certifies as follows:

1.      The American Society of Composers, Authors and Publishers (ASCAP) has no parent corporation, and no publicly held company holds more than 10% of its stock.

2.      Broadcast Music, Inc. (BMI) has no parent corporation.  The only publicly held company that directly or indirectly owns 10% or more of its stock is Gannett Co., Inc., through an indirect, wholly owned subsidiary.

3.      The Recording Industry Association of America (RIAA) has no parent corporation, and no publicly held company holds more than 10% of its stock.

4.      SESAC, Inc. (SESAC) has no parent corporation, and no publicly held company holds more than 10% of its stock.

DATED: August 2, 2013          MITCHELL SILBERBERG & KNUPP LLP
                               Russell J. Frackman
                               J. Matthew Williams


                               By:  /s/ Russell J. Frackman
                                    Russell J. Frackman
                                    rjf@msk.com

                               Attorneys for *Amici Curiae*

# TABLE OF CONTENTS

INTERESTS OF *AMICI CURIAE* ............................................................ 1

SUMMARY OF ARGUMENT ............................................................ 7

ARGUMENT ............................................................ 10

    I.    The District Court Erroneously Held That Intentionally
        Encouraging Infringement Is Not Evidence Of An Ability To
        Control It Absent Evidence Of Knowledge Of Specific Acts Of
        Infringement. ............................................................ 10

    II.    The District Court Ignored *Grokster* And Misconstrued *Viacom II*
        By Conflating Inducement With Active Editorial Control. .............. 15

    III.    The District Court Failed To Take Into Account That Defendants'
        Refusal To Implement Filtering Technology Is An Important
        Element Of Inducement And Control. ................................................ 17

CONCLUSION ............................................................ 22

CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF
    APPELLATE PROCEDURE 32(A) ............................................................ 23

CERTIFICATE OF SERVICE ............................................................ 24

# TABLE OF AUTHORITIES

## CASES

*A&M Records, Inc. v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001) .............................................................3

*A&M Records, Inc. v. Napster, Inc.*,
  284 F.3d 1091 (9th Cir. 2002) ...........................................................18

*ALS Scan, Inc. v. RemarQ Communities, Inc.*,
  239 F.3d 619 (4th Cir. 2001) .............................................................22

*Arista Records LLC v. Lime Group LLC*,
  784 F. Supp. 2d 398 (S.D.N.Y. 2011) ...................................19, 20, 21

*Arista Records LLC v. Usenet.com, Inc.*,
  633 F. Supp. 2d 124 (S.D.N.Y. 2009) ................................................21

*Arista Records LLC v. Usenet.com, Inc.*,
  608 F. Supp. 2d 409 (S.D.N.Y. 2009) ................................................19

*Columbia Pictures Indus. v. Fung*,
  96 U.S.P.Q. 2d (BNA) 1620 (C.D. Cal. 2009) ..................................12

*Columbia Pictures Indus. v. Fung*, 710 F.3d 1020 (9th Cir. 2013) .......................12

*Famous Music Corp. v. Bay State Harness Horse Racing & Breeding Ass'n, Inc.*,
  554 F.2d 1213 (1st Cir. 1977) .............................................................3

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*,
  443 F.2d 1159 (2d Cir. 1971) .............................................................3

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005).................................................................passim

*Perfect 10, Inc. v. CCBill LLC*,
  488 F.3d 1102 (9th Cir. 2007) ...........................................................15

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
    213 F. Supp. 2d 1146 (C.D. Cal. 2002) ................................................8, 9, 15, 16

*Shapiro, Bernstein & Co. v. H.L. Green Co.*,
    316 F.2d 304 (2d Cir. 1963) ....................................................................................3

*Viacom Int'l, Inc. v. YouTube, Inc.*,
    676 F.3d 19 (2d Cir. 2012) ..........................................................................passim

*Viacom Int'l, Inc. v. YouTube, Inc.*,
    107 U.S.P.Q. 2d (BNA) 1157 (2013) ..........................................................passim

*Viacom Intn'l, Inc. v. YouTube, Inc.*,
    718 F. Supp. 2d 514 (S.D.N.Y. 2010) ...............................................................18

## STATUTES

17 U.S.C.,
    § 512(i)......................................................................................................18
    § 512(c)(1)(A)(i) and (ii) ......................................................................11
    § 512(c)(1)(B) ..............................................................................passim
    § 512(m)..............................................................................................18, 19

## OTHER AUTHORITIES

Amir Efrati, *Google Takes 7% Stake In Vevo*, WALL ST. J., July 3, 2013 ...............4

Daniel Hurwitz, *Watch: YouTube's Most Popular Videos of 2012*, USA TODAY,
    Dec. 21, 2012 ........................................................................................................3

Ed Christman, *RIAA & NMPA Eyeing Simplified Music Licensing System, Could
    Unlock 'Millions' In New Revenue*, BILLBOARD, June 13, 2013........................5

Jon Healy, *A Non-SOPA Broadside Aimed At Online Piracy Hotbeds*, L.A. TIMES,
    July 15, 2013........................................................................................................6

Mathew Karnitschnig & Julia Angwin, *Media Firms Say Google Benefited From
    Film Piracy*, WALL ST. J., Feb. 12, 2007............................................................6

Press Release, RIAA, *Streaming Music and Investment*, Dec. 20, 2012...................5

iv

Press Release, RIAA, *One Year, 20 Million Links To Illegal Songs Sent To Google: This Is How It's Supposed To Work?*, May 22, 2013 ........................... 13

Press Release, RIAA, *Some Clear Facts About Google's "Transparency" Report*, May 30, 2012 ................................................................................. 14

Report on the Digital Millennium Copyright Act of 1998, H.R. Rep. No. 105-551, Pt. 2, 105th Cong., 2d Sess. (1998) ...................................................... 14, 18, 20

## INTERESTS OF *AMICI CURIAE*

With the consent of all parties, *Amici Curiae* the American Society of Composers, Authors and Publishers ("ASCAP"), Broadcast Music, Inc. ("BMI"), the Recording Industry Association of America ("RIAA"), and SESAC, Inc. ("SESAC"), respectfully submit this brief in support of Appellants and reversal.[1] *Amici* are associations and organizations whose members create and disseminate a wide variety of musical compositions and sound recordings. *Amici* and their members also license their music to a variety of third parties, including to internet service providers that offer legitimate digital services to consumers. As organizations whose purpose is to protect the ability to license and receive fair remuneration for the exploitation of copyrighted, creative content, *Amici* are uniquely situated to articulate for the Court the widespread harm to creators and copyright owners – including musicians, songwriters, record labels, and music publishers – that would be caused by affirming the district court's erroneous opinion.

ASCAP, BMI, and SESAC are performing rights organizations ("PROs"). Their mission is to enable songwriters, composers, lyricists, and music publishers to receive fair remuneration for the public performances of their works. Together,

---

[1] Pursuant to F.R.A.P. 29(c)(5) and Local Rule 29.1, *Amici* state that counsel for the parties have not authored this brief in whole or in part. No one other than *Amici* and their members contributed money that was intended to fund preparing or submitting this brief.

the PROs represent more than one million music copyright owners and creators, who grant the PROs the nonexclusive right to license non-dramatic public performances of their many millions of copyrighted works. The PROs in turn offer blanket licenses to parties seeking to perform these works, conferring the right to perform, for the stated term, any and all of the millions of musical works owned by PRO members. A wide variety of licensees take advantage of these blanket licenses, including internet service providers, wireless providers and websites, cable and satellite television providers, television and radio stations, restaurants, hotels, and sports arenas.

The Recording Industry Association of America (RIAA) is the trade organization that supports and promotes the creative and financial vitality of the major recorded music companies. Its members are the music labels that comprise the most vibrant record industry in the world. RIAA members create, manufacture and/or distribute approximately 85% of all legitimate recorded music produced and sold in the United States. In support of its members, the RIAA works to protect the intellectual property and First Amendment rights of artists and music labels; conduct consumer, industry and technical research; and monitor and review state and federal laws, regulations and policies. The RIAA protects the ability of the music business to invest in new artists and new music and, in the digital arena, to give online services space to continue to prosper.

2

For over a century, in contexts ranging from dancehalls to community concerts to racetracks to the Internet, courts have recognized that performing or making infringing music available is a significant "draw" that provides a financial benefit. *See, e.g.*, *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963) ("[T]he cases are legion which hold the dance hall proprietor liable for the infringement of copyright resulting from the performance of a musical composition by a band … whose activities provide the property with a source of customers and enhanced income."); *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1163 (2d Cir. 1971) (supervisor of community concerts derived "financial benefit from the actions of the primary infringers" performing infringing music); *Famous Music Corp. v. Bay State Harness Horse Racing & Breeding Ass'n, Inc.*, 554 F.2d 1213, 1214 (1st Cir. 1977) (racetrack derived financial benefit from playing infringing music while patrons were not "absorbed in watching the races"); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001) ("More users register with the Napster system as the 'quality and quantity of available music increases.'") (citation omitted).  It is undeniable that accessing professionally produced copyrighted content, such as the songs, recordings and music videos produced by *Amici*'s members, is a primary driver of internet growth (as well as the popularity of Defendant YouTube's website).  *See* Daniel Hurwitz, *Watch: YouTube's Most Popular Videos of 2012*,

3

USA TODAY, Dec. 21, 2012 ("This year, high-quality original video content pushed aside YouTube's standard, homemade hits.").[2]  Given the high level of consumer demand for professionally produced content, *Amici* and their members have embraced a variety of methods for disseminating their copyrighted works.[3]

Following its acquisition by Defendant Google, but well after much of the infringement at issue in this case took place, YouTube invested substantial resources in creating and implementing a filtering system in order to facilitate copyright licensing and protection.  RIAA member companies then licensed certain uses of their recordings on the YouTube.com website.  And recently, they entered a joint venture with Google whereby professionally produced music videos may be viewed on the Vevo.com website (also accessible as a "channel" on the YouTube.com website).  *See* Amir Efrati, *Google Takes 7% Stake In Vevo*, WALL ST. J., July 3, 2013 ("Vevo has long been the most-viewed 'channel' on YouTube, according to comScore.").[4]  RIAA also has announced, along with the National Music Publishers' Association ("NMPA"), an effort to establish a micro-licensing system that will make it easier for occasional online users of music to obtain

---

[2] Available at:  http://www.usatoday.com/story/life/tv/2012/12/17/top-10-youtube-clips-of-2012/1775693/.

[3] For a list of licensed and legitimate online music services *see* Music Matters, Find Music, http://whymusicmatters.com/find-music.

[4] Available at:  http://blogs.wsj.com/digits/2013/07/03/google-takes-7-stake-in-vevo/.

licenses at affordable prices. *See* Ed Christman, *RIAA & NMPA Eyeing Simplified Music Licensing System, Could Unlock 'Millions' In New Revenue*, BILLBOARD, June 13, 2013.[5]  Efforts like these, as well as the availability of blanket licenses from the PROs and the success of digital music streaming services, have led to a rise in investments in online music services by venture capital firms and media companies. *See* Press Release, RIAA, *Streaming Music and Investment*, Dec. 20, 2012 ("[V]enture capital investment in the music arena shot past half a billion dollars in 2012.").[6]

The instant case involves unlicensed, unauthorized acts of infringement that occurred in the early, lawless days of YouTube.  It is of paramount importance for the courts to correctly interpret and apply the safe harbors available under the Online Copyright Infringement Liability Limitation Act ("OCILLA") to these facts, otherwise this case will stand as a bellweather for infringers who continue to ply their activities unabated by the law.  Unfortunately, despite the best efforts by copyright owners to increase the availability of their works through licensed services, unlawful competition from infringers nevertheless continues to inhibit optimal growth of authorized online services.   Much of this infringement is

---

[5] Available at:  http://www.billboard.com/biz/articles/news/record-labels/1566550/riaa-nmpa-eyeing-simplified-music-licensing-system-could.

[6] Available at:  http://www.riaa.com/blog.php?content_selector=riaa-news-blog&blog_selector=Streaming-Music-and-Investment&news_month_filter=12&news_year_filter=2012.

facilitated by companies operating as "user generated" content websites, search engines, and advertising brokers, that resist doing what they can do to limit infringement. *See, e.g.,* Jon Healy, *A Non-SOPA Broadside Aimed At Online Piracy Hotbeds*, L.A. TIMES, July 15, 2013 (stating that Google only recently agreed to follow a set of best practices and to decline to do business with websites "principally dedicated to selling counterfeit goods or engaging in copyright piracy").[7]  In some circumstances, companies even go so far as to intentionally design their services in order to take advantage of the demand for access to infringing files by aiding and abetting pirates. *See, e.g.*, Mathew Karnitschnig & Julia Angwin, *Media Firms Say Google Benefited From Film Piracy*, WALL ST. J., Feb. 12, 2007 (citing "sworn statements" by defendants in a copyright infringement lawsuit that, in order to help the defendants increase advertising revenue on pirate sites, "Google supplied them with keywords, including terms such as 'bootleg movie download,' 'pirated,' and 'download harry potter movie,' which boosted traffic to their sites").[8]  This conduct stalls normal licensing negotiations in the digital world, depriving copyright owners of important sources of revenue and unfairly disadvantaging those service providers that cooperate to limit infringement and provide access to authorized content.

---

[7] Available at:  http://www.latimes.com/news/opinion/opinion-la/la-ol-online-advertising-movie-music-piracy-20130715,0,6509412.story.

[8] Available at:  http://online.wsj.com/article/SB117125197567105533.html.

*Amici* submit this brief to comment specifically on the district court's erroneous interpretation and misapplication of this Court's analysis in *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 36-38 (2d Cir. 2012) ("*Viacom II*") of the "right and ability to control" standard under 17 U.S.C. § 512(c)(1)(B).  The district court blatantly misconstrued *Viacom II*'s holding that evidence of inducement of copyright infringement under *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 937 (2005) is indicative of an ability to control infringement. The lower court's holding effectively converts the safe harbors from a system of balanced responsibilities shared between internet services and copyright owners into a one-sided notice and takedown statute, contrary to Congressional intent. Such a regime would open the floodgates to widespread infringement online.   It excuses the service provider, the one entity with the best ability to control the infringing content before it is widely disseminated, from any obligations except mopping up belatedly after infringements occur in response to takedown notices. And, it removes any incentive for the service provider to cooperate with copyright owners to do what it can to limit ongoing infringement.  *Amici* respectfully ask the Court to reverse.

## <u>SUMMARY OF ARGUMENT</u>

In *Viacom II*, this Court provided two non-exhaustive "examples" of conduct that "substantially influences," and thus evidences an ability to control

7

infringement. *Viacom II*, 676 F.3d at 38. The first example was conduct analogous to the acts of the defendant in *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146 (C.D. Cal. 2002). *Id.* The second example was inducing copyright infringement. *Id.*(citing *Grokster*, 545 U.S. at 937).

With respect to the first example, the Court explained that in *Cybernet* the defendant exercised editorial control over its website. *Id*. "[T]he service provider instituted a monitoring program by which user websites received 'detailed instructions regard[ing] issues of layout, appearance, and content'" while "forb[idding] certain types of content and refus[ing] access to users who failed to comply with its instructions." *Id.* With respect to the second example, the Court stated: "inducement of copyright infringement under [*Grokster*,] which 'premises liability on purposeful, culpable expression and conduct,' might also rise to the level of control under § 512(c)(1)(B)." *Id*. The district court erroneously conflated the two distinct examples of control enunciated in *Viacom II* by largely ignoring the elements and the facts establishing inducement under *Grokster*. *Viacom Int'l, Inc. v. YouTube, Inc.*, 107 U.S.P.Q. 2d (BNA) 1157, 1163-65 (2013) ("*Viacom III*"). Instead, the district court wrongly used this Court's reference to *Grokster* to once again import a specific knowledge requirement into the right and ability to control analysis, rendering that prong of the safe harbor superfluous, in direct

8

conflict with this Court's holding in *Viacom II*.  *Compare id. with Viacom II*, 676 F.3d at 36.

Defendants here possessed the right and ability to control infringement on the YouTube.com website under both the *Grokster* and the *Cybernet* standards. *See* Appellants' Opening Brief at 26-28. In this brief *Amici* urge the Court to elaborate on its reference in *Viacom II* to the inducement theory.  There is more than enough evidence for a jury to reasonably conclude that YouTube and Google's "words and deeds" were directed to promoting infringement in order to earn revenues from delivering advertising to huge numbers of consumers who undeniably were drawn to the service by the availability of the infringing, copyrighted content. *See Grokster*, 545 U.S. at 938-39 ("aiming to satisfy a known source of demand for copyright infringement" when the "commercial sense of [an] enterprise turns on high-volume use" is evidence of "a purpose to cause copyright violations").  Properly analyzed under the *Grokster* standard, Google and YouTube's conduct evidences they intended to promote their service to encourage copyright infringement.  That constitutes control.

## ARGUMENT

**I.    The District Court Erroneously Held That Intentionally Encouraging Infringement Is Not Evidence Of An Ability To Control It Absent Evidence Of Knowledge Of Specific Acts Of Infringement.**

The district court largely ignored this Court's instruction to consider evidence of inducement under *Grokster* when analyzing whether Defendants had the ability to control infringement, while giving little more than lip service to the issue (and then misinterpreting its significance). The district court erroneously construed this Court's reference to *Grokster* to import a knowledge requirement into the ability to control analysis.

> By its example of the extreme *Grokster* case as what "might also rise to the level of control under § 512(c)(1)(B)" (676 F.3d at 38), the Viacom Court of Appeals kept intact its "*first and most important*" determination (*id.* at 30) that the DMCA requires "*actual knowledge or awareness of facts or circumstances that indicate specific and identifiable instances of infringement*" before disqualifying a service provider from the safe harbor (*id.* at 32).

*Viacom III*, 107 U.S.P.Q. 2d (BNA) at 1163 (emphasis added). This paltry analysis flatly contradicts *Viacom II*'s instruction that inducement is an example of "a service provider exerting substantial influence on the activities of users, without necessarily – or even frequently – acquiring knowledge of specific infringing activity." *Viacom II*, 676 F.3d at 38. As a result, *Viacom II* pointedly noted that the district court previously "erred by importing a specific knowledge requirement

10

into the control and benefit provision[.]"  *Id.* at 36.  The district court's new opinion cannot be squared with this Court's holding.

The district court's error appears to be derivative of a conclusion that the requirements for proving (or disproving) actual or red flag knowledge under §512(c)(1)(A)(i) and (ii) somehow carry over into the right and ability to control analysis under § 512(c)(1)(B).[9]  The district court took the highlighted language quoted above from the section of *Viacom II* that dealt with knowledge and not right and ability to control.  The context in which this Court used that language is clear from the sentence preceding and introducing the italicized excerpts and that specifically references the statutory provision that deals with knowledge:  "*Based on the text of § 512(c)(1)(A)*, as well as the limited case law on point, we affirm the District Court's holding that actual knowledge or awareness of facts or circumstances that indicate specific and identifiable instances of infringement will disqualify a service provider from the safe harbor."  *Viacom II*, 676 F.3d at 31 (emphasis added).  That has nothing to do with control.

Critically, the Supreme Court in *Grokster* did not consider, much less require, specific knowledge as an element of inducement.  Whereas the Ninth Circuit in *Grokster* had held that "distribution of a commercial product capable of

---

[9] For a more detailed description of the statutory scheme, *see Viacom II*, 676 F.3d at 26-28.

substantial noninfringing uses could not give rise to contributory liability for infringement unless the distributor had actual knowledge of specific instances of infringement and failed to act on that knowledge," the Supreme Court reversed and vacated that holding. *Grokster*, 545 U.S. at 927-941. The Court ruled that liability for inducement may attach where "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." *Id.* at 919. In other words, "[a]n unlawful objective to promote infringement can be shown by a variety of means." *Columbia Pictures Indus. v. Fung*, 96 U.S.P.Q. 2d (BNA) 1620, 1631 (C.D. Cal. 2009), *aff'd in part, vacated in part by* 710 F.3d 1020 (9th Cir. 2013).

As the Ninth Circuit recently held, echoing *Viacom II*, a plaintiff need not prove that a defendant induced specific acts of infringement by encouraging them, much less that a defendant *knew* of specific infringing acts. *Fung*, 710 F.3d at 1037, 1046 (citing *Viacom II*, 676 F.3d at 38). Instead, a plaintiff need only point to evidence of a defendant's intent and that "acts of infringement by third parties were caused by the product distributed or services provided." *Id.* at 1037.[10] Therefore, under *Viacom II*, *Fung* and *Grokster*, the district court erred by

---

[10] In reaching this holding, the Ninth Circuit expressly rejected Google's contrary position in this case, which was before the Ninth Circuit in an *amicus* brief filed by the company in *Fung*. *Fung*, 710 F.3d at 1037.

concluding that Defendants' conscious "motivation" to "welcom[e]" infringement (*Viacom III*, 107 U.S.P.Q. 2d (BNA) at 1164-65) was irrelevant because he believed there was no evidence that Defendants knowingly induced specific acts of infringement.

For that reason, the district court's discussion of Defendants' responses to takedown notices in the section of its opinion on § 512(c)(1)(B) is entirely misplaced. *See Viacom III*, 107 U.S.P.Q. 2d (BNA) at 1164-65. The district court appeared to be perfectly comfortable with the fact that "evidence proves that YouTube *for business reasons* placed much of the 'burden on Viacom and the other studios to search YouTube 24/7 for infringing clips." *Id.* at 1161, 1165 (emphasis added). In the district court's view, "that is where the burden lies under the safe harbor" and it is "entirely workable" for a copyright owner to provide a website provider with thousands of takedown notices per day. *Id.* But *Viacom II* provides no support for the district court's formulation.[11] In fact, this Court made it

---

[11] The notice and takedown process is far from "entirely workable." *See Viacom III*, 107 U.S.P.Q. 2D (BNA) at 1161. It is cumbersome, burdensome, ineffective, extremely costly, and often futile. As *Amici* explained in their brief in support of Appellants in the appeal that led to the *Viacom II* decision, *Amici* invest enormous amounts of time and money into notice and takedown. Nevertheless, access to infringing files and services remains widespread. Google's own search engine notice and takedown practices are indicative of the hurdles copyright owners face. *See* Press Release, RIAA, *One Year, 20 Million Links To Illegal Songs Sent To Google: This Is How It's Supposed To Work?*, May 22, 2013 (explaining that RIAA sent Google over twenty million takedown notices in one year because the same works are continuously infringed on websites accessible through Google's

clear that the OCILLA is to be interpreted so that each disqualifying prong set forth in the statute stands independently and must be given its own weight.  *See Viacom II*, 676 F.3d at 36 (discussing knowledge and right and ability to control: "statutory interpretations that render language superfluous are disfavored"); *see also* House Committee on Commerce, Report on the Digital Millennium Copyright Act of 1998, H.R. Rep. No. 105-551, Pt. 2, 105th Cong., 2d Sess., at 54 (1998) ("The Committee emphasizes that new Section 512 does not specifically mandate use [by copyright owners] of a notice and takedown procedure.").

*Viacom II* held that evidence a defendant induced infringement, under *Grokster*, "which premises liability on purposeful, culpable expression and conduct, might also rise to the level of control." *Viacom II*, 676 F.3d at 38.  This Court concluded that although the statute requires "something more than the ability to remove or block access to materials posted on a service provider's website," (*id.*) that ability combined with "words and deeds" (*Grokster*, 545 U.S. at 941) inducing infringement is indicative of control. *Viacom II*, 676 F.3d at 38.  In

---

search engine), *available at* http://www.riaa.com/blog.php?content_selector=riaa-news-blog&blog_selector=One-Year-&news_month_filter=5&news_year_filter=2013; Press Release, RIAA, *Some Clear Facts About Google's "Transparency" Report*, May 30, 2012 (explaining that Google has several policies related to its search engine that render the notice and takedown process ineffective), *available at* https://www.riaa.com/blog.php?content_selector=riaa-news blog&blog_selector=Clear-Facts &blog_type=&news_month_filter=5&news_year_filter=2012.

*Grokster* "the culpable act [wa]s not merely the encouragement of infringement but also the distribution of the tool intended for infringing use." *Id.* at 940 n. 13. The same is true here (even Google recognized that YouTube was a "'rogue enabler' of content theft" whose "business model is completely sustained by pirated content"). Appellants' Opening Brief at 32.[12]

## II.   The District Court Ignored *Grokster* And Misconstrued *Viacom II* By Conflating Inducement With Active Editorial Control.

The district court ignored *Grokster*'s inducement construct and myopically focused on contrasting this case with the facts at issue in *Cybernet*. *Viacom III*, 107 U.S.P.Q. 2d (BNA) at 1163-65. *Cybernet* control is largely based on limiting, excluding, or removing material from a service (*i.e.*, exercising editorial control). *Viacom II*, 676 F.3d at 38.   In contrast, *Grokster* control is largely based on inviting *or* intentionally welcoming use of a service to attract infringing content. *See Grokster*, 545 U.S. at 938 ("Whether the messages were communicated [to potential customers] is not... the point.... The function of the message in the theory of inducement is to prove by a defendant's own statements that his unlawful

---

[12] Given Defendants' ability to control infringement, they lose the protection of the OCILLA under § 512(c)(1)(B).  In this case, the evidence shows that the availability of infringing videos on the YouTube.com website attracted hordes of consumers looking for access to copyrighted works.  *See* Appellants' Opening Brief at 38-41.  Thus, Defendants "receive[d] a financial benefit directly attributable to the infringing activity" under 17 U.S.C. § 512(c)(1)(B).  *See Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1117 (9th Cir. 2007) ("'direct financial benefit' should be interpreted consistent with the similarly-worded common law standard for vicarious copyright liability").

purpose disqualifies him from claiming protection[.]"). The district court failed to recognize the importance of this distinction.

One way of exercising control by inducement is (1) an internal intent to enable infringement combined with (2) a failure to use available means to reduce the availability of infringing material and (3) a clear profit motive. *Id.* at 939-40 ("unlawful objective [was] unmistakable" where defendant "showed itself to be aiming to satisfy a known source of demand for copyright infringement[;]" never "attempted to develop filtering tools or other mechanisms to diminish the infringing activity[;]" and "ma[de] money by selling advertising space"). So, unlike the analysis for assessing whether a defendant exercised editorial control over infringing content under *Cybernet*, the *Grokster*-mandated inducement analysis does not require any active involvement in what content appears on a website. Indeed, the "decentralized architecture" of the software at issue in *Grokster* prevented the defendants in that case from even knowing what content was being infringed by their users. *Id.* at 923, 928.

The district court never fully analyzed the elements of inducement and ignored the Defendants' improper "motiv[es]." *Viacom III*, 107 U.S.P.Q. 2d (BNA) at 1164-65. As just one example out of many, YouTube's founders made a conscious decision not to remove infringing videos because they knew that if they did so "site traffic [would] drop to maybe 20% of what it [was]." Appellants'

16

Opening Brief at 8; *see also id.* at 31-33.  Instead, the district court dismissed Grokster as an "extreme" case (a description never used by this Court) and appended additional requirements onto the inducement test by wrongly (and repeatedly) requiring  "participation" or "coercion" on the part of the service provider. *Id.*

Applying the correct standard, a reasonable jury could conclude, based on the extensive record in this case, that the Defendants engaged in "purposeful, culpable expression and conduct," indicating that they provided a service "with the object of promoting its use to infringe copyrights." *Grokster*, 545 U.S. at 936-937. By holding otherwise, the district court erred.

## III. The District Court Failed To Take Into Account That Defendants' Refusal To Implement Filtering Technology Is An Important Element Of Inducement And Control.

In addition to wrongly analyzing Defendants' obvious "purposeful, culpable expression and conduct," the district court *excused* Defendants' refusal to use readily available technologies to stop or reduce infringement of Viacom's works. *Viacom III*, 107 U.S.P.Q. 2d (BNA) at 1165.  In *Grokster*, the Supreme Court held that the evidence of a defendant's intention to target an audience that wanted access to infringing files was "given added significance" by the fact that "neither company attempted to develop filtering tools or other mechanisms to diminish the infringing activity using their software." *Grokster*, 545 U.S. at 939.  Nevertheless,

despite the district court's admission that Defendants here "welcomed" infringing material because it drew consumers to their service (*Viacom Intn'l, Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514, 518 (S.D.N.Y. 2010)), the court endorsed Defendants' "business decision" to *selectively* filter only for their licensors while withholding the same filtering from copyright owners, like Viacom, with whom Defendants could not reach financial deals. *Viacom III*, 107 U.S.P.Q. 2d (BNA) at 1165.

The district court's holding that Defendants' selective filtering cannot be considered because the OCILLA contains a provision that liability limitations are not contingent on proactive monitoring of a website (17 U.S.C. § 512(m)) misconstrues the statute. *Viacom III*, 107 U.S.P.Q. 2d (BNA) at 1165. When Congress passed the OCILLA in 1998, filtering tools that easily could identify infringing material were not yet available. *See A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1097-98 (9th Cir. 2002) (describing flaws in filtering technologies available in 2002). Thus, Congress left it up to "affected parties" to identify and develop technological solutions rather than mandating the use of specific technologies. *See* H.R. Rep. No. 105-551, Pt. 2, at 61; 17 U.S.C. § 512(i).[13] That

---

[13] *Amici* believe that by clarifying that service providers did not have to monitor their services, Congress intended to protect user privacy, not to discourage them from proactively protecting copyrights. *See* H.R. Rep. No. 105-551, Pt. 2, at 64 (stating that the "monitoring" provision "is designed to protect the privacy of Internet users."). A service provider actively inducing infringement surely cannot

does not mean that 17 U.S.C. § 512(m) prohibits a court from considering an ISP's intentional refusal to implement filtering tools as one type of evidence of an ability to control infringement. The contrary is true. *See Grokster*, 545 U.S. at 939 ("While the Ninth Circuit treated the defendants' failure to develop such tools as irrelevant because they lacked an independent duty to monitor their users' activity, we think this evidence underscores Grokster's and StreamCast's intentional facilitation of their users' infringement."). Defendants did not have to "develop such tools." They are readily available today and were available in the years during which Defendants induced infringement of Viacom's copyrights.

The music industry is familiar with how courts have handled refusals by service providers to utilize available filtering technologies. Courts have accepted and relied on expert testimony submitted in support of the record industry plaintiffs regarding the efficacy of filtering. *See, e.g.*, *Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398, 414 (S.D.N.Y. 2011) (concluding that recording industry "expert opinions on the effectiveness of various infringement-reducing technologies are reliable"); *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 425 n. 23 (S.D.N.Y. 2009) (concluding that testimony was "deserving of

---

hide behind the "no monitoring" provision. *See id.* at 61 ("The Committee believes that technology is likely to be the solution to many of the issues facing copyright owners and service providers in the digital age."). Regardless, nothing in § 512(m) addresses the use of filtering technologies.

substantial weight"). Filtering technologies, such as keyword or metadata filtering[14] and acoustic fingerprinting,[15] have greatly evolved since the days of Napster. These mechanisms work to limit infringement in an affordable, scalable manner that does not interfere with legitimate uses of websites or services. By adopting these measures and blocking copyrighted content *before* it reaches a mass audience, responsible service providers are cooperating to limit infringement and are doing precisely what Congress expected them to do when it passed the OCILLA. *See* H.R. Rep. No. 105-551, Pt. 2, at 49 (Congress designed the OCILLA to "preserve[] strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment").

Defendants' inducing message was not limited to their refusal to utilize filtering tools to block Viacom's copyrighted works. Selective filtering of the type implemented by Defendants sends an even more direct inducing message (*i.e.*, that

---

[14] Keyword filtering involves screening for file names and other data associated with uploads that indicates the files contain copyrighted content. *Lime Group*, 784 F. Supp. 2d at 430.

[15] "Acoustic fingerprinting can monitor the uploading or downloading of digital files. Two audio files that sound the same will have the same acoustic fingerprint. Digital files may be transmitted to a content recognition filter that compares the files against an existing database of unauthorized digital content. If the acoustic fingerprint of a particular file matches a copyright-protected file present in the existing database, the transfer of that file may be blocked." *Lime Group*, 784 F. Supp. 2d at 430, n.30.

the service provider will remove or block certain works, for example those of its financial partners, while refusing to do so with respect to other works despite possessing the ability to do so). *See Lime Group LLC*, 784 F. Supp. 2d at 430 ("This selective filtering further demonstrates LW's knowledge of infringement-mitigating technologies and the company's intentional decision not to employ any such technologies in a way that meaningfully deters LimeWire users' infringing activities."); *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 153 (S.D.N.Y. 2009) ("As in *Grokster*, Defendants did not even attempt to use 'filtering tools or other mechanisms to diminish the infringing activity' on their service; worse yet, Defendants had developed such tools, but declined to use them when to do so would have harmed their business model and customer base.").

There is no reason for a legitimate service provider to refuse to either license professionally produced content or implement existing and available technologies to limit infringement. Refusing to do so indicates an intent to benefit from infringement and the undeniable online draw of *Amici*'s (and other copyright owners') copyrighted content. Here, YouTube's selective filtering, together with the other evidence of inducement as described in Appellants' brief (and not credited by the district court), establish that Defendants had the "right and ability to control" infringement from which they received a direct financial benefit; therefore, Defendants were not the type of service provider that the OCILLA was

designed and intended to shield.  *See ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619, 625 (4th Cir. 2001) ("The DMCA's protection of an innocent service provider disappears at the moment the service provider loses its innocence.").

## <u>CONCLUSION</u>

The district court's opinion misconstrues this Court's mandate and misapplies the law.  It sends the wrong message and effectively denies copyright owners protection against those who knowingly and intentionally build their business on and profit from infringement.  *Amici* urge the Court to reverse the district court's summary judgment ruling and remand for a trial on the merits.

DATED: August 2, 2013          MITCHELL SILBERBERG & KNUPP LLP
                               Russell J. Frackman
                               J. Matthew Williams

                         By:   /s/ Russell J. Frackman
                               Russell J. Frackman
                               rjf@msk.com

                               Attorneys for *Amici Curiae*

22

## <u>CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(A)</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because:  this brief contains 5,036 words, excluding the parts of the

brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because: this

brief has been prepared in a proportionally spaced typeface using Microsoft Word

2010 in 14 point, Times New Roman.


DATED: Augsut 2, 2013          MITCHELL SILBERBERG & KNUPP LLP
                               Russell J. Frackman
                               J. Matthew Williams


                               By:  /s/ Russell J. Frackman
                                    Russell J. Frackman
                                    rjf@msk.com

                                    Attorneys for *Amici Curiae*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 2nd day of August, a true and correct copy of the foregoing *Amici Curiae* Brief was served on all counsel of record in this appeal via CM/ECF pursuant to Local Rule 25.1(h).

DATED:  August 2, 2013          By:    /s/ Russell J. Frackman
                                        Russell J. Frackman