# 13-1720-cv

# United States Court of Appeals
## for the
## Second Circuit

VIACOM INTERNATIONAL, INC., COMEDY PARTNERS, COUNTRY MUSIC
TELEVISION, INC., PARAMOUNT PICTURES CORPORATION,
BLACK ENTERTAINMENT TELEVISION, LLC,

*Plaintiffs-Appellants,*

– v. –

YOUTUBE, INC., YOUTUBE, LLC, GOOGLE, INC.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF *AMICI CURIAE* RONALD A. CASS, RAYMOND T. NIMMER, and STUART N. BROTMAN IN SUPPORT OF PLAINTIFFS-APPELLANTS

Lawrence A. Sucharow
LABATON SUCHAROW LLP
140 Broadway, 34th Floor
New York, New York 10005
(212) 907-0700

*Counsel for Amici Curiae Ronald A. Cass,*
*Raymond T. Nimmer, and Stuart N. Brotman*

# TABLE OF CONTENTS

INTEREST OF THE *AMICI CURIAE* ........................................................... 1

SUMMARY OF ARGUMENT ..................................................... 3

ARGUMENT .................................................................. 5

A.  LEGAL RULES SUPPORT EFFICIENT SECONDARY
    LIABILITY FOR COPYRIGHT INFRINGEMENT ......................... 5

    1.  Legal Responsibility Should Rest with the  Party Best
        Able to Avoid or Limit Harm...................................... 5

    2.  Copyright Law Also Places Legal Responsibility on the
        Party Best Able to Avoid or Limit Harm .................................. 10

B.  THE DMCA DOES NOT ABROGATE RULES SUPPORTING
    EFFICIENT SECONDARY LIABILITY ......................................... 15

    1.  The DMCA, Like Copyright Law Generally, Is Consistent
        with Broader Principles of Legal Responsibility ..................... 15

    2.  DCMA § 512(c)(1)(B)'s "Control and Benefit" Provision
        Implements Background Common Law Rules ........................ 19

    3.  The Court Below Applied the Wrong Legal Test for
        Summary Judgment under Copyright Law and the DCMA ..... 23

CONCLUSION .......................................................... 28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*In re Aimster Copyright Litig.*,
    334 F.3d 643 (7th Cir. 2003) ............................................................... *passim*

*Arista Records LLC v. Usenet.com, Inc.*,
    633 F. Supp. 124 (S.D.N.Y. 2009) ...........................................................21

*Basic Books, Inc. v. Kinko's Graphics Corp.*,
    758 F. Supp. 1522 (S.D.N.Y. 1991) ........................................................10

*Columbia Pictures Indus., Inc. v. Fung*,
    No. CV 06-5578, 2009 WL 6355911 (C.D. Cal. Dec. 21, 2009), *aff'd*
    710 F.3d 1020 (9th Cir. 2013) ........................................................... 16, 17

*Columbia Pictures Indus., Inc. v. Fung*,
    710 F.3d 1020 (9th Cir. 2013) ...........................................................17, 22

*Fonavisa, Inc. v. Cherry Auction, Inc.*,
    76 F.3d 259 (9th Cir. 1996) ................................................................15, 24

*Kalem Co. v. Harper Brothers*,
    222 U.S. 55 (1911) ............................................................................. 12, 13

*Matar v. Dichter*,
    563 F.3d 9 (2d Cir. 2009) ...................................................................17, 20

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005) ............................................................................. *passim*

*Meyer v. Holley*,
    537 U.S. 280 (2003) .................................................................................11

*Perfect 10, Inc. v. CCBill, LLC*,
    488 F.3d 1102 (9th Cir. 2007) ................................................................16

*Polygram Int'l Publ'g, Inc. v. Nevada/TIG, Inc.*,
    855 F. Supp. 1314 (D. Mass. 1994) .........................................................15

*Shapiro, Bernstein & Co. v. H.L. Green Co.*,
　　316 F.2d 304 (2d Cir. 1963) ..................................................... 14, 21, 24, 27

*Sony Corp. of America v. Universal City Studios, Inc.*,
　　464 U.S. 417 (1984) ................................................................. *passim*

*Tiffany (NJ) Inc. v. eBay Inc.*,
　　600 F.3d 93 (2d Cir. 2010) ........................................................21, 22, 24

*United States v. Carroll Towing Co.*,
　　159 F.2d 169 (2d Cir. 1947) ..............................................................5, 6, 7

*Viacom Int'l, Inc. v. YouTube, Inc.*,
　　718 F. Supp. 2d 514 (S.D.N.Y. 2010) ..........................................................4

*Viacom Int'l, Inc. v. YouTube, Inc.*,
　　No. 07-cv-02103 (S.D.N.Y. Apr. 18, 2013), slip op. ..............................25, 26

*Viacom International, Inc. v. YouTube, Inc.*,
　　676 F.3d 19 (2d Cir. 2012) ................................................................ *passim*

## STATUTES

17 U.S.C. § 107 .........................................................................................11

17 U.S.C. § 512 *et seq*. ....................................................................... *passim*

## OTHER AUTHORITIES

Alan O. Sykes, *The Boundaries of Vicarious Liability: An Economic
　　Analysis of the Scope of Employment Rule and Related Legal
　　Doctrines*, 101 Harv. L. Rev. 563 (1988)....................................................8, 9

Frank H. Easterbrook, *Cyberspace and the Law of the Horse*, 1996 U. Chi.
　　Legal F. 207 ..................................................................................10

Lawrence A. Cunningham, *Traditional Versus Economic Analysis: Evidence
　　from Cardozo and Posner Torts Opinions*, 62 Fla. L. Rev. 667 (2010) ........7

Richard A. Epstein, *A Theory of Strict Liability*, 2 J. Legal Stud. 151 (1973)..........7

Richard A. Epstein, *The Many Faces of Fault in Contract Law: Or How to Do Economics Right, Without Really Trying*, 107 Mich. L. Rev. 1461 (2009)....................................................................................7

Richard A. Posner, *A Theory of Negligence*, 1 J. Legal Stud. 29 (1972) ..................6

Richard A. Posner, *Strict Liability: A Comment*, 2 J. Legal Stud. 205 (1973)........22

Ronald A. Cass & Keith N. Hylton, *Laws of Creation: Property Rights in the World of Ideas* ch. 6 (Harv. Univ. Press 2013) .......................................11, 22

Steven Shavell, *Economic Analysis of Accident Law* (Harv. Univ. Press 1987)....................................................................................8

Weixiao Wei, *ISP Indirect Liability Regime: An Economic Efficient Liability Regime for Online Copyright Protection Shaped by Internet Technology*....................................................................................16

Wendy J. Gordon, *Fair Use as Market Failure: A Structural and Economic Analysis of the* Betamax *Case and Its Predecessors*, 82 Colum. L. Rev. 1600 (1982) ........................................................................11

William M. Landes & Richard A. Posner, *The Economic Structure of Tort Law* (Harv. Univ. Press 1987) .........................................6, 7, 8, 24

## INTEREST OF THE *AMICI CURIAE*[1]

*Amici* are professors and scholars who teach and write in the fields of intellectual property law, torts, media law, and related areas of law and economics. Each is personally concerned with the status and development of the law and believes that the questions raised by this case are of the highest importance. Their individual qualifications are as follows:

Ronald A. Cass is Dean Emeritus of Boston University School of Law, where he served as Dean and Melville Madison Bigelow Professor of Law from 1990-2004, and also is a senior fellow at the International Centre for Economic Research. A law professor since 1976, he has taught and written about intellectual property law, law and economics, tort liability and immunity, constitutional law, and other subjects, to law students, economics students, lawyers, doctoral candidates, and judges in the United States, Europe, Asia, Central and South America. His most recent book, published

---

[1] The parties have consented to the filing of this brief. The views expressed herein are those of the individual *amici*, and do not necessarily represent the views of any group or organization with which any of them may be affiliated. *Amici* represent none of the parties in this action, and write solely to offer their perspective on the important legal and economic issues at stake in this dispute. This brief was not written in whole or in part by counsel for a party. No person or entity other than *amici* made any monetary contribution to the preparation or submission of this brief. *Amici* and their counsel were not compensated for work on this brief.

-1-

by Harvard University Press in 2013, explores the relation of intellectual property law to doctrines in law and economics.

Raymond T. Nimmer is the Leonard Childs Professor of Law at the University of Houston Law Center (where he also served as Dean from 2006-2013) and co-director of the Houston Intellectual Property and Information Law Institute. He was the Fulbright Distinguished Chair of International Commercial Law at Universidade Católica in Lisbon, and he teaches and writes in the areas of intellectual property law, information law, commercial law, and technology law.

Stuart N. Brotman is Lecturer on Law at Harvard Law School, where he teaches Entertainment and Media Law. Under appointment by the Library of Congress, he served as an inaugural member of the Copyright Arbitration Royalty Panel. He is the author of numerous works on legal and policy issues related to entertainment and information media and technologies.

## SUMMARY OF ARGUMENT

The dispute in this case turns on interpretation of provisions defining the scope of contributory and vicarious liability for copyright infringement from the use of Internet sites — in this instance, the YouTube site — to reproduce and disseminate large amounts of copyrighted material without authorization from copyright owners.  In interpreting the legal provisions respecting responsibility for infringement in these circumstances, the Court should keep in mind the principle that legal responsibility generally rests on the party best able to prevent, limit, or eliminate harm.  This principle, sometimes described as finding the "least cost avoider" or "most efficient risk bearer," has been a fundamental consideration shaping many legal rules, including rules of copyright law.  It has special importance where one party is uniquely situated to limit or prevent harm and has supported rules of liability under both contributory and vicarious responsibility doctrines.

Decisions of the Supreme Court of the United States make clear that this principle also is the basis for the law of secondary liability in copyright, and the Court has applied rules based on this principle to firms providing technologies, including Internet services, that support infringing activity. The Digital Millennium Copyright Act "DMCA") does not by its terms change the law governing secondary liability, but the Act does makes clear

-3-

that the principle applied by the Supreme Court should not extend liability to enterprises that have minimal connection to or ability to control copyright infringement. *See, e.g.*, 17 U.S.C. § 512(c)(1).

This Court has held that, under the DMCA, firms with specific knowledge of copyright violations (actual or constructive) and firms with a financial interest in copyright violations and the right and ability to control on-going violations will be subject to the ordinary rules of secondary liability, but the mere legal or physical ability to block access to content on an Internet site will not suffice to subject an Internet Service Provider to liability for infringement as a vicarious or contributory infringer. *See Viacom International, Inc. v. YouTube, Inc.*, 676 F.3d 19, 36-38 (2d Cir. 2012) (*Viacom II*).[2] *Viacom II* declares that DMCA's provision respecting the right and ability of an internet service provider to control the retention of infringing material, 17 U.S.C. § 512(c)(1) (B), requires "something more." *Viacom II*, 676 F.3d at 37-38. The most logical meaning of that "something more" — the meaning that is consistent with prior Supreme Court precedents and the language of the DMCA — reads the law as requiring a

---

[2]    The district court's initial decision, granting summary judgment to defendants, *Viacom Int'l, Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514 (S.D.N.Y. 2010), typically is referred to as *Viacom I*. Amici follow that convention here.

-4-

financial interest in the infringement plus a reasonable ability to control the retention of infringing material, a test that is sensitive to the economic costs and benefits of such liability (essentially placing liability on Internet Service Providers that are the efficient risk bearers).    In contrast, expanding insulation from liability by requiring that ISPs have knowledge of specifically infringing material in order to fall outside the safe harbor described in 17 U.S.C. § 512(c)(1)(B), as the decision below does, runs counter to this Court's express holding in *Viacom II*, to the structure of the DMCA and background copyright law, and to broadly-accepted legal doctrines.  For that reason, the decision below should be reversed.

## ARGUMENT

### A.    LEGAL RULES SUPPORT EFFICIENT SECONDARY LIABILITY FOR COPYRIGHT INFRINGEMENT

#### 1.    Legal Responsibility Should Rest with the Party Best Able to Avoid or Limit Harm

One of the most basic principles underlying liability rules is that legal responsibility for harm should fall on those who most cost-effectively can limit or eliminate harm.  This notion has long roots in law, and the shape of common law generally conforms to this principle.  Perhaps the clearest articulation of this principle is Learned Hand's famous formula for determining when there is liability for negligently caused harm:  "if the probability be called $P$; the injury $L$; and the burden [of adequate precautions

-5-

to avoid the injury], *B*; liability depends upon whether *B* is less than *L* multiplied by *P*; i.e., whether *B < PL*." *See United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947).

Although Judge Hand's formulaic encapsulation of the principle is lauded as a foundation stone of efficiency in the law,[3] the *Carroll Towing* court did not break new ground; it merely clarified the basis for a long-accepted legal rule.[4]  The understanding that the party who is the "least cost avoider" or the "efficient risk bearer" is legally responsible for unintended harm has guided the law both before and after *Carroll Towing*.  Tort rules largely are organized around that principle, and so are rules for enforcement of contracts and property rights, including intellectual property rights.

For example, the concept of "due care" that historically has been central to tests for negligence in tort law incorporates much the same set of evaluations as an efficiency-based approach to liability.  The core question for evaluating whether someone has exercised due care is whether the precautions taken were all that reasonably should have been taken.  Reasonableness in this context turns mainly on the cost-effectiveness of the

---

[3]   *See* Richard A. Posner, *A Theory of Negligence*, 1 J. Legal Stud. 29 (1972).

[4]   *See* William M. Landes & Richard A. Posner, *The Economic Structure of Tort Law* 85-88 (Harv. Univ. Press 1987).

-6-

precautions.   Individuals (and enterprises) are not required to take precautions that cost more than the value of the harms the precautions can be expected to prevent, nor are they required to take precautions when another individual can prevent the same harm at far less cost.  Despite the different language, the traditional due care inquiry is essentially the same as the economic inquiry Judge Hand formalized.[5]

The principle of efficient harm-avoidance, the goal set out in *Carroll Towing*, also represents a broad consensus among legal scholars.   Even scholars who prefer different fault-based rules or strict liability rules over the Hand formula or related negligence-based rules embrace legal tests designed to produce efficient risk-bearing.[6]   Moreover, scholars from both sides of this divide especially endorse liability for any party that is uniquely well positioned to avoid harm, finding liability rules for those settings much

---

[5]   *See, e.g.*, *id.* at 86-107.

[6]   *See*, *e.g.*, Lawrence A. Cunningham, *Traditional Versus Economic Analysis: Evidence from Cardozo and Posner Torts Opinions*, 62 Fla. L. Rev. 667 (2010); Richard A. Epstein, *The Many Faces of Fault in Contract Law:  Or How to Do Economics Right, Without Really Trying*, 107 Mich. L. Rev. 1461 (2009); Richard A. Epstein, *A Theory of Strict Liability*, 2 J. Legal Stud. 151 (1973).

easier than cases in which both parties must act to achieve the efficient risk-reducing outcome.[7]

These principles of efficient harm-avoidance are particularly important in situations where the expense of identifying and pursuing those directly responsible for the harm makes direct deterrence impracticable. In those instances, the prospect of secondary liability creates an incentive for the party able to prevent the harm at the lowest cost to take steps to do so. Without the motivation of avoiding secondary liability, the least cost avoider would have little reason, from an economic perspective, to make efforts to minimize the harm. Thus, the law holds people liable for their contributions to legal infractions under civil law of contributory liability when (i) there is reason to know that products or services they provide will be used in ways that violate the law or that harm others and (ii) there is a relatively simple (cost-effective) way for the sellers to prevent the harm.

Similarly, the law commonly makes individuals and enterprises vicariously responsible for the conduct of others when they can efficiently control that conduct (and have a right to do so), even if they have not contributed to it. This is the case in many continuing relationships,

---

[7]    *See* Landes & Posner, *supra* note 4, at 90-92; Steven Shavell, *Economic Analysis of Accident Law* 17-18 (Harv. Univ. Press 1987).

especially where the party has a financial stake in the conduct, as is the case with employers and employees.[8]  Often, the vicariously liable enterprise is the only one that can efficiently take measures to prevent harms from occurring or limit their impact or the only entity that, as a practical matter, is likely to face legal incentives consistent with deterring harm.

Where the underlying law applicable to direct responsibility does not require intentional wrongdoing, the law of secondary responsibility follows suit.  As a rule, it does not require actual knowledge that a specific buyer will misuse a product or service when there is enough information to signal the likelihood of misuse by a given class of buyers and there are relatively simple means for identifying who falls into the suspect class.  Anything that raises the probability that the seller is turning a blind eye to the infraction — or, worse, has reason to be sympathetic to it — makes legal culpability or liability more likely.[9]

That the harm caused in this case was the result of activities that took place over the Internet should make no difference.  The principles of efficient harm-avoidance have equal application to conduct using ancient

---

[8]    *See*, *e.g.*, Alan O. Sykes, *The Boundaries of Vicarious Liability: An Economic Analysis of the Scope of Employment Rule and Related Legal Doctrines*, 101 Harv. L. Rev. 563 (1988).

[9]    The same point can be seen in a more general framework in other areas of law. *See, e.g.*, Sykes, *supra* note 8.

and modern technologies and have been applied for generations in similar form, whether the harm is transmitted in person or over the Internet.[10]

### 2. Copyright Law Also Places Legal Responsibility on the Party Best Able to Avoid or Limit Harm

The basic principles of copyright law, including rules of secondary liability for infringement, are similar to those applied elsewhere in the law. Given that the number of potential users of works is large and generally quite difficult for copyright owners to monitor, copyright law's requirement that those who want to reproduce copyrighted works are responsible for obtaining permission, or liable if they do not, *see, e.g.*, *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522 (S.D.N.Y. 1991), follows least cost avoider principles. Those principles would not, and the law does not, make everyone liable for infringement in all settings; particular rules address situations in which the person engaged in copying may not be the best positioned to limit harm. So, for example, special rules on "fair use" — *e.g.*, use of minor parts of a larger work for educational or similar purposes and not for commercial purposes — are designed to allow copying that has unusual public worth and limited effect on the ability of authors to protect

---

[10] *See generally* Frank H. Easterbrook, *Cyberspace and the Law of the Horse*, 1996 U. Chi. Legal F. 207; *see also, e.g.*, *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005).

the value of their creative work.[11]  Such special rules fit together with the core of copyright liability in endeavoring to make the person responsible who can avoid harm at the lowest cost.[12]

As in other areas of law where the courts have held that a statute that is silent on the issue will be construed to incorporate ordinarily applicable background rules, such as rules respecting contributory and vicarious liability, *e.g.*, *Meyer v. Holley*, 537 U.S. 280, 285 (2003), copyright law long has been interpreted to incorporate secondary liability for infringement. *See, e.g.*, *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) ("*Grokster*") ("[T]hese doctrines of secondary liability emerged from common law principles and are well established in the law." (citations omitted)).

In *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ("*Sony*"), the Supreme Court accepted secondary liability under copyright law for individuals or entities whose actions encouraged or

---

[11]  *See, e.g.*, Wendy J. Gordon, *Fair Use as Market Failure:  A Structural and Economic Analysis of the* Betamax *Case and Its Predecessors*, 82 Colum. L. Rev. 1600 (1982).  The fair use doctrine is codified at 17 U.S.C. § 107.

[12]  *See* Ronald A. Cass & Keith N. Hylton, *Laws of Creation:  Property Rights in the World of Ideas* ch. 6 (Harv. Univ. Press 2013); William M. Landes & Richard A. Posner, *The Economic Structure of Intellectual Property Law* 85-123 (Belknap Press 2003).

facilitated infringement, in keeping with the Court's earlier decision in *Kalem Co. v. Harper Brothers*, 222 U.S. 55 (1911).[13]  However, the Court decided that secondary liability did not attach based on the mere sale of a "staple article of commerce" that was primarily used for purposes that did not infringe copyrights.  *Sony*, 464 U.S. at 442.  In its 2005 decision in *Grokster*, the Supreme Court made clear that even where substantial non-infringing uses exist, liability can be found if a business endeavors to promote its product or service for uses that infringe copyright and profits

---

[13]  *Kalem* involved liability for producing an unauthorized dramatization of the book *Ben-Hur*.  The defendant had not actually performed or exhibited the film as required for direct liability under the 1909 Copyright Act.  Justice Holmes, writing for the Court, said:

> In some cases where an ordinary article of commerce is sold, nice questions may arise as to the point at which the seller becomes an accomplice in a subsequent illegal use by the buyer.  It has been held that mere indifferent supposition or knowledge on the part of the seller that the buyer of spirituous liquor in contemplating such unlawful use is not enough to connect him with the possible unlawful consequences, but that if the sale was made with a view to the illegal resale, the price could not be recovered.  But no such niceties are involved here.  The defendant not only expected but invoked by advertisement the use of its films for dramatic reproduction of the story.  That was the most conspicuous purpose for which they could be used, and the one for which especially they were made.

 222 U.S. at 62-63 (citations omitted).

-12-

from those uses, especially where possible cost-effective means for limiting infringement are available and are not employed. *Id.* at 939-40.

The approach to contributory liability implemented in *Sony* and *Grokster* is in keeping with the least-cost-avoidance principles embraced throughout the law. For products that are used primarily for legitimate purposes and for which there is no evident cost-effective means for a seller to prevent illegitimate uses, liability does not attach merely because it is foreseeable that some purchasers will use the product to infringe copyright. Where, however, there is obvious benefit to the seller from widespread use of a product for infringement (in particular where the seller profits financially), and where there are potential cost-effective means for limiting the amount or duration of infringements, the seller will be held liable for contributing to the infringement. In those circumstances, the fact that the business's personnel were unaware of a specific copyright violation will not insulate it against liability in the absence of reasonable efforts to prevent infringement. *See Grokster*, 545 U.S. at 936; *In re Aimster Copyright Litig.*, 334 F.3d 643, 645-46 (7th Cir. 2003) ("*Aimster*") ("Recognizing the impracticability or futility of a copyright owner's suing a multitude of individual infringers, the law allows a copyright holder to sue a contributor

-13-

to the infringement instead, in effect as an aider and abettor." (citation omitted)).

Similarly, vicarious liability for infringement attaches when an entity has the right to control someone else's conduct and a cost-effective means for doing that. This Court, in *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304 (2d Cir. 1963) ("*H.L. Green*"), found vicarious liability for a business that leased space to someone selling phonograph records (many of which turned out to be infringing) and profited from the infringing sales in an arrangement that gave the lessor more control than an ordinary landlord renting space for a standard fee. Rightly, the Court did not require knowledge of specific infringements to find liability. *Id.* at 307-08. The imposition of secondary liability in these circumstances gives the party best equipped to deter infringement the incentive to take steps toward this goal. *See id.* at 308 (vicarious liability would "simply encourage" the lessor to control its lessee's actions, "thus placing responsibility where it can and should be effectively exercised").

The same considerations supported findings of both contributory and vicarious liability for a swap meet operator who had the right and ability to monitor vendors' sales of infringing sound recordings and had general knowledge that there were substantial infringing sales at the meet but did not

-14-

take appropriate steps to monitor the vendors and terminate permission for sales by offending vendors. *See Fonavisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 261-64 (9th Cir. 1996) ("*Fonavisa*"). There was not an immediate financial reward to the swap meet operator from the sales, but the court deemed it sufficient that "the sale of pirated recordings at the Cherry Auction swap meet [was] a 'draw' for customers." *Id*. at 263-64. In these circumstances, vicarious liability meets the legal test and creates incentives for efficient efforts to enforce legal requirements. *See also Polygram Int'l Publ'g, Inc. v. Nevada/TIG, Inc.*, 855 F. Supp. 1314, 1325 (D. Mass. 1994) (vicarious liability "has the added benefit of creating a greater incentive for the enterprise to police its operations carefully to avoid unnecessary losses").

### B.    THE DMCA DOES NOT ABROGATE RULES SUPPORTING EFFICIENT SECONDARY LIABILITY

#### 1.    The DMCA, Like Copyright Law Generally, Is Consistent with Broader Principles of Legal Responsibility

The Digital Millennium Copyright Act ("DMCA"), and in particular its "safe harbor" provision respecting Internet Service Providers ("ISPs") that host information posted by users, 17 U.S.C. § 512(c), also accords with efficient liability concepts. The DMCA was designed to balance interests in commercial growth of Internet resources with interests in protection of intellectual property. *See, e.g.*, H.R. Rep. No. 105-551(II), at 23 (1998).

-15-

ISPs often will be the least cost avoiders for preventing or limiting harm from copyright infringement over the Internet,[14] and the DMCA permits liability for ISPs in circumstances where that is efficient.

Although this Court determined in *Viacom II* that the DMCA does not preserve the background law of secondary copyright liability in its entirety, 676 F.3d at 37, this Court and other Courts also have made clear that the DMCA should not be read as working a wholesale abrogation of prior law. *See, e.g.*, *Aimster*, 334 F.3d at 655; *Viacom II*, 676 F.3d at 35; *Perfect 10, Inc. v. CCBill, LLC*, 488 F.3d 1102, 1107 (9th Cir. 2007). Instead, the DMCA serves to clarify the circumstances that would prevent liability under a traditional, economics-based approach. *See, e.g.*, H.R. Rep. No. 105-551(I), at 11 (1998) (the DMCA "codifies the core of current case law dealing with the liability of on-line service providers"); S. Rep. No. 105-190, at 2, 19 (1998) (the goal of the DMCA is to "clarify" the liability of service providers and others but still "to leave current law in its evolving state"); *Columbia Pictures Indus., Inc. v. Fung*, No. CV 06-5578, 2009 WL 6355911, at *15 (C.D. Cal. Dec. 21, 2009), *aff'd*, 710 F.3d 1020 (9th Cir.

---

[14] *See, e.g.*, Weixiao Wei, *ISP Indirect Liability Regime: An Economic Efficient Liability Regime for Online Copyright Protection Shaped by Internet Technology*, 23d BILETA Ann. Conf. Proceedings (2008), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1398323. *See also Aimster*, 334 F.3d at 645-46.

-16-

2013) (judgment on merits *aff'd*, injunction *rev'd & revised*) ("In many ways, the Digital Millennium Copyright Act is simply a restatement of the legal standards establishing secondary copyright infringement — in many cases, if a defendant *is* liable for secondary infringement, the defendant *is not* entitled to Digital Millennium Copyright Act immunity; if a defendant *is not* liable for secondary infringement, the defendant *is* entitled to Digital Millennium Copyright Act immunity.").  This is in keeping with rules of construction generally disfavoring changes in background law without express statement.  *See, e.g.*, *Viacom II*, 676 F.3d at 35 ("As a general matter, we interpret a statute to abrogate a common law principle only if the statute 'speak[s] directly to the question addressed by the common law.' *Matar v. Dichter*, 563 F.3d 9, 14 (2d Cir. 2009).").

The safe harbor provisions do not, by and large, speak directly to or mandate overturning prior law; instead, they constitute affirmative defenses narrowly drawn in ways generally consistent with basic principles of copyright law and least cost avoidance.  *See, e.g.*, *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1039-40 (9th Cir. 2013) ("*Fung II*").  The DMCA gives ISPs safe harbor under § 512(c) only if they meet a number of *cumulative* criteria; failure on any one of these denies the ISP safe harbor.  There is no safe harbor if there is actual knowledge of infringement or

-17-

awareness of facts or circumstances from which such infringing activity is apparent. 17 U.S.C. § 512(c)(1)(A)(i), (ii). There is no safe harbor if the ISP profits from the infringing activity in cases in which the ISP "has the right and ability to control" the activity, 17 U.S.C. § 512(c)(1)(B), or if the ISP fails to take down infringing material when it *becomes aware* of it, 17 U.S.C. § 512(c)(1)(A)(iii). This is the case regardless of whether the copyright owner has requested that infringing works be removed. A separate provision states that, in order to come within safe harbor protection, an ISP must promptly take down specific infringing material when *notified* about it. 17 U.S.C. § 512(c)(1)(C), (c)(3).

By its terms, the DMCA contemplates liability for ISPs not only for direct infringement but also when they have actual knowledge of infringement by others and do not take appropriate actions, when they have constructive knowledge similar to that required in other contributory infringement contexts, or when they have the right and ability to reduce infringements from conduct that they reasonably can control. In this regard, the DMCA plainly spells out conditions that are special applications of least cost avoiding approaches. Thus, for example, the Seventh Circuit's decision in *Aimster*, which deals with both the DMCA and underlying copyright law,

-18-

expressly treats the DMCA as sharpening the application of underlying copyright law in particular settings, not as undercutting it:

> The [DMCA] does not abolish contributory infringement. The common element of its safe harbors is that the service provider must do what it can reasonably be asked to do to prevent the use of its service by "repeat infringers." 17 U.S.C. § 512(i)(1)(A).

334 F.3d at 655.

So, too, this Court's decision in *Viacom II* reads the safe harbor provision of § 512(c) as generally fitting together with, rather than replacing, prior interpretations of copyright law. For instance, while the law states that eligibility for the ISP safe harbor protection cannot be conditioned on a duty to monitor or a general requirement that ISPs affirmatively seek to identify infringing activity, 17 U.S.C. § 512(m), the law also incorporates background rules on "willful blindness." *Aimster*, 334 F.3d at 650-51; *Viacom II*, 676 F.3d at 34-35. Overall, the lesson of thoughtful decisions of this and other courts is that the DMCA can and should be interpreted as largely consistent with prior law.

### 2.     DCMA § 512(c)(1)(B)'s "Control and Benefit" Provision Implements Background Common Law Rules

A critical question raised in *Viacom II* was the meaning of § 512(c)(1)(B)'s statement that, to come within the safe harbor protection of § 512(c), an ISP may "not receive a financial benefit directly attributable to

the infringing activity in a case in which the service provider has the right and ability to control such activity." 17 U.S.C. § 512(c)(1)(B). This Court concluded that the provision could not mean that ISPs needed specific notice of particular infringing content to have the ability to control the infringing activity, as that construction of § 512(c)(1)(B) would make the requirements of § 512(c)(1)(A)(i) and (ii) superfluous. *See Viacom II*, 676 F.3d at 36. At the same time, the Court also decided the law could not mean that any ISP with the legal right and physical ability to block access to infringing content on its site was excluded from eligibility for the safe harbor of § 512(c), as that effectively would make virtually any service provider able to comply with the "take down" requirements of § 512(c)(1)(A)(iii) and § 512(c)(1)(C), (c)(3) ineligible for the law's protection. *See Viacom II*, 676 F.3d at 37.

The *Viacom II* decision concluded that "something more" than mere legal right and physical ability to block access was needed in order to come within the "control" portion of the "benefit and control" provision of § 512(c)(1)(B), but it left unanswered just what that "something more" would be. *See Viacom II,* 676 F.3d at 38. Given the long-standing canon that statutes should be construed as consistent with common law except where that is clearly contrary to the statute's meaning, *see*, *e.g.*, *Matar v. Dichter*, 563 F.3d at 14, this provision (like the DMCA generally) should be

-20-

understood to implement background common law rules on secondary liability, including the application of those rules to copyright law, apart from particular aspects that would not fit the language and structure of the statute. Having concluded that common law rules would have extended liability to any ISP having the ability to block access to infringing material,[15] the Court viewed the "control and benefit" provision as not coextensive with common law. *Viacom II*, 676 F.3d at 37. But the Court rightly did not express a view that a further departure from common law rules was required by DMCA's terms and structure.

In *Amici*'s view, the best reading of § 512(c)(1)(B)'s control requirement is one that implements the least cost avoider approach that underpins common law and background copyright rules on secondary liability. That approach follows the canon respecting statutes and common law and also accords with the approach taken by the Supreme Court in *Sony* and *Grokster* and by this Court in *H.L. Green* and in *Tiffany (NJ) Inc. v.*

---

[15]  *See Viacom II*, 676 F.3d at 37. The Court relied on a statement in *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 124, 157 (S.D.N.Y. 2009), declaring that the ability to block access to material is evidence of the right and ability to control the activity. It is not clear to Amici that *Arista* would be sufficient authority for the conclusion that would suffice under common law to establish the predicate control needed for vicarious liability. Ultimately, however, that issue should not affect analysis of the remainder of § 512(c)(1)(B)'s requirements.

*eBay Inc.*, 600 F.3d 93 (2d Cir. 2010) ("*Tiffany*").[16]   The approach also accords with decisions of the Seventh Circuit in *Aimster*, and the Ninth Circuit in *Fung II*.

All of these decisions approach questions of secondary liability through the lens of what constitutes a reasonable accommodation of the costs and benefits of placing responsibility on a party that may be better positioned than others to stop or limit infringement of intellectual property rights.  Judge Posner framed the point directly in stating that the DMCA safe harbors simply ask ISPs to do what they "can reasonably be asked to do to prevent the use of [their] service[s] by 'repeat infringers.'"  *Aimster*, 334 F.3d at 655.  That is the essence of the least cost avoider (or efficient risk bearer) standard of common law, as Judge Posner has explained in other contexts.[17]  The Ninth Circuit's interpretation of the "control and benefit" provision in *Fung II*, likewise looked at information relevant to a least cost avoider analysis as well as to the exact language used in the DMCA.  In

---

[16]   Although the *Tiffany* case involved questions of secondary liability under trademark law, where such liability has been given narrower scope than under copyright law, *see, e.g.*, Cass & Hylton, *supra*, chs. 6 & 7, the Court looked at questions of incentives, costs, and benefits that are exactly the issues within the compass of the least cost avoider analysis that provides the underpinning for traditional liability rules.

[17]   *See, e.g.,* Richard A. Posner, *Strict Liability: A Comment*, 2 J. Legal Stud. 205 (1973).

particular, the court looked at evidence that the infringing content on Fung's Internet site attracted subscribers whose numbers in turn attracted advertising revenues (constituting a direct benefit under § 512(c)(1)(B)), and the organization of material on Fung's site in ways that facilitated locating material likely to be infringing (along with other promotional activity by Fung) sufficed to demonstrate the "something else" discussed in *Viacom II* respecting Fung's ability to control the infringing activity. *See Fung II*, 710 F.3d at 1044-46.

### 3.    The Court Below Applied the Wrong Legal Test for Summary Judgment under Copyright Law and the DCMA

In the instant case, the right inquiry for the district court to have made in judging whether YouTube carried its burden of persuasion that no genuine dispute of fact existed respecting its right and ability to control on-going infringement on its site from which it plainly profited was to ask if YouTube demonstrated beyond question that it lacked the reasonable ability to limit infringement on the site.

The question that remains, then, is whether YouTube is in a position reasonably — that is, cost-effectively in comparison to copyright owners (the alternative risk-bearers) — to limit the infringements. This is the question that should have been asked in implementing the *Viacom II* decision on remand; it properly relates the "ability to control" language in §

-23-

512(c)(1(B) to prior law without making any of the provisions in the DMCA superfluous or illogical.  Rightly understood, it is not a simple matter of asking whether it is burdensome for YouTube to identify and remove offending material or whether that burden can be cost-effectively borne with respect to some obviously infringing material but not all possibly infringing material.  The question at the heart of the reasonableness inquiry regarding the ability to control both requires a *balance* of the costs and benefits of identifying and limiting infringements (because the responsibility that comes with "control and benefit" is not absolute) and also requires a *comparative* analysis (because it is reasonable to put the burden on YouTube if it is the least cost avoider but not if the copyright holders are the least cost avoiders).[18]  In this regard, the fact that YouTube made available to some copyright holders the service of checking for and removing access to material that is likely to be infringing (without prior demand from the copyright holder or the identification by others of specific infringing

---

[18]  That is the essence of the least cost avoider inquiry that has been embraced in so many areas of law, including copyright.  *See, e.g.*, *Sony*; *H.L. Green*; *Tiffany*; *Fonavisa*; Landes & Posner, *supra*, at 85-123.

material),[19] is at least evidence of its comparative advantage with respect to some classes of infringements.

Instead of following the directions of this Court or analyzing what "the ability to control such [infringing] activity" might mean in line with prior law, the district court below expressly incorporated a requirement that the ISP know of specifically identified infringing material as a precondition to the ISP being able to control its removal (directly contrary to this Court's holding in *Viacom II*) and concluded on the basis of a non-comparative analysis that the burden on an ISP such as YouTube of identifying and removing infringing material — even fairly obviously infringing material of the sort it knew was being posted on its site and from which it directly benefited — was too great to come within the meaning of § 512(c)(1)(B)'s exclusion.  *See Viacom Int'l, Inc. v. YouTube, Inc.*, No. 07-cv-2103, slip op. at 11-20 (S.D.N.Y. Apr. 18, 2013) ("*Viacom III*").  Its decision that the law requires actual knowledge of specific infringements, *Viacom III*, slip op. at 12, directly contradicts this Court's holding on that point in *Viacom II*:  "we hold that the District Court erred by importing a specific knowledge requirement into the 'control and benefit' provision." *Viacom II*, 676 F.3d at

---

[19] *See Viacom Int'l, Inc. v. YouTube, Inc.*, No. 07-cv-2103, slip op. at 16-17 (S.D.N.Y. Apr. 18, 2013) ("*Viacom III*").

-25-

36. The District Court concluded on remand that because this Court read §

512(c)(1)(A) as requiring specific knowledge of infringement, a specific

knowledge requirement carries over into § 512(c)(1)(B), *despite the Court's*

*express statement to the contrary*.  That was manifest error.

Further, the court below erred in its analysis of what constitutes the

ability to control.  It gave no weight to the fact that YouTube had available

cost-effective means for limiting harm, had employed those means, had

discontinued them in order to profit from the infringements, and then made

them available only to those willing to pay additional fees.[20]  A decision not

to use cost-effective mechanisms — such as filtering — in the face of

information showing massive copyright violations is consistent with a desire

to encourage copyright violations, the linchpin of liability for contributory

infringement.  As Justice Souter's opinion for the *Grokster* Court said in a

similar context respecting co-defendants Grokster and StreamCast:

> [N]either company attempted to develop filtering tools or other
> mechanisms to diminish the infringing activity using their
> software.  While the Ninth Circuit treated the defendants'
> failure to develop such tools as irrelevant because they lacked
> an independent duty to monitor their users' activity, we think
> this evidence underscores Grokster's and StreamCast's
> intentional facilitation of their users' infringement.

545 U.S. at 939.

---

[20] *See Viacom III*,  slip op. at 14-17.

-26-

While the DMCA does not impose an affirmative monitoring obligation, unconnected to evidence of willful blindness or of "control and benefit," it also does not bar a requirement for ISPs to filter for infringing material under conditions where that is both cost-effective and necessary to prevent an ISP from benefitting from infringements that its structure and business plan invite. *See, e.g.*, *Aimster*, 334 F.3d at 650-51; *Fung II*, 710 F. 3d at 1044-46; *Viacom II*, 676 F.3d at 34-35, 38. The reasoning under the DMCA, in other words, is similar in this respect to that of the Supreme Court in *Grokster*.

The approach taken in the decision below in this case marks a sharp departure from the instructions of *Grokster*, *Aimster*, *H.L. Green*, and other cases. The district court's reading of the law would allow service providers who knowingly profit from massive copyright infringement on their web sites wholly to escape liability so long as they block or otherwise remove infringing material for which they have actual, specific knowledge — regardless of the service provider's ability to cheaply and efficiently limit infringement from material on its site. This flies in the face of established principles of legal responsibility, efficient risk avoidance, and secondary liability in copyright law, and it misreads and misapplies the DMCA.

-27-

*Amici* urge this Court to reject the decision below in favor of traditional principles of efficient risk avoidance embedded in the rules of responsibility for copyright infringement that have been accepted by the Supreme Court, are consistent with the language of the DMCA, in particular § 512(c)(1)(B), and conform to this Court's decision in *Viacom II*.

## CONCLUSION

For the foregoing reasons, *amici* urge the Court to reverse the judgment of the District Court and remand for further proceedings.


Dated:  August 2, 2013                Respectfully submitted,

                                      LABATON SUCHAROW LLP


                                       /s/ Lawrence A. Sucharow
                                      Lawrence A. Sucharow
                                      140 Broadway, 34th Floor
                                      New York, New York 10005
                                      (212) 907-0700

                                      *Counsel for Amici Curiae Ronald A. Cass,*
                                      *Raymond T. Nimmer, and Stuart N. Brotman*

-28-

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

The undersigned counsel for *amici curiae* Ronald A. Cass, Raymond T. Nimmer, and Stuart N. Brotman certifies that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 6,242 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  In preparing this certificate, I relied on the word count program in Microsoft Word.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in 14-point Times New Roman font.

Dated:  August 2, 2013

  /s/ Lawrence A. Sucharow
      Lawrence A. Sucharow
      *Counsel for Amici Curiae*