# 13-1720-cv

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT



VIACOM INTERNATIONAL, INC., COMEDY PARTNERS,
COUNTRY MUSIC TELEVISION, INC., PARAMOUNT PICTURES CORPORATION,
BLACK ENTERTAINMENT TELEVISION, LLC,

*Plaintiffs-Appellants,*

*v.*

YOUTUBE, INC., YOUTUBE, LLC, GOOGLE INC.,

*Defendants-Appellees.*

—————————

*On Appeal from the United States District Court
for the Southern District of New York*

## BRIEF FOR DEFENDANTS-APPELLEES

David H. Kramer
Michael H. Rubin
WILSON SONSINI GOODRICH & ROSATI PC
650 Page Mill Road
Palo Alto, California 94304
(650) 493-9300

Brian M. Willen
WILSON SONSINI GOODRICH & ROSATI PC
1301 Avenue of the Americas
New York, New York 10019
(212) 999-5800

Andrew H. Schapiro
David B. Schwartz
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Defendants-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. Rule 26.1, YouTube states that Appellees YouTube, Inc. and YouTube, LLC are wholly owned subsidiaries of Appellee Google Inc. YouTube further states that Google Inc. does not have a parent corporation and that no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT..............................................i

TABLE OF AUTHORITIES .......................................................v

INTRODUCTION ...........................................................1

COUNTERSTATEMENT OF ISSUES PRESENTED...........................1

COUNTERSTATEMENT OF FACTS ........................................2

    A.    YouTube's Origins And Operations...................................2

        1.    YouTube's Founding Purpose.........................................2

        2.    YouTube's Extensive Efforts To Prevent Infringement...3

        3.    YouTube's Vast Array Of Authorized Videos ..................6

        4.    Viacom's False And Distorted Story ..............................7

    B.    Viacom And Its Relationship With YouTube.........................13

    C.    Viacom's Clips-In-Suit .................................................15

    D.    Procedural History ....................................................16

        1.    The District Court Grants Summary Judgment To YouTube.....................................................................16

        2.    This Court Orders A Limited Remand On Four Issues.17

        3.    The District Court Again Grants Summary Judgment.19

SUMMARY OF ARGUMENT ................................................21

ARGUMENT ..............................................................23

I.    The District Court Correctly Held That YouTube Did Not Have Actual Knowledge Or Awareness That Any Of Viacom's Clips-In-Suit Were Infringing .......................................23

    A.    Viacom Admits There Is No Evidence That YouTube Knew Any Clip-in-Suit Was Infringing................................24

    B.    Viacom's Burden-Shifting Argument Is Meritless ..............25

    C.    YouTube Has Shown Its Lack of Knowledge .......................29

## TABLE OF CONTENTS
(continued)

**Page**

II. The District Court Correctly Held That YouTube Was Not Willfully Blind To The Alleged Infringement Of Any Clips-In-Suit ............................................................................... 33

    A. Under The DMCA, Willful Blindness Must Be Shown As To Particular Infringing Material ..................................... 33

    B. Viacom's Effort To Use Willful Blindness To Revive Its General Knowledge Arguments Should Be Rejected ........... 35

    C. Viacom's "Evidence" Of Willful Blindness Does Not Create A Jury Question ......................................................... 39

III. The District Court Correctly Held That YouTube Is Protected By The DMCA's Control-And-Benefit Provision ........... 43

    A. "Control" Requires "Substantial Influence" Over The Infringing Activity At Issue .................................................. 43

    B. Viacom Cannot Show That YouTube Had Substantial Influence Over The Infringement Of Any Clips-In-Suit ...... 45

        1. Viacom Cannot Establish Control Via Inducement ....... 45

            a. Viacom misunderstands inducement and its connection to the DMCA ........................................ 46

            b. The district court correctly found that YouTube did not induce anyone to engage in the alleged infringement ........................................................... 49

        2. Viacom Cannot Establish Control Based On YouTube's Content Policies Or Monitoring Efforts ....... 52

    C. YouTube Did Not Receive A Financial Benefit Directly Attributable To Viacom's Alleged Infringing Activity .......... 56

        1. The DMCA Does Not Codify A Broad "Draw" Test ........ 56

        2. The DMCA Protects YouTube's Advertising-Supported Business Model ............................................. 59

IV. Viacom's Request For Judicial Reassignment Is Meritless .......... 62

# TABLE OF CONTENTS
(continued)

**Page**

CONCLUSION ...................................................................... 62

CERTIFICATE OF COMPLIANCE ........................................... 63

CERTIFICATE OF SERVICE................................................... 64

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bayway Refining Co. v. Oxygenated Mktg. & Trading A.G.,*
    215 F.3d 219 (2d Cir. 2000).............................................28

*BBS Norwalk One, Inc. v. Raccolta, Inc.,*
    117 F.3d 674 (2d Cir. 1997).............................................28

*Capitol Records, LLC v. Vimeo, LLC,*
    --- F. Supp. 2d ----, 2013 WL 5272932
    (S.D.N.Y. Sept. 18, 2013) .......................................... passim

*Columbia Pictures Indus., Inc. v. Fung,*
    710 F.3d 1020 (9th Cir. 2013) ................................... passim

*Corbis Corp. v. Amazon.com, Inc.,*
    351 F. Supp. 2d 1090 (W.D. Wash. 2004)............................26, 53, 54

*CoStar Grp., Inc. v. LoopNet, Inc.,*
    373 F.3d 544 (4th Cir. 2004) ...........................................29

*Fonovisa, Inc. v. Cherry Auction, Inc.,*
    76 F.3d 259 (9th Cir. 1996) ............................................58

*Gallo v. Prudential Resid. Servs., Ltd. P'ship,*
    22 F.3d 1219 (2d Cir. 1994)............................................24

*Global-Tech Appliances, Inc. v. SEB S.A.,*
    131 S. Ct. 2060 (2011) ...............................33, 34, 38, 39, 47

*Hendrickson v. eBay, Inc.,*
    165 F. Supp. 2d 1082 (C.D. Cal. 2001) ................................53

*Io Grp., Inc. v. Veoh Networks, Inc.,*
    586 F. Supp. 2d 1132 (N.D. Cal. 2008) .......................... passim

*MGM Studios Inc. v. Grokster, Ltd.,*
    545 U.S. 913 (2005) ............................................... passim

v

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Obodai v. Demand Media, Inc.*,
  2012 WL 2189740 (S.D.N.Y. June 13, 2012) ................................. 26

*Perfect 10 v. Visa Int'l Servs. Ass'n*,
  494 F.3d 788 (9th Cir. 2007) ........................................ 48

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  No. CV-05-4753 (C.D. Cal. Nov. 4, 2008) ..................................... 27

*Perfect 10, Inc. v. CCBill LLC*,
  488 F.3d 1102 (9th Cir. 2007) ....................................... 59

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
  213 F. Supp. 2d 1146 (C.D. Cal. 2002) .................................... 54, 55

*Tiffany (NJ) Inc. v. eBay, Inc.*,
  576 F. Supp. 2d 463 (S.D.N.Y. 2008) .............................. 37

*Tiffany (NJ) Inc. v. eBay, Inc.*,
  600 F.3d 93 (2d Cir. 2010)................................... 37, 38, 39

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
  718 F.3d 1006 (9th Cir. 2013) ................................. passim

*UMG Recordings, Inc. v. Veoh Networks, Inc.*,
  665 F. Supp. 2d 1099 (C.D. Cal. 2009) .............................. 26, 31, 32

*United States v. Aina-Marshall*,
  336 F.3d 167 (2d Cir. 2003).............................................. 34

*United States v. Johnson*,
  567 F.3d 40 (2d Cir. 2009)............................................. 62

*United States v. Rybicki*,
  354 F.3d 124 (2d Cir. 2003) (en banc)............................. 44

*Viacom Int'l, Inc. v. YouTube, Inc.*,
  676 F.3d 19 (2d Cir. 2012)..................................... passim

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Wolk v. Kodak Imaging Network, Inc.*,
    840 F. Supp. 2d 724 (S.D.N.Y. 2012) ............................ 27, 28, 54, 59

## STATUTES

17 U.S.C. §512(c) ................................................................... passim

17 U.S.C. §512(*i*) ............................................................... 40, 53

17 U.S.C. §512(m) .............................................................. passim

47 U.S.C. §230(c)(2) ................................................................. 53

## LEGISLATIVE MATERIALS

H.R. Rep. No. 105-551 (II) (1998) ............................... 28, 57, 60

H.R. Rep. No. 105-796 (1998) (Conf. Rep.) ..................... 29, 53

S. Rep. No. 105-190 (1998) ........................... 29, 56, 57, 58, 59

## OTHER AUTHORITIES

31A C.J.S. Evidence §200 (2012) .......................................... 30

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* §12B.04[A][1][b][i] ................................................ 32

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* §12B.04[A][1][d] ................................................... 27

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* §12B.04[B][4][c] .................................................. 27

6 Patry on Copyright §21:85 (2012)[1] ............................... 58

---

[1]  Professor Patry became a Google employee in October 2006.

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

Emmys.com, *Winners Announced for the 65th Primetime Engineering Awards* (Sept. 25, 2013)..............................................5

## INTRODUCTION

When this case first came before it, this Court ruled for YouTube on the central legal issues in dispute: that generalized awareness of infringement cannot oust a service provider from the DMCA safe harbor, and that service providers are not required to affirmatively police their websites in an effort to identify possible infringements. Having affirmed on those points, the Court went on to hold that summary judgment had been "premature" because a few record-centered issues required further consideration. The case was therefore remanded for the district court to address four discrete questions regarding YouTube's safe-harbor eligibility. The district court did just that. Carefully reviewing the evidence and faithfully applying this Court's rulings, Judge Stanton granted summary judgment to YouTube. That decision was correct, and Viacom's effort now to reargue, in different guises, points that this Court has already rejected is unavailing. After nearly seven years, the time has come to bring this case to a close. The district court's judgment should be affirmed.

## COUNTERSTATEMENT OF ISSUES PRESENTED

Whether the district court correctly held that the DMCA safe harbor protects YouTube against Viacom's infringement claims, where:

1.     Viacom has conceded that there is no evidence that YouTube had knowledge or awareness of any specific infringements corresponding to Viacom's "clips-in-suit";

2.     Viacom fails to identify any evidence that YouTube was willfully blind to any particular alleged infringements, but instead seeks to use the willful-blindness doctrine to resurrect the discredited arguments that YouTube can be disqualified based on a failure to act in the face of generalized awareness of infringing activity; and

3.     YouTube did not exert "substantial influence" over any of the alleged infringements at issue, and YouTube has an industry-standard business model that generates revenue from a vast array of non-infringing uses.

## COUNTERSTATEMENT OF FACTS

### A.    YouTube's Origins And Operations

This Court's decision in *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012) ("*Viacom*") describes YouTube's origins, growth, and the operation of its website. SPA43-44. Here, we highlight some important facts about YouTube that Viacom ignores or distorts.

### 1.    YouTube's Founding Purpose

YouTube was founded as "the first online community site that allows members to post and share personal videos." JAXVI:4129. In hundreds of internal emails and other communications, YouTube's founders

2

spelled out their vision for the site—to "focus on real personal clips that are taken by everyday people" (JAXII:3041) in order to "become the primary outlet of user-generated content on the Internet" (JAXII:3055).[2]

In keeping with that vision, the founders wanted users to upload personal videos, not videos that infringed others' copyrights. JAXII: 2985-86(¶¶3-6), 2990-91(¶¶15-16), 3026-33(¶¶2-22). As Chad Hurley told his co-founders, "we should never promote piracy or tell [users] how to do it." JAXIII:3066. YouTube's earliest advertisements emphasized its goal to "become a community of digital video authors and their videos." JAIX:2172(¶¶11-13); JAXII:3028-30(¶¶9-10), 3047-49. The very name of the service and its motto ("Broadcast Yourself") reinforced the focus on personal videos. JAIX:2171-72(¶¶8-9); JAXII:3037; JAXV:3691 ("The videos you upload should be about you (hence, YouTube!)").

2.    YouTube's Extensive Efforts To Prevent Infringement

YouTube has consistently worked to deter users from uploading unauthorized material and to assist copyright owners in stopping infringement. YouTube's terms of use have always prohibited users from

---

[2] *See, e.g.*, JAXII: 3036 (YouTube is "a repository for all kinds of personal videos"), 3038 (describing YouTube as "a site that features creative videos from personal users"), 3041 ("we aren't a film site, but a personal video clips site"); JAXIII:3060 ("the key to our success is personal videos"), 3067 ("YouTube is a new service that allows people to easily upload, tag, and share personal videos"); JAXV:3815 (YouTube's goal to "to secure our position as the #1 place for personal videos on the internet").

posting infringing material. JAIX:2181(¶49). YouTube enforced those terms from the start: when YouTube's founders occasionally came across what looked like professionally produced content that they were concerned may have been posted without authorization, they *rejected* such videos. *See, e.g.*, JAV:1314; JAIX:2171-72(¶9); JAXII:3029-32(¶¶11, 15-17), 3046, JAXIII:3060-66; JAXVI:3978-79(¶6), 3981-84. In July 2005, for example, Chad Hurley wrote to a user whose video had been "rejected because it was copyrighted material," explaining that "[w]e are trying to build a community of real user-generated content." JAXIII:3064.

As the site developed, YouTube's copyright-enforcement apparatus grew along with it. Within a few months of its launch, YouTube adopted a robust DMCA policy, registering an agent to receive notices of alleged infringement from copyright holders and expeditiously removing videos identified in such notices. YouTube also pioneered a "three-strikes" rule for terminating the accounts of users suspected as repeat infringers. YouTube built a team of employees available around the clock to help copyright owners remove unauthorized material. It imposed a time-limit for videos to prevent the posting of full-length television shows and movies. YouTube also posted notices throughout its website re-minding users that they are prohibited from uploading unauthorized content and educating them about copyright law. JAIX:2182-83(¶¶53-54), 2186(¶¶60-63), 2187-90(¶¶65-69, 71-75), 2192-93(¶¶80-82), 2194-

95(¶¶86-87); JAXXII:5699-707(¶¶64, 76-79, 83-85). Copyright owners and anti-piracy groups have repeatedly praised YouTube for these efforts. JAIX: 2194-95(¶87); JAXIII:3091(¶22); JAXIV:3589.

YouTube has also been an industry leader in using technology to combat infringement. In early 2006, it introduced a tool that allows copyright holders to mark allegedly infringing videos and seek their removal with the click of a button. JAIX:2196(¶¶90-93). At the same time, YouTube began deploying "hashing" technology that blocks identical copies of videos removed in response to takedown notices. JAIX:2195-96(¶¶88-89). In February 2007, YouTube started using audio-based "fingerprinting" technology licensed from Audible Magic. JAIX:2196-98(¶¶94-96); JAXVI:4005-07(¶¶2-7). Recognizing the limits of these existing technologies, YouTube became the first website of its kind to build its own fingerprinting system. JAIX:2198(¶¶97, 100); JAXIII:3074-82(¶¶11-28).

YouTube's groundbreaking "Content ID" system uses audio- and video-fingerprinting technology developed in-house to identify videos and apply the copyright owner's designated policy to those videos. JAIX:2198-200(¶¶97-110). Since it launched in October 2007, Content ID has been successfully used by thousands of copyright holders. JAIX:2199-2200(¶¶104, 109-10). (Indeed, YouTube recently won an Emmy Award from the television industry for its work on Content ID. Emmys.com, *Winners Announced for the 65th Primetime Engineering*

*Awards* (Sept. 25, 2013), http://www.emmys.com/news/press-releases/ winners-announced-65th-primetime-emmy-engineering-awards.)   After helping test Content ID in its development stage, Viacom agreed to start using it in February 2008. JAIX:2200(¶¶111-112); JAXVI:3993-94(¶¶7, 9-10). Recognizing Content ID's effectiveness, Viacom has abandoned its infringement claims for the thousands of clips-in-suit uploaded to YouTube after May 2008, the date that Viacom actually began using Content ID. JAXXIII:5943(¶172).

### 3.    YouTube's Vast Array Of Authorized Videos

YouTube hosts an extraordinary range of original and other authorized videos. The hundreds of millions of videos that users have uploaded to YouTube (JAIX:2176(¶32), 2194(¶86)) are endlessly varied: amateur comedy routines, raw video footage taken in war zones or during protests in foreign capitals, clips of cats playing the piano, videos teaching people how to fix a faucet or bake a cake, and messages sent by U.S. soldiers overseas to their families back home. JAXV:3799-813(¶¶2-22). In addition to all this user-generated content, YouTube has entered into partnerships with numerous television and movie studios, sports leagues, record labels, and music publishers. JAIX:2180(¶43), 2215(¶164). These content creators make their material available on YouTube either by uploading it directly or by "claiming" videos posted by others. JAIX:2202(¶121), 2215(¶164). Even without express partnerships, many professional content owners—including Viacom—routinely

post their material on YouTube for marketing purposes and authorize others to do the same. *Infra* Part C.

### 4. Viacom's False And Distorted Story

Viacom ignores the vast record summarized above. Instead, as it did in its original appeal brief, Viacom strings together out-of-context quotations from a handful of documents. Br. 4-16. As this Court recognized, none of these documents refers to the videos identified by Viacom (the "clips-in-suit"). SPA54. We respond briefly to explain why no one looking at the actual evidence could reasonably draw the inferences that Viacom conjures:

• Citing a single document, Viacom claims that YouTube's policy was to build up its numbers "through whatever tactics, however evil." Br. 4 (quoting JAV:1173). Here is what YouTube's co-founder Steve Chen actually wrote: "If I were running the show I'd say, we concentrate all of our efforts in building up our numbers as aggressively as we can through whatever tactics, however evil *i.e. scraping myspace*." JAV:1173 (emphasis added). As the text that Viacom omits shows, Chen's fleeting idea—to use a computer program to gather information about users of MySpace—had nothing to do with copyright (nor was it ever adopted). JAXVI:3972.

• Again pointing to a lone document, this one discussing a cease-and-desist letter for videos unrelated to this case, Viacom asserts that YouTube "embraced the infringement." Br. 5-6 (citing JAXII:2937).

7

But the joking reaction by Jawed Karim (another YouTube co-founder) to this letter—one that did not identify any particular videos—shows nothing like that. Viacom does not (and could not) claim that the founders ignored that demand or refused to comply with it.

• Viacom cites an email in which Chen supposedly chastised Karim for "putting stolen videos on the site." Br. 6 (quoting JAV:1328). But it is undisputed that those videos were "user-generated videos created by airplane enthusiasts" that Karim had found on other websites. They did not belong to Viacom, and are irrelevant to this case. JAXVII:4208. In any event, Chen told Karim to "stop" posting such videos (JAV:1328), emphasizing that "we aren't a stupid videos site" and "we want to promote personal videos" (JAXVII:4270).

• Viacom quotes another email in which Chen wrote that the "only reason why our traffic surged was due to a video of this type." JAV:1335. This exchange had nothing to do with content from Viacom or other professional media companies. It concerned another viral video, this one "of a person playing the drinking game 'quarters.'" JAXVI:3971. Chen and Hurley's discussion about that video does not remotely suggest a "plan to facilitate and profit from infringement" (Br. 6).

• Referencing a September 3, 2005 email, Viacom attributes to Chen the statement that removing "obviously copyright infringing stuff" would reduce YouTube's traffic by 80 percent. Br. 8 (quoting JAV:1323-25). That is not what Chen said: his off-the-cuff guess related to the

possible effect of removing so-called "stupid videos"—amateur videos, often of stunts or pranks, making the rounds on the Internet, which were a frequent subject of debate among YouTube's founders. JAV:1323-25; JAXVI:3970-71. Indeed, in this very document, Chen and Karim *agreed* that YouTube should *continue* taking down clips from TV shows and movies—because they did not want YouTube to "look like a dumping ground for copyrighted stuff." JAV:1323. "If we keep that policy," Karim wrote, "I don't think our views will decrease at all." *Id.*

•      Viacom points to another email (one already discussed and dismissed by this Court (SPA53-54)) in which YouTube's founders debated whether to preemptively remove a clip of a Space Shuttle launch. Br. 8. Viacom claims that this email is somehow evidence of a "policy" of keeping all infringing clips until it received a takedown notice, but the actual document reflects YouTube's decision to *continue removing* "stuff like movies/tv shows," while suggesting a different approach for "short news clips," based in part on a reasonable belief that such clips were fair uses. JAV:1337.

•      Viacom attacks YouTube for ending, in late 2005, a brief experiment with a feature that allowed users to flag videos as potentially infringing. Br. 9-10. Viacom ignores the undisputed record showing that "community flagging" proved ineffective—unsurprisingly, given that random users have no reliable way to distinguish authorized videos from unauthorized ones. In the two weeks that flagging was operative,

9

users flagged only 53 videos. JAXVII:4283-84. Those videos—which include clips of household pets, a Pepsi commercial, and a filmmaker's demo reel—only confirm the problems with relying on users to guess about possible infringement. JAXVII:4288-89; JAXVIII:4601 (Exs. 387A/B to 393A/B). Recognizing these flaws, YouTube replaced user-flagging with the mechanism that the DMCA actually contemplates—removing videos based on sworn notices from copyright owners. JAXII:3032-33(¶¶20-21); JAXV:3814.

- Viacom's alludes to a training guide that references the *Daily Show* (Br. 10), but fails to mention that the guide used that show merely to illustrate YouTube's policies regarding *sexually explicit* content. JAII:286. The document did not speak to the separate question of copyright infringement, nor did it say that *Daily Show* clips (or any other videos) would be permitted if their presence was unauthorized.[3]

- Viacom's claim that YouTube Product Manager Maryrose Dunton "killed" an "automated anti-infringement tool" (Br. 10-11) disregards the undisputed evidence that—months before the date of the

---

[3] Viacom's claim that *Daily Show* clips were "blatantly infringing" (Br. 10) is belied by its own actions. Viacom executives felt "very strongly" that they did not "want to stop the colbert and daily clips." JAXIV:3502, 3366-68. So Viacom instructed its copyright-monitoring agent *not* to remove most *Daily Show* clips from YouTube. JAXIV:3510-16, 3577; JAXXI:5253-54; JAXXII:5618-39; *cf.* JAXXII:5647 (Viacom telling ACLU that it "did not take down" "many" *Daily Show* clips from YouTube because they may have been fair uses).

document Viacom cites—YouTube had *already* launched that tool (a minor one allowing users and copyright holders alike to receive alerts when videos with "tags" matching designated keywords were uploaded). JAXVI:3974-75(¶¶2-6).

• Viacom repeats its allegations that YouTube delayed and selectively implemented fingerprinting technology. Br. 12-13, 15-16. This Court has made clear that those allegations are legally irrelevant because YouTube cannot be deprived of the safe harbor based on how it used fingerprinting. SPA64-65. Viacom's allegations are also contrary to the record. The technology at issue, Audible Magic, was designed to identify sound recordings—not television and movie clips. JAXII:3074(¶11); JAXVI:3992(¶2), 4005(¶2). When it licensed Audible Magic in October 2006, YouTube was the *first* user-generated-content website to do so. JAXVI:4005(¶¶2-3). Moreover, it was not until 2007 that Viacom provided Audible Magic any reference fingerprints, meaning that even if YouTube had used that technology earlier or differently, it would have been useless for identifying Viacom content. JAXIX:4878, 4881-83, 4946-49, 4951-52, 4959-60, 4963-64; *cf.* JAXXI:5386-87 (YouTube introducing Viacom to Audible Magic in December 2006). When Viacom eventually tested Audible Magic, it found it ineffective and unreliable (JAXIX:4897, 4900), validating YouTube's concerns about broadly applying that *audio* fingerprinting technology to a *video*

11

service (JAXIII:3074-76(¶¶11-13); JAXVI:4006-07(¶¶5-6); JAXIX:4763-65).

•   Despite what Viacom claims (Br. 15), moreover, the record shows that YouTube *never* relied on a copyright holder's unwillingness to license content as a basis for refusing to let it use Audible Magic or any other filtering technology. JAXIII:3074(¶9); JAXVI:4007-13(¶¶7-13); JAXVII:4261; JAXVIII:4712, 4722-24; JAXIX:4732-34, 4850-52. Various copyright owners used Audible Magic exclusively to block content on YouTube. JAXIII:3074(¶10); JAXVIII:4715-16; JAXIX:4732-34, 4780-83.[4] Meanwhile, YouTube was at work building a better solution, Content ID. JAXIII:3075-79(¶¶13-19); JAXVI:3992(¶2). As soon as Content ID launched in 2007, YouTube made it freely available to copyright owners without any condition of a content-licensing deal. JAXIII:3079-80(¶¶21-23); JAXVI:3993-94(¶¶7-9).

---

[4] Viacom repeatedly relies (Br. 13, 25, 35, 54) on the deposition testimony of the MPAA's Dean Garfield that someone at YouTube supposedly told him that the company would not employ filtering technology because copyrighted content was a "major lure"—even though Garfield could not say when the comment was made, who made it, or even whether it was a man or a woman. JAXXI:5415-21. This unreliable hearsay has no support in the documentary record, and, indeed, is contradicted by Garfield's own email in which he told Viacom that YouTube was—and always had been—willing to work with MPAA to test filtering solutions. JAXIX:4982. Viacom also cites (Br. 15-16) a February 2007 email from Google's general counsel, which said the opposite of what Viacom claims. The email explained to Viacom that Google was still evaluating filtering tools and was "open to discussing your possible participation in these tests." JAIX:2161.

- Finally, Viacom points to comments about YouTube made by Google Video employees at the time when the two services were competitors. Br. 13-14. Prior to Google's acquisition of YouTube, Google employees had no way to assess infringement on YouTube, and their third-party statements are probative of nothing. These employees all testified that, after the acquisition, they learned that YouTube's copyright policies were robust and that YouTube was filled with authorized videos that content owners had uploaded or deliberately left up. JAXXI:5260(¶142), 5284-85(¶189).

## B.    Viacom And Its Relationship With YouTube

Viacom has long embraced YouTube to advance its business. Recognizing that "YouTube is a powerful marketing platform that most networks are using for promotion" (JAXXII:5581), Viacom and various marketing agencies posted numerous clips from Viacom television programs and movies to YouTube. JAIX:2180-81(¶¶44, 46), 2202-04(¶¶121, 123-124); JAXIII:3142-48, 3309; JAXIV:3448-53; JAXVI:4060, 4065-75, 4082-86, 4090-4125; JAXXII:5681-83; JAXXIII:5943-44(¶¶174-175). Viacom did some of its uploading openly, but much of it was covert, using dozens of obscure YouTube accounts that bore no obvious link to Viacom. JAXIII:3307-26; JAXV:3856-73; JAXVI:4057-58; JAXXII:5539-42(¶¶2-6), 5560-67, 5710-14(¶125). Viacom also issued confidential (and ever changing) instructions to its copyright-monitoring agents to leave on YouTube an array of user-posted videos containing Viacom content,

13

including clips from shows like *The Daily Show* and *The Colbert Report*. JAIX:2209(¶130); JAXIII:3313-14, 3353-54, 3359; JAXIV:3502-03, 3510-21, 3532-65, 3570-77; JAXXII:5618-44, 5710-14(¶125), 5721-27(¶¶128, 131-135); JAXXIII:5944(¶176).

Faced with this record, Viacom now acknowledges its marketing activities and tries to minimize them. Br. 18. But the evidence clearly establishes that: (1) Viacom posted or authorized what it described as a "boatload" of videos (JAXIII:3179-80); (2) while YouTube was generally aware that authorized Viacom videos were on YouTube, it did not know, and could not have known, the full range of clips that Viacom had posted (JAXXII:5717-20(¶127), 5746-47(¶1.64)); (3) even Viacom itself (and its monitoring agents) routinely had trouble distinguishing the videos that Viacom had authorized to appear on YouTube from those it had not (JAIX:2213-14(¶¶149-152); JAXII:2961-83; JAXIII:3115-16(¶¶15-16), 3119, 3130-38(¶¶3, 5-14), 3238-42, 3300-01, 3313-14; JAXIV:3389-90, 3425-26, 3429-30, 3438, 3523-25; JAXV:3679-81; 3855, JAXVI:3927-37; JAXXII:5605-16, 5544-46(¶11)), and (4) Viacom deliberately left on YouTube countless videos that it knew about and could have had removed at the click of a button.

Not content just with *using* YouTube to promote its content, Viacom tried to acquire YouTube in 2006, after Viacom's executives determined that "[c]onsumption of 'branded' content on YT is relatively low" (JAXIV:3618) and "user generated content appears to be what's driving

it right now" (JAXIX:4984). The same year, Viacom proposed a content partnership with YouTube. JAXIII:3099(¶8); JAXV:3875; JAXXI:5291-92(¶203). When negotiations stalled in February 2007, Viacom tried to pressure YouTube by sending takedown notices for approximately 100,000 clips. JAIX:2187(¶68); JAXV:3883; JAXXI:5294-95(¶¶209-210); JAXXII:5721-24(¶128). In its zeal to inflate the number of takedowns (JAXXIII:5780, 5791), Viacom erroneously targeted many clips that Viacom itself had authorized to be on YouTube, as well as thousands of other videos in which Viacom had no copyright interest at all. JAIX:2212(¶145); JAXX:5173-77; JAXXII:5745-46(¶¶1.63). By the next business day, YouTube had removed the videos that Viacom had identified. SPA79. With its tactics having failed to secure the business deal it wanted, Viacom sued YouTube in March 2007.

## C.    Viacom's Clips-In-Suit

This case concerns the alleged infringement of a closed universe of videos posted on YouTube at various times between 2005 and 2008. As this Court explained, "only the current clips-in-suit are at issue in this litigation." SPA54. All those clips were removed from YouTube years ago. SPA45 n.7.

Viacom originally claimed that hundreds of thousands of YouTube videos infringed its copyrights, but ultimately identified approximately 63,000 clips-in-suit. JAXIII:3135(¶¶6-7). It turned out, however, that Viacom's own employees and agents had actually uploaded many of

15

those clips. JAIX:2213-14(¶¶150-152); JAXIII:3135-36(¶¶8-11); JAXXII:5745-46(¶¶1.63); JAXXIII:5973-75. Even when it realized that fact (after years of litigation), Viacom and its lawyers still were unable to identify all the clips-in-suit that Viacom was responsible for posting. JAXXII:5717-20(¶127), 5544-46(¶11). Many clips-in-suit, moreover, are identical to or indistinguishable from promotional clips that Viacom now acknowledges uploading. JAXIII:3139-40(¶17); JAXXII:5542-44(¶¶9-10), 5745-46(¶1.63).

## D. Procedural History

### 1. The District Court Grants Summary Judgment To YouTube

In 2010, YouTube and Viacom filed cross-motions for summary judgment on the applicability of the DMCA safe harbors and Viacom's claim of "inducement" under *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005). The district court denied Viacom's motion and granted summary judgment to YouTube, finding that it qualified for DMCA protection "against all of plaintiffs' claims for direct and secondary copyright infringement." SPA30. In response to Viacom's inducement claim, the court explained that the "*Grokster* model does not comport with that of a service provider" like YouTube that hosts a wide range of non-infringing material and complies with the DMCA. SPA22.

2.    This Court Orders A Limited Remand On Four Issues

On appeal, this Court endorsed most of the district court's DMCA rulings, but concluded that four discrete issues needed to be addressed before summary judgment could be granted. SPA66-67.

*First*, this Court confirmed that the "basic operation of §512(c) requires knowledge or awareness of specific infringing activity." SPA48. The Court rejected as irreconcilable with the language of the statute Viacom's argument that service providers have "an amorphous obligation to 'take commercially reasonable steps' in response to a generalized awareness of infringement." *Id*. Referring to a few documents that the district court had not discussed, but uncertain whether they "referenced" the "current clips-in-suit," the Court concluded that it was "premature" to have granted summary judgment to YouTube. SPA54. The Court remanded for the district court to determine "whether any specific infringements of which YouTube had knowledge or awareness correspond to the clips-in-suit in these actions." *Id*.

*Second*, this Court addressed the relationship between the DMCA and willful blindness. The Court explained that §512(m)—which is "incompatible with a broad common law duty to monitor or otherwise seek out infringing activity based on general awareness that infringement may be occurring"—"limits" willful blindness in this context. SPA55-56. As limited, the doctrine "may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of specific instances of in-

17

fringement under the DMCA." *Id.* The Court remanded for consideration of whether YouTube had been willfully blind to the infringement of any of the clips-in-suit. *Id.* The Court made clear that for these first two issues, the record "is now complete." SPA67.

*Third*, rejecting Viacom's argument that §512(c)(1)(B) of the DMCA codifies the law of vicarious liability, the Court held that the "right and ability to control" infringing activity exists only in circumstances involving "a service provider exerting substantial influence on the activities of users." SPA60. The Court remanded for the district court to address "whether the plaintiffs have adduced sufficient evidence to allow a reasonable jury to conclude that YouTube had the right and ability to control the infringing activity and received a financial benefit directly attributable to that activity." SPA60-61.

*Fourth*, the Court held that three of YouTube's core software functions are covered by §512(c). SPA61-63. Rather than resolving whether a final function ("syndication" involving "the manual selection of copyrighted material for licensing") was similarly covered, the Court remanded for a determination "whether any of the clips-in-suit were in fact syndicated to any other third party." SPA63-64.

This Court rejected plaintiffs' argument that YouTube was disqualified from DMCA protection because it had allegedly "permitted only designated 'partners' to gain access to content identification tools by which YouTube would conduct network searches and identify infringing

18

material." SPA64. The Court explained that, in light of §512(m), "YouTube cannot be excluded from the safe harbor by dint of a decision to restrict access to its proprietary search mechanisms." SPA65. Finally, the Court held that a "finding of safe harbor application necessarily protects a defendant from all affirmative claims for monetary relief," including a claim of inducement under *Grokster*. SPA65. The case was remanded with instructions to the district court to permit "renewed motions for summary judgment as soon as practicable." SPA67.

### 3.    The District Court Again Grants Summary Judgment

On remand, after Viacom agreed that no further discovery was required, YouTube renewed its motion for summary judgment on the four remaining issues. In a detailed opinion, the district court granted YouTube's motion. SPA96-97.

As to knowledge, the district court explained that Viacom conceded that it had "failed to come forward with evidence establishing YouTube's knowledge of specific clips-in-suit." SPA76 (quoting Viacom's opposition brief). Viacom argued that its lack of evidence of clip-specific knowledge somehow precluded YouTube from claiming DMCA protection, but the court rejected that argument as "extravagant." SPA78. The court held that Viacom's concession answered the remand inquiry on knowledge. SPA79.

The district court next held that Viacom failed to create a triable issue on willful blindness. The court explained that under this Court's

19

ruling, "what disqualifies the service provider from the DMCA's protection is blindness to 'specific and identifiable instances of infringement.'" SPA81 (quoting SPA51). Because Viacom made "no showing of willful blindness to specific infringements of clips-in-suit," the court held that YouTube was protected by the safe harbor. SPA83.

The district court also concluded that "YouTube did not have the right and ability to control infringing activity within the meaning of §512(c)(1)(B)." SPA94. The court explained that the concept underlying this Court's ruling is that "a service provider, even without knowledge of specific infringing activity, may so influence or participate in that activity, while gaining a financial benefit from it, as to lose the safe harbor." SPA85. Carefully reviewing Viacom's evidence—including its claims about inducement—the court found that Viacom did not satisfy that test. SPA87-94.

Finally, the court held that YouTube's general "syndication" offerings—which entail "neither manual selection nor delivery of videos"—are protected by the §512(c) safe harbor. SPA95-96.[5]

Accordingly, the district court found that YouTube was entitled to summary judgment on the DMCA. SPA96-97. This appeal followed.

---

[5] Viacom has elected not to appeal the district court's ruling on syndication. Br. 24 n.9. Because that ruling was a direct application of this Court's decision, it should be affirmed.

## SUMMARY OF ARGUMENT

The district court correctly ruled in YouTube's favor on each of the remaining issues in the case.

*Knowledge*. This Court held that disqualifying a service provider from the DMCA safe harbor requires evidence that the provider knew or was aware of specific infringing material. SPA54. Recognizing that it cannot make that showing, Viacom now seeks to invert the burden of proof, arguing that YouTube must affirmatively prove that it *lacked* knowledge of the infringing nature of each clip-in-suit. The district court rightly rejected Viacom's novel tactic, explaining that Viacom's conceded inability to identify any "specific infringements of which YouTube had knowledge or awareness" that "correspond to the clips-in-suit" (SPA54) ends the knowledge inquiry. SPA79. In any event, there is ample evidence of YouTube's lack of clip-specific knowledge—including the very fact that the voluminous record in this case contains no such evidence.

*Willful Blindness.* This Court held that the willful-blindness doctrine—as "limit[ed]" by §512(m) of the DMCA—can "in appropriate circumstances" be used to make the necessary showing of clip-specific knowledge. SPA56. That was not license for Viacom to resurrect its already rejected argument that inaction in the face of general knowledge of infringement takes a service providers out of the safe harbor. Instead, to establish disqualifying knowledge under the DMCA via willful blind-

21

ness, a plaintiff must show that the service provider was aware of a high probability that *the particular material at issue was infringing* and took deliberate action to avoid confirming that fact. Viacom cannot make that showing as to any of its clips-in-suit.

*Control-And-Benefit.* To have the "right and ability to control" under the DMCA, a service provider must exert "substantial influence" on the activities of its users. SPA60. A finding of control thus cannot be based on the provider's generalized editorial power over its website or free-floating claims about its bad "intent." Correctly applying this Court's ruling, the district court held that Viacom's evidence fails to establish control because it "shows neither participation in, nor coercion of, user infringement activity." SPA91.

In response, Viacom invokes inducement, but under the "substantial influence" standard Viacom would have to show that YouTube actually encouraged or promoted infringing activity and thus helped bring about the alleged infringement of the clips-in-suit. There is no such evidence here. Viacom is equally wrong in suggesting that YouTube should lose the safe harbor because it adopted and tried to enforce general policies about acceptable content on its website. As all the cases confirm, YouTube's efforts to apply its content policies—including its decisions about how to use monitoring tools such as user-flagging and fingerprinting—cannot disqualify it from DMCA protection.

Separate from Viacom's failure to show control, YouTube is entitled to summary judgment because Viacom cannot show that YouTube earned a financial benefit "directly attributable to the infringing activity" at issue. The DMCA's text and legislative history make clear that Congress did not codify the Ninth Circuit's broad judge-made version of the "draw" test for vicarious liability. Instead, the statute protects services, like YouTube, that have a legitimate business model that does not depend on or favor infringement.

Judge Stanton correctly held that YouTube was entitled to summary judgment. The decision below should be affirmed, rendering moot Viacom's baseless request to reassign this case to a new judge.

## ARGUMENT

### I.  The District Court Correctly Held That YouTube Did Not Have Actual Knowledge Or Awareness That Any Of Viacom's Clips-In-Suit Were Infringing

Viacom admits, as it did before the district court, that it cannot make the showing of clip-specific knowledge that this Court's ruling requires. That answers the first remand question. Viacom's attempt to avoid summary judgment on knowledge by reversing the applicable burden of proof is contrary to this Court's decision, numerous other precedents, and the DMCA.

23

## A.    Viacom Admits There Is No Evidence That YouTube Knew Any Clip-in-Suit Was Infringing

The "most important question" before this Court in the first appeal was whether the DMCA requires knowledge of "specific and identifiable" instances of infringement. SPA47. The Court held that it does, rejecting Viacom's argument that "generalized awareness" is enough. SPA48. The only remaining issue was whether Viacom could point to any evidence that "YouTube had knowledge or awareness of any specific instances of infringement" corresponding to the particular clips-in-suit. SPA66. Rather than make that showing on remand, Viacom admitted to the district court that it had no evidence "that would allow a clip-by-clip assessment of actual knowledge." SPA76. Viacom now tells this Court that it "cannot identify all or even most of the specific clips of which YouTube was aware." Br. 47-48.

These concessions end the knowledge inquiry. It is black-letter law that "the moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Resid. Servs., Ltd. P'ship*, 22 F.3d 1219, 1223-24 (2d Cir. 1994). That is the situation here. YouTube explained that for each of Viacom's clips-in-suit, there was no evidence that YouTube had actual or red-flag knowledge. SPA75 (referencing JAXXIII:6038). And Viacom admits as much. Because Viacom "lack[s] proof that YouTube had knowledge or awareness of any specific in-

24

fringements of clips-in-suit," the district court correctly granted summary judgment to YouTube. SPA79.

## B.    Viacom's Burden-Shifting Argument Is Meritless

Unable to come up with evidence that YouTube had clip-specific knowledge, Viacom claims that it need not offer any evidence at all. On remand, Viacom argued (for the first time) that YouTube has the burden of *disproving* knowledge, and that it must do so on a clip-by-clip basis. The district court correctly rejected Viacom's "extravagant" burden-shifting argument. SPA78.

In *Viacom*, this Court made clear that if plaintiffs wanted to evict YouTube from the safe harbor, the burden was on them to come forward with evidence showing that YouTube had knowledge of specific clips-in-suit. For example, this Court explained that much of the evidence Viacom relied on was "insufficient, standing alone, *to create a triable issue of fact* as to whether YouTube actually knew, or was aware of facts or circumstances that would indicate, the existence of particular instances of infringement." SPA52 (emphasis added). With respect to other evidence, the Court wrote that "the *plaintiffs may have raised a material issue of fact* regarding YouTube's knowledge or awareness of specific instances of infringement." SPA53 (emphasis added). But even that would not defeat summary judgment unless Viacom could tie YouTube's purported knowledge to the actual clips-in-suit. SPA54 n.9. This Court therefore instructed the district court to "determine on remand whether

25

any specific infringements of which YouTube had knowledge or awareness correspond to the clips-in-suit." SPA54.

Viacom ignores these passages, which show that the burden is not on YouTube to prove a negative by demonstrating its lack of knowledge as to each clip-in-suit. To the contrary, the entire premise of this Court's decision is that YouTube is entitled to summary judgment unless *plaintiffs* can present evidence from which a jury could find that "YouTube had knowledge or awareness of any specific instances of infringement corresponding to the clips-in-suit." SPA66. Viacom now admits that it cannot do so. Nothing more is required to affirm the district court.

Viacom's effort to reverse the burden of proof is contrary not only to this Court's decision but all other relevant case law. Understanding that the applicable burden rests with the copyright owner, courts routinely grant summary judgment to service providers where, as here, the plaintiff fails to present evidence showing that the defendant had knowledge of infringement under the DMCA. *See, e.g.*, *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1023 (9th Cir. 2013); *Obodai v. Demand Media, Inc.*, 2012 WL 2189740, at *6-7 (S.D.N.Y. June 13, 2012); *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F. Supp. 2d 1099, 1108 (C.D. Cal. 2009) ("*UMG II*"); *Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1149 (N.D. Cal. 2008); *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1107-09 (W.D. Wash. 2004). No DMCA case has required a service provider to affirma-

tively prove its lack of knowledge of particular infringements. Instead, "[t]o disqualify defendant from the safe harbor, the copyright claimant must show defendant's actual knowledge or a 'red flag' waving in its face." 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* §12B.04[A][1][d] n.145; *see also id.* §12B.04[B][4][c] ("[T]he copyright owner bears the burden of demonstrating knowledge independently of the failed notification."); *Perfect 10, Inc. v. Amazon.com, Inc.*, No. CV-05-4753, slip op. at 8 (C.D. Cal. Nov. 4, 2008) (Dkt. No. 221) ("[I]t is [plaintiff's] burden to show that [defendant] had actual knowledge of infringement within the meaning of section 512(c).").

Nothing Viacom cites (Br. 43-45) suggests otherwise. *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724 (S.D.N.Y. 2012), actually undercuts Viacom's argument. Like the cases discussed above, *Wolk* granted summary judgment to the service provider after finding "no evidence that [the defendant] had actual or constructive knowledge of the copyright infringement [plaintiff] alleges." *Id.* at 746. The other decisions (and legislative history) that Viacom invokes refer merely to the overall burden of establishing the safe-harbor defense. *E.g.*, *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1039 (9th Cir. 2013). That is not the question here. YouTube might have been required to prove its threshold DMCA eligibility—that it is a "service provider," that it implemented a repeat-infringer policy, and that it accommodates "standard technical measures." *Wolk*, 840 F. Supp. 2d at 743. And it did

27

so. But, as this Court made clear, the situation is different with respect to the statute's *disqualifying* factors (such as knowledge and control/benefit).[6] The DMCA does not require YouTube to prove a negative by coming forward with clip-specific evidence of its lack of knowledge and its inability to control.[7]

Adopting Viacom's approach would directly undermine the DMCA. The statute was designed to protect service providers against claims for contributory liability. H.R. Rep. No. 105-551 (II), at 53 (1998). To make out such a claim, the plaintiff typically must show that the defendant had knowledge of infringement. *Wolk*, 840 F. Supp. 2d at 750-51. Under Viacom's proposed burden-allocation, however, a service provider seeking safe-harbor protection against a contributory claim would be required to introduce evidence to conclusively *disprove* knowledge. But a

---

[6] In discussing the DMCA's control-and-benefit provision, this Court expressly stated that plaintiffs bear the burden of proof. SPA60-61 (instructing district court to determine "whether the *plaintiffs have adduced sufficient evidence* to allow a reasonable jury to conclude that YouTube" had the right and ability to control) (emphasis added). There is no reason the allocation of the burden would be any different under the knowledge provisions, and Viacom offers none.

[7] Viacom (Br. 45 n.15) cites a few irrelevant cases discussing admiralty law and civil forfeiture. These cases say nothing about how the DMCA allocates the burden of proving knowledge. Viacom also ignores that in various contexts, this Court has declined to impose the "unfair requirement" of proving a negative on parties seeking summary judgment. *BBS Norwalk One, Inc. v. Raccolta, Inc.*, 117 F.3d 674, 677 (2d Cir. 1997); *Bayway Refining Co. v. Oxygenated Mktg. & Trading A.G.*, 215 F.3d 219, 225 n.4 (2d Cir. 2000).

28

service provider able to make that showing would have no need for the DMCA, because, in the absence of knowledge, the plaintiff's claim would have failed in the first instance. By rendering the statute superfluous in most contributory-liability cases, Viacom defies congressional intent that the DMCA's "limitations of liability apply if the provider is found to be liable under existing principles of law." *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 553 (4th Cir. 2004) (quoting H.R. Rep. No. 105-796, at 73 (1998) (Conf. Rep.)).[8]

## C.    YouTube Has Shown Its Lack of Knowledge

Viacom's burden-shifting argument is not only wrong, it is irrelevant. Even if YouTube had some initial duty to establish its lack of knowledge, it made whatever showing was necessary.

---

[8] Noting that the DMCA places the "burden of identifying what must be taken down" on copyright owners, the district court recognized another problem with Viacom's approach: that it would subvert Congress' careful allocation of enforcement responsibility by withholding safe-harbor protection from service providers unless they are able to affirmatively disprove knowledge on an item-by-item basis. SPA78-79. Viacom responds by asserting that the requirements for takedown notices are irrelevant to the burden of establishing knowledge. Br. 44. But Viacom ignores that—under both the notice provision *and* the knowledge provision—"the burden remains with the copyright holder rather than the service provider." *Shelter Capital*, 718 F.3d at 1023; *see also* SPA50 (explaining that, in applying red-flag knowledge "we do not place the burden of determining whether materials are actually illegal on a service provider").

While Viacom is vague about what evidence it thinks would suffice (Br. 43-44), a service provider plainly could not be required to introduce detailed declarations or records from all of its employees purporting to disclaim knowledge of each individual item at issue. Instead, the most that YouTube could reasonably be required to do is point to facts making probable that it did not have the kind of knowledge required by the DMCA. *Cf.* 31A C.J.S. Evidence §200 (2012) ("The court will more promptly discharge a litigant from the burden of evidence where the proposition is a negative one, and the burden of evidence is sustained by proof which renders probable the existence of the negative fact, nothing in the nature of a demonstration being required."). YouTube has done that and more.

Initially, the very fact that the "voluminous record" in this case (SPA54 n.9) includes no evidence that YouTube knew of any specific infringements is itself powerful evidence that YouTube *lacked* such knowledge. But the evidence negating YouTube's knowledge does not stop there. YouTube showed that it did not prescreen or otherwise review the vast majority of user-uploaded videos, and thus would be unlikely even to know that a given clip was on the service. JAIX:2179(¶36). YouTube also showed that when it did acquire knowledge relevant to the clips-in-suit—such as when it received takedown requests from Viacom—it expeditiously removed those clips. SPA45 n.7; JAIX:2187-88(¶¶65-69), 2201-02(¶¶117-120); JAXXII:5699-

30

700(¶64); *accord UMG II*, 665 F. Supp. 2d at 1107 (relying on similar evidence). And it showed that even if someone at YouTube had been aware of certain Viacom clips-in-suit, the nature of those clips—along with Viacom's rampant stealth-marketing and "leave-up" practices—would vitiate any basis for imputing knowledge of infringement to YouTube. *E.g.*, *id.* at 1110 & n.13. This readily satisfies any threshold burden YouTube might have had to demonstrate its lack of knowledge. As the district court found, therefore, Viacom's concession that it lacks "the kind of evidence that would allow a clip-by-clip assessment of actual knowledge" (SPA75) is not a reason to deny summary judgment—it is the reason that summary judgment is required.

Finally, Viacom's half-hearted attempt (Br. 46-47) to retreat from its concession and try to show YouTube's knowledge of a handful of clips-in-suit fails. Viacom waived this argument by failing to present it below. In any event, the limited "evidence" Viacom cites does not meet the DMCA's strict standards for actual and red-flag knowledge. Viacom claims that YouTube "approved" certain clips-in-suit. But it cites nothing more than a chart created by its own lawyers. JAXI:2780.[9] Neither that chart nor its accompanying attorney declaration offers any descrip-

---

[9] This chart was not part of the original summary-judgment record, and Viacom's reliance on it thus appears contrary to the Court's instruction that the record on knowledge (and willful blindness) is "complete." SPA67.

tion of the purported approval process; indeed, neither document indicates that YouTube even actually reviewed the clips in question. These documents simply are not evidence of anything.

Even if it were considered, Viacom's chart fails to create a jury question on knowledge. According to Viacom, any supposed "review" of the clips was for terms-of-use violations other than copyright. On Viacom's theory, if YouTube employees glanced at certain videos to determine, for example, whether they were pornographic, they were also obligated to determine whether those videos infringed Viacom's copyrights. What Viacom demands is precisely the "investigation of 'facts and circumstances' … to identify material as infringing" that the DMCA disclaims. SPA50-51 (quoting *UMG II*, 665 F. Supp. 2d at 1108). The statute's knowledge provisions recognize that, absent unusual circumstances, service providers cannot determine at a glance whether material is copyrighted, licensed, or "permitted under the fair use doctrine." *Shelter Capital*, 718 F.3d at 1022 (quoting S. Rep. No. 105-190, at 48 (1998)); *accord* 4 Nimmer & Nimmer, *supra*, at §12B.04[A][1][b][i] ("the 'flag' must be brightly red indeed—and be waving in the provider's face"). That is especially true here, where Viacom flooded YouTube with authorized videos, and even Viacom (and its lawyers) struggled to distinguish authorized clips from unauthorized ones. S*upra* pp.13-16.[10]

---

[10] As explained below (*infra* pp.41-42), moreover, Viacom's retread of Jawed Karim's 2006 memo still fails to bridge the evidentiary gap

## II.  The District Court Correctly Held That YouTube Was Not Willfully Blind To The Alleged Infringement Of Any Clips-In-Suit

This Court held that the DMCA "limits" the common-law willful-blindness doctrine so that the doctrine "may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of specific instances of infringement." SPA56. That ruling was not an invitation for Viacom to resurrect the same general-knowledge arguments that this Court rejected. Instead, as the district court ruled (SPA81), willful blindness, like all other kinds of knowledge under the DMCA, requires a showing linked to the particular infringing material at issue—here, the clips-in-suit. Viacom cannot make that showing.

### A.  Under The DMCA, Willful Blindness Must Be Shown As To Particular Infringing Material

Even outside the DMCA, willful blindness has an "appropriately limited scope that surpasses recklessness and negligence." *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070-71 (2011). When applied to the DMCA, this Court held, the doctrine is "limited" even further, because "§512(m) is incompatible with a broad common law duty to monitor or otherwise seek out infringing activity based on general awareness that infringement may be occurring." SPA55-56. Willful blindness thus cannot be applied in a way that causes a service provider

---

that this Court identified—it does not identify any clips-in-suit as to which YouTube had knowledge or awareness and could have "expeditiously" removed.

to lose the safe harbor because it fails to look for specific instances of infringement in the face of generalized knowledge. *See Shelter Capital*, 718 F.3d at 1023 (rejecting willful-blindness claim because "the DMCA recognizes that service providers who do not locate and remove infringing materials they do not *specifically* know of should not suffer the loss of safe harbor protection.") (emphasis added); *Capitol Records, LLC v. Vimeo, LLC*, --- F. Supp. 2d ----, 2013 WL 5272932, at *21 (S.D.N.Y. Sept. 18, 2013) (holding that "proof of willful blindness must be tailored" to "the specific infringing content at issue").

Instead, willful blindness is simply an alternative way for a plaintiff to prove the knowledge of "specific and identifiable instances of infringement" that the DMCA requires. SPA81 (quoting SPA51). That is confirmed by the very formulation that this Court used: someone is willfully blind where he "was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." SPA55 (quoting *United States v. Aina-Marshall*, 336 F.3d 167, 170 (2d Cir. 2003)). Here, the "fact in dispute" is whether Viacom's clips-in-suit were infringing. SPA54. To establish YouTube's knowledge of that fact through willful blindness, Viacom therefore must present evidence that YouTube (1) subjectively believed there was a high probability that a particular clip-in-suit was infringing and (2) took deliberate actions to avoid confirming that belief. *See Global-Tech*, 131 S. Ct. at 2070.

34

## B.    Viacom's Effort To Use Willful Blindness To Revive Its General Knowledge Arguments Should Be Rejected

Unable to make that showing, Viacom tries to change the legal standard. Viacom argues that a service provider is willfully blind if it is "aware of a high probability of infringement occurring on its service" and "refus[es] to conduct a reasonable follow-up inquiry," deploy "anti-infringement tools," or "make further inquiries." Br. 51-52. This effort to recast willful blindness as another form of generalized knowledge is totally misguided.

As applied to the DMCA, the first step of the willful-blindness inquiry asks not, as Viacom suggests (Br. 49), whether the service provider was aware of a high probability that infringing material, *as a general matter*, was available on the service. The assumption underlying the DMCA is that services eligible for protection will host some infringing material. *Shelter Capital*, 718 F.3d at 1021, 1024. That antecedent knowledge cannot be sufficient to trigger a potential loss of the safe harbor. Instead, as this Court explained, the "basic operation of §512(c) requires knowledge or awareness of specific infringing activity." SPA48. "To hold otherwise—i.e., that instances of willful blindness as to infringing content collateral to the litigation are sufficient to divest a defendant of safe harbor protection—would swallow *Viacom*'s requirement that actual or red flag knowledge be specific to the sued-upon content." *Vimeo,* 2013 WL 5272932, at *21.

35

Viacom's "find the infringing clips" approach to willful blindness (Br. 57) is indistinguishable from the argument about knowledge that this Court rejected in the first appeal. The Court held that "to mandate an amorphous obligation to 'take commercially reasonable steps' in response to generalized awareness of infringement … cannot be reconciled with the language of the statute." SPA48. Viacom cannot revive this discredited theory in the guise of willful blindness. Congress would not have written a strict requirement of particularized knowledge into the DMCA had it intended to allow plaintiffs to avoid making any clip-specific showing merely by invoking a common-law doctrine that is nowhere mentioned in the statute or its legislative history.

Viacom's position also conflicts with §512(m). The "follow-up inquiry" or "basic investigatory steps" that Viacom demands (Br. 51-52) is precisely the "broad common law duty to monitor or otherwise seek out infringing activity based on a general awareness that infringement may be occurring" that §512(m) disavows. SPA55-56. Viacom cannot evade this rule by labeling YouTube's decision not to take certain anti-infringement measures in the face of general knowledge as a "deliberate" refusal to investigate. "Section 512(m) is explicit: DMCA safe harbor protection cannot be conditioned on affirmative monitoring by a service provider." SPA55. That provision contains no exception based on the provider's subjective motivation, and reading in such a limitation would render its protections illusory. This case shows why. Viacom is

36

arguing that YouTube's reliance on §512(m)—such as its approach to community flagging (Br. 54)—is itself the bad-faith conduct that evidences willful blindness. But YouTube's choice to abide by the DMCA by not seeking out possible infringing activity is not a valid basis for disqualifying it from the safe harbor. *Vimeo*, 2013 WL 5272932, at \*22 (rejecting broad application of willful-blindness in light of §512(m)).

In arguing that it can use willful blindness to transform generalized knowledge into specific knowledge, Viacom relies (Br. 51-53) on *Tiffany v. eBay*, but that case undermines Viacom's position. *Tiffany* was a trademark-infringement case that did not involve the DMCA. Nevertheless, the district court held, and this Court affirmed, that eBay was not willfully blind even though (1) it was "generally aware" that Tiffany marks were being infringed and (2) it did not investigate the "extent of counterfeit Tiffany jewelry on its website" or analyze its data to "prevent further infringement." *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 463, 514 (S.D.N.Y. 2008), *aff'd in relevant part* 600 F.3d 93, 103 (2d Cir. 2010). The court cautioned that allowing Tiffany to prevail on a willful-blindness theory would impermissibly impose "an affirmative duty to take precautions against potential counterfeiters, *even when eBay had no specific knowledge of the individual counterfeiters*." *Id.* at 515 (emphasis added). *Tiffany* shows that, even without the limitations imposed by the DMCA, willful blindness cannot be used to require ser-

vice providers to find and prevent specific instances of infringement based only on general knowledge.[11]

This does not render willful blindness "superfluous" (Br. 49) to the DMCA's "red-flag knowledge" provision. Whereas red-flag knowledge is based on an *objective* standard (whether the information that the service provider had "would have made the specific infringement 'objectively' obvious to a reasonable person" (SPA49)), willful blindness is based on *subjective* bad faith (whether the service provider made a "deliberate effort to avoid guilty knowledge" (SPA56)). But both ways of showing knowledge require proof "tailored" to "the specific infringing content at issue in the litigation." *Vimeo*, 2013 WL 5272932, at *21. While willful blindness does independent work, it is neither surprising nor anomalous that a doctrine with a "limited scope" to begin with (*Global-Tech*, 131 S. Ct. at 2070), which is further "limited" by the DMCA (SPA56), applies only in a narrow set of circumstances.

---

[11] Viacom relies on this sentence from the appellate decision in *Tiffany*: "When [a service provider] has reason to suspect that users of its service *are infringing a protected mark*, it may not shield itself from leaning of the particular infringing transactions by looking the other way." *Tiffany*, 600 F.3d at 109 (emphasis added). But Viacom misleadingly edits out the italicized language (Br. 50), which confirms that this Court, like the district court, understood the willful-blindness inquiry to focus on eBay's subjective awareness of the likelihood that *particular infringements* of Tiffany's trademarks were occurring. That is all the more necessary in applying the DMCA.

## C.    Viacom's "Evidence" Of Willful Blindness Does Not Create A Jury Question

Viacom does not even try to make a showing of willful blindness under the DMCA's standards. The district court thus correctly granted summary judgment to YouTube. SPA83.

As applied to the DMCA, the first prong of the willful-blindness test asks whether YouTube was aware of a "high probability" that any of Viacom's clips-in-suit were infringing. But nowhere does Viacom make any reference to the clips-in-suit. Instead, Viacom (Br. 52) points to evidence—including the same "surveys" and "estimates" that this Court has already found "insufficient" to show knowledge (SPA51-52)— much of which has nothing to do with Viacom material at all. As this Court has explained, a service provider's general knowledge that the plaintiffs' products were available through its website "is insufficient to trigger liability" for willful blindness. SPA56 n.10 (quoting *Tiffany*, 600 F.3d at 110). Viacom's "evidence" thus cannot, as a matter of law, create a jury question.

Viacom also fails on the second prong. Viacom offers no evidence that YouTube took "deliberate actions" to avoid confirming that any clips-in-suit were infringing. *Global-Tech*, 131 S. Ct. at 2070-71. Instead, Viacom argues—repeating its tired claims about community flagging and Audible Magic—that failing to take affirmative steps based on generalized knowledge amounts to willful blindness. Br. 54-55. These

assertions fail as a matter of law. Flagging and fingerprinting are ways for a service provider to affirmatively seek out infringing activity. Under §512(m), a service provider has no obligation to deploy such tools. SPA64-65; *Vimeo*, 2013 WL 5272932, at *22 (failure to "use sophisticated monitoring technology in its possession to seek out and remove instances of infringing content" not willful blindness under DMCA); *Io*, 586 F. Supp. 2d at 1150 (stopping community flagging not willful blindness).

Viacom's claims that YouTube deliberately "disabled" community flagging and "selectively" used Audible Magic are both untrue and irrelevant. This Court expressly rejected plaintiffs' argument that YouTube loses the safe harbor because it supposedly "permitted only designated 'partners' to gain access to content identification tools." SPA64. It held in no uncertain terms that "YouTube cannot be excluded from the safe harbor by dint of a decision to restrict access to its proprietary search mechanisms." SPA64-65. Viacom's suggestion (Br. 57 n.19) that this ruling somehow applies only in the context of §512(*i*) is nonsensical. The holding in *Viacom* was based on consideration of §512(*i*) "in conjunction with §512(m)." SPA65. And section 512(m) not only applies to willful blindness, it directly "limits" the doctrine. SPA56.

Viacom's assertions also fail because they are unconnected to the clips-in-suit. Other than an unsupported assertion in its brief (Br. 56), Viacom offers no evidence that YouTube would actually have located,

recognized as infringing, then been able to expeditiously remove any of the clips-in-suit had it used flagging or Audible Magic differently. To the contrary, the evidence of the few clips identified through YouTube's community-flagging experiment shows just how ineffective it was. JAXVII:4283-84. Likewise, as explained above (*supra* pp.11-12), Viacom's delay in providing its works for fingerprinting means that even if YouTube had deployed Audible Magic earlier, it would not have identified any Viacom content. Indeed, Viacom admitted that it *never* used Audible Magic to find its works on any website. JAXIX:4947. Viacom cannot invoke willful blindness to fill these gaps in the record.[12]

Finally, Viacom again relies on Jawed Karim's March 2006 memo. But, as the district court explained, this document fails to establish willful blindness as to any clip-in-suit. SPA83. Karim's memo lists five Viacom television programs (clips of which, it turns out, Viacom itself was posting or intentionally leaving on YouTube (JAXVI:4186-94; JAXXII:5721-27(¶¶128-135); JAXXIII:6029-32(¶¶174-176)); it does not identify any particular videos. On remand, Viacom submitted a declaration that identifies the 450 clips-in-suit from those programs that were

---

[12] Viacom's reference (Br. 53) to YouTube's review of various clips to assess potential violations other than copyright remains unavailing. Beyond all the other problems with this "evidence" discussed above (*supra* pp.31-32) Viacom offers no basis for thinking that YouTube deliberately avoided determining whether these "approved" clips were infringing (or indeed, did anything other than apply its normal review processes). Without that, there can be no finding of willful blindness.

uploaded before the date of the memo. JAXI:2779-80(¶2(c)). But there is no evidence that Karim was aware of any of those clips, much less all of them.[13] Even if he was, moreover, there would be no basis for imputing Karim's awareness of those clips to YouTube. JAXXIII:5943(¶173) (Karim was then an independent consultant, not a YouTube employee). Whatever clips Karim may have seen were not clips that YouTube saw and whatever belief he may have formed is not awareness of a high likelihood of infringement that can be charged to YouTube. Beyond all that, there is no evidence that YouTube made a deliberate effort to avoid confirming the infringing nature of the material Karim mentioned. At the time of the memo, in fact, YouTube was conducting "spot reviews" in an effort to identify and remove clips of the very shows that Karim mentioned. JAXIII:3114-15(¶¶11-13); JAXXI:5321(¶271). In short, like the rest of Viacom's evidence, the Karim memo is "simply insufficient to establish willful blindness of specific instances of infringement at issue in the litigation." *Vimeo*, 2013 WL 5272932, at *21.

---

[13] The record contains employee-viewing data from Karim (JAXXII:5547-48(¶¶13-14)), but Viacom has not pointed to anything in that data that helps its case. Instead, Viacom complains (Br. 46-47) that perhaps if it had some broader universe of viewing data, it might have been able to make a better case, but that is pure speculation. Viacom allowed the record to become "complete" (SPA67) without moving for the production of additional viewing data.

### III. The District Court Correctly Held That YouTube Is Protected By The DMCA's Control-And-Benefit Provision

To disqualify YouTube from the DMCA based on §512(c)(1)(B), Viacom would have to "adduce[] sufficient evidence to allow a reasonable jury to conclude that YouTube had the right and ability to control the infringing activity and received a financial benefit directly attributable to that activity." SPA60-61. Under this Court's ruling, "control" exists only where the service provider exerts a "substantial influence" over the infringing activity of its users. SPA60. As the district court found, Viacom cannot make that showing. Apart from Viacom's failure to show control, YouTube is entitled to summary judgment because it did not earn a financial benefit directly from the alleged infringement of the clips-in-suit.

#### A. "Control" Requires "Substantial Influence" Over The Infringing Activity At Issue

This Court has already rejected Viacom's argument that the DMCA's "control and benefit" provision codifies the law of vicarious liability. SPA59. "Something more" is required, and the Court explained that the additional element necessary for "control" involves "a service provider exerting substantial influence on the activities of users." SPA60; *see Vimeo*, 2013 WL 5272932, at *22-32 (applying substantial influence test).

In adopting the "substantial influence" formulation, this Court rejected two arguments that Viacom made in the first appeal: (1) that a

43

service provider's ordinary power over its website is enough to establish control under the DMCA; and (2) that control exists whenever a service provider *fails to take steps* to limit infringement. Given that "the statute presupposes a service provider's control of its system or network" (*Io*, 586 F. Supp. 2d at 1151), and expressly disclaims any affirmative monitoring requirement (§512(m)), those things cannot be a basis for a finding of control. SPA58-59; *accord Shelter Capital*, 718 F.3d at 1029 (applying control provision narrowly in light of §512(m)). Consistent with those principles, this Court confirmed that a more active form of conduct is required—substantially influencing, and thus actually helping to bring about, the infringing activity. SPA59-60. The district court faithfully applied the DMCA when it held that to trigger the control provision, "the provider must influence or participate in the infringement." SPA86.

Because "only the current clips-in-suit are at issue in this litigation" (SPA54), moreover, Viacom must make this showing as to those clips. By its terms, "substantial influence" insists on a clear link between the service provider's conduct and the resulting infringement. The statute's text confirms that. The DMCA refers to the provider's control over "*the* infringing activity" from which it received a financial benefit. §512(c)(1)(B) (emphasis added). As in the DMCA's actual-knowledge provision (§512(c)(1)(A)(i)), the use of the definite article here points to specific acts of infringement. *See United States v.*

44

*Rybicki*, 354 F.3d 124, 137-38 & n.12 (2d Cir. 2003) (en banc). That makes sense: the safe harbor applies to particular infringement claims, and it should not be lost merely because a service provider exerts control over (or earns a financial benefit from) activities that do not result in the infringement and have nothing to do with the plaintiff's case.

## B. Viacom Cannot Show That YouTube Had Substantial Influence Over The Infringement Of Any Clips-In-Suit

After carefully reviewing the record, the district court concluded that Viacom's evidence "shows neither participation in, nor coercion of, user infringement activity." SPA91. Viacom does not challenge that conclusion. It identifies no Viacom material (much less any clips-in-suit) as to which a reasonable jury could find YouTube substantially influenced the alleged infringement. Indeed, the phrase "substantial influence" does not even appear in Viacom's brief. Viacom instead makes two arguments, both of which depart from this Court's ruling and the DMCA.

### 1. Viacom Cannot Establish Control Via Inducement

Viacom first points to this Court's citation of *Grokster*. Br. 28-34. But Viacom conflates the question of liability for inducement at common law with the distinct question relevant to the DMCA—whether the service provider exerts a "substantial influence" on the activities of infringing users. Viacom does not come close to demonstrating that YouTube engaged in the kind of purposeful encouragement of infringement that would be necessary to establish "control."

45

a. *Viacom misunderstands inducement and its connection to the DMCA*

Viacom's claim that control can be established by a showing that YouTube "operated its service with the intent that it be used to in-fringe" (Br. 31) distorts the link between inducement and the DMCA. It also misstates the standard for inducement liability more generally.

In invoking *Grokster*, this Court did not suggest that any prima facie inducement claim would disqualify a service provider from the safe harbor. To the contrary, the Court squarely rejected that argument, holding that the DMCA "protects a defendant from all affirmative claims for monetary relief"—including inducement. SPA65. Under that ruling, the analysis of an inducement claim under *Grokster* is not the same as the control analysis under the DMCA. Those are separate in-quiries that must be conducted "independently." *Fung*, 710 F.3d at 1040. The DMCA necessarily provides greater protections for service providers than do the common-law inducement standards. *Vimeo*, 2013 WL 5272932, at *28 (court "skeptical" that "inducement alone could provide an adequate basis for a finding … of control").

The "substantial influence" formulation confirms that Viacom's broad conception of inducement cannot give rise to "control." A service provider does not exert substantial influence on infringement by having a subjective hope that infringement occurs. It does so by *actively mani-festing* an unlawful purpose: promoting infringing uses, communicating

46

an inducing message, assisting users in acts of infringement, or otherwise clearly and directly encouraging users to infringe. This Court explained that for inducing activity even potentially to amount to control under the DMCA, it must involve culpable "expression and conduct"—not just bad intent. SPA60 (quoting *Grokster*, 545 U.S. at 937). That follows from the text of the statute: a requirement of *control* puts the emphasis on the causal relationship between the service provider and its users, rather than merely on subjective *intent*.

Even outside the DMCA, moreover, inducement liability requires more than just a passive "intent to host and profit from infringement" (Br. 30). The Supreme Court made clear in *Grokster* that the defendant must act with the "object of *promoting* its use to infringe copyright." 545 U.S. at 936-37. And the plaintiff must prove that intent by pointing to clear evidence that "active steps were taken with the purpose of bringing about infringing acts." *Id.* at 938.[14] This insistence on affirmative proof of "statements or actions directed to promoting infringement" was central to *Grokster* (*id.* at 935), and subsequent inducement cases (*e.g.*, *Global-Tech*, 131 S. Ct. at 2065 ("inducement must involve the taking of affirmative steps to bring about the desired result"); *Perfect 10 v. Visa*

---

[14] *See also, e.g.*, *Grokster*, 545 U.S. at 940 n.13 (inducement requires evidence that "the distributor intended *and encouraged* the product to be used to infringe") (emphasis added); 941 (evidence must show "a purpose to *cause and profit from* third-party acts of copyright infringement") (emphasis added).

*Int'l Servs. Ass'n*, 494 F.3d 788, 801 (9th Cir. 2007) (to "establish inducement liability, it is crucial to establish that the distributors 'communicated an inducing message'") (citation omitted)).[15]

The district court thus was right to hold that a service provider cannot lose the safe harbor merely by knowing about infringement, passively welcoming it, or having an impure heart. SPA86. Instead, the provider must take affirmative steps to encourage or promote unlawful uses of its service, and those steps must help bring about "the infringing activity" at issue. Applying these principles, a court recently granted summary judgment under the control provision to Vimeo, a video-hosting service similar to YouTube, finding no basis to conclude that the service "exerted substantial influence on its users' activities through inducement." *Vimeo*, 2013 WL 5272932, at *27-32.

---

[15] The Ninth Circuit's decision in *Fung* followed these principles. *Fung* confirmed that inducement "requires a high degree of proof of the improper object" of "promoting" infringing uses, which "must be affirmatively communicated through words or actions." 710 F.3d at 1034. *Fung* did not "reject[] the notion that a service provider needed to expressly encourage infringing use of the service." Br. 30. To the contrary, the court described the existence of an inducing message as a "crucial requirement" and explained that there was overwhelming evidence of Fung's "active encouragement of the uploading of torrent files concerning copyrighted content." *Fung*, 710 F.3d at 1035-36 (describing this as "the most important" evidence of the "clear expression or other affirmative steps" required for inducement).

48

   b.   *The district court correctly found that YouTube did not induce anyone to engage in the alleged infringement*

As in *Vimeo*, the record here clearly establishes the legitimacy of YouTube's service and negates any suggestion that it "substantially influenced" infringement by purposefully encouraging users to infringe.

*First*, as the district court found after reviewing the parties' extensive submissions on remand, there is "no evidence that YouTube induced its users to submit infringing videos." SPA93. A showing that the defendant actively encouraged piracy was integral in *Grokster*, 545 U.S. at 924-25, 936-37, *Fung*, 710 F.3d at 1035-36, and every other successful inducement case. And it certainly would be necessary to establish the "substantial influence" over the activity at issue required for a finding of "control" under the DMCA. *See Vimeo*, 2013 WL 5272932, at *29 ("generalized effort to promote videos that incorporate music" insufficient to show "inducement by way of the exertion of substantial influence on the activities of users"). Here, however, YouTube solicited only authorized videos, and its communications to users always sought to *discourage* infringement. *Supra* Part A.1-2. This is dispositive of the control inquiry.

*Second*, far from taking "active steps" to promote infringement, YouTube indisputably took a number of affirmative measures to combat it. *Supra* Part A.2. There has never been a finding of inducement (much less substantial influence) where a service took *any* meaningful action

49

to deter infringement—let alone did all that YouTube did. As the district court recognized, the *Grokster* model simply "does not comport" with a service like YouTube that has actively embraced the DMCA and consistently worked to limit infringement. SPA22.

*Third*, YouTube is dominated by non-infringing material—from user-generated content of every variety to authorized videos from a host of professional content creators. *Supra* Part A.3. Viacom does not (and could not) dispute the overwhelming array of original and authorized content on YouTube. The scale of these noninfringing uses further negates any inference that YouTube encouraged or influenced users to infringe.

Against this backdrop, Viacom's limited foray into the record (Br. 31-32) does nothing to cast doubt on YouTube's DMCA eligibility. Viacom does not even try to show that YouTube actively encouraged infringement. It instead claims that YouTube operated its service hoping that infringement would occur. Even if that were so, it would not amount to "substantial influence" over the infringing activity. But the scant evidence that Viacom highlights fails to demonstrate even that.

- Viacom's claims that YouTube's founders adopted "evil" tactics, participated in infringement, and refused to block "obviously copyright infringing stuff" are unsupported by the record—indeed, they are belied by the very documents on which Viacom relies. *Supra* Part A.4. Viacom's distortions and rhetoric cannot stave off summary judgment.

50

*Cf. Vimeo*, 2013 WL 5272932, at *31 (control cannot be established by "limited anecdotal evidence"; "there must be a showing that the service provider's substantial influence over users' activities was significantly more widespread and comprehensive").

- Viacom's abstract assertions about YouTube's use of community flagging and filtering technology are equally misleading (*supra* pp.9-12), and they also ignore the law. *Grokster* made clear that inducement liability cannot be "merely based on a failure to take affirmative steps to prevent infringement." 545 U.S. at 939 n.12. The DMCA is even clearer about that restriction. SPA65 ("refusing to provide access to mechanisms by which a service provider affirmatively monitors its own network" cannot deprive service of DMCA protection); *Vimeo*, 2013 WL 5272932, at *31 (rejecting claim that "evidence of inducement may be found in Vimeo's failure to implement filtering technologies" because it "would conflict with the express language of §512(m)").

- Viacom's guesses about the amount of "copyrighted" or "premium" content on YouTube ignore the Supreme Court's admonition that "mere knowledge of infringing potential or of actual infringing uses" is not enough for inducement liability. *Grokster*, 545 U.S. at 937. In any event, the scope of the infringement alleged here is orders-of-magnitude different from *Grokster*, *Fung*, and all other successful inducement cases. While those services "provided an expansive platform for wholesale infringement" (*Vimeo*, 2013 WL 5272932, at *32),

51

YouTube provides an unrivaled platform for original, creative expression. Viacom's own executives recognized that "consumption of 'branded' content on Y[ouTube] is relatively low" (JAXIV:3618), Viacom's own research concluded that the "most popular clips on YouTube were largely user generated" (JAXX:5039) and Viacom's own general counsel acknowledged that the "difference between YouTube's behavior and Grokster's is staggering" (JAXIX:4984).

Even without regard to the DMCA, therefore, YouTube could not be held liable for inducement. Viacom certainly cannot invoke *Grokster* to make the more stringent showing required to establish control under §512(c)(1)(B). No jury could find that YouTube engaged in "purposeful, culpable expression and conduct" that exerted a "substantial influence" on the infringing activity that Viacom alleges in this case. SPA60.

> 2. Viacom Cannot Establish Control Based On YouTube's Content Policies Or Monitoring Efforts

Viacom's second argument is that YouTube had "control" because it "prescribed detailed rules regarding acceptable content, which it enforced through a monitoring program." Br. 34. This argument fails as a matter of law. YouTube cannot be disqualified from the DMCA because it adopted general policies regarding the kind of material allowed on its service or because it made efforts to enforce those policies.

YouTube's content policies, of course, include a ban on copyright-infringing material. JAXIII:3085-87(¶¶5-8). The DMCA assumes that

service providers will prohibit infringement and enforce that prohibition in "appropriate circumstances." §512(*i*)(1)(A). Doing what the DMCA requires cannot be a basis for a finding of control. SPA58-59. Unsurprisingly, courts have repeatedly granted summary judgment to service providers with content policies similar to YouTube's. *E.g.*, *Vimeo*, 2013 WL 5272932, at *2-3; *Io*, 586 F. Supp. 2d at 1150-54; *Corbis*, 351 F. Supp. 2d at 1110.

YouTube's actual efforts to enforce its policies do not create "control" either. By virtue of §512(m), a service provider that does nothing affirmatively to police its service for infringement is protected. A service provider likewise does not lose the safe harbor by going beyond its statutory obligations in an effort to stop at least some infringement, as YouTube has done. The DMCA does not require that perverse result: "Courts should not conclude that the service provider loses eligibility for limitations on liability under section 512 solely because it engaged in a monitoring program." *Hendrickson v. eBay, Inc.*, 165 F. Supp. 2d 1082, 1094 (C.D. Cal. 2001) (quoting H.R. Rep. 105-796, at 73); *see also Vimeo*, 2013 WL 5272932, at *26.

Nor can YouTube be excluded from the DMCA because it took steps to stop other objectionable uses of its service, such as pornography or excessively violent material. In trying to root out such material, YouTube was acting in a way that Congress has determined to merit special statutory protection. 47 U.S.C. §230(c)(2) (immunity for online

services that restrict access to "objectionable" material). It would be absurd—and unsupported by the DMCA—to find that by working to prevent users from being exposed to sexually explicit or other inappropriate material, YouTube put its safe harbor at risk. *See, e.g., Io*, 586 F. Supp. 2d at 1150-51 (rejecting argument that Veoh had "control" because it "established and enforced policies that prohibit users from engaging in a host of illegal and other conduct on its website").

Recognizing that, the court in *Vimeo* held the service provider's monitoring program, which aimed "to filter from the Website content that veers from its mission," lacked "the 'something more' that *Viacom* demands." *Vimeo*, 2013 WL 5272932, at *26. Contrasting that program with the far more detailed monitoring system in *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146 (C.D. Cal. 2002), the court held that Vimeo was entitled to summary judgment because it "does not purport to, and in practice does not, exert substantial influence over the content of the uploaded material." *Vimeo*, 2013 WL 5272932, at *26; *see also Wolk*, 840 F. Supp. 2d at 748 (similarly distinguishing *Cybernet*); *Corbis*, 351 F. Supp. 2d at 1110 (same).

Viacom's reliance on *Cybernet* (Br. 34-35) fails for the same reasons. That case involved an "age verification service" nothing like YouTube or the other user-submitted content websites that have been found not to have "control" under the DMCA. Cybernet had a direct business relationship with its member-websites, which involved placing

54

a computer "script" on the websites themselves, giving them "extensive advice," including "detailed instructions regarding issues of layout, appearance, and content," and rigorously prescreening its members, refusing "to allow sites to use its system until they comply with its dictates." *Cybernet*, 213 F. Supp. 2d at 1157, 1160, 1163-64, 1173, 1181-82.

There is nothing like that here. YouTube leaves ultimate "editorial decisions in the hands of its users," *Vimeo*, 2013 WL 5272932, at *26, and does not prescreen or "control what content users choose to upload before it is uploaded," *Io*, 586 F. Supp. 2d at 1153. In short, as the district court explained:

> There is no evidence that YouTube induced its users to submit infringing videos, provided users with detailed instructions about what content to upload or edited their content, prescreened submissions for quality, steered users to infringing videos, or otherwise interacted with infringing users to a point where it might be said to have participated in their infringing activity.

SPA93.

The rest of Viacom's argument rehashes its claims about YouTube's use of community flagging and fingerprinting. Br. 35-38. Here too, these claims are false and legally irrelevant. Under §512(m), "DMCA safe-harbor protection cannot be conditioned on affirmative monitoring by a service provider." SPA55. YouTube's use of—or its decision not to use or to "restrict access" to—such tools cannot be a basis for a finding of control. SPA65; *see Vimeo*, 2013 WL 5272932, at *31 (reject-

55

ing plaintiffs' reliance on "Vimeo's failure to implement filtering technologies"); *supra* p.40.

Finally, Viacom refers vaguely to YouTube's general efforts to "organize videos on the site by subject matter and popularity." Br. 36 n.13. But, as the district court found, this is (at most) evidence of YouTube's general ability to control its system, not of its "substantial influence" over others' infringing activities. SPA91-94; *cf. Vimeo*, 2013 WL 5272932, at *26 (rejecting claim that Vimeo exerted substantial influence "because Vimeo employees have discretion as to how they interact with content on the Website").

### C.  YouTube Did Not Receive A Financial Benefit Directly Attributable To Viacom's Alleged Infringing Activity

Because the district court held that YouTube did not have control over the infringing activity, it did not address the DMCA's financial-benefit provision. That provision offers an independent basis for granting summary judgment to YouTube.

#### 1.  The DMCA Does Not Codify A Broad "Draw" Test

The proper application of the financial-benefit provision is explained by the legislative history: "In general, a service provider conducting a legitimate business would not be considered to receive a 'financial benefit directly attributable to the infringing activity' where the infringer makes the same kind of payment as non-infringing users of the provider's service." S. Rep. 105-190, at 44-45; H.R. Rep. 105-551 (II),

56

at 54. This test distinguishes service providers "conducting a legitimate business" from those whose "value of the service lies in providing access to infringing material." *Id.* Services that have no value other than facilitating infringement, or that are intentionally skewed to profit from it, will fail the test. Legitimate services, which derive genuine financial benefit from non-infringing activities and do not favor infringement, are protected.

Recognizing that it cannot disqualify YouTube under this standard, Viacom argues for an expansive, indirect version of the "draw" test used in the Ninth Circuit (though not by this Court) to evaluate some vicarious-infringement claims. Br. 38-40. Viacom's effort to conflate the DMCA's narrow financial-benefit provision with a broad application of the judge-made draw test should be rejected. Viacom's approach is contrary to the DMCA's text, which requires a financial benefit "directly attributable" to "the" infringing activity. §512(c)(1)(B). This language makes clear the importance of a clear and direct link between the infringement at issue and the financial benefit. In Viacom's hands, however, the draw standard would allow decidedly *indirect* benefits to trigger the loss of safe-harbor protection. Viacom argues (Br. 40-41), for example, that YouTube had a disqualifying benefit because it built up a large user base in part by attracting users who wanted to watch professionally produced content (some of which was unauthorized) and then relied on that user base to make the site more enticing. Beyond Via-

com's mischaracterization of the record, the story it tells is one where the financial gain comes not directly from infringement itself, but in a highly *indirect* manner, from advertising revenue. Even if such tangential benefits might be sufficient for vicarious liability, they do not provide what the DMCA demands. *See* 6 Patry on Copyright §21:85 (2012) ("the financial benefit cannot be nondirect financial benefit, such as driving traffic to a site … to hold otherwise would be to read the term 'direct' out of the statute").

Viacom's argument is also irreconcilable with the legislative history, which explains that "periodic payments for service from a person engaging in infringing activities" (or fees based on "connect time") do not constitute a disqualifying financial benefit under the DMCA. S. Rep. 105-190, at 44; H.R. Rep. 105-551 (II), at 54. But such payments would likely qualify as financial benefits under the broad draw test that Viacom advocates. *See, e.g.*, *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263 (9th Cir. 1996). The fact that Congress specifically excluded such payments confirms that the DMCA was intended to depart from an expansive understanding of the common law, not codify it.

Accordingly, Viacom's reliance on the Ninth Circuit's decision in *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102 (9th Cir. 2007), is misplaced. That case went astray insofar as it suggested that the DMCA's

financial-benefit provision codifies the common law.[16] This Court has not followed that aspect of *CCBill*, and should not do so here. Instead, the Court should embrace the "common-sense" test set out in the legislative history (S. Rep. 105-190, at 44) and hold that a service provider does not earn a disqualifying financial benefit if it conducts a legitimate business that is not skewed to or otherwise premised on earning money from infringing activity. *See, e.g., Wolk*, 840 F. Supp. 2d at 748 (no financial benefit where plaintiff offered "no evidence indicating that [defendant] capitalizes specifically because a given image a user selects to print is infringing").

### 2. The DMCA Protects YouTube's Advertising-Supported Business Model

Viacom asks this Court to disregard all of this because YouTube "funds its activities through advertising rather than charging its users a fee." Br. 39. That makes no sense. Advertising-supported services more readily qualify for the safe harbor than the fee-supported services discussed in the legislative history. In an ad-supported model, the money is paid by third parties who are not infringers and who do not encourage infringement. (Indeed, one company that spent millions of dollars advertising on YouTube was Viacom itself. JAXIII:3105-06(¶4)).

---

[16] Although it applied the wrong test, the Ninth Circuit actually held that the service provider was entitled to summary judgment because the link between the alleged infringement and the defendant's financial gain was too attenuated. *CCBill*, 488 F.3d at 1118.

Receiving revenue from such advertisers is plainly a less direct benefit than taking money straight from infringing users or activities. Given that Congress intended to protect otherwise-legitimate businesses that received payments directly from infringers, it cannot be the case that providers are disqualified merely because they earn revenue from advertising.

Under Viacom's approach, any service that relies on advertising would have a disqualifying financial benefit if any user was attracted by any unauthorized material (even material not at issue in the case)—no matter how insignificant that draw, how many users came to visit authorized material, or how much value the service generated from legitimate content. That is not what Congress intended. The DMCA was designed to "foster the continued development of electronic commerce," H.R. Rep. No. 105-551 (II), at 21, and it does not condemn the business model of nearly every online service that hosts user-submitted content.

Viacom relies on the Ninth Circuit's decision in *Fung,* but that ruling did not accept the broad application of the draw theory that Viacom advocates. 710 F.3d at 1044 ("our opinions have not suggested that the 'financial benefit' prong of §512(c)(1)(B) is peripheral or lacks teeth"). The court certainly did not endorse the idea that having an ad-supported business model takes a service provider outside the DMCA. Viacom omits the Ninth Circuit's actual explanation of why Fung earned a disqualifying financial benefit:

60

> Fung promoted advertising *by pointing to infringing activity*;
> obtained advertising revenue that depended on the number
> of visitors to his sites; attracted primarily visitors who were
> seeking to engage in infringing activity, as that is mostly
> what occurred on his sites; and encouraged that infringing
> activity. *Given this confluence of circumstances*, Fung's rev-
> enue stream was tied directly to the infringing activity in-
> volving his websites, both as to his ability to attract adver-
> tisers and as to the amount of revenue he received.

*Id.* at 1045 (emphases added). No similar "confluence of circumstances"
is present here. *Cf.* Br. 40-41.

In contrast to the defendant in *Fung*, YouTube is just the sort of
legitimate service that the DMCA protects. It hosts an enormous num-
ber of non-infringing videos and generates significant value from those
videos. JAXIII:3097-100(¶¶1-10), 3105-06(¶¶4-5); JAXV:3799-3813(¶¶1-
22). Most of YouTube's other revenue comes from advertisements run
on its home page and on the pages listing the results of users' search
queries. JAXIII:3105-06(¶¶3, 5). By their very nature, those ads do not
produce revenue directly from infringement and they certainly do not
favor infringing uses over non-infringing ones. JAIX:2216(¶168);
JAXXII:5727-28(¶167); JAXXIII:6033(¶178). In short, YouTube does not
receive a "financial benefit directly attributable to the infringing activi-
ty" by earning revenue the same way as nearly all comparable service
providers (JAXIII:3108(¶12))—through an advertising-based business
model that does not favor infringing material or seek to benefit from it.

## IV.  Viacom's Request For Judicial Reassignment Is Meritless

Judge Stanton has ably presided over this case for more than six years. He is intimately familiar with the parties, the issues, and the facts. Viacom's only complaint is that Judge Stanton has rejected its legal arguments and granted summary judgment to YouTube. Br. 57. That is not a legitimate basis for removing him. Litigants cannot demand a new judge merely because the one assigned to their case does not find their legal positions convincing. *See, e.g.*, *United States v. Johnson*, 567 F.3d 40, 54 (2d Cir. 2009).

## CONCLUSION

The district court's decision granting summary judgment to YouTube should be affirmed.

October 25, 2013                                      Respectfully submitted,

                                                      s/ *Andrew H. Schapiro*
                                                       Andrew H. Schapiro
David H. Kramer                                        David B. Schwartz
Michael H. Rubin
WILSON SONSINI GOODRICH & ROSATI PC    QUINN EMANUEL URQUHART &
650 Page Mill Road                                       SULLIVAN. LLP
Palo Alto, CA 94304                                   51 Madison Ave. 22nd Floor
(650) 493-9300                                        New York, NY 10010
                                                      (212) 849-7000
Brian M. Willen
WILSON SONSINI GOODRICH & ROSATI PC
1301 Avenue of the Americas
New York, NY 10019
(212) 999-5800


*Counsel for YouTube*

## CERTIFICATE OF COMPLIANCE

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A), because it is written in 14-point Century Schoolbook font.

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B), because it contains 13,963 words, excluding the portions excluded under Fed. R. App. P. 32(a)(7)(B)(iii).

DATED:  October 25, 2013

*s/ Andrew H. Schapiro*
Andrew H. Schapiro
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
51 Madison Ave. 22nd Floor
New York, NY 10010
(212) 849-7000

*Counsel for YouTube*

## CERTIFICATE OF SERVICE

I, Andrew H. Schapiro, a member of the Bar of this Court, hereby certify that on October 25, 2013, I electronically filed the foregoing "Brief For Defendants-Appellees" with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED:  October 25, 2013

*s/ Andrew H. Schapiro*
Andrew H. Schapiro
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
51 Madison Ave. 22nd Floor
New York, NY 10010
(212) 849-7000

*Counsel for YouTube*