# 13-1720-cv

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

VIACOM INTERNATIONAL, INC., COMEDY PARTNERS,
COUNTRY MUSIC TELEVISION, INC., PARAMOUNT PICTURES CORPORATION,
BLACK ENTERTAINMENT TELEVISION, LLC,

*Plaintiffs-Appellants,*

*v.*

YOUTUBE, INC., YOUTUBE, LLC, GOOGLE INC.,

*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the Southern District of New York

**BRIEF OF AMICI CURIAE EBAY INC.; FACEBOOK,
INC.; IAC/INTERACTIVECORP; TUMBLR, INC.; AND
YAHOO! INC. SUPPORTING DEFENDANTS-
APPELLEES AND AFFIRMANCE**

Joseph C. Gratz
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA 94111
415-362-6666

*Attorneys for Amici Curiae
eBay Inc.; Facebook, Inc.; IAC/InterActiveCorp;
Tumblr, Inc.; and Yahoo! Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for Amici Curiae certifies the following information:

eBay Inc.; Facebook, Inc.; IAC/InterActiveCorp; and Yahoo! Inc. state that none of them has a parent corporation and that no publicly held corporations own 10% or more of the stock of any of them.  Tumblr, Inc. states that its parent corporation is Yahoo! Inc.

# TABLE OF CONTENTS

**PAGE NO.**

IDENTITY AND INTEREST OF AMICI CURIAE ...............................1

INTRODUCTION AND SUMMARY OF ARGUMENT.......................5

ARGUMENT .................................................................9

    I.    Requiring service providers to affirmatively prove that they lacked knowledge of specific infringements would create serious practical problems. ............................................................9

        A.    Service providers should not be punished for monitoring. ...................................... 10

        B.    Without specific information from the copyright holder, a service provider cannot know whether activity is infringing. ..................... 11

        C.    Requiring the service provider to affirmatively prove lack of knowledge would require burdensome and intrusive recordkeeping.......................................... 14

    II.    Willful blindness requires acting to avoid knowledge, not the failure to affirmatively seek facts indicating infringing activity. .................................16

    III.    The safe harbor cuts off liability for all infringement claims, including claims of secondary liability and inducement. ..............................20

CONCLUSION .................................................................22

CERTIFICATE OF COMPLIANCE.....................................24

CERTIFICATE OF SERVICE.............................................25

# TABLE OF AUTHORITIES

PAGE NO.

## Cases

*Arista Records, LLC v. Lime Group LLC*, 784 F. Supp. 2d 313 (S.D.N.Y. 2011) ................................................................................................ 8

*Lenz v. Universal Music Corp.*, No. 5:07-cv-03783-JF, 2013 WL 271673 (N.D. Cal. Jan. 24, 2013). .................................................................... 12

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) ..................................................................... 21, 22

*Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012) ....... 19, 21

## Statutes

17 U.S.C. § 512 ................................................................................. 11, 21

17 U.S.C. § 512(c) .............................................................................. 6, 17

17 U.S.C. § 512(f) .................................................................................. 12

17 U.S.C. § 512(g) ................................................................................... 6

17 U.S.C. § 512(m) ...................................................................... 7, 17, 19

47 U.S.C. § 230 ....................................................................................... 11

## Other Authorities

Appellants' First Brief on Cross-Appeal, *Lenz v. Universal Music Corp.*, Nos. 13-16106, 13-16107 (9th Cir. Oct. 9, 2013), ECF No. 23............. 13

Brief of Amicus Curiae the Recording Industry Association of America in Support of Appellants, *Lenz v. Universal Music Corp.*, Nos. 13-16106, 13-16107 (9th Cir. Oct. 16, 2013), ECF No. 34. ........................ 13

Peter Swire, *Safe Harbors and a Proposal to Improve the Community Reinvestment Act*, 79 VA. L. REV. 349, 369 (1993) ............................... 19

**Rules**

Fed. R. App. P. 29(a) .................................................................. 1

Pursuant to Federal Rule of Appellate Procedure 29(a), all parties have consented to the filing of this brief by amici curiae.

## IDENTITY AND INTEREST OF AMICI CURIAE[1]

Amici Curiae eBay Inc.; Facebook, Inc.; IAC/InterActiveCorp ("IAC"); Tumblr, Inc.; and Yahoo! Inc. (collectively "Amici") are some of the largest and best-known online service providers. They file this brief to provide the perspective of online service providers who have developed popular and innovative services in reliance on the safe harbor provisions of the Digital Millennium Copyright Act ("DMCA").

Founded in 1995 in San Jose, California, eBay Inc. connects millions of buyers and sellers globally on a daily basis through eBay, the world's largest online marketplace. By providing online platforms, tools and services to help individuals and small, medium and large merchants around the globe engage in online and mobile commerce, eBay facilitates transactions. eBay Marketplaces had more than 112 million active users at the end of 2012, engaged in transactions across

---

[1] Amici hereby certify that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting the brief; and no person other than Amici contributed money intended to fund preparing or submitting the brief.

thousands of unique categories with the richest and deepest inventory of products ever assembled.  At any given moment, over 350 million listings are available for sale on eBay across a multitude of formats that includes auction-style, fixed price, and local listings.  Throughout its history, eBay has served individual buyers and sellers along with businesses ranging in size from part-time sole proprietorships to some of the most recognized household brand names and everything in between.

Founded in 2004, Facebook's mission is to give people the power to share and make the world more open and connected.  Facebook provides online services in over 100 languages and dialects to over 1.1 billion active users worldwide, well over half of whom use the service every day.  People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what matters to them.  Likewise, businesses and public figures use Facebook to connect and share with their customers and fans around the world.

IAC is a leading Internet company that owns over 50 established and start-up brands, including Ask.com, About.com, Match.com, HomeAdvisor.com, and Vimeo.com.  These brands reach many millions

of people worldwide and have been recognized as leaders in their segments. Ask.com was one of the first major Internet search engines and has been recognized for its web search technology and focus on providing answers to user queries. Today, Ask.com's network of websites answers questions from 100 million monthly users worldwide. Vimeo, launched in 2004, provides a high-quality video platform that allows people around the world to share and discover original videos. Vimeo has 20 million registered members and reaches a global monthly audience of more than 100 million.

Tumblr, Inc. was founded in 2007 by its CEO David Karp in New York City, and is now a wholly-owned subsidiary of Yahoo! Inc. Tumblr's mission is to serve creators by providing the best products and services, on all platforms, to enable them to create their best work and distribute it online to the audience that they deserve. Tumblr is home to nearly 150 million blogs and over 65 billion posts which reach an audience of hundreds of millions of people worldwide each month.

Founded in 1994 by two Stanford PhD candidates, Yahoo! Inc. operates one of the most trafficked Internet destinations in the world and attracts hundreds of millions of users every month through its

3

engaging media, content, and communications offerings.  Yahoo aims to deliver deeply personalized digital experiences using technology, insights based on data, and intuition to bring together personally relevant content and experiences from across the Web.   Yahoo is focused on making the world's daily habits inspiring and entertaining— whether searching the web, emailing friends, sharing photos with family, or simply checking the weather, sports scores or stock quotes.

Amici depend upon the DMCA safe harbor, and have built their products and services in reliance on its protections.  It is essential to their businesses that, if Amici conscientiously follow the safe harbor requirements and act upon notices of claimed infringement that copyright holders send, Amici will not be subject to the threat of enormous claims by copyright holders for the conduct of their users.

The safe harbor has played a critical role in encouraging Amici to develop some of the most important online services in the world.  Those services have transformed the way people form communities, communicate with each other, do business with each other, and enrich social life and our culture.  In recent years we have also seen how they

4

galvanize regional political and social movements that transform the modern world.

The American public has come to rely upon these services for a wealth of benefits: connecting with others, creating new markets, learning new ideas, self-expression, experiencing new interests and passions, and promoting and discovering new artistic movements. While few can predict the twists and turns that technology and business models will take, one fact is certain: a stable, consistent, clear rule of law promotes innovation, investment, and enterprise.

For that reason the Amici have a vital interest in clear and consistent application of the law of DMCA safe harbors. Amici urge the Court to affirm the district court's decision below and to preserve the settled expectations and practices of the industries that have built their businesses in reliance on the safe harbor.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This Court's previous ruling decided the lion's share of the questions in this case; the district court's "clean-up" summary judgment order correctly resolved the remaining issues. Amici, and the rest of the industry, have been living under the DMCA—under the rules set forth

by the district court's opinion, which are consistent with other courts'
holdings—for fifteen years.  The burden has never been placed on
service providers like Amici to negate their own supposed knowledge of
infringement; service providers have never been required to investigate
their own services to avoid being found willfully blind; and service
providers' hearts have never been scoured for evidence of subjective
desire that infringement take place.  The sky has not fallen.  The
DMCA operates well for copyright holders and service providers alike.
The settled expectations of service providers, which are reflected in the
district court's order, should not be disturbed.

The scheme devised by Congress is an elegant one, as the DMCA
requires that both copyright holders and online service providers work
together for their mutual benefit.  Section 512(c)(1)(C) and (c)(3) require
copyright holders to bear responsibility for identifying alleged
infringements and notifying online service providers so that the
providers can disable access to the infringing activity or material.
Section 512(c)(1)(C) also requires service providers expeditiously to
remove or disable access to challenged activity or material upon receipt
of a valid notice by a copyright holder.  Section 512(g) allows the

providers to restore material upon receipt of a valid counter-notification. This provision authorizes the service provider to step aside while the copyright owner and the user litigate (if necessary) the allegations of infringement. Section 512(m) provides that service providers need not monitor their services or affirmatively seek facts indicating infringing activity.

Some copyright holders would like to revisit the allocation of responsibilities that Congress set forth in the DMCA. They seek to place the burden of identifying copyright infringement on the service provider, where the DMCA places it squarely on the copyright holder. This manifests in their desire to place the burden on service providers to *negate* their own knowledge of infringement, rather than requiring the copyright holder to establish that the service provider knew of infringement. It manifests in their desire to require a service provider to investigate generalized allegations of infringement, lest it be deemed "willfully blind." And it manifests in their assertion that control over infringing activity can be established even where users were never so much as encouraged to infringe. The district court's decision follows an

unbroken line of cases rejecting these arguments, which would disturb the shared responsibilities imposed by Congress in the DMCA.

The importance of the DMCA to online service providers like Amici cannot be overstated.  Without the DMCA's safe harbor, many online service providers would find themselves exposed to the risk of extreme damages for conduct they cannot effectively control, and those who wished to bring new technologies and services to the public would find it difficult or impossible to do so.  Copyright plaintiffs have sued online services and technology providers for billions of dollars, and in one case within this Circuit they even articulated a theory for *trillions* of dollars in damages.[2]  The reason for these numbers is that the Copyright Act authorizes statutory damages, without proof of actual loss to the copyright holder, of up to $150,000 per work infringed, and online service providers may interact with millions of works per day.

Because of the potential for enormous damages, bright lines and consistent legal outcomes are paramount.  Responsible companies such as Amici need consistency and clarity so that they can operate and

---

[2] *See Arista Records, LLC v. Lime Group LLC*, 784 F. Supp. 2d 313, 317 (S.D.N.Y. 2011) (rejecting plaintiffs' damages theory).

innovate free from the threat of major litigation.  That is why this Court

should ensure that the DMCA safe harbor remains reliable, balanced,

and meaningful.

## ARGUMENT

### I.  Requiring service providers to affirmatively prove that they lacked knowledge of specific infringements would create serious practical problems.

Viacom does not argue for reversal of the district court's summary

judgment order because there is evidence in the record demonstrating

that YouTube knew of specific infringements.  Instead, Viacom argues

that reversal is required because of the *absence* of evidence in the record

regarding YouTube's knowledge of specific infringements, saying that

YouTube must prove the negative.  Placing the burden of negating

knowledge on the service provider would both give rise to grave

practical problems and would run contrary to the purpose of the statute.

Viacom attempts to minimize the practical impact of the radical

shift it proposes, arguing that "in the ordinary case . . . a service

provider will readily be able to meet its burden of showing that it lacked

disqualifying knowledge."[3]  In Viacom's view, a service provider "can

---

[3] Opening Brief for Plaintiffs-Appellants ("Viacom Br.") at 43.

simply demonstrate, for example, that it had no ability or no occasion to monitor its site."[4]

This is cold comfort to Amici, for three reasons.

## A.    Service providers should not be punished for monitoring.

Viacom suggests that a service provider could negate knowledge by showing that it had "no occasion to monitor its site" at all.[5]  Far from being the "ordinary case,"[6]  this is a virtual impossibility—and would be a very bad result for society even if it were possible.

The products and services that Amici offer are overwhelmingly used for their intended purposes of personal expression and lawful commerce.  But whenever a service is open to billions of users, some will misuse it.  Some types of misuse can be reliably identified on sight with no additional information or context.  For example, many service providers have rules requiring that posts be on-topic; that adult content be clearly marked as such (or disallowing it completely); and so on.  No information from a third party is required to determine whether these

---

[4] *Id.*

[5] *Id.*

[6] *Id.*

rules are violated, and enforcing these sorts of "rules of the road" is critical to building well-functioning online communities.

Congress has recognized that going above and beyond legal requirements in this way, far from giving rise to potential liability, should be encouraged: that is the policy behind, for example, the "Good Samaritan" provisions of the Communications Decency Act, 47 U.S.C. § 230. A service provider should not be required to let its site descend into anarchy in order to remain within the § 512 safe harbor. Monitoring to keep users safe must not give rise to a concomitant duty to attempt to discern the contours of a third party's legal rights and determine whether those rights have been violated.

### B.    Without specific information from the copyright holder, a service provider cannot know whether activity is infringing.

Infringement—as opposed to use that is licensed or otherwise permissible—can only be reliably identified by the copyright holder.

The copyright holder is in exclusive possession of information that could give rise to knowledge or awareness of specific infringing activity. It is unworkable to require a service provider to make important judgments on insufficient information, or to make it liable for failure to

11

act in that context.   To be aware of facts from which copyright infringement is apparent, a service provider must know the identity of the work; the identity of the uploader; the identity of the author; the identity of the copyright claimant of the work; whether the uploader and copyright holder have a relationship; and, if so, what the scope of that relationship is (such as an agency or license).   Even if those facts were known, a service provider must still make a legal judgment based on further facts pertaining to fair use (perhaps for purposes of parody or criticism) or substantial similarity.

Indeed, when the shoe is on the other foot, large copyright holders shrug their shoulders and say that it's too difficult to tell whether user-generated content is infringing or not.   In *Lenz v. Universal Music Corp.*[7] the world's largest record company was sued under 17 U.S.C. § 512(f) for failing to consider fair use before sending a DMCA notice with respect to a short video of a baby dancing to a Prince song playing in the background.   The district court ruled that the record company was required to consider fair use before sending the notice.   The record company appealed, arguing that "[e]valuating fair use is not an 'I know

[7] No. 5:07-cv-03783-JF, 2013 WL 271673 (N.D. Cal. Jan. 24, 2013).

it when I see it' exercise," but instead "is time consuming, open-ended, and indeterminate."[8]  The Recording Industry Association of America concurred, calling fair use "one of the most confounding doctrines in copyright law," which is "notoriously troublesome to apply" and "does not lend itself to rapid or simple judgments."[9]  If the copyright holders themselves are uncomfortable making decisions about infringement and fair use, how can they expect service providers (or their employees or users) to do so?

Amici and other online service providers have experienced numerous examples where the public and even agents for rights holders have been misguided about the lawfulness of uploads.  A recording artist posts a video, the record company claims it infringes, and the artist asks it to be restored after a takedown.  A member of the public complains of an infringement where a filmmaker actually uploaded his own film.  A copyright holder uploads apparently bootleg content in the

---

[8] Appellants' First Brief on Cross-Appeal at 33-34, *Lenz v. Universal Music Corp.*, Nos. 13-16106, 13-16107 (9th Cir. Oct. 9, 2013), ECF No. 23.

[9] Brief of Amicus Curiae the Recording Industry Association of America in Support of Appellants, *Lenz v. Universal Music Corp.*, Nos. 13-16106, 13-16107 (9th Cir. Oct. 16, 2013), ECF No. 34.

hopes of creating "buzz," and the public assumes it is unauthorized. Here, Viacom itself apparently could not accurately determine what content it did or did not authorize for posting on YouTube. In this context, things may not be as they seem, and it is indeed very difficult to discern genuine "red flags" of infringing activity. Amici speak from experience in this regard.

Penalizing service providers for imperfect judgments, or requiring them to exclude lawful material or activity in order to avoid risk, is contrary to the purpose of the safe harbor: to provide predictable outcomes and clear rules for compliance. For that reason, the copyright holder's identification of specific infringing material should be deemed a necessary (though not a sufficient) condition to establish a service provider's knowledge of infringement.

## C. Requiring the service provider to affirmatively prove lack of knowledge would require burdensome and intrusive recordkeeping.

Requiring service providers to negate knowledge of infringement would give rise to serious practical difficulties in running Amici's businesses.

If the burden were on Amici to affirmatively prove a lack of knowledge of the infringing nature of each piece of content on the services Amici operate, Amici might well need to keep voluminous and intrusive records for use in later litigation.  And even if those records were kept, they would have little relevance: when an employee of a service provider looks at a piece of content, they do not have the necessary information from the copyright holder to determine whether it is licensed or otherwise permitted, and they do not have the legal training to make determinations on legal issues such as fair use.  These are precisely the kind of determinations that *lawyers* find difficult.  We cannot reasonably make everyone else wrestle with them too, and premise a service provider's liability on a non-lawyer's views on an issue as to which they are unqualified to opine.

Placing the burden of negating knowledge on the service provider leads to other practical problems, as well.  If, as Viacom urges, a service provider must come forward to explain what content its employees viewed and what conclusions those employees drew after that viewing, that service provider might be forced to choose between maintaining the safe harbor and maintaining the attorney-client privilege.  Issues such

as license and fair use naturally lend themselves to requests for legal advice. Communications with or among a service provider's lawyers regarding copyright issues are protected by the attorney-client privilege, but under Viacom's theory, the service provider might be required to waive that privilege lest they be unable to meet their burden to negate knowledge and thus lose their safe harbor.

A service provider's burden in asserting the safe harbor is therefore fulfilled where it demonstrates that it meets the "Conditions for Eligibility" set forth in 17 U.S.C. § 512(i) and that it has not received any communications from copyright holders specifically identifying the allegedly infringing material. Requiring a more elaborate showing would impose an unreasonable burden on service providers while providing no reliable basis to impute knowledge of infringement.

## II. Willful blindness requires acting to avoid knowledge, not the failure to affirmatively seek facts indicating infringing activity.

Viacom would prefer to place the burden of policing its copyright on service providers. That desire does not justify its latest attempt to impose a duty of investigation on service providers who lack specific knowledge of identifiable infringements. In its latest brief, Viacom

16

clothes its argument in the garb of willful blindness. But it is the same old argument: that when a service provider thinks there may be copyright infringement taking place, it should launch an investigation and get to the bottom of the matter.

That is not the law. Section 512 excludes infringement claims from the protection of the safe harbor where the service provider was "aware of facts or circumstances from which infringing activity is apparent."[10] But "[n]othing in this section shall be construed to condition the applicability of" the safe harbor on "a service provider . . . affirmatively seeking facts indicating infringing activity."[11] That is precisely what Viacom urges when it says that a service provider should "make further inquiries" or "deploy anti-infringement tools" to seek out infringements or "conduct a reasonable follow-up inquiry" when it gains general knowledge of unidentified infringements.[12] Viacom's desired outcome is squarely precluded by the statute.

---

[10] 17 U.S.C. § 512(c)(1)(A)(ii).

[11] 17 U.S.C. § 512(m).

[12] Viacom Br. at 51-52.

This result does not depend on how easy or difficult it would be for the service provider to undertake the investigation.  Under the statute, it does not matter whether a "follow-up inquiry" is "reasonable" or unreasonable; it does not matter whether filtering tools are expensive, or cheap, or free; it does not matter whether material that a copyright holder later asserts to be infringing could have been located by typing a single word into a search box on the service provider's website. Congress could have—but didn't—instruct courts to conduct a cost/benefit analysis to determine whether it was more efficient in a particular case to place the burden of investigation on the service provider or on the copyright holder.  Instead, Congress drew a bright line: a service provider *never* has to affirmatively seek facts indicating infringing activity in order to keep its safe harbor.  The service provider may, of course, go above and beyond the legal requirements, but the law does not place any burden of investigation on the service provider.

This kind of certainty is the entire purpose of a safe harbor.  In facing the "threatening storm" of copyright claims, a service provider can "take its chances on the trackless deeps of the ocean, or seek shelter

instead in the certainty of a safe harbor."[13]  If uncertain line-drawing is involved, the safe harbor does not serve its purpose.

This is not to say that there are not some situations in which willful blindness could come into play.  As this Court held, "§ 512(m) limits—but does not abrogate—the [willful blindness] doctrine."[14] Willful blindness could be shown, even in light of § 512(m), where a service provider acts affirmatively and deliberately to avoid confirming infringement where the service provider was aware of a high probability that a specific, identifiable infringement was taking place.  For example, if a service provider takes steps to block Viacom's computers (and only Viacom's computers) from viewing content that is available to the rest of the general public, that service provider would not have knowledge of specific infringements—but it would arguably have acted affirmatively to avoid learning the specifics.  Section 512(m) limits the application of the willful blindness doctrine to situations like these, where the service provider acts affirmatively to avoid gaining

---

[13] Peter Swire, *Safe Harbors and a Proposal to Improve the Community Reinvestment Act*, 79 VA. L. REV. 349, 369 (1993) (presenting a general theory of safe harbors).

[14] *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 35 (2d Cir. 2012).

information (such as a notification from a copyright holder) that would confirm that specific, identifiable material is infringing.

This conclusion is supported by the practicalities that Amici experience every day in operating their services. Together, Amici have tens of thousands of employees and reach an audience of well over a billion people worldwide. Amici cannot be expected to go down a rabbit hole every time a surmise arises in the mind of an employee or user that a piece of content may infringe copyright. The content, of course, may be fair use, may be expressly licensed, or may be content which a copyright holder has deliberately decided not to take down. Congress placed the responsibility for seeking out infringements on the shoulders of the copyright holder, who is in the best position to know what licenses it has granted and what postings it condones.

## III. The safe harbor cuts off liability for all infringement claims, including claims of secondary liability and inducement.

Viacom argues that providers of ad-supported Internet services are categorically ineligible for the safe harbor if the underlying infringement liability results from inducement. That argument is inconsistent with the legislative history and judicial interpretation of

the DMCA.  The safe harbor's provisions "protect qualifying service providers from liability for all monetary relief for direct, vicarious, and contributory infringement."[15]  Inducement liability is simply one species of contributory liability for copyright infringement.[16]  Ergo, where its requirements are met, Section 512 provides a safe harbor against liability for infringement by inducement.

To be sure, there is a significant overlap between secondary infringers who have communicated an inducing message to their users and those who have the "right and ability to control" the infringement that is induced.  But the two categories are not completely overlapping, and the analysis is not the same.  The question for control is whether the service provider is "exerting substantial influence on the activities of users";[17] the question for inducement is whether the service provider has acted "with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster

---

[15] H.R. Rep. 105-551 (Part II), at 50; S. Rep. No. 105-190, at 19-20 (1998).

[16] *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) ("One infringes contributorily by intentionally inducing or encouraging direct infringement[.]").

[17] *Viacom*, 676 F.3d at 38.

infringement."[18]  One may exert that substantial influence without inducing, or one may induce without exerting that substantial influence.  They overlap: for example, declaring on the front page of one's website that the website is intended for the exchange of unlawful copies of major motion pictures, and that all other content will be removed, would meet both tests.  But the tests are not the same.  Viacom's references to "*Grokster* intent" misconstrue *Grokster* (because *Grokster* establishes a test based not on state of mind, but on "purposeful, culpable expression and conduct").  But they are also beside the point.  Answering the question of whether a plaintiff has made out a prima facie case for inducement does not answer the question whether liability for that inducement is limited by the DMCA safe harbor.

## CONCLUSION

The district court's decision correctly analyzed the law.  It respected Congress' purpose in enacting it.  It respected the practical realities of the symbiosis of copyright protection and online innovation that Amici witness in their daily business and foster in their

---

[18] *Grokster*, 545 U.S. at 919.

relationships with copyright holders.  Amici curiae eBay Inc.; Facebook, Inc.; IAC/InterActiveCorp; Tumblr, Inc.; and Yahoo! Inc. urge this Court to affirm the decision below.


DATED:  November 1, 2013                Respectfully submitted,

                                        */s/ Joseph C. Gratz*
                                        Joseph C. Gratz
                                        DURIE TANGRI LLP
                                        *Attorneys for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A), because it is written in 14-pt Century Schoolbook font, and with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B), because it contains 4,297 words, excluding the portions excluded under Fed. R. App. P. 32(a)(7)(B)(iii).  This count is based on the word-count feature of Microsoft Word.

DATED:  November 1, 2013                    */s/ Joseph C. Gratz*
                                            Joseph C. Gratz
                                            DURIE TANGRI LLP
                                            *Attorneys for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system on November 1, 2013.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that, for any participants in the case who are not registered CM/ECF users, I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days.

DATED:  November 1, 2013            */s/ Joseph C. Gratz*
                                    Joseph C. Gratz
                                    DURIE TANGRI LLP
                                    *Attorneys for Amici Curiae*