# 13-1720-cv

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

VIACOM INTERNATIONAL INC., COMEDY PARTNERS, COUNTRY
MUSIC TELEVISION, INC., PARAMOUNT PICTURES CORPORATION, and
BLACK ENTERTAINMENT TELEVISION LLC,

*Plaintiffs-Appellants*,

v.

YOUTUBE, INC., YOUTUBE, LLC, and GOOGLE INC.,

*Defendants-Appellees*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

**BRIEF OF *AMICUS CURIAE***
**COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION**
**IN SUPPORT OF APPELLEES AND URGING AFFIRMANCE**

_____

Matt Schruers
Ali Sternburg
Computer & Communications
   Industry Association
900 17th Street NW, 11th Floor
Washington, D.C. 20006
(202) 783-0070
mschruers@ccianet.org

Jonathan Band
Jonathan Band PLLC
21 Dupont Circle NW
Suite 800
Washington, D.C. 20036
(202) 296-5675
jband@policybandwidth.com
*Counsel of Record*

November 1, 2013

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus curiae* CCIA states that:

CCIA represents large, medium-sized, and small companies in the high technology products and services sectors, including computer hardware and software, electronic commerce, telecommunications and Internet products and services – companies that collectively generate more than $250 billion in annual revenues. A complete list of CCIA members is available at http://www.ccianet.org/members. No publicly held corporation has an ownership stake of 10% or more in CCIA.

/s/ Jonathan Band
Counsel for *Amicus Curiae*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................... iv

INTEREST OF *AMICUS* ...................................................................... 1

SUMMARY OF ARGUMENT ................................................................. 2

ARGUMENT ............................................................................................ 3

I.  A SUBSTANTIAL PORTION OF THE U.S. ECONOMY DEPENDS
    UPON THE SAFE HARBOR THAT THIS LITIGATION ASSAILS ........ 4

    A. DMCA-Reliant Services Constitute A Growing Portion Of The
       Economy ................................................................................... 4

    B. A Robust DMCA Is Essential To Internet-Enabled Expression And
       Commerce ................................................................................. 6

II. THE COURT SHOULD AFFIRM THAT YOUTUBE QUALIFIED FOR
    THE SAFE HARBOR ............................................................................ 12

    A. The District Court Reasonably Implemented This Court's
       Instruction When Interpreting DMCA § 512(c)(1)(B)'s "Right-
       And-Ability-To-Control" Standard ........................................... 13

    B. The District Court Reasonably Concluded That YouTube Lacked
       the Requisite Knowledge........................................................... 17

    C. The DMCA Safe Harbor Requires Rights-Holders To Give Notice
       Before Bringing Suit................................................................. 20

CONCLUSION .................................................................................... 22

# TABLE OF AUTHORITIES

Page

## CASES

*Capitol Records, LLC v. Vimeo, LLC*,
2013 WL 5272932 (S.D.N.Y. Sept. 18, 2013) ........................................... 15

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008)... 7

*Columbia Pictures Indus., v. Fung*, 710 F.3d 1020 (9th Cir. 2013) ........... 14, 15, 17

*Computer Associates Int'l, Inc., v. Altai, Inc.*, 982 F.2d 693 (2d Cir. 1992) .......... 10

*CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F. 3d 544 (4th Cir. 2004) ........................ 12

*Golan v. Ashcroft*, 132 S. Ct. 873 (2012) ............................................................. 19

*MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) ......................... 10, 15, 17

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) .............. 10, 14

*Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102 (9th Cir. 2007) ................. 16, 18, 22

*Perfect 10, Inc. v. Google, Inc.*, 416 F. Supp. 2d 828 (C.D. Cal. 2006),
*aff'd*, 508 F.3d 1146 (9th Cir. 2007) ............................................................. 8

*Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997) ................................ 9

*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ........ 17

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
718 F.3d 1006 (9th Cir. 2013) .................................................. 6, 7, 10, 16, 18

*Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012) ...................... 13, 16

*Viacom Int'l, Inc. v. YouTube, Inc.*,
2013 WL 1689071 (S.D.N.Y. April 18, 2013) ............................................. 20

iv

# STATUTES

17 U.S.C. § 107 ........................................................................................... 19

17 U.S.C. § 512(c) ..........................................................................2, 11-13, 16, 21

17 U.S.C. § 512(h) .......................................................................................... 11

17 U.S.C. § 512(i) ........................................................................................... 11

17 U.S.C. § 512(m) ................................................................................... 10, 19

47 U.S.C. § 230 .......................................................................................... 9, 17

# LEGISLATIVE MATERIALS

H.R. Rep. 105-551(II) (1998) ........................................................................ 10

H.R. Rep. 105-796 (1998) .............................................................................. 14

S. Rep. 105-190 (1998).......................................................................... 7, 10, 14

# OTHER SOURCES

Michael Carrier, *Copyright and Innovation: The Untold Story,*
    2012 WIS. L. REV. 891 (2012) ...................................................................... 6

U.S. Census Bureau, *2008 E-Stats* (2010) ..................................................... 4

U.S. Copyright Office, Directory of OSP Designated Agents ................................. 8

David Dean, *et al.*, BCG, *The Internet Economy in the G-20:*
    *The $4.2 Trillion Growth Opportunity* (2012) ............................................. 5

Exec. Ofc. of the President, Nat'l Econ. Council/OSTP,
  *A Strategy for American Innovation: Driving Towards
  Sustainable Growth and Quality Jobs* (2009) ................................................ 4

Google Transparency Report (2013) ...................................................... 11

Matthew Le Merle *et al.*, Booz & Company, *The Impact of U.S.
  Internet Copyright Regulations on Early-Stage Investment:
  A Quantitative Study* (2011) ............................................................ 6

Josh Lerner *et al.*, Analysis Group, *The Impact of Copyright Policy
  Changes on Venture Capital Investment in Cloud Computing
  Companies* (2011) ...................................................................... 10

Ryan Lizza, *The YouTube Election*, N.Y. TIMES, Aug. 20, 2006 ........................... 6

McKinsey & Co., *Measuring the value of search* (2011)........................................ 8

McKinsey Global Inst., *Internet Matters: The Net's sweeping impact
  on growth, jobs and prosperity* (2011) ...................................................... 5, 9

McKinsey Global Inst., *The great transformer: The impact of
  the Internet on economic growth and prosperity* (2011).............................. 5

Claire Cain Miller, *How Obama's Internet Campaign Changed Politics*,
  N.Y. TIMES, Nov. 7, 2008.............................................................. 5

OECD, *The OECD Internet Economy Outlook 2012* (2012) ................................. 5

Eliot Van Buskirk, *Veoh Files for Bankruptcy After Fending Off
  Infringement Charges*, WIRED, Feb. 12, 2010 ............................................. 7

**BRIEF OF *AMICUS CURIAE* COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION IN SUPPORT OF APPELLEES AND URGING AFFIRMANCE**

## INTEREST OF *AMICUS*[1]

The Computer & Communications Industry Association (CCIA) represents large, medium-sized, and small companies in the high technology products and services sectors, including computer hardware and software, electronic commerce, telecommunications and Internet products and services – companies that collectively generate approximately a quarter trillion in annual revenues. All parties have consented to the filing of this brief.

When the parties were last before this Court, CCIA was granted leave to file an *amicus* brief arguing that reversal of the decision below, which found YouTube complied with the DMCA safe harbor, would severely impair the market for online platforms. Now, two and a half years later, Viacom persists in advancing highly technical arguments about compliance with the safe harbor that only increase uncertainty for the tens of thousands of DMCA-reliant service providers. CCIA's members depend upon a robust and unambiguous safe harbor. Indeed, unlike the

---

[1] CCIA states, pursuant to Rule 29.1 of the Rules of this Court, that although Google is a member of CCIA, none of the parties to this case nor their counsel authored this brief in whole or in part; nor did any party or any party's counsel contribute money intended to fund preparing or submitting the brief; nor did anyone else other than *amicus* and its counsel contribute money that was intended to fund preparing or submitting this brief.

appellees, some CCIA members and many companies throughout the Internet industry cannot shoulder the oppressive burden of six years of federal court litigation. CCIA submits this brief appealing for certainty, such that no more innovative, DMCA-compliant service providers should be litigated into bankruptcy.

## SUMMARY OF ARGUMENT

This brief explains that a substantial portion of our modern, Internet-enabled economy depends upon a robust and unambiguous interpretation of the DMCA "notice and takedown" safe harbor. Tens of thousands of service providers rely directly upon the DMCA safe harbor, and an even greater number of businesses rely upon those service providers to reach new customers, and compete in the global marketplace at lower costs. These businesses are essential to facilitating Internet-enabled, First Amendment-protected speech, including political speech, as well as online and traditional commerce.

The brief argues that affirming the district court's ruling that YouTube complied with the DMCA's requirements will ensure that the DMCA remains an effective safe harbor for Internet service providers. Specifically, the district court reasonably implemented this Court's instruction regarding DMCA § 512(c)(1)(B)'s "right-and-ability-to-control" standard, and reasonably concluded that YouTube lacked the requisite knowledge that would deny application of the

2

safe harbor.  Finally, this brief argues that Viacom's attempt to avoid proving it gave notice of alleged infringement would read "notice" out of "notice and takedown" and should be rejected.

## ARGUMENT

When Viacom brought this suit, there were no iPhones, and a "tablet" was something you ingested.  Years of litigation have now passed, during which the Internet has grown to serve countless users through billions of Internet-enabled devices.  Viacom is now before this Court a second time, briefing issues substantially similar to those it raised two years ago.  It persists in its argument that YouTube may not receive the benefits of the DMCA's "notice and takedown" safe harbor, despite having shouldered that statute's burdens.  Viacom's requested outcome offers no hope of concluding this litigation.  Instead of bringing it to a close, Viacom asks the Court to remand to a new judge, seeking a "do-over" on years of pretrial procedure.

Congress could not have intended to protect service providers from secondary liability for user infringement, only to subject them to millions of dollars in legal fees spent on protracted litigation over that very protection.  A safe harbor that is merely an invitation to years of costly litigation is no safe harbor at all. Given Viacom's single-minded insistence on monitoring and filtering, which flies in the face of express language in the DMCA, and given that Viacom itself

bemoans the interminability of its own litigation (*see* Viacom Br. at 1, 57), Viacom's intended message is clear: the DMCA safe harbor notwithstanding, new startups wishing to avoid years of litigation purgatory must either monitor third party content and install expensive filtering apparatuses, or pay a license to the entertainment industry. To avoid giving credence to this message and casting a pall over an increasingly important sector of the U.S. economy, this litigation must be brought to an end.

## I. A SUBSTANTIAL PORTION OF THE U.S. ECONOMY DEPENDS UPON THE SAFE HARBOR THAT THIS LITIGATION ASSAILS.

### A. DMCA-Reliant Services Constitute A Growing Portion Of The Economy.

Within the United States, DMCA-reliant Internet services represent a substantial portion of the U.S. economy. An even greater portion of the economy depends upon those service providers to reach new customers, and compete in the global marketplace at lower costs. As early as 2008, the Department of Commerce estimated e-commerce shipments, sales, and revenues at $3.8 trillion; by 2009, the Internet was adding an estimated $2 trillion to annual GDP.[2] By 2016, the Internet

---

[2] *See* U.S. Census Bureau, *2008 E-Stats* (2010), at 2; Exec. Ofc. of the President, Nat'l Econ. Council/OSTP, *A Strategy for American Innovation: Driving Towards Sustainable Growth and Quality Jobs* (2009), at 5, *available at* http://www. whitehouse.gov/administration/eop/nec/StrategyforAmericanInnovation.

economy will reach an estimated \$4.2 trillion in the G-20 economies.[3]  By

expanding markets and increasing efficiency, DMCA-reliant service providers

spread wealth to traditional industries across the economy.  In fact, up to 13% of

business sector value added in the U.S. in 2010 and 21% of the GDP growth in

mature economies over five years can be attributed to the Internet.[4]

     In addition to facilitating commerce, DMCA-reliant platforms promote

speech and expression.  Platforms like YouTube have transformed political activity

and civic participation, and disintermediated historical gatekeepers, including

Viacom itself.  President Obama's 2008 campaign told the New York Times that

"[t]he campaign's official stuff they created for YouTube was watched for 14.5

million hours… To buy 14.5 million hours on broadcast TV is \$47 million."[5]

---

[3] David Dean, *et al.*, BCG, *The Internet Economy in the G-20: The \$4.2 Trillion Growth Opportunity* (2012), *available at* http://www.bcg.com/documents/ file100409.pdf.

[4] McKinsey Global Inst., *Internet Matters: The Net's sweeping impact on growth, jobs and prosperity* (2011), *available at* http://www.mckinsey.com/insights/ high_tech_telecoms_ internet/internet_matters (75% of Internet's benefits accrues to traditional industries); *see also* McKinsey Global Inst., *The great transformer: The impact of the Internet on economic growth and prosperity* (2011), *available at* http://www.mckinsey.com/insights/high_tech_telecoms_internet/the_great_transfo rmer; *see* OECD, *The OECD Internet Economy Outlook 2012* (2012), *available at* http://www.oecd.org/sti/ieconomy/ieoutlook.htm (up to 13% of business sector value-add).

[5] Claire Cain Miller, *How Obama's Internet Campaign Changed Politics*, N.Y. TIMES, Nov. 7, 2008, *at* http://bits.blogs.nytimes.com/2008/11/07/how-obamas-internet-campaign-changed-politics/.

From its inception, YouTube fundamentally altered the American political campaign.[6]

### B. A Robust DMCA Is Essential To Internet-Enabled Expression And Commerce.

These services require a robust and unambiguous interpretation of the DMCA's "notice and takedown" safe harbor.  In the absence of that – if the DMCA only replaces the *in terrorem* effect of copyright's statutory damages with the *in terrorem* effect of legal bills – the economic benefits described above may be lost.  These risks are particularly salient for the many service providers which would not exist without financial backing from venture capitalists, who are often deterred from investing by the potential of liability for users' actions or user-generated content.  Surveys confirm that liability risks deter investment in this field.[7]  One scholar has collected numerous accounts of innovators intimidated by threats of personal liability, with one entrepreneur stating that litigation had "the deterrent effect it was intended to have on innovation."[8]

---

[6] *See* Ryan Lizza, *The YouTube Election*, N.Y. TIMES, Aug. 20, 2006, *at* http://www.nytimes.com/2006/08/20/weekinreview/20lizza.html.

[7] Matthew Le Merle *et al*., Booz & Company, *The Impact of U.S. Internet Copyright Regulations on Early-Stage Investment A Quantitative Study* (2011), *available at* http://www.booz.com/media/file/BoozCo-Impact-US-Internet-Copyright-Regulations-Early-Stage-Investment.pdf.

[8] Michael Carrier, *Copyright and Innovation: The Untold Story*, 2012 WIS. L. REV. 891, 944 (2012), *available at* http://wisconsinlawreview.org/wp-content/files/2-Carrier.pdf.  *See also UMG Recordings, Inc. v. Shelter Capital*

Indeed, the *Shelter Capital* case, *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006 (9th Cir. 2013), is instructive in this manner: despite the fact that "promising start-up" Veoh was ultimately exonerated after extended litigation, exoneration did not come before the DMCA-compliant online video site had been ground into Chapter 7 bankruptcy. After bankrupting Veoh, the plaintiffs continued their litigation against Veoh's investors.[9] For its part, Viacom claims Veoh was distinct, and more virtuous than YouTube, *see* Viacom Br. at 34 n.12, seemingly oblivious to the dissonance in holding out a company bankrupted by DMCA litigation as a paradigm for DMCA compliance.

Conversely, additional certainty spurs "the necessary investment in the expansion" of the Internet that Congress had in mind when enacting the DMCA. *See* S. Rep. 105-190, at 8 (1998). For example, this Court's 2008 holding in *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008), also known as "*Cablevision*," was estimated to have inspired up to $1.3 billion in

---

*Partners LLC*, 718 F.3d 1006 (9th Cir. 2013) (litigation by UMG against Shelter Capital and two other investors in online service Veoh).

[9] Eliot Van Buskirk, *Veoh Files for Bankruptcy After Fending Off Infringement Charges*, WIRED, Feb. 12, 2010, *at* http://www.wired.com/business/2010/02/veoh-files-for-bankruptcy-after-fending-off-infringement-charges/ ("History will add online video site Veoh to the long list of promising start-ups driven into bankruptcy by copyright lawsuits — despite the fact that unlike the others, it actually prevailed in court.").

investment in U.S. cloud computing firms in the 30 months following the decision.[10]

In this manner, the DMCA's protections have made possible the business of the Internet's search engines, which today "have become essential sources of vital information for individuals, governments, non-profits, and businesses,"[11] and generate an annual $780 billion in value worldwide.[12]  These protections also offer legal certainty for tens of thousands of other, similarly situated businesses across the U.S. economy.  All websites, from the largest to the smallest, that enable user comment are platforms for communication and thus have potential liability exposure.  Over 66,000 services have complied with U.S. Copyright Office formalities to receive the protections of the DMCA,[13] ranging from household names like appellees YouTube and Google to small and medium-sized enterprises,

---

[10] Josh Lerner *et al*., Analysis Group, *The Impact of Copyright Policy Changes on Venture Capital Investment in Cloud Computing Companies* (2011), *available at* http://www.analysisgroup.com/uploadedFiles/Publishing/Articles/Lerner_Fall2011_Copyright_Policy_VC_Investments.pdf

[11] "It is by now a truism that search engines such as Google Image Search provide great value to the public. Indeed, given the exponentially increasing amounts of data on the web, search engines have become essential sources of vital information for individuals, governments, non-profits, and businesses who seek to locate information."  *Perfect 10, Inc. v. Google, Inc.*, 416 F. Supp. 2d 828, 848-49 (C.D. Cal. 2006), *aff'd*, 508 F.3d 1146 (9th Cir. 2007).

[12] *See* McKinsey & Co., *Measuring the value of search* (2011), *available at* http://www.mckinsey.com/insights/marketing_sales/measuring_the_value_of_search.

[13] *See* U.S. Copyright Office, Directory of OSP Designated Agents, *at* http://www.copyright.gov/onlinesp/list/a_agents.html.

which cannot so easily shoulder the burden of six years of litigation. Taken as a whole, these thousands of platforms enable the unprecedented capacity of First Amendment speech and global commerce that characterizes the Internet revolution. Collectively, this industry enables us to check our email, remotely store our files, back up our photographs, use social media, and discuss and comment on news and other matters of national importance. This industry provides what the Supreme Court has described as the "vast platform from which to address and hear from a worldwide audience of millions of readers, viewers, researchers, and buyers." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 853 (1997). So equally vast is the reach of the Copyright Act today, however, that many, perhaps most, actions we take online involve a service provider relying upon the legal certainty of the DMCA safe harbor.

The DMCA safe harbor thus constitutes a cornerstone of the modern Internet economy. Along with the Communications Decency Act safe harbor, 47 U.S.C. § 230, and the First Amendment of the U.S. Constitution, the DMCA comprises the unique legal foundation that enables almost $8 trillion in commerce each year.[14] Congress laid this cornerstone in 1998, acknowledging that Internet investment would not occur if service providers faced copyright infringement liability for

---

[14] McKinsey, *Internet Matters: The Net's sweeping impact on growth, jobs and prosperity*, *supra* note 4.

content they handled "in the ordinary course of their operations". *See* S. Rep. 105-190, at 8 (1998). Having been "loath to permit the specter of liability to chill innovation that could also serve substantial socially beneficial functions," *Shelter Capital*, 718 F.3d at 1014, Congress enacted a compromise, consistent with its goal of maintaining copyright law's "delicate equilibrium" and "avoid[ing] the effects of monopolistic stagnation," *see Computer Associates Int'l, Inc., v. Altai, Inc.*, 982 F.2d 693, 696 (2d Cir. 1992), thereby "managing the tradeoff" between technological innovation and artistic protection. *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 928 (2005).

This compromise saddled service providers with the costs of responding to millions of complaints in exchange for liability limitations, while guaranteeing rights-holders a rapid response to claims in exchange for the responsibility to affirmatively report infringement. The DMCA safeguards "qualifying service providers from liability for all monetary relief for direct, vicarious and contributory infringement," S. Rep. 105-190, at 40; H.R. Rep. 105-551(II), at 50 (1998), and guarantees that they "may be subject only to the narrow injunctive relief set forth in section 512(j)." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007). Additionally, the statute makes clear that services providers need not "monitor their services or affirmatively seek facts indicating infringing activity." *See* § 512(m)(1). In exchange, rights-holders – including those with little or no

10

access to counsel – receive expeditious extrajudicial relief in response to complaints about infringing online content, and the ability to subpoena users' identifying information, *see* § 512(h), in order to facilitate independent claims against alleged infringers. In essence, rights-holders may receive an automatic, extrajudicial injunction simply by sending a service provider a short email identifying the allegedly infringing material.

The DMCA's safe harbor is not freely granted to service providers, however. In order to qualify for this protection, a service provider must adopt and implement a policy to terminate access to repeat infringers. 17 U.S.C. § 512(i). A service provider must also accommodate "standard technical measures," should a consensus standard be in use, *id*. § 512(i)(B), and designate on its service, on its website, and to the Copyright Office, contact information of "an agent to receive notifications of claimed infringement." *Id*. § 512(c)(2). In addition, and most importantly, the service provider must develop a compliance program that "expeditiously" facilitates notice and takedown of allegedly infringing content: the DMCA's primary purpose. To this end, some DMCA compliance departments assist rights-holders with millions of takedown requests a year.[15]

---

[15] *See, e.g.*, Google Transparency Report (2013), *available at* http://www.google.com/ transparencyreport/removals/copyright/ (approximately 180 million takedown requests in first 10 months of 2013).

These actions by service providers mitigate the costs that rights-holders would otherwise face in responding to potential acts of infringement.  Expanding liability risks in a way that would discourage DMCA compliance would injure both service providers and rights-holders.  For this reason, it is best to consider "the DMCA's safe harbor for ISPs to be a floor, not a ceiling, of protection." *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 555 (4th Cir. 2004).

## II. THE COURT SHOULD AFFIRM THAT YOUTUBE QUALIFIED FOR THE SAFE HARBOR.

Insofar as the defendants complied expeditiously with Viacom's takedown demands and otherwise adhered to the regulatory formalities of the DMCA, Viacom's strategy years ago turned to exploiting the DMCA provisions under which, in instances of bad faith, a compliant service provider may nevertheless lose the safe harbor.  Those instances involve (a) cases of "actual knowledge," (b) cases of what the DMCA's legislative history has referred to as "red flag" knowledge, and (c) cases where service providers "receive a financial benefit directly attributable to the infringing activity" and have "the right and ability to control such activity." *See* § 512(c)(1)(B).  To this end, Viacom again returns with its argument that the district court has twice rejected: that despite complying with the obligations of the DMCA's safe harbor, YouTube should nevertheless be denied the statute's protections.

12

Viacom does so by alleging the existence of hyper-technical flaws in the district court's analysis.  If this Court were to adopt Viacom's strained interpretations of the DMCA, it would require legal counsel for startups and small service providers to make metaphysical distinctions beyond their practical ability.

## A. The District Court Reasonably Implemented This Court's Instruction When Interpreting DMCA § 512(c)(1)(B)'s "Right-And-Ability-To-Control" Standard.

On remand, Judge Stanton ruled that Viacom's evidence did not reach the level of "something more" needed to satisfy the right-and-ability-to-control standard.  Viacom objects to the district court opinion's reference to "participation" in or "coercion" of user infringement, however, and characterizes these words as "a heightened standard."  Viacom Br. at 33.  Yet when this Court described what would satisfy the "something more" standard it (a) pointed to *Grokster*'s requirement of "purposeful, culpable expression and conduct" and (b) stated that cases of service providers satisfying right-and-ability-to-control "involve a service provider exerting substantial influence" on user activities. *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 38 (2d Cir. 2012) ("*Viacom*"). The district court opinion recited this Court's instructions in full, and held that Viacom had not met that standard.  Viacom's complaint thus reduces to a hair-splitting objection that, having parsed "participation" and "coercion" from the

district court opinion, these are not functionally the same as "purposeful conduct" that "exert[s] substantial influence."

It cannot be the case that, as some of Viacom's *amici* suggest, any *prima facie* showing of secondary liability prevents application of the safe harbor. Congress intended the DMCA to limit secondary liability. *See* H.R. Rep. 105-796, at 73 (1998); S. Rep. 105-190, at 20 (1998). To prohibit the safe harbor's application in these cases would render the law a dead letter, applicable only in cases where it was not needed, and inapplicable in the only cases when an otherwise DMCA-compliant service provider would need it. Interpreting the statute to protect from liability only in cases where no liability exists is thus clearly contrary to the statute's meaning.

Viacom's allegations regarding inducement of copyright infringement should therefore not prohibit application of the safe harbor, and indeed, previous efforts to circumscribe the DMCA's application in this manner have been rejected. In *Amazon.com*, the Ninth Circuit held that "the limitations on liability contained in 17 U.S.C. § 512 protect secondary infringers as well as direct infringers." *Amazon.com*, 508 F.3d at 1175. Even *Fung*, upon which Viacom and its *amici* substantially rely, held that "a service provider liable for inducement could be entitled to protection under the safe harbors." *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1040 (9th Cir. 2013).

14

The Southern District of New York's recent *Vimeo* decision involved a video-sharing platform similar to YouTube, and similarly addressed whether Vimeo had met the "something more" standard. The *Vimeo* court indicated it was "skeptical that, under the circumstances of this case, inducement alone could provide an adequate basis for a finding that Vimeo had the right and ability to control." *Capitol Records, LLC v. Vimeo, LLC*, 2013 WL 5272932, at *28 (S.D.N.Y. Sept. 18, 2013). The court concluded that Vimeo's video-sharing platform was "dramatically different" from the *Grokster* and *Fung* defendants' peer-to-peer networks, which "provided an expansive platform for wholesale infringement." *Id.* at *32.

This is entirely consistent with the Supreme Court's assessment that intentional inducement "leaves breathing room for innovation," because the doctrine "absolves the equivocal conduct of selling an item with substantial lawful as well as unlawful uses, and limits liability to instances of more acute fault than the mere understanding that some of one's products will be misused." *Grokster*, 545 U.S. at 932-33 (internal citations and quotation omitted).

Not only is Judge Stanton and the *Vimeo* court's approach – and distinction of the facts of *Grokster* and *Fung* – consistent with the statutory text and Congress's legislative intent, it is an approach that other members of the Internet industry, including members of *amicus* CCIA, can reasonably implement: A

15

service provider has the right and ability to control under § 512(c) when it has purposefully and culpably influenced its users to infringe, *Viacom*, 676 F.3d at 38, that is, it "exerts [ ] substantial influence" or "high levels of control over activities of users." *Shelter Capital*, 718 F.3d at 1030.

Unlike Viacom's interpretation of a service provider's responsibilities, which involves finding a legally dispositive difference between "coerce" and "exert substantial influence over," this approach is clear. This is a rule that a startup's legal counsel, who may be faced with a large number of takedown notices that by law must be addressed "expeditiously," could reasonably implement.

Viacom also renews its prior complaint that YouTube should be compelled to monitor or filter online content, despite the DMCA's express language that this obligation is "place[d] squarely on the owners of the copyright." *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007); *accord Viacom*, 676 F.3d at 35. In fact, service providers enabling user-generated content do often take efforts to filter certain content, particularly content that is unlawful *per se* (as opposed to lawful content, like copyrighted works, whose unauthorized *use* may be unlawful). For example, some foreign jurisdictions prohibit adult content by law, and of course companies must comply with such rules to enter those markets. Sites may also choose to employ text filters for obscene or profane speech in order to encourage civil discourse. Pointing to similar filtering efforts by YouTube,

16

Viacom seeks to use this against the platform, *see* Viacom Br. at 37, effectively

asking this Court to penalize the service provider for efforts going beyond its legal

obligation.  This would run contrary to Congress's policy on service providers, as

indicated in 47 U.S.C. § 230.

### B. The District Court Reasonably Concluded That YouTube Lacked The Requisite Knowledge.

Viacom also returns to its contention that YouTube should not receive the

safe harbor, despite having otherwise complied with the statute, because it had

actual knowledge, or was "willfully blind" to specific acts of infringement.

Viacom persists in its objection that YouTube's founders should have sought out

more potentially infringing content on the service, despite the DMCA's express

statement that no such obligation exists.[16]

---

[16] As when it last appeared before this Court, Viacom points to a YouTube employee's meaningless estimate that "probably 75-80% of our views came from copyrighted material." *E.g.*, Viacom Br. at 10, 11.  In reality, nearly all views were likely of "copyrighted material," since copyright attaches automatically at fixation to nearly everything appearing on YouTube, and indeed on the Internet in general (a fact further underscoring the importance of a robust DMCA).  Assuming this estimate referred to unauthorized content, however, it includes no estimate of whether the content actually infringed.  *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 447 (1984) ("Even unauthorized uses of a copyrighted work are not necessarily infringing.").  The fact that a substantial portion of the uses for YouTube content is non-infringing, *e.g.*, quotations, political commentary, parodies, reviews, criticism, and transformative mashups, distinguishes YouTube from *Grokster*, 545 U.S. at 936-37, and *Fung*, 710 F.3d at 1035, upon which Viacom and its *amici* rest much of their argument.

It is broadly accepted, as *Shelter Capital* stated, that "general knowledge that [a site] hosted copyrightable material and that its services could be used for infringement is insufficient to constitute a red flag." *See Shelter Capital*, 718 F.3d at 1023. Such general knowledge might be argued to attach as soon as a service provider receives its first DMCA takedown notice. In fact, the very act of a service provider registering a DMCA agent with the Copyright Office indicates knowledge that a service could be used to infringe. Of course, it would be absurd to conclude that service providers' efforts to comply with the statute cause them to lose its protections. Thus, specific knowledge of the location of specific infringements should be required.

Just as the *Shelter Capital* plaintiffs asked the Ninth Circuit to "change course… by adopting a broad conception of the knowledge requirement," *Shelter Capital*, 718 F.3d at 1022, and the Ninth Circuit declined, so too should this Court decline to interpret willful blindness to include general knowledge of infringement. As the Ninth Circuit explained, "[w]e do not place the burden of determining whether [materials] are actually illegal on a service provider," and "[w]e impose no such investigative duties on service providers." *Id.* at 1023 (quoting *CCBill*).

Viacom's interpretation of willful blindness amounts to an effort to sneak "general knowledge" of infringement – which the DMCA indicates is insufficient – back into the DMCA inquiry, under a different name. Viacom cites Judge

Stanton's reference to YouTube having "information that infringements were occurring with particular works belonging to Viacom," and extrapolates that once YouTube received "repeated" notices regarding Viacom's *The Daily Show* (Viacom's example), it constituted willful blindness for YouTube to permit any copies of *The Daily Show* to remain on its platform. Viacom Br. at 48-49.

*The Daily Show*, however, is a news program parody and, as such, contains extensive commentary on politics and the media. A user might post a segment to express agreement (or disagreement) with the underlying political message. A user might also quote or remix a segment of the program with his or her own original material, for purposes of public debate. Finally, a segment posted may only be a few seconds long. In other words, there is a high likelihood that a vast number of user postings of *Daily Show* clips are fair use or non-infringing. Thus, failure to proactively take down *Daily Show* material could not constitute *per se* willful blindness without impinging upon fair use, 17 U.S.C. § 107, and the First Amendment. *See Golan v. Ashcroft*, 132 S. Ct. 873, 890 (2012) (fair use defense is a "built-in First Amendment accommodation").

Moreover, to the extent that an interpretation of willful blindness requires monitoring and filtering upon receiving a DMCA notice for *The Daily Show* (or any other work), that interpretation flatly contradicts § 512(m)'s unambiguous statement that service providers have no obligation to monitor. While the district

19

court stated that "under appropriate circumstances the imputed knowledge of the willfully-avoided fact may impose a duty to make further inquiries that a reasonable person would make," *see Viacom Int'l, Inc. v. YouTube, Inc.*, 2013 WL 1689071, at *4 (S.D.N.Y. April 18, 2013), it must also be that willful blindness means more than the general knowledge that a particular work has been infringed on a service provider's platform, since such a construction would violate § 512(m).

### C. The DMCA Safe Harbor Requires Rights-Holders To Give Notice Before Bringing Suit.

On the district court's instruction, YouTube furnished a list of over 63,000 clips upon which it had no record of a notice of infringement. *Id.* at *1. Viacom was unable to refute this, but maintains it does not have to. That is, Viacom argues that rather than be compelled to show it gave notice under the notice and takedown system, it is YouTube's obligation to prove no such notice existed. Viacom Br. at 42-44. Viacom complains that the district court opinion interpreted the § 512(c) safe harbor "as a determination by Congress that 'the burden of identifying what must be taken down is to be on the copyright owner.'" Viacom Br. at 22. *Amicus* CCIA agrees with this interpretation. Viacom disagrees, however, even though the very principle of the DMCA's notice and takedown framework was to limit litigation by creating an extrajudicial framework under which the rights-holder

20

must first give notice, and the service provider's responsibility is to respond expeditiously.

Viacom's argument attempts to escape the one burden placed on it by the DMCA safe harbor: giving notice. *See* § 512(c)(3)(A). Under Viacom's theory, a rights-holder may sue a service provider regarding third party content, and should the service provider protest that the rights-holder never sent the required takedown notice, the rights-holder has no obligation to demonstrate otherwise.

Not surprisingly, the district court rejected this construction, which reads "notice" out of "notice and takedown." A rights-holder cannot shirk the statutory responsibility to provide notice and then claim that the service provider's burden of proof absolves that omission. Judge Stanton instead pointed to § 512(c)(3)(A), which plainly indicates that the burden is on the rights-holder, who "must" furnish "written notification… that includes substantially" sufficient information to identify and remove content. *Id.* Viacom now complains, Viacom Br. at 21-22, that this application of the statute "flipped" the rule regarding defendants' general burden to prove defenses. Yet nowhere does the DMCA require that service providers maintain records of documents they *have not received*.[17] In fact, it is Viacom and its *amici* that propose "flipping" a rule, by urging this Court to do

---

[17] The DMCA states that flawed notices "shall not be considered" with respect to knowledge. *See* § 512(c)(iii)(B). Given that Congress admonished that incomplete or partial notice should not be construed to the detriment of the service provider, it would be inconsistent to do so in a case of no notice at all.

what others have previously declined to do: "shift a substantial burden from the

copyright owner to the provider." *CCBill*, 488 F.3d at 1113.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be

affirmed.

Respectfully submitted,


/s/ Jonathan Band

Matt Schruers                           Jonathan Band
Ali Sternburg                           Jonathan Band PLLC
Computer & Communications               21 Dupont Circle NW
   Industry Association              Suite 800
900 17th Street NW, 11th Floor          Washington, D.C. 20036
Washington, D.C. 20006                  jband@policybandwidth.com
mschruers@ccianet.org                   (202) 296-5675
(202) 783-0070

Counsel for *Amicus Curiae*


November 1, 2013

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 4,862 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the types style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.


/s/ Jonathan Band
Jonathan Band
Jonathan Band PLLC
21 Dupont Circle NW
Suite 800
Washington, D.C. 20036
jband@policybandwidth.com
(202) 296-5675

Counsel for *Amicus Curiae*


November 1, 2013

# CERTIFICATE OF SERVICE

I hereby certify, that on this 1st day of November, 2013, a true and correct copy of the foregoing Brief of *Amicus Curiae* Computer & Communications Industry Association was timely filed in accordance with Fed. R. App. P. 25(a)(2)(D) and served on all counsel of record via CM/ECF pursuant to Second Circuit Rule 25.1(h).

/s/ Jonathan Band
Jonathan Band
Jonathan Band PLLC
21 Dupont Circle NW
Suite 800
Washington, D.C. 20036
jband@policybandwidth.com
(202) 296-5675

Counsel for *Amicus Curiae*

November 1, 2013