# 13-1720-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

VIACOM INTERNATIONAL INC., COMEDY PARTNERS, COUNTRY MUSIC
TELEVISION, INC., PARAMOUNT PICTURES CORPORATION,
BLACK ENTERTAINMENT TELEVISION LLC,

*Plaintiffs-Appellants,*

—against—

YOUTUBE, INC., YOUTUBE, LLC, GOOGLE INC.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR NATIONAL CONSUMERS LEAGUE, CONSUMER ACTION, HUMAN RIGHTS WATCH, ACCESS, AND FREEDOM HOUSE AS *AMICI CURIAE* SUPPORTING APPELLEES

ANTHONY P. SCHOENBERG
DEEPAK GUPTA
ERIK C. OLSON
FARELLA BRAUN + MARTEL LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

*Counsel for Amici Curiae
    National Consumers League,
    Consumer Action, Human Rights
    Watch, Access, and Freedom
    House*

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Rules 26.1 and 29(c)(1) of the Federal Rules of Appellate Procedure:

The National Consumers League certifies that it is a privately held 501(c)(3) non-profit corporation organized for the benefit of its members, that it has no parent or subsidiary corporations, and that no publicly held company owns 10% or more of its stock.

Consumer Action certifies that it is a privately held 501(c)(3) non-profit corporation organized for the benefit of its members, that it has no parent or subsidiary corporations, and that no publicly held company owns 10% or more of its stock.

Human Rights Watch certifies that it is a privately held 501(c)(3) non-profit corporation organized for the benefit of its members, that it has no parent or subsidiary corporations, and that no publicly held company owns 10% or more of its stock.

Access certifies that it is a privately held 501(c)(3) non-profit corporation organized for the benefit of its members, that it has no parent or subsidiary corporations, and that no publicly held company owns 10% or more of its stock.

Freedom House certifies that it is a privately held 501(c)(3) non-profit corporation organized for the benefit of its members, that it has no parent or subsidiary corporations, and that no publicly held company owns 10% or more of its stock.

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENTS.................................. i

TABLE OF CONTENTS .................................................... ii

TABLE OF AUTHORITIES ............................................... iv

INTEREST OF *AMICI CURIAE* ........................................ 1

ARGUMENT ............................................................... 4

I.    OPEN VIDEO PLATFORMS ARE ESSENTIAL
      TOOLS FOR THE FAST, LOW-COST, GLOBAL
      GATHERING AND DISSEMINATION OF USER-
      CREATED INFORMATION RELEVANT TO
      DIVERSE ISSUES .................................................. 7

      A.    *Amici* Are Using Open Video Platforms to
            Promote Human Rights and Democratic Values ............ 9

            1.    Open Video Platforms Bring a Special
                  Power in Calling to Account Those Who
                  Abuse Human Rights ........................................ 13

            2.    The Role of Open Internet Video Platforms
                  In Promoting The Cause of Human Rights Is
                  Well Documented ............................................ 15

      B.    *Amici* Use Open Video Platforms For  Consumer
            Advocacy, a Benefit Also Made Possible By The
            DMCA ........................................................ 20

II.   BY PLACING THE BURDEN OF MONITORING
      COPYRIGHT INFRINGEMENT ON COPYRIGHT
      HOLDERS, THE DMCA HAS MADE FAST, CHEAP
      PLATFORMS FOR GLOBAL INFORMATION
      DISSEMINATION LIKE YOUTUBE POSSIBLE ................ 25

      A.    Congress Intended That The Safe Harbor Would
            Encourage Service Providers to Expand the
            Variety and Quality of Services on the Internet .......... 25

ii

B.    To Place the Burden of Policing Infringement on Service Providers Would Undermine Congress' Intent By Discouraging the Expansion of Open Internet Video Platforms ................................................. 26

CONCLUSION ................................................................................. 29

CERTIFICATE OF COMPLIANCE ................................................ 31

CERTIFICATE OF SERVICE ......................................................... 32

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
 718 F.3d 1006 (9th Cir. 2013) ...................................................... 28

*UMG Recordings, Inc. v. Veoh Networks, Inc.*,
 665 F. Supp. 2d 1099, 1111 (C.D. Cal. 2009) .............................. 28

## FEDERAL STATUTORY AUTHORITIES

Copyright Act, 17 U.S.C.
 §§ 101 et seq. ................................................................... 3, 4, 27
 § 102 ............................................................................................ 8
 § 512(m)(1) ............................................................................ 26, 28

## FEDERAL RULES AND REGULATIONS

Fed. R. App. P.
 26.1 ............................................................................................. 1
 32 .............................................................................................. 31
 32(a)(7)(B) ............................................................................... 31
 32(a)(7)(B)(iii) ......................................................................... 31

Second Circuit Rule
 29.1(b) ........................................................................................ 1

## LEGISLATIVE MATERIALS

H.R. Rep. No. 105-551 (1998) .................................................. 23, 24

S. Rep. No. 105-190 (1998) ................................................. 6, 25, 28

## ADDITIONAL AUTHORITIES

LOUIS D. BRANDEIS, OTHER PEOPLE'S MONEY AND HOW THE
 BANKERS USE IT (1914) ................................................................ 14

Edward Lee, *Decoding the DMCA Safe Harbors*, 32 Colum. J.L. & Arts 233, 260 (2008) ................................................................ 5, 6

*Iran Doctor Tells of Neda's Death,* BBC NEWS (June 25, 2009) ...... 17

Joe Mullin, *Uh-oh Veoh: Big Copyright Win Can't Save Online Video-Sharing Company*, CORP. COUNSEL (Mar. 4, 2010) ........... 29

Megan O'Neill, *How YouTube is Aiding the Libyan Revolution*, SOCIAL TIMES (Feb. 26, 2011) ........................................................ 18

John Pollock, *How Egyptian and Tunisian Youth Hacked the Arab Spring*, MIT TECH. REVIEW (Aug. 23, 2011) ........................ 17

Jennifer Preston, *Movement Began With Outrage and a Facebook Page That Gave It an Outlet*, N.Y. TIMES (Feb. 6, 2011) ......................................................................................... 19

Jerome H. Reichmann, Graeme B. Dinwoodie & Pamela Samuelson, *A Reverse Notice and Takedown Regime to Enable Public Interest Users of Technically Protected Copyright Works*, 22 Berkeley Tech. & L.J. 981 (2007) ......................................................... 5-6, 28

*'Neda' becomes rallying cry for Iranian protests*, CNN.COM, (June 22, 2009) ......................................................................................... 18

SOPHOCLES, OEDIPUS THE KING, (Ian Johnston trans., *available at* https://records.viu.ca/~johnstoi/sophocles/oedipustheking.htm) (c. 420 B.C.) .................................................................................. 13

Donna Trussel, *Anonymous Captured Neda's Death, and Now the Polk Award*, POLITICS DAILY (2010) ............................................. 17

Andrew K. Woods, *The YouTube Defense: Human Rights Go Viral*, SLATE, (Mar. 28, 2007) ................................................................. 7

v

# INTEREST OF *AMICI CURIAE*

*Amici curiae* the National Consumers League ("NCL"), Consumer Action,  Human Rights Watch, Access, and Freedom House respectfully submit this brief in support of appellees.[1]

NCL is the nation's oldest consumer organization, representing consumers and workers on marketplace and workplace issues since its founding in 1899 by two of the nation's pioneering social reformers, Jane Addams and Josephine Lowell.  Its mission is to protect and promote social and economic justice for consumers and workers in the United States and abroad.  To that end NCL provides government, businesses, and other organizations with the consumer's perspective on a wide range of important concerns including developments in technology.

Consumer Action is a nonprofit organization that has championed the rights of underrepresented consumers nationwide since 1971.  Throughout its history, the organization has dedicated its resources to promoting financial literacy and advocating for consumer

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(c)(5) and Second Circuit Rule 29.1(b), *amici* state that no counsel for a party has written this brief in whole or in part; and that no person or entity, other than the *amici*, the members of *amici*, or counsel for *amici* has made a monetary contribution that was intended to fund the preparation or submission of this brief.  All parties, Appellants and Appellees, have consented to the filing of this brief.

rights in both the media and before lawmakers in order to promote economic justice for all.  Among a wide range of other initiatives, Consumer Action works to promote policies to ensure that consumers have access to a fast, affordable and open Internet that provides a level playing field for all websites and Internet technologies.

Human Rights Watch is one of the world's leading independent organizations dedicated to defending and protecting human rights. Founded as the Fund for Free Expression, the organization has a long-standing commitment to defending free speech, the right to information, and the work and security of human rights defenders everywhere.  For 30 years, Human Rights Watch has conducted rigorous, objective investigations of possible human rights violations around the world, has engaged in strategic, targeted advocacy, and has worked to build a secure legal foundation for human rights throughout the world.

Access is an international organization that works to extend and defend the rights of users at risk around the world.  Its work is premised on the belief that the realization of human rights and meaningful political participation in the 21st Century is increasingly dependent on access to the Internet  and other forms of communication technology.  *See* www.accessnow.org.  Founded in

the aftermath of the 2009 Iranian elections, Access provides global policy guidance and direct technical and advocacy support to human rights and pro-democracy activists around the world.

Freedom House is an independent watchdog organization that monitors freedom, supports democratic change, and advocates for democracy and human rights around the world. *See* www.freedomhouse.org. Since its founding in 1941, with Eleanor Roosevelt and Wendell Willkie serving as honorary co-chairpersons, Freedom House has been a vigorous proponent of democratic values and a steadfast opponent of dictatorships of the far left and the far right.

The workers, consumers, and activists that *amici* represent, and for whom they advocate, depend on the Internet as a free and fair marketplace for the exchange of ideas. Open Internet video platforms such as YouTube have become an indispensable forum for the review and critique, by and for consumers and citizens alike, of everything from products, services, and entertainment on the one hand, to videos that shine a light on human rights abuses and promote democratic values in an environment free from censorship. *Amici* and their members, then, have a significant interest in the Court's resolution of this case and particularly its interpretation of the Copyright Act, 17

3

U.S.C. §§ 101 *et seq.* and the Digital Millennium Copyright Act provisions codified at Section 512 (the "DMCA" or the "Act").

*Amici* strongly support the district court's decision, which correctly interprets the DMCA in a manner that gives effect to the plain intent of Congress to preserve the Internet as a fair and functional marketplace and as a medium that allows the rapid dissemination of video content that can profoundly impact the advancement of human rights and consumer advocacy around the world all the while taking into account the rights and needs of both copyright holders and Internet users.

## ARGUMENT

Today, fifteen years after the DMCA was enacted, a diverse new generation of content creators is uploading and globally broadcasting information over open Internet video platforms like YouTube.  The latest statistics indicate that 100 hours of video are being uploaded to YouTube every minute.[2]  This new category of "broadcast" content is not created only by the major commercial media corporations; nor is it owned by them.  Yet its social importance is unmistakable.

These *amici*, storied organizations who are among the nation's

---

[2] *See* http://www.youtube.com/yt/press/statistics.html (last visited October 28, 2013).

4

most active champions of workers, consumers and activists, some whose origins date back over a century, stand among this new generation of Internet broadcasters.

The National Consumers League, Consumer Action and their constituents use open Internet video platforms to gather and broadcast videos discussing the merits (and faults) of a variety of products, services and entertainment as well as videos teaching about the dynamics and dangers of consumer credit. Human Rights Watch, Access and Freedom House use these platforms to gather and convey information about human rights abuses happening around the world, to promote free speech and to advocate for democratic values. Having incorporated platforms like YouTube in their day-to-day activities, these *amici* share a common interest in maintaining the continuing vitality of such systems.

Once again at issue in the second appeal of this litigation is how safe the safe harbor provisions in the DMCA really are for open Internet video platforms such as YouTube. Congress enacted the DMCA safe harbors to "ensur[e] that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand,"[3] and to "facilitate the robust

---

[3] Edward Lee, *Decoding the DMCA Safe Harbors*, 32 Colum. J.L. & Arts 233, 260 (2008) (quoting S. Rep. No. 105-190, at 8 (1998)); *see*

development and world-wide expansion of electronic commerce, communications, research, development, and education in the digital age."[4]  In the shelter of those safe harbors, over the past decade and a half, a new ecosystem of service providers like YouTube and content creators  who depend on them, among whom stand these *amici*, has emerged.

The DMCA safe harbors paved the way for this world of new media, and they did so by crafting a careful balance of duties among copyright owners and technology providers.  By freeing service providers from having to police the content posted by their users and removing the correlative risk of dangerously unpredictable secondary copyright liability so long as they abide by notice and takedown, Congress ensured that the interests of copyright owners would not eclipse or forestall the progress of the Internet.  Were that balance disturbed, this vibrant new ecosystem -- on which *amici* and millions of other new content creators depend -- would be gravely endangered.

Make no mistake -- the Court's decision in this case has the potential, if appellants' arguments are accepted, to severely limit the

---

*also* Jerome H. Reichmann, Graeme B. Dinwoodie & Pamela Samuelson, *A Reverse Notice and Takedown Regime to Enable Public Interest Users of Technically Protected Copyright Works*,  22 Berkeley Tech. & L.J. 981, 993-94 (2007).

[4] Lee, *supra*, at 260 (quoting S. Rep. No. 105-190, at 1-2 (1998)).

protections of the safe harbor provisions of the DMCA.  Should that
happen, the very foundations of our present day participative,
interactive Internet would be shaken.  Should Viacom's rule be
adopted, that would risk the shutdown of many present day service
providers and discourage investment in countless future YouTubes.[5]
Such a result would be plainly antithetical to the aims of the DMCA
and highly detrimental to the interests of *amici*.

It is with these perspectives that *amici* urge the Court to uphold
the district court's ruling which properly interprets the plain language
of Section 512 of the DMCA.

## I.     OPEN VIDEO PLATFORMS ARE ESSENTIAL TOOLS FOR THE FAST, LOW-COST, GLOBAL GATHERING AND DISSEMINATION OF USER-CREATED INFORMATION RELEVANT TO DIVERSE ISSUES.

Open Internet video platforms such as YouTube empower every
individual with an Internet connected digital recording device – i.e., a
smartphone and a data plan – to globally broadcast the images and
sounds that they see, hear or create.   Furthermore, they empower
every individual with access to an Internet-enabled device to view,

---

[5] YouTube's implications for human rights advocacy have
been recognized since its early days. *See*, *e.g.*, Andrew K. Woods, The
YouTube Defense: Human Rights Go Viral, SLATE (Mar. 28, 2007),
*available at* www.slate.com/id/2162780/ (last visited October 25,
2013).

hear and recommend those recordings.  Thus, these technologies have disrupted the old order of who is allowed to engage in mass communication.  No longer is that power reserved solely to the traditional gatekeepers of information like governments and major media corporations.  Now ordinary individual users on both sides of this technology – the uploaders and the viewers of user-created videos – can communicate vividly and directly with each other on literally every subject impacting their lives, from whether and how they should throw off the yoke of a tyrannical government to which movie to see this weekend.

These ubiquitous acts of recording inherently implicate copyright law, the protections of which subsist in all "original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."[6]  It was in recognition of this inherent tension between copyright law and the development of digital media technologies that Congress enacted clear and capacious safe harbors; thereby the development of these new technologies would not be impeded by copyright law.  In the shelter of those safe harbors, there has emerged

---

[6] *See* 17 U.S.C. § 102.

an ever growing ecosystem of open platforms, such as YouTube.
Owing to the DMCA, these platforms are not captives of a
"permissions culture," which would create an environment of
insurmountable cost and risk for technology creators, but rather one of
safety.  In this ecosystem of new platforms has emerged a new culture
of content creation and free global communication, one which these
*amici* have embraced and leveraged to carry out their goals.

A.    ***Amici* Are Using Open Video Platforms to Promote Human Rights and Democratic Values.**

The number of videos currently on YouTube relating to human
rights issues is breathtaking.  A search on www.youtube.com, for
example, for "human rights" returns "[a]bout 11,100,000 results."[7]
The top twenty results returned are produced or curated by sources
like the Office of the High Commissioner for Human Rights of the
United Nations, the nonprofit Human Rights Action Center, the
London School of Economics, Human Rights Watch, and the
University of California.  The subject matter of these videos spans
issues of justice and equity that are affecting people in every corner of
the world.  Topics include the Universal Declaration of Human
Rights, commentary regarding specific potential human rights

---

[7] Last searched October 24, 2013.

9

violations in Bahrain, and an epidemic of sexual violence in Egypt.[8]
Not one of these videos appears to contain content over which
Viacom or any other major entertainment corporation can claim
copyright ownership.

YouTube also allows new content creators to create their own
"channels" where users can learn about the content creator, see all the
other videos that the creator has posted, and subscribe to the channel
to be automatically notified about updates to the creator's channel.
This allows new content creators to draw viewers' attention to not
only the video that first exposed them to the creator's channel, but
also videos on other issues that may be of interest to the viewer.

For example, Human Rights Watch has a YouTube channel, as
do Freedom House and Access.[9]  Thousands of users have subscribed
to these channels and the videos posted by these human rights

---

[8] *See* http://www.youtube.com/watch?v=hTlrSYbCbHE (Human
Rights Action Center's video on Universal Declaration of Human
Rights); http://www.youtube.com/watch?v=2OrIeuAFndU (video
posted by RT news organization on potential human rights abuses in
Bahrain); http://www.youtube.com/watch?v=VZmdhwd3axw (Human
Rights Watch video on epidemic of sexual violence in Egypt).  All
sites last visited October 24, 2013.

[9] *See* http://www.youtube.com/user/HumanRightsWatch (Human
Rights Watch YouTube channel);
http://www.youtube.com/user/FreedomHouseDC (Freedom House);
http://www.youtube.com/user/accessorg (Access).  All sites last
visited October 24, 2013.

organizations have been viewed millions of times. Indeed, as of
October 24, 2013, YouTube was Human Rights Watch's primary
video distribution platform. There were 17,280 subscribers to Human
Rights Watch's channel, and its videos had been viewed 4,801,447
times, with over 5,000,000 minutes watched. The Human Rights
Watch channel includes numerous videos on diverse human rights
issues across the globe, from execution and hostage-taking by Syrian
rebels in their current war with the Syrian government (which in less
than two weeks time had been viewed more than 52,000 times and
generated nearly 500 comments) to the holding of incarcerated
teenagers in solitary confinement here in the United States (viewed
nearly 20,000 times since its publication a year ago).[10]

Access has used YouTube in various collaborative projects,
including the distribution of a video criticizing proposals from a
consortium called "The International Telecommunication Union,"
("ITU") which brings together governments such as China and Russia,
and posed a serious threat to the free and open Internet in 2012. The

---

[10] *See* http://www.youtube.com/watch?v=U10D0-wiJ8A&feature=c4-
overview-vl&list=PL73F4876AF62C15CC (video report on
executions and hostage-taking by Syrian rebels);
http://www.youtube.com/watch?v=i7hynBLs1fU&feature=c4-
overview-vl&list=PLF1E29F715F114C19 (video report on teens held
in solitary confinement in the United States). Both sites last visited
October 25, 2013.

video has reached nearly 175,000 views in a year.[11]  On October 26,
2013, StopWatching.Us, a coalition of more than 100 public advocacy
organizations and companies from across the political spectrum and of
which *amicus* Access is a member, organized a rally against mass
surveillance by the NSA.[12]  These activists used YouTube  to deliver
videos that informed and energized their constituents.  Some of these
videos have been viewed over one million times.[13]  A "crowdfunding"
campaign webpage that featured the coalition's YouTube video raised
more than $47,000 on behalf of the coalition.[14]

The technical capabilities and features of open Internet video
platforms like YouTube far surpass what these organizations could
develop on their own.  Human Rights Watch, for example, tried to
serve its own videos from 2005 to 2008. This was costly from both a
personnel and budgetary perspective, and still could not match the
quality of YouTube's high definition video and speed of playback.
Further, *amici* benefit from YouTube's mobile optimization, social

---

[11] *See* http://www.youtube.com/watch?v=XzNQarkk95Q (video report
on the threats to Internet freedom posed by Internet governance
proposals)

[12] *See* https://rally.stopwatching.us (Last Visited October 31, 2013)

[13] https://www.youtube.com/watch?v=aGmiw_rrNxk  (Last Visited
October 31, 2013)

[14] *See* http://www.indiegogo.com/projects/stop-watching-us-a-rally-
against-nsa-surveillance-on-october-26th--2 (web page which includes
video report on rally against mass surveillance)

sharing, and ability to live-stream events, such as the launch of
Human Rights Watch's 2013 World Report. YouTube's translation
and subtitling enhancements allow *amici* to easily connect with
viewers who speak other languages, too.[15]

Open video platforms such as YouTube undeniably provide
new content creators with tools to raise awareness of issues of
importance with a viewership that spans the world.

> **1.    Open Video Platforms Bring a Special Power in
> Calling to Account Those Who Abuse Human
> Rights.**

They say a picture is worth a thousand words. The power of
*moving* pictures is no doubt worth many more. Humanity has long
understood the power of seeing. As far back as the 5th Century B.C.,
the Greek playwright Sophocles told the story of Oedipus the King,
who gouged out his eyes because he could not bear to look at the
terrible truth of his own life – that he had unwittingly killed his father
and wed his mother.[16] When the truth is deeply troubling, as it often
is when it comes to human rights abuses, it is harder to disbelieve,

---

[15] *See* http://www.youtube.com/watch?v=HdxnIfY3NQQ (How to add
Subtitles on YouTube).

[16] SOPHOCLES, OEDIPUS THE KING, at ll. 1556-57 (Ian Johnston trans.,
*available at*
https://records.viu.ca/~johnstoi/sophocles/oedipustheking.htm) (c. 420
B.C.).

ignore, or forget it once we have witnessed it with our own eyes.

The profound effect of seeing is innate, and thus has not changed since ancient times, so unsurprisingly activists have long sought to harness the impact and credibility of video evidence to stir opposition to human rights abuses. Visibility and transparency serve to make all institutions, including government, more accountable. "Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman."[17] Yet when the tools that would make such visibility possible are controlled by the very institutions whose excesses or corruption they would expose, they are much less likely to serve that salutary purpose. It is thus not an understatement to say that by literally placing access to a global viewing audience in the hands of ordinary citizens around the world, open Internet video platforms have made it harder for governments and others in power to keep human rights abuses in the shadows.

The international nonprofit organization WITNESS, for example, established in 1992, sought to increase awareness of human rights abuses by making video cameras broadly available to human rights activists. Now, as discussed above, almost anyone with a cell

---

[17] LOUIS D. BRANDEIS, OTHER PEOPLE'S MONEY AND HOW THE BANKERS USE IT 92 (1914).

phone can take a video of human rights abuses and upload it onto open Internet video platforms like YouTube freely and quickly, and then broadcast it globally, bypassing the traditional forms of censorship that would otherwise make this kind of vivid mass communication impossible.  Indeed, it is believed that the video of the death of Neda Soltan in Iran, described below, was captured with a cell phone video camera.

### 2.    The Role of Open Internet Video Platforms  In Promoting The Cause of Human Rights Is Well Documented.

The impact of videos posted on open Internet video platforms like YouTube have real world consequences on human rights issues affecting millions of people.  The use of such platforms to spark and sustain the movements that led to mass protests and changes in governments across the Middle East serve as excellent examples of how powerful these tools are in motivating and mobilizing people around human rights abuses.

Starting in 2009, Malala Yousafzai, a young girl in Pakistan, used an Internet blog to share details about her life under Taliban rule. In 2012, the Taliban retaliated by shooting her.  She survived the shooting, and since then has become a globally recognized spokesperson for the importance of children's education.  This year,

15

Time magazine recognized Malala as one of the 100 Most Influential People in the World, and she was nominated for the Nobel Peace Prize.  The Internet has played a central role in promoting the rise of awareness about Malala's story and the issues for which she stands.  A search for Malala on YouTube turns up 931,000 videos.  This includes videos from well known media companies like CNN, PBS, and the New York Times, as well as videos by new content creators, such as the United Nations and the U.S. Department of State.[18]

In Tunisia, where the Arab Spring is credited with getting its start, the use of open Internet video platforms, including YouTube, to broadcast videos of human rights abuses galvanized the revolution that resulted in the overthrow of President Zine El Abidine Ben Ali, who had ruled the country for 23 years.[19]  For example, "[o]ne graphic and deeply distressing video was highly influential: it shows Kasserine's [a town in Tunisia] hospital in chaos, desperate attempts to treat the injured, and a horrifying image of a dead young man with

---

[18] *See* http://www.youtube.com/watch?v=a3tO3zIm3JM (United Nations video); http://www.youtube.com/watch?v=13A1Dar20As (U.S. Department of State video).  Both sites last visited October 28, 2013.

[19] *See* http://en.wikipedia.org/wiki/Arab_Spring (crediting the protests that occurred in Tunisia on December 18, 2010 in response to the self-immolation of Mohamed Bouazizi, a Tunisian street vendor, as the spark for the Arab Spring) (last visited October 24, 2013).

his brains spilling out."[20]  "Posted and reposted hundreds of times on YouTube, Facebook, and elsewhere, it set off a wave of revulsion across North Africa and the Middle East."[21]  According to some observers, that video "made the second half of the revolution."[22]

After the disputed presidential elections in 2009 in Iran in which President Mahmoud Ahmadinejad claimed victory, thousands of Iranians took to the streets in protest.  A young woman named Neda Agha Soltan was shot and killed during one of these protests, likely by a Basij (paramilitary) sniper supporting the government.[23]  Someone nearby took a brief video of Neda's death.  "The video wound up with the Guardian, Voice of America and five individuals, one of whom put it on Facebook.  Someone else uploaded it to YouTube, and from there the video went viral."[24]  What may have

---

[20] *See* John Pollock, *How Egyptian and Tunisian Youth Hacked the Arab Spring*, MIT TECHNOLOGY REVIEW (Aug. 23, 2011), *available at* http://www.technologyreview.com/featuredstory/425137/streetbook/ (last visited October 24, 2013).

[21] *Id.*

[22] *Id*.

[23] *See Iran Doctor Tells of Neda's Death,* BBC News (June 25, 2009), *available at* http://news.bbc.co.uk/2/hi/8119713.stm (last visited October 24, 2013).

[24] Donna Trussel, *Anonymous Captured Neda's Death, and Now the Polk Award*, POLITICS DAILY (2010), *available at* http://www.politicsdaily.com/2010/02/18/anonymous-captured-nedas-death-and-now-the-polk-award/) (last visited October 24, 2013).

remained a local or even unreported event became a sensation, and

Neda's name became an international rallying cry in support of the

protests.[25]

In Libya, despite the fact that the Qaddafi government blocked

access to YouTube about a week after protests against it began in

2011, Libyans were still able to get numerous videos of what was

going on in the country uploaded to the site.[26]  They were doing this in

a variety of ways, both new (having the footage "mirrored" by

volunteers outside the country who took the footage that was uploaded

to other sites, and then uploading it to YouTube) and old-fashioned

(crossing the border into neighboring countries and using Internet

access there to upload the videos to YouTube).[27]  The fact that so

many videos (possibly thousands) were ultimately uploaded in the

week after this government-imposed blackout shows that the

otherwise low- or no-cost of access to open Internet video platforms

helps ordinary individuals overcome even the most severe attempts at

---

[25] *See 'Neda' becomes rallying cry for Iranian protests*, CNN.COM,
(June 22, 2009) *available at*
http://www.cnn.com/2009/WORLD/meast/06/21/iran.woman.twitter/
(last visited October 24, 2013).

[26] Megan O'Neill, *How YouTube is Aiding the Libyan Revolution*,
SOCIAL TIMES (Feb. 26, 2011), *available at*
www.socialtimes.com/2011/02/youtube-libyan-revolution/ (last
visited October 25, 2013).

[27] *Id.*

censorship.

Observers also credit open Internet video platforms with fueling popular resistance to the government of Hosni Mubarak in Egypt, eventually leading to Mr. Mubarak's ouster from power.  In particular, after a young Egyptian businessman, Khaled Said, was brutally beaten to death by Egyptian police, possibly because he had come into possession of videos showing police corruption, photos of his disfigured face captured on a cell phone at the morgue were posted to Facebook, and videos contrasting pictures of him alive and smiling with the images from the morgue were posted on YouTube.[28]  Some credited the murder of Mr. Said, and by extension the photos and videos posted on Facebook and YouTube that broadcast the horror of it to hundreds of thousands – if not millions – of Egyptians, with being the first "catalyst" of the uprising against Mr. Mubarak.[29]

### B.    *Amici* Use Open Video Platforms For Consumer Advocacy, a Benefit Also Made Possible By The DMCA.

Open Internet video platforms are also important fora for consumers to publish, for little or no cost, their own reviews of

---

[28] Jennifer Preston, *Movement Began With Outrage and a Facebook Page That Gave It an Outlet*, N.Y. TIMES (Feb. 6, 2011), *available at* www.nytimes.com/2011/02/06/world/middleeast/06face.html?pagewanted=all (last visited October 24, 2013).
[29] *Id*.

19

products, services and entertainment across the entirety of today's

commercial market, and, on the viewing side, to inform themselves,

also for little or no cost, *before* they purchase any of these things.  A

search for "product review" on YouTube, for example, yields about

7,640,000 results.[30]  The video results include reviews of products as

diverse as the "Sodastream" home water carbonation system, "As I

Am" hair products, and "Klim Adventure Rally Pants and Valdez

Parka" for motorcyclists.[31]  Several of these product review videos

have been viewed millions of times.[32]

Similarly, a search for "movie review" yields about 15,700,000

results.[33]  The variety of these reviews is limited only by the number

of movies released and the range of user viewpoints.  And viewers

obviously appreciate these viewpoints, as many of these movie

reviews have been viewed hundreds of thousands of times.[34]  Such

---

[30] Last searched October 25, 2013.

[31] *See* http://www.youtube.com/watch?v=3vcZ6dLXrtw (Sodastream);
http://www.youtube.com/watch?v=i8NnEUNd2IM (As I Am);
http://www.youtube.com/watch?v=EpcrNzlaez8 (Klim Adventure
Rally Patents and Valdez Parka).  All sites last visited October 25,
2013.

[32] *See*, *e.g.*, http://www.youtube.com/watch?v=_OSOi_xKjrQ
(product review of child's toy PlaySkool Busy Poppin Pals, viewed
8,797,300 times as of October 25, 2013).

[33] Last searched October 25, 2013.

[34] *See* http://www.youtube.com/watch?v=aD-3j_BnZAE (*The
Conjuring* movie review, viewed 374,885 times as of October 25,

objective, third-party reviews allow consumers to make better informed decisions about how they choose to spend their time and money.  The capabilities that open Internet video platforms put into their hands also allow them to pass on the wisdom of those decisions to others.

*Amicus* the National Consumers League has its own YouTube Channel, which it uses to teach "LifeSmarts," i.e. practical life skills, through a "game show" like format.  These game shows address issues like credit, technology and the environment.[35]  The ConsumerMan show, also under the National Consumers League LifeSmarts umbrella, teaches skills like money management to young people.[36]

Consumer Action has a channel that includes "hangouts on air," which include videos like "Understanding How Prepaid Cards Work," "Navigating Financial Complexity" and "Online Tracking

---

2013); http://www.youtube.com/watch?v=jv1RTULln4I (*The Wolverine* movie review, viewed 375,896 times as of October 25, 2013); http://www.youtube.com/watch?v=_H3iv8T9SfU (*Pacific Rim* movie review, viewed 458,899 times as of October 25, 2013).

[35] *See* http://www.youtube.com/user/nationalconsumers (last visited October 28, 2013).

[36] *See* http://www.youtube.com/watch?v=BkQot37m-4c&list=PL5C570F858BAEE1F7 (last visited October 28, 2013).

Protections."[37]

Also available on YouTube are videos on do-it-yourself repair of consumer products as diverse as smartphones to garbage disposals.[38]  Obviously knowing the cost and difficulty of product repair allows consumers to make better informed decisions about what makes the most sense economically when dealing with a broken product that affects their day-to-day lives:  paying someone else to repair it, repairing it themselves, or simply throwing the product out and purchasing a new one.

Consumer organizations and their constituents thus unquestioningly benefit from the vivid, easy, and low-cost information exchange that open video platforms allow.   And from early on, the promotion of such benefits has been a goal of Congress in fashioning the DMCA.  Repeatedly during its consideration of the bills that became the DMCA, Congress stressed the need to strike a balance that would protect not only copyright holders but, also, the nation's consumers.  In this respect *amici* and Congress share similar

---

[37] *See* http://www.youtube.com/channel/UCFnGGfEjgPS2GhsJCkyZv_Q (last visited October 28, 2013).

[38] *See* http://www.youtube.com/watch?v=Zpi_-OawKT4 (do-it-yourself repair of front glass of Samsung Galaxy S3); http://www.youtube.com/watch?v=kzTPox1kARo  (do-it-yourself repair of garbage disposal).  Both sites last visited October 25, 2013.

goals for, and a similar understanding of, the DMCA.

Without question, the revolutionary aspect of new digital technologies was at the forefront of Congress's consideration when it passed the DMCA.  And it recognized the direct impact this revolution has on the lives of consumers and the operations of the commercial marketplace:

> Much like the agricultural and industrial revolutions that preceded it, the digital revolution has unleashed a wave of economic prosperity and job growth.  Today, the information technology industry is developing versatile and robust products to enhance the lives of individuals throughout the world, and our telecommunications industry is developing new means of distributing information to these consumers in every part of the globe.  In this environment, the development of new laws and regulations will have a profound impact on the growth of electronic commerce and the Internet.[39]

Congress recognized the need in this new environment for new legal mechanisms not only to protect authors and copyright holders from copyright infringement but also, to "protect consumers from misinformation."[40]  To that end, the DMCA was intended as a modernization that would "extend[] into the digital environment the bedrock principle of 'balance' in American intellectual property law

---

[39] H.R. Rep. No. 105-551 ("House Report"), pt. 2, at 28 (1998).

[40] *See* House Report, pt. 1, at 10-11.

for the benefit of both copyright owners and users."[41]  And Congress understood the need for that modernization to include "rules that ensure . . . consumers have a stake in the growth in electronic commerce."[42]

The legislative history of the DMCA demonstrates bi-partisan support for the notion that the Act was intended to strike a balance that expressly recognized, included, and protected the nation's consumers:  "Whatever protections Congress grants should not be wielded as a club to thwart consumer demand for innovative products, consumer demand for access to information, consumer demand for tools to exercise their lawful rights, and consumer expectations that the people and expertise will exist to service these products."[43]

## II.   BY PLACING THE BURDEN OF MONITORING COPYRIGHT INFRINGEMENT ON COPYRIGHT HOLDERS, THE DMCA HAS MADE FAST, CHEAP PLATFORMS FOR GLOBAL INFORMATION DISSEMINATION LIKE YOUTUBE POSSIBLE.

### A.   Congress Intended That The Safe Harbor Would Encourage Service Providers to Expand the Variety and Quality of Services on the Internet.

Congress enacted the safe harbor of the DMCA in order to

---

[41] House Report, pt. 2, at 32.

[42] *See id.*

[43] House Report, pt. 2 at 87 (Additional comments of Rep. Scott Klug of Wisconsin and Rep. Rick Boucher of Virginia).

promote the continued improvement and expansion of the Internet. "Title II [the safe harbor] clarifies the liability faced by service providers who transmit potentially infringing material over their networks.  In short, Title II ensures that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will expand."[44]  Congress deemed this necessary because "without clarification of their liability, service providers may hesitate to make the necessary investment in the expansion of the speed and capacity of the Internet."[45]

One of the ways in which Congress ultimately limited service providers' liability was by placing the burden of policing Internet copyright infringement where it belonged: on copyright holders.  It explicitly excused service providers from having to monitor user posted files.[46]  Notice-and-takedown worked well between the parties in this case, with Viacom providing YouTube with take-down notices for over 100,000 clips, and YouTube taking them down the next

---

[44] Sen. Rep. No. 105-190 ("Senate Report"), pt. 2, at 2 (1998).
[45] *Id.*, pt. 3, at 8.
[46] 17 U.S.C. § 512(m)(1) (providing that entitlement to the safe harbor shall not be conditioned on a "service provider monitoring its service or affirmatively seeking facts indicating infringing activity, except to the extent consistent with a standard technical measure complying with the provisions of subsection (i).")

business day.[47]  The Court need not and should not disrupt that well-functioning balance by shifting the burden of policing from copyright holders to service providers, at the cost of not only open Internet video platforms like YouTube, but also, for example, the millions of human rights activists and consumers who benefit from their availability, ease of use, and breadth and speed of transmission that these platforms provide.

### B. To Place the Burden of Policing Infringement on Service Providers Would Undermine Congress' Intent By Discouraging the Expansion of Open Internet Video Platforms.

To subject open Internet video platforms to onerous affirmative duties of policing user-uploaded content, as Viacom urges, would impose an unsustainable burden that would defeat Congress' core objective with the DMCA.  Instead of fostering innovation and investment in open video platforms, such a rule would discourage and deter the expansion of such services.

For a service provider like YouTube to *manually* monitor for potential infringement would be impracticable.  Take for example, the video discussed above, which was posted to YouTube by Access and criticizes the positions of the International Telecommunication Union

---

[47] *See* Opening Br. for Pls.-Appellants (D.I. 35), at 17.

("ITU").  That  video takes "samples" from the ITU website which are arguably copyrighted, but which in the context of the video are fair use.  For YouTube to identify and analyze all such potential copyright infringements in the hundred-plus hours of video uploaded to its service each minute would require a cripplingly costly manual review.  Moreover, any such review would risk a dangerously high error rate, because service providers are not competent to recognize what third-party copyright owners claim to own, what they do not own, and what despite their ownership a copyright holder may wish to freely distribute (such as the movie trailers that studios like Viacom often share freely on sites like YouTube).  Service providers also cannot reliably substitute for a judicial body in making accurate fair use determinations.  As any error could result in ruinous statutory damages under the Copyright Act, service providers would be forced to exercise excessive caution and over-police content, which would undermine the express aims of the DMCA.[48]

What's more, an affirmative obligation on platforms to monitor for allegedly infringing materials would entail surveilling all user activity on the platform, a violation of user privacy which has a further chilling effect on free speech and which is directly contrary to

---

[48] Reichmann, Dinwoodie & Samuelson, *supra*, at 993-94.

27

17 U.S.C. § 512(m)(1).

These are precisely the reasons why Congress excused service providers from having to actively monitor their systems for copyright infringement and placed the burden on content owners.  This created the conditions of safety in which service providers could "make the necessary investment in the expansion of the speed and capacity of the Internet."[49]  Under Viacom's rule, however, the prohibitive costs of affirmatively monitoring for infringement and the specter of potentially devastating copyright damages for failing to do so would conspire to severely discourage such investment.  For example, the prevailing defendant in *UMG Recordings, Inc. v. Veoh Networks, Inc.*, whom the district court held was entitled to the protection of the DMCA safe harbor, still had to file for bankruptcy, citing the shadow that the long-running copyright suit had cast on its efforts to raise capital.[50]

Nor should a service provider be *punished*, as Viacom suggests YouTube should be here, for implementing *some* kinds of content

---

[49] Senate Report, pt. 3, at 8.

[50] *See* 665 F. Supp. 2d 1099, 1111-12, 1118 (C.D. Cal. 2009), *aff'd sub nom UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006 (9th Cir. 2013); Joe Mullin, *Uh-oh Veoh: Big Copyright Win Can't Save Online Video-Sharing Company*, CORP. COUNSEL (Mar. 4, 2010).

28

filtering that consumers demand, such as allowing users to identify videos that contain pornographic or hate speech material and restricting access to such material, while not implementing copyright-filtering technology.  To do so would provide truly perverse incentives for open Internet video platforms to do nothing to protect, for example, children from online pornography or other material that parents consider harmful, because it might expose them to liability for copyright infringement.

## CONCLUSION

The affirmative duty of open Internet video platforms to monitor user-uploaded content for copyright infringement that appellants suggest here would not only undermine Congress' intent that the DMCA should be applied to expand the variety and quality of content on the Internet, but also would simply be censorship by another name, and make open video platforms less democratic.  The platforms would become more like television, more closed and controlled by content gatekeepers.  This would harm the ability of human rights activists to get their messages out to the world quickly – if at all – and consumers to get honest, objective, third-party information about the products, services and entertainment they have purchased or may purchase.  *Amici* therefore respectfully submit that

the judgment of the district court should be affirmed.

Dated:  November 1, 2013          FARELLA BRAUN + MARTEL LLP

By: */s/ Anthony P. Schoenberg*

Anthony P. Schoenberg
Deepak Gupta
Erik C. Olson
Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104

Counsel for *Amici Curiae* National
Consumers League, Consumer Action,
Human Rights Watch, Access, and
Freedom House

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32 of the Federal Rules of Appellate Procedure, I certify that:

1.      This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains fewer than 5,951 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii); and

2.      This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using 14-point Times New Roman.

Dated:   November 1, 2013

                                    */s/ Anthony P. Schoenberg*
                                    ANTHONY P. SCHOENBERG

31

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of November, 2013, a true and correct copy of the foregoing Brief for National Consumers League, Consumer Action, Human Rights Watch, Access, and Freedom House as *Amici Curiae* Supporting Appellees was served on all counsel of record in this appeal via CM/ECF pursuant to Second Circuit Rule 25.1(h)(1)-(2).

Dated:   November 1, 2013

/s/ Anthony P. Schoenberg
ANTHONY P. SCHOENBERG