# 13-1720-cv

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

VIACOM INTERNATIONAL INC., COMEDY PARTNERS, COUNTRY MUSIC
TELEVISION, INC., PARAMOUNT PICTURES CORP., BLACK ENTERTAINMENT
TELEVISION LLC.,

PLAINTIFFS-APPELLANTS,

V.

YOUTUBE, INC., YOUTUBE, LLC, GOOGLE, INC.,

DEFENDANTS-APPELLEES.

On Appeal From The United States District Court
For The Southern District of New York
Honorable Louis L. Stanton, District Judge

**BRIEF OF AMICI CURIAE
ELECTRONIC FRONTIER FOUNDATION
AND PUBLIC KNOWLEDGE
IN SUPPORT OF APPELLEES AND AFFIRMANCE**

Corynne McSherry
Michael Barclay
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109-7701
Telephone: (415) 436-9333
corynne@eff.org

Sherwin Siy
PUBLIC KNOWLEDGE
1818 N St. NW, Suite 410
Washington, DC 20036
Telephone:  (202) 861-0020
ssiy@publicknowledge.org

*Attorneys for Amici Curiae*

November 1, 2013

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Amici Curiae Electronic Frontier Foundation and Public Knowledge state that neither has a parent corporation and that no publicly held company owns 10% or more of either of their stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ................................................... i

TABLE OF AUTHORITIES .............................................................. iv

TABLE OF CONVENTIONS .............................................................. vii

STATEMENT OF INTEREST ............................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................... 3

ARGUMENT ....................................................................... 7

I.      "Inducement" Cannot Be Equivalent to "Right and Ability to Control"
        Under the DMCA ........................................................... 7

II.     Viacom and Its Amici Misstate the Law of Inducement Liability for
        Products and Services Having Substantial Non-Infringing Uses ............. 8

        A.   The *Grokster* Standard for Inducement Is Designed to Ensure that
             Copyright Law Will Not Unduly Impede the Development of New
             Products and Services That Have Non-infringing Uses .................. 9

        B.   Viacom Improperly Relies on Rulings Involving Services That
             Were Not Found to Be Capable of
             Substantial Non-Infringing Uses ..................................... 12

        C.   Appellate and District Courts Consistently Distinguish Products
             and Services With Substantial Non-Infringing Uses .................... 14

III.    Patent Law Inducement Principles Also Support a Heightened Standard
        Where Substantial Non-Infringing Uses Exist ............................. 17

        A.   Patent Law Requires Instructions or Similar Steps, Actually
             Communicated to the User, Where the Product or Service Has
             Substantial Non-Infringing Uses ..................................... 19

        B.   Where the Product or Service Has Substantial Non-Infringing Uses,
             Liability for Inducement Is Limited to Specific Infringements
             Actually Caused by the Accused Inducer's Acts ........................ 23

        C.   Acts of Omission Do Not Establish Inducement Liability ............... 24

        D.   Taking Guidance from Patent Law, the Court Should Apply a

Rigorous Inducement Standard to Products With Significant Non-infringing Uses ................................................................................ 25

IV.    YouTube Has Substantial Non-Infringing Uses, Did Not Engage in Inducement, and Did Not Have the "Right and Ability to Control" ....... 26

CONCLUSION ................................................................................ 29

# TABLE OF AUTHORITIES

Page(s)

## Federal Cases

*A&M Records, Inc. v. Napster, Inc.*,
   239 F.3d 1004 (9th Cir. 2001) ................................................................. 14

*ACCO Brands, Inc. v. ABA Locks Manufacturer Co., Ltd.*,
   501 F.3d 1307 (Fed. Cir. 2007) ......................................................... 20, 21

*Arista Records LLC v. Lime Group LLC*,
   784 F. Supp. 2d 398 (S.D.N.Y. 2011) ............................................... 14, 28

*Arista Records LLC v. Usenet.com, Inc.*,
   633 F. Supp. 2d 124 (S.D.N.Y. 2009) ..................................................... 14

*Capitol Records, Inc. v. MP3tunes, LLC*,
   821 F. Supp. 2d 627 (S.D.N.Y. 2011) ....................................................... 4

*Capitol Records, LLC v. Vimeo, LLC*,
   No. 09 Civ. 10101 RA, 2013 WL 5272932 (S.D.N.Y. Sept. 18, 2013) ... 16

*Columbia Pictures Industries, Inc. v. Fung*,
   710 F.3d 1020 (9th Cir. 2013) ............................................. 13, 14, 16, 28

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
   363 F.3d 1263 (Fed. Cir. 2004) ............................................................... 23

*E-Pass Techs., Inc. v. 3Com Corp.*,
   473 F.3d 1213 (Fed. Cir. 2007) ............................................................... 22

*Fromberg, Inc. v. Thornhill*,
   315 F.2d 407 (5th Cir. 1963) ................................................................... 21

*Fujitsu Ltd. v. Netgear Inc.*,
   620 F.3d 1321 (Fed. Cir. 2010) ............................................................... 23

*Henry v. A.B. Dick Co.*,
   224 U.S. 1 (1912) ..................................................................................... 10

*Io Group, Inc. v. Veoh Networks, Inc.*,
   586 F. Supp. 2d 1132 (N.D. Cal. 2008) .................................................. 15

iv

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005) .......................................................................... passim

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*,
    54 F. Supp. 2d 966 (C.D. Cal. 2006) ....................................................... 13

*Mirror Worlds, LLC v. Apple Inc.*,
    692 F.3d 1351 (Fed. Cir. 2012) ................................................................ 22

*Oak Indus., Inc. v. Zenith Elecs. Corp.*,
    697 F. Supp. 988 (N.D. Ill. 1988)................................................... 20, 22, 24

*Plastering Dev. Ctr., Inc. v. Perma Glas-Mesh Corp.*,
    371 F. Supp. 939 (N.D. Ohio 1973) ......................................................... 22

*Sony Corp. of America v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) ............................................................................ passim

*Tegal Corp. v. Tokyo Electron Co.*,
    248 F.3d 1376 (Fed. Cir. 2001) ................................................................ 24

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
    718 F.3d 1006 (9th Cir. 2013) ............................................................. passim

*Universal City Studios, Inc. v. Sony Corp. of Am.*,
    80 F. Supp. 429 (C.D. Cal. 1979)
    *aff'd in part, rev'd in part*, 659 F.2d 963 (9th Cir. 1981)
    *rev'd*, 464 U.S. 417 (1984) ...................................................................... 17

*Viacom Int'l Inc. v. YouTube, Inc.*,
    718 F. Supp. 2d 514 (S.D.N.Y 2010) ....................................................... 27

*Viacom Int'l, Inc. v. YouTube, Inc.*,
    676 F.3d 19 (2d Cir. 2012) ................................................................. passim

**Federal Statutes**

17 U.S.C. § 512(c) ................................................................................... 15, 25

17 U.S.C. § 512(c)(1)(B) ................................................................................ 4

35 U.S.C. § 271(b) ............................................................................. 19, 20, 21

35 U.S.C. § 271(c) ......................................................................... 18, 19, 20, 21

**Legislative Materials**

H.R. Rep. No. 105-551 (1998) ............................................................. 7

H.R. Rep. No. 105-796 (1998) ............................................................. 8

S. Rep. No. 105-190 (1998) ................................................................. 8

**Other Authorities**

Zachary Sniderman, *YouTube Alternatives & Why They Make Sense*, Mashable
 (May 11, 2011) .......................................................................... 16

# TABLE OF CONVENTIONS

| | |
|---|---|
| Viacom | Plaintiffs/Appellants Viacom International Inc., Comedy Partners, Country Music Television, Inc., Paramount Pictures Corporation, and Black Entertainment Television LLC (collectively) |
| Google | Defendant/Appellee Google, Inc. |
| Appellees | Defendants/Appellees YouTube, YouTube LLC and Google, collectively |
| YouTube | Defendants/Appellees YouTube, YouTube LLC and Google, collectively |
| Viacom Br. | Viacom's Opening Brief, dated July 26, 2013 |
| YouTube Br. | YouTube's Brief, dated October 25, 2013 |
| MPAA Br. | Amicus Brief of Motion Picture Association of America ("MPAA") et al., dated August 2, 2013 |
| ASCAP Br. | Amicus Brief of American Society of Composers, Authors, and Publishers, ("ASCAP"), et al., dated August 2, 2013 |
| JA__ | Joint Appendix |
| ECF No. | District Court Docket No. (in S.D.N.Y. Case No. 07-2103 unless indicated) |
| *Viacom II* (in italics) | *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012) |
| Appeal No. 10-3270 | The previous appeal to this Court (the appeal that resulted in the *Viacom II* opinion) |

# STATEMENT OF INTEREST[1]

*Amici curiae* submit this brief pursuant to Fed. R. App. P. 29.  All parties have consented to the filing of this brief.

The Electronic Frontier Foundation ("EFF") is a nonprofit civil liberties organization that has worked for over 20 years to protect consumer interests, innovation, and free expression in the digital world.  EFF and its over 24,000 dues-paying members have a strong interest in assisting the courts and policymakers to help ensure that copyright law serves the interests of creators, innovators, and the general public.

EFF has historically been concerned that overly expansive interpretations of copyright secondary liability can unduly inhibit innovation.  *See, e.g.*, Brief for Respondents at 24-26, *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) (No. 04-480).[2]  Given the importance of this case to future interpretations of the safe harbors for secondary liability outlined in the Digital Millennium Copyright Act, EFF has followed the case closely since its

---

[1] No party's counsel authored this brief in whole or in part.  Neither any party nor any party's counsel contributed money that was intended to fund preparing or submitting this brief.  No person other than amici, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.  Web sites cited in this brief were last visited on October 21, 2013.

[2] Available at: http://w2.eff.org/IP/P2P/MGM_v_Grokster/20050301_respondents_brief.pdf.

inception.  EFF previously filed two amicus briefs in the litigation, one before the district court (ECF No. 240, filed April 12, 2010) and one before this Court in Appeal No. 10-3270 (ECF No. 296, filed April 7, 2011).  As explained in greater detail below, the instant brief focuses primarily on a particular issue not cleanly raised until the latest round of briefing: the role of, and standard for, inducement analysis in the DMCA context.

Public Knowledge ("PK") joins this brief to protect the rights of Internet users, and to ensure that consumers benefit from new online business models and technologies.  PK is a non-profit public interest 501(c)(3) corporation, and its primary mission is to promote technological innovation, protect the legal rights of all users of copyrighted works, and ensure that emerging copyright and telecommunications policies serve the public interest.

Applying its years of expertise in these areas, PK frequently files amicus briefs at the district and appellate level in cases that raise novel issues at the intersection of media, copyright, and telecommunications law.  Public Knowledge joined EFF's amicus brief in the district court (ECF No. 240, filed April 12, 2010), and filed its own amicus brief in Appeal No. 10-3270 (ECF No. 468, filed September 27, 2011).  *See also Kirtsaeng v. John Wiley & Sons, Inc.*, 132 S. Ct. 1905 (2012); *Costco Wholesale Corp. v. Omega S.A.*, 131 S. Ct. 565 (2010); *Golan v. Holder*, 132 S. Ct. 873 (2012); *Cartoon Network, LP v.*

*CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008), *cert. denied*, *CNN, Inc. v. CSC Holdings, Inc.*, 557 U.S. 946 (2009); *MDY Industries, LLC v. Blizzard Entertainment, Inc.*, 629 F.3d 928 (9th Cir. 2010); *Vernor v. Autodesk, Inc.*, 621 F.3d 1102 (9th Cir. 2010); *American Broadcasting Companies, Inc. v. Aereo, Inc.*, 2012 U.S. Dist. LEXIS 96309 (S.D.N.Y. July 11, 2012); *WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594 (S.D.N.Y. 2011); *In re Cellco P'ship*, 663 F. Supp. 2d 363 (S.D.N.Y. 2009); *Arista Records LLC v. Lime Wire LLC*, No. 06-CV-5936 GEL 2 (S.D.N.Y. Sept. 30, 2008); *Elektra Enter. Group v. Barker*, 551 F. Supp. 2d 234 (S.D.N.Y. 2008).

## INTRODUCTION AND SUMMARY OF ARGUMENT

As the Court is doubtless aware, the many innovative businesses that have been created in the shelter of the safe harbors of the Digital Millennium Copyright Act ("DMCA") – and the users who rely upon those innovators – have been following this case closely. The legal certainty the DMCA safe harbors provide is crucial to those innovators' ability to survive and thrive in the new economy, creating new forms of commerce and platforms for speech – precisely as Congress intended. This litigation has been the vehicle for a variety of efforts to undermine those safe harbors, which this Court has wisely resisted.

In this latest round, Viacom raises several last-ditch arguments. Amici

will not attempt to speak to most of them, but rather focus on two aspects of Viacom's theory of the case: (a) its claim that inducement liability is effectively equivalent to "right and ability to control"; and (b) its loose interpretation of the standard for inducement liability. If accepted, Viacom's analysis would threaten innovation by undermining a key principle of copyright and patent law: ample breathing room must be given for technologies and services that, like YouTube, are capable of substantial non-infringing uses.

In *Viacom II*, this Court concluded that the "right and ability to control" infringing activity under 17 U.S.C. § 512(c)(1)(B) "requires something more than the ability to remove or block access to materials posted on a service provider's website." *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 38 (2d Cir. 2012) (citing *Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 645 (S.D.N.Y. 2011)). The Court suggested actions similar to those of the Defendants in *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) ("*Grokster*") might be evidence of the required level of control. *Viacom II*, 676 F.3d at 38.

Viacom and its amici take this suggestion and run with it, apparently assuming that this appeal largely begins and ends with *Grokster*, *i.e.*, that if YouTube's actions could lead to liability under *Grokster*, YouTube is also liable

4

under the DMCA.  *See* Viacom Br. at 27-38; MPAA Br. at 10-21; ASCAP Br. at 10-22.

Viacom is wrong, for at least two reasons.

First, Viacom overstates the relevance of *Grokster*.  The DMCA safe harbor expressly provides protection for all types of secondary liability, including inducement.  Therefore, a showing of inducement cannot be enough to effectively strip a commercial service provider of DMCA protections.

Second, Viacom misunderstands the standard for inducement liability set forth in *Grokster*, treating it as little more than a "thought-tort," the elements of which are met whenever there is evidence that a person provided a product or service with the knowledge or intent that it be used to infringe.  Viacom's approach ignores the role that substantial non-infringing use plays in the standards for inducement liability.  Where, as here, a product or service is capable of substantial non-infringing uses, the bar against an inducement finding is, and should be, high.  Moreover, under copyright law, inducement requires a showing of specific intent, affirmative acts in furtherance of that intent, and actual causation.  Thoughts and words, divorced from specific infringements, are not enough.

Again, inducement need not play nearly the central role at this stage of the litigation that Viacom hopes.  To the extent the Court gives consideration to the

inducement standard, however, Amici urge the Court not to muddy inducement doctrine by accepting Viacom's interpretation of the standard for liability. Rather, the Court should follow the strict standard laid out by the Supreme Court in *Grokster*.

Moreover, Amici suggest the Court take guidance from patent law's well-developed rules for inducement liability. If an allegedly infringing technology has substantial non-infringing uses, patent liability follows only if (1) the accused infringer actually caused acts of direct infringement by its actions or instructions; and (2) such instructions specifically taught all the steps needed to infringe. Mere acts of omission cannot suffice, and damages are limited to those specific instances cases of direct infringement actually caused by the defendant's instructions.

These limits, like the DMCA safe harbors, help ensure that the law does not unduly inhibit the development and use of new technologies and services that may have beneficial uses, merely because they happen to have unauthorized uses as well. And they help ensure that an innovative company cannot be held liable for infringement based on a few (or even several) ill-chosen internal statements, or other incautious acts that may occur when the founders do not have a lawyer advising their every move.

Faced with a paucity of actual evidence of wrongdoing, and a wealth of evidence of actual substantial non-infringing uses, Viacom and its amici have little choice but to urge this Court to endorse a simplistic and loose interpretation of both the DMCA and the standard for inducement. To avoid increasing the legal burden on new platforms (and their users), we respectfully urge the Court to reject that interpretation, affirm the district court's ruling, and put an end to this litigation at last.

## ARGUMENT

### I. "INDUCEMENT" CANNOT BE EQUIVALENT TO "RIGHT AND ABILITY TO CONTROL" UNDER THE DMCA

Viacom and its *amici* make two fundamental mistakes in their discussion of inducement liability and "right and ability to control." Their first error is to suggest that a *prima facie* showing of *Grokster* inducement should be enough to establish "right and ability to control" under the DMCA. That cannot be right. The DMCA's protections are designed to protect an otherwise compliant service provider against secondary liability – including inducement liability. *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1028-29 (9th Cir. 2013) ("*Veoh*"); *Viacom II*, 676 F.3d at 37-38; H.R. Rep. No. 105-551, pt. 2, at 50, 53 (1998) ("Section 512(c) limits the liability of qualifying service providers for claims of direct, vicarious and contributory infringement. . ..");

7

*accord* H.R. Rep. No. 105-796, at 73 (1998); S. Rep. No. 105-190, at 20 (1998).

The statutory scheme would be nonsensical if the safe harbor against secondary liability could be lost if a copyright owner could show that a service provider had induced infringement, *i.e.*, was secondarily liable. Thus, something more than mere inducement must be required. *Viacom II*, 676 F.3d at 37-38; *Veoh*, 718 F.3d at 1028-29. At most, inducement standards could be a starting point to find "right and ability to control."

YouTube has briefed this issue at length, *see* YouTube Br. at 45-47, and we will not repeat those arguments here. Rather, we focus the remainder of this brief on Viacom's second mistake: its flawed analysis of whether YouTube's conduct could actually qualify as inducement in the first place.

## II.   VIACOM AND ITS AMICI MISSTATE THE LAW OF INDUCEMENT LIABILITY FOR PRODUCTS AND SERVICES HAVING SUBSTANTIAL NON-INFRINGING USES

Even if a showing of "inducement" were sufficient to establish right and control for DMCA purposes, which it is not, Viacom and its amici misread the standard for such a showing. Viacom and its amici incorrectly reduce inducement liability to little more than the operation of a service with the intent that it be used to infringe. *See, e.g.*, Viacom Br. at 31 ("a jury could reasonably conclude that YouTube operated its service with the intent that it be used to infringe."); MPAA Br. at 17; ASCAP Br. at 12.

8

That is not enough. Where, as here, the case involves products and services that are capable of substantial non-infringing uses, more is always required. As explained below, the Supreme Court has taken care to ensure that copyright does not impede beneficial uses, and tailored inducement standards accordingly. District and appellate courts have done the same.

Simply put, the inducement liability threshold is stricter for products and services that have substantial non-infringing uses versus ones that don't. Liability in such cases is strictly limited to circumstances of "acute fault" from the service provider. *Grokster*, 545 U.S. at 932-33. This essential principle helps ensure that the public is not unduly deprived of products and services that can be used for non-infringing purposes – such as the service at issue in this case, a mainstream platform that has been enormously beneficial to the growth of free speech and commerce.

A.    **The *Grokster* Standard for Inducement Is Designed to Ensure that Copyright Law Will Not Unduly Impede the Development of New Products and Services That Have Non-infringing Uses**

The Supreme Court has twice cautioned against allowing secondary liability claims for copyright infringement to hinder non-infringing uses. Thus, in *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ("*Sony*"), the Court refused to impose liability for contributory infringement for "staple articles":

9

"[A] sale of an article which though adapted to an infringing use is also adapted to other and lawful uses, is not enough to make the seller a contributory infringer.  Such a rule would block the wheels of commerce."

. . .

The staple article of commerce doctrine must strike a balance between a copyright holder's legitimate demand for effective—not merely symbolic—protection of the statutory monopoly, and the rights of others freely to engage in substantially unrelated areas of commerce.

*Id.* at 441-42 (quoting *Henry v. A.B. Dick Co.,* 224 U.S. 1, 48 (1912)).

In *Grokster,* the Court reaffirmed this important principle:

We are, of course, mindful of the need to keep from trenching on regular commerce or discouraging the development of technologies with lawful and unlawful potential.  Accordingly, just as *Sony* did not find intentional inducement despite the knowledge of the VCR manufacturer that its device could be used to infringe, 464 U.S., at 439, n. 19, mere knowledge of infringing potential or of actual infringing uses would not be enough here to subject a distributor to liability.

545 U.S. at 937.  Accordingly**,** *Grokster* articulates an inducement standard that effectively distinguishes between services dedicated to piracy and those that have a legitimate purpose: Only "one who distributes a device with the object of promoting its use to infringe copyright, as shown by a clear expression or other affirmative steps taken to foster infringement" can be found liable for inducement.  *Id.* at 936-37.

By its terms, this standard requires the plaintiff to show: (1) that the defendant acted with the *specific objective* of promoting the use of its product to

infringe; (2) that the defendant furthered that objective by *affirmative acts* taken to foster infringement; and (3) that the infringement at issue *actually resulted* from the defendant's inducing conduct.

In other words, the Supreme Court did not intend inducement to be a kind of "thought-tort" which imposes liability merely for an undeveloped bad purpose. As elaborated in *Grokster*, inducement requires some degree of communication from the service provider to its users. The "classic instance of inducement is by advertisement or solicitation that broadcasts a message designed to stimulate others to commit violations." *Id.* at 937. A finding of such direct solicitation was essential to the holding in *Grokster* itself. *Id*. at 938 (observing that both defendants "communicated a clear message" to users that they should use defendants' technology to violate copyright); *id*. at 924 ("each one clearly voiced the objective that recipients use [the software] to download copyrighted works, and each took active steps to encourage infringement").

Moreover, there must be a causal connection between the defendant's inducing conduct and the resulting acts of infringement about which the plaintiff complains. The Court repeatedly made clear that an inducer is liable "for the *resulting* acts of infringement by third parties." *Id.* at 919, 937 (emphasis added); *see also id*. at 941 (evidence must show "a purpose *to cause* and profit from third-party acts of copyright infringement) (emphasis added). Therefore,

the defendant must take action intended to cause copyright violations, and it is liable only for any specific infringements that occur *as a result* of those inducing actions.

*Grokster* imposed these requirements for inducement so that the standard would not impede legitimate services that are capable of substantial non-infringing uses. *Grokster* did not impose liability for "ordinary acts incident to product distribution, such as offering customers technical support or product updates . . . ." *Id*. at 937. Instead, liability depends on "purposeful, culpable expression and conduct." *Id*. Only by insisting on such a high bar for a showing of inducement could the Court be assured that its rule would not "compromise legitimate commerce or discourage innovation having a lawful promise." *Id*.

> In sum, where an article is "good for nothing else" but infringement, there is no legitimate public interest in its unlicensed availability, and there is no injustice in presuming or imputing an intent to infringe. Conversely, the doctrine absolves the equivocal conduct of selling an item with substantial lawful as well as unlawful uses, and limits liability to instances of more acute fault than the mere understanding that some of one's products will be misused. It leaves breathing room for innovation and a vigorous commerce.

*Id.* at 932-33 (citations omitted).

### B. Viacom Improperly Relies on Rulings Involving Services That Were Not Found to Be Capable of Substantial Non-Infringing Uses

Viacom's leading cases do not save its theory. In particular, Viacom

12

relies on *Grokster*, 545 U.S. at 936-37, and *Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020, 1035 (9th Cir. 2013) ("*Fung*") for the propositions that only "intent to host and profit from infringement" is required to show inducement; and that only "internal communications" are sufficient to prove inducement, regardless of "[w]hether the messages were communicated [to customers]." Viacom Br. at 30. But neither of these cases support liability based on such a limited showing.

In *Grokster*, for example, the Court concluded that there was evidence of infringement "on a gigantic scale." *Grokster*, 545 U.S. at 940; *see also Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*, 454 F. Supp. 2d 966, 985 (C.D. Cal. 2006) (on remand from the Supreme Court, finding that "[a]lmost 97% of the files actually requested for downloading were infringing or highly likely to be infringing."). The district court thus eventually concluded that the service at issue was, in essence, "good for nothing else" but infringement. *Grokster*, 545 U.S. at 932.

As for *Fung,* in that case the defendants did not even argue that their services were capable of substantial non-infringing uses. And while a simple numerical formula summarizing actual usage cannot fairly be used to determine whether a service is *capable* of substantial non-infringing uses, it is at least relevant that the Ninth Circuit found that Isohunt and other services contained

between 90-96% infringing material, leading the court to conclude that "the vastly predominant use of Fung's services has been to infringe copyrights." *Fung*, 710 F.3d at 1034.

Viacom's amici make the same mistake, citing a variety of cases concerning services that were found to be overwhelmingly dedicated to infringement. MPAA Br. at 8-9, 19-21 (*citing A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001); (87% copyrighted files); *Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398, 424 (S.D.N.Y. 2011); (93% of files copyrighted and not authorized for Limewire service); *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 131-32 (S.D.N.Y. 2009) (94% of files on Usenet service were "infringing or highly likely to be infringing")); ASCAP Br. at 19. (These and other P2P services are summarized in *Fung*, 710 F.3d at 1025-28.)

On these facts, none of these courts chose to grapple with the second prong of the *Grokster* standard: where a service has substantial non-infringing uses, liability for inducement must be limited "to instances of more acute fault than the mere understanding that some of one's products will be misused." *Grokster*, 545 U.S. at 932-33.

### C.    Appellate and District Courts Consistently Distinguish Products and Services With Substantial Non-Infringing Uses

More helpful to the analysis is the *Veoh* line of cases, which speak

14

directly to the relevance of substantial non-infringing uses. Veoh, like YouTube, was a service that allowed users to upload videos and like YouTube, had "many music videos that could in fact legally appear. . . ." *Veoh*, 718 F.3d at 1021 (emphasis omitted). When content owners sought to shut down the service, courts repeatedly noted Veoh's non-infringing uses. One district court specifically compared Veoh to Napster, noting that "Veoh is distinct from Napster . . . Napster existed solely to provide the site and facilities for copyright infringement, and its control over its system was directly intertwined with its ability to control infringing activity." *Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1153 (N.D. Cal. 2008) (cited approvingly in *Veoh*, 718 F.3d at 1020). By contrast, Veoh's service hosted a wealth of user-provided non-infringing content, such as "job interviews, to family gatherings, to films by aspiring filmmakers"; Veoh's content partners; and Veoh's own promotional videos. *Io Group*, 586 F. Supp. 2d at 1136.

Against this background, the Ninth Circuit agreed with *Viacom II* and absolved Veoh of liability based upon "right and ability to control" and inducement. *Veoh*, 718 F.3d at 1030-31 (superseding opinion, holding that Veoh did not "exert[] substantial influence on the activities of users.").

Recently, in the context of inducement and § 512(c)'s "right and ability to control," the Southern District of New York also highlighted the difference

15

between the business models found to have been embraced by Grokster and Fung, on the one hand, and business models such as YouTube and Veoh, on the other.   The case involved Vimeo, a service similar to YouTube and Veoh.[3] Finding that Vimeo had not induced infringement, the court noted that

> The defendants in both [Grokster and Fung] provided an expansive platform for wholesale infringement. . . . This case thus presents circumstances dramatically different in kind and smaller in scale and scope.

*Capitol Records, LLC v. Vimeo, LLC*, No. 09 Civ. 10101 RA, 2013 WL 5272932 (S.D.N.Y. Sept. 18, 2013), slip opn. at 52-53.

The *Vimeo* analysis helps explain why *Veoh* and *Fung* reached different outcomes – despite the fact that both *Veoh* and *Fung* were decided by the same panel, and even argued the same day.  *Veoh*, 718 F.3d at 1007, 1010; *Fung*, 710 F.3d at 1020, 1023.  *Fung's* conclusions on "right and ability to control," and inducement, can be reconciled with *Veoh*, in part, by looking at the services' vast differences as to their non-infringing uses.  (Viacom barely mentions *Veoh*, let alone attempts to distinguish it.)

The distinction finds precedent in *Sony* as well.  The *Sony* district court imposed a heightened standard of inducement for the Betamax because of its substantial non-infringing uses.  *Universal City Studios, Inc. v. Sony Corp. of*

---

[3] *See* Zachary Sniderman, *7 YouTube Alternatives & Why They Make Sense*, Mashable (May 11, 2011) (comparing YouTube, Veoh, and Vimeo), available at: http://mashable.com/2011/05/11/youtube-alternatives/.

16

*Am.*, 480 F. Supp. 429, 460-61 (C.D. Cal. 1979) *aff'd in part, rev'd in part,* 659 F.2d 963 (9th Cir. 1981) *rev'd*, 464 U.S. 417 (1984). There, some of the defendants' advertising affirmatively suggested using the Betamax to compile a home library of copyrighted shows (an infringing use), but inducement was still not found because there was no evidence that such advertisements actually caused direct infringement by any home user. In other words, there was no evidence that the defendants made any advertisements or other specific statements which actually induced another to infringe. Because of the non-infringing uses of the Betamax, the court declined to impose liability merely because the "defendants knew it was likely that people would use the Betamax to record copyrighted works. . . ." *Id*. at 460.

## III.   PATENT LAW INDUCEMENT PRINCIPLES ALSO SUPPORT A HEIGHTENED STANDARD WHERE SUBSTANTIAL NON-INFRINGING USES EXIST

To the extent that there may be any ambiguity regarding inducement liability standards under copyright law, the Court may look to patent law for guidance, as did the Supreme Court in both *Sony* and *Grokster*. *Grokster*, 545 U.S. at 932-33, 936-37 ("For the same reasons that *Sony* took the staple-article doctrine of patent law as a model for its copyright safe-harbor rule, the inducement rule, too, is a sensible one for copyright."); *Sony*, 464 U.S. at 439-42 ("The closest analogy is provided by the patent law cases to which it is appropriate to refer because of the historic kinship between patent law and

17

copyright law.").  Indeed, patent law is particularly salient here, given its long history grappling with the challenge of ensuring that secondarily liability claims, including inducement claims, do not unduly impede the development of technologies with substantial non-infringing uses.

Against that background, it is telling that the relevance of substantial non-infringing uses is considered important enough to be enshrined in the patent statute.  35 U.S.C. § 271(c).  In copyright, secondary liability is solely a judicial doctrine.  *Grokster*, 545 U.S. at 930; *Sony*, 464 U.S. at 434-35.  Copyright law's *judicially created* inducement liability should be no more expansive than patent law's *statutory* liability, especially given that the doctrines are committed to balancing the interests of authors and inventors on the one hand, and the interests of the public on the other.  *Sony*, 464 U.S. at 431-32 ("In a case like this, in which Congress has not plainly marked our course, we must be circumspect in construing the scope of rights created by a legislative enactment which never contemplated such a calculus of interests."), 441 ("in contributory infringement cases arising under the patent laws the Court has always recognized the critical importance of not allowing the patentee to extend his monopoly beyond the limits of his specific grant.").

A.    **Patent Law Requires Instructions or Similar Steps, Actually Communicated to the User, Where the Product or Service Has Substantial Non-Infringing Uses**

The Patent Act contains two types of secondary liability.  First, the Act defines contributory infringement as the offer to sell or sale of a material part of a patented invention with the following:

> knowing the same to be especially made or especially adapted for use in an infringement of such patent, *and not a staple article or commodity of commerce suitable for substantial noninfringing use* . . .

35 U.S.C. § 271(c) (emphasis added).  Thus, the statute partly describes something resembling the "thought-tort" that Viacom and its amici believe suffices to establish inducement liability and, by extension, "right and ability to control": selling something with knowledge that it could and would be used in an infringement.  But § 271(c) is not so simple: it also specifically requires that the thing sold is "not a staple article or commodity of commerce suitable for substantial noninfringing use." *Id.*

The second form of indirect liability under the Patent Act is covered by 35 U.S.C. § 271(b), which provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer."  Where a party is already liable for contributory infringement because of the knowing sale of non-staples, § 271(b) adds little – the party is already secondarily liable.  Where the party provides products or services having substantial non-infringing uses,

19

inducement liability might attach – but only in certain limited circumstances.

A district court has helpfully explained the interplay between § 271(c) and § 271(b) as follows:

> *It is, perhaps, an unwarranted extension of § 271(b) to use it as a basis for ascribing liability in the absence of active solicitation.* The same conduct — sale of material or apparatus which can only be used in an infringement — is contributory infringement under § 271(c). The supplier of a staple will be liable for active inducement if it tells its purchaser, "Here is how we can help you infringe." It is liable if it sells a compound containing the staple when that compound can only be used effectively to practice a patented method, and it so intends, and § 271(c) so provides. *The supplier is not liable if it merely makes that staple available, even though it knows that some purchasers will use it to infringe, and § 271(c) makes that distinction.*

*Oak Indus., Inc. v. Zenith Elecs. Corp.*, 697 F. Supp. 988, 994 (N.D. Ill. 1988) (emphasis added) (cited approvingly in *Grokster*, 545 U.S. at 936). Patent doctrine thus makes a distinction based on whether the product or process has substantial non-infringing uses. If such uses are present, a heightened standard applies and a party is only liable for inducement if it takes additional steps to ensure direct infringement by the customer.

In *ACCO Brands, Inc. v. ABA Locks Manufacturer Co., Ltd.*, 501 F.3d 1307 (Fed. Cir. 2007), for example, the court held that "[i]n order to prove direct infringement, a patentee must either point to specific instances of direct infringement or show that the accused device necessarily infringes the patent in suit." *Id*. at 1313. In that case, the accused infringing device had substantial

20

non-infringing uses:

> Here, the parties do not dispute that the accused device can be operated in either of two modes—the infringing Dornfeld method or the noninfringing press-to-lock method. Because the accused device can be used at any given time in a noninfringing manner, the accused device does not necessarily infringe the '989 patent.

*Id*.  The defendant only instructed its users on the "noninfringing press-to-lock method," not the infringing method, so neither direct infringement nor inducement could be presumed.

By contrast, in *Fromberg, Inc. v. Thornhill*, 315 F.2d 407 (5th Cir. 1963) (cited approvingly in *Grokster*, 545 U.S. at 936), the court found inducement liability with respect to certain sales where the defendant's salesmen had personally demonstrated how to use the defendant's products in an infringing manner.  *Id*. at 412.  However, there were other sales of the defendant's products, described by the court as "routine commercial sales and distributions" of the products "to dealers or others who might on their own, wholly unaided – that is, 'induced' – by Defendant" use the products to directly infringe the patent.  *Id*. at 413.  Such sales posed a "different problem," and the court held that no liability could be imposed under § 271(b) without the trial court first finding that the products were not commodities of commerce suitable for substantial non-infringing use under § 271(c).  *Id*. at 413-14.  The case was remanded for this determination.

Moreover, a party is liable for inducement only where it offers specific instructions to the user to infringe.  In *Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351, 1360-61 (Fed. Cir. 2012), for example, the court held that the defendant was not liable for inducement where its manuals did not teach all of the steps necessary to infringe the patent:

> It is well settled that excerpts from user manuals as evidence of underlying direct infringement by third parties of products that can be used in a non-infringing manner are by themselves insufficient to show the predicate acts necessary for inducement of infringement.  *E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213 (Fed. Cir. 2007).  When manuals only teach "customers each step of the claimed method in isolation," but not "all the steps of the claimed method together," the manuals alone cannot support infringement.  *Id*. at 1222.

*Id*. at 1360.  *See also Oak Indus.*, 697 F. Supp. at 993; *Plastering Dev. Ctr., Inc. v. Perma Glas-Mesh Corp.*, 371 F. Supp. 939, 950-51 (N.D. Ohio 1973) (advertising of a commodity with noninfringing uses without specific instructions as to how to use it in an infringing manner did not constitute actively inducing infringement).  The level of instruction, encouragement, or aiding and abetting required to impose liability for actively inducing infringement requires that the defendant "has encouraged others through its literature, to take each and every step" of the patented method.  *Plastering Dev. Ctr.,* 371 F. Supp. at 950.  A mere suggestion that a product be used in a potentially infringing manner does not suffice.

**B.** **Where the Product or Service Has Substantial Non-Infringing Uses, Liability for Inducement Is Limited to Specific Infringements Actually Caused by the Accused Inducer's Acts**

In addition, where there are substantial non-infringing uses, inducement liability is limited to those *specific* instances of direct infringement *actually caused* by the defendant's acts. For example, in *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263 (Fed. Cir. 2004), the patent was directed to the IEEE 1394 standard. The patent owner tried to prove inducement merely by the sale of a standards-compliant product. However, causation was not this broad. The Federal Circuit stated that "Dynacore must therefore either demonstrate that LANs compliant with the IEEE 1394 Standard necessarily infringe the '732 Patent, or point to a specific instance of direct infringement and restrict its suit to liability stemming from that specific instance." *Id*. at 1275-76. The court concluded that the patent contained a limitation that the standard would not necessarily meet, so a presumption of direct infringement and inducement was improper. *Id*. at 1277. The court had previously noted,

> A defendant's liability for indirect infringement must relate to the identified instances of direct infringement. Plaintiffs who identify *individual* acts of direct infringement must restrict their theories of vicarious liability — and tie their claims for damages or injunctive relief — to *the identified act.*

*Id*. at 1274; *see also Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1328-30 (Fed. Cir. 2010) (limiting liability for inducement to only those four sales where

23

customer service records showed that Netgear's staff advised customers to practice the infringing claims); *Oak Indus.*, 697 F. Supp. at 993 ("the plaintiff must establish that the defendant purposefully caused, urged or encouraged another individual to infringe plaintiff's patent with knowledge of the likely infringing result.").

### C.     Acts of Omission Do Not Establish Inducement Liability

Finally, patent law is careful not to impose liability for mere acts of omission.  In *Tegal Corp. v. Tokyo Electron Co.*, 248 F.3d 1376 (Fed. Cir. 2001), for example, the Federal Circuit reversed a finding of contempt based on alleged inducement for the defendant's failure to take steps to ensure that its corporate affiliates complied with an injunction.  The plaintiff's theory was that the defendant "had an affirmative obligation" to police its affiliates.  *Id*. at 1378. The court held that inducement "requires an affirmative act of some kind," so inducement could not be "premised on an omission" or based on "evidence of mere inaction."  *Id*. at 1378-79.  *See also Grokster*, 545 U.S. at 939 n.12 ("[o]f course, in the absence of other evidence of intent, a court would be unable to find contributory infringement liability merely based on a failure to take affirmative steps to prevent infringement, if the device otherwise was capable of substantial noninfringing uses.  Such a holding would tread too close to the *Sony* safe harbor.")

24

**D.    Taking Guidance from Patent Law, the Court Should Apply a Rigorous Inducement Standard to Products With Significant Non-infringing Uses**

The well-established patent inducement standard outlined above is consistent with *Grokster's* basic approach and findings.  *See* discussion *supra* Part II.A.  Taken together, these authorities counsel against accepting the loose inducement standard that Viacom and its supporting amici advocate.  For example, in *Viacom II*, this Court held that "right and ability to control" is not limited to instances where the defendant had knowledge of specific infringing items.  *Viacom II*, 676 F.3d at 36.  Assuming that is true for *knowledge*, it is still not true for *causation* under patent law.  Where a product or service has substantial non-infringing uses, under the above cases liability for inducement is limited to the specific, identified acts of direct infringement *actually caused* by the defendant's inducing acts or instructions.  Damages are limited to those specific items.  By the same token, for the "right and ability to control" aspect of § 512(c), a safe harbor applicant would be disqualified *only* as to those specific infringing items that its instructions to its users actually caused.

In addition, Viacom and its amici argue that YouTube is liable for its alleged failure to use adequate filtering or monitoring tools before May 2008.  Viacom Br. at 16, 30-32, 37-38; ASCAP Br. at 17-22.  But both this Court *and* the Ninth Circuit have rejected the proposition that § 512(c) imposes an

25

affirmative duty upon safe harbor applicants to monitor their system. *Viacom II*, 676 F.3d at 35; *Veoh*, 718 F.3d at 1027-29.  Patent law similarly does not impose inducement liability based on inaction.

As noted, patent and copyright have long been recognized as sister doctrines, particularly with respect to inducement liability.  Given that patent law states a clear and unambiguous rule that is consistent with the limited copyright jurisprudence on inducement, Amici urge the Court to treat that rule as persuasive authority.

## IV.    YOUTUBE HAS SUBSTANTIAL NON-INFRINGING USES, DID NOT ENGAGE IN INDUCEMENT, AND DID NOT HAVE THE "RIGHT AND ABILITY TO CONTROL"

There appears to be no factual dispute that YouTube has substantial non-infringing uses.  Indeed, such uses are overwhelming.  *See, e.g.*, YouTube Br. at 6-7; JA-XV:3799-3813 (Walk declaration); Brief of the "Sideshow Coalition" as Amicus Curiae In Support of Defendants (ECF No. 349-3, filed May 28, 2010); Brief for Electronic Frontier Foundation et al. as *Amici Curiae* Supporting Defendants at 5-13, Appeal No. 10-3270 (ECF No. 296, filed April 7, 2011) (describing use of YouTube for political speech); Brief for Anaheim Ballet et al. as Amici Curiae Supporting Appellees at 11-16, Appeal No. 10-3270 (ECF No. 299, filed April 7, 2011) (use of YouTube for distribution of content by new artists); Brief for National Alliance for Media Art and Culture, *et*

*al*., as Amici Curiae Supporting Defendants at 9-18, Appeal No. 10-3270 (ECF No. 274, filed April 7, 2011) (same).[4]

YouTube even has substantial non-infringing uses that benefit Viacom. For example, Viacom used YouTube for its own marketing purposes. YouTube Br. at 13-14; JA-XII:3020-3025 (Chan declaration); JA-XIII:3101-3103 (Ostrow declaration); JA-XIII:3142-3148 (chart of Viacom's use of YouTube for promotional purposes); JA-XIII:3238-3242 (chart of mistaken takedowns by Viacom).

Thus it is not surprising, as the district court found, "[i]t is not remotely the case that YouTube exists 'solely to provide the site and facilities for copyright infringement.'" *Viacom Int'l Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514, 526 (S.D.N.Y 2010). Given these substantial non-infringing uses, and taking a page from patent law, to label YouTube an inducer Viacom had to show that YouTube had taken active steps to encourage and teach infringing activity, and create a clear chain of causation between those acts and specific instances of actual infringement.

Viacom did not do so. At most, Viacom identified solely *internal* YouTube knowledge and communications about possible infringing use.

---

[4] These citations refer primarily to briefs filed earlier in the litigation. Amici are aware that numerous groups are filing contemporaneous amicus briefs in support of YouTube that describe a wide variety of non-infringing uses of YouTube's services.

Viacom Br. at 5-14, 31-32; *but see* YouTube Br. at 7-13 (arguing that Viacom distorted the record). Such internal communications at most could establish general intent, but not the additional facts required to show inducement. Significantly, Viacom does not show that (1) YouTube engaged in *any* external communications to users suggesting that YouTube be used for an infringing service; (2) let alone that such instructions actually resulted in a specific infringement of *any* unauthorized content of anyone; (3) let alone any of the clips in suit. Thus, Viacom fell far short of showing inducement, much less the "right and ability to control" required by *Viacom II*.

Notably, courts in the principal inducement cases upon which Viacom and its amici rely, such as Fung and Limewire, concluded there was substantial evidence of *external* communications. For example, Fung's isoHunt service "prominently featured a list of 'Box Office Movies,' containing the 20 highest-grossing movies then playing in U.S. theaters" and requested "that users upload torrents for specific copyrighted films. . . ." *Fung*, 710 F.3d at 1036. The Limewire service also promoted its service to former Napster users, ran "press campaigns on college campuses relating to 'file-sharing and getting free MP3's,'" and engaged in public advertisements promoting "free music downloads." *Arista Records*, 784 F. Supp. 2d at 427-28. Viacom offers no evidence that YouTube did any of these things.

28

## <u>CONCLUSION</u>

For the foregoing reasons, Amici urge the Court to affirm the district court's judgment. In addition, should the Court decide to reach the issue of inducement, Amici urge the Court to ensure that its inducement analysis takes careful account of the overwhelming use of YouTube's services for non-infringing purposes.

Dated: November 1, 2013

By:   /s/ Corynne McSherry__

Corynne McSherry
Michael Barclay
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109-7701
Telephone: (415) 436-9333
corynne@eff.org

Sherwin Siy
PUBLIC KNOWLEDGE
1818 N St. NW, Suite 410
Washington, DC 20036
Telephone:  (202) 861-0020
ssiy@publicknowledge.org

*Attorneys for Amici Curiae
Electronic Frontier Foundation and
Public Knowledge*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS PURSUANT TO FED. R. APP. P. 32(a)(7)(C)

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify as follows:

1.    This Brief of Amici Curiae Electronic Frontier Foundation and Public Knowledge In Support Of Appellees And Affirmance complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,567 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010, the word processing system used to prepare the brief, in 14 point font in Times New Roman font.

Dated: November 1, 2103

By:   /s/ Corynne McSherry

Corynne McSherry
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109-7701
Telephone: (415) 436-9333
corynne@eff.org

*Attorneys for Amici Curiae*
*Electronic Frontier Foundation*
*and Public Knowledge*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of November, 2013, a true and correct copy of the foregoing Brief of Amici Curiae Electronic Frontier Foundation and Public Knowledge In Support Of Appellees And Affirmance was served on all counsel of record in this appeal via CM/ECF pursuant to Second Circuit Rule 25.1(h)(1)-(2).

Dated: November 1, 2013

By:   /s/ Corynne McSherry

Corynne McSherry
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109-7701
Telephone: (415) 436-9333
corynne@eff.org

*Attorneys for Amici Curiae*
*Electronic Frontier Foundation*
*and Public Knowledge*