# 13-1720-CV

## UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

VIACOM INTERNATIONAL INC., COMEDY PARTNERS, COUNTRY MUSIC TELEVISION, INC., PARAMOUNT PICTURES CORP., BLACK ENTERTAINMENT TELEVISION LLC,

*PLAINTIFFS-APPELLANTS,*

v.

YOUTUBE, INC., YOUTUBE, LLC, GOOGLE, INC.,

*DEFENDANTS-APPELLEES.*

On Appeal from the United States District Court
For the Southern District of New York
Honorable Louis L. Stanton, District Judge

**BRIEF OF AMICUS CURIAE
CONSUMER ELECTRONICS ASSOCIATION
IN SUPPORT OF APPELLEES AND AFFIRMANCE**

Kenneth B. Wilson
COASTSIDE LEGAL
455 1st Avenue
Half Moon Bay, CA 94019
Telephone: (650) 440-4211
Facsimile: (650) 440-4851
ken@coastsidelegal.com
*Attorneys for Amicus Curiae*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Amicus Curiae Consumer Electronics Association states that it does not have a parent corporation and that no publicly held company owns 10% or more of its stock.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

CORPORATE DISCLOSURE STATEMENT ................................................... i

TABLE OF AUTHORITIES ............................................................ iv

TABLE OF CONVENTIONS ............................................................ vii

STATEMENT OF INTEREST .......................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 2

ARGUMENT ........................................................................ 5

I.   Throughout History, The Content Industries Have Repeatedly – and Erroneously – Contended that New Technologies Would Harm Them ... 5

   A.   Contentions in This Case ................................................ 5

   B.   Contentions About Previous Technologies ..................................... 7

        1.   John Philip Sousa and the Gramophone/Player Piano ............. 7

        2.   Radio ..................................................................... 8

        3.   Cable Television ....................................................... 9

        4.   The Photocopier ...................................................... 10

        5.   The VCR ................................................................ 11

        6.   Audiocassettes and Home Taping ......................... 13

        7.   The MP3 Player ...................................................... 14

        8.   The DVR .............................................................. 15

II.  Courts Should Not Restrain New Technologies Having Substantial Non-Infringing Uses ............................................................ 16

   A.   Previous Technologies .................................................. 16

   B.   Like Previous Technologies, YouTube Was Designed and Marketed for Its Substantial Non-Infringing Uses ......................... 18

C.  Like Previous Technologies, YouTube Has Not Harmed the
Content Industries – Just the Opposite ........................................... 20

III.  Practical and Technological Consequences of Reversal ........................ 23

A.  Background: The Problem of Massive Statutory Damages ........... 23

B.  "Willful Blindness" to Alleged Infringements ............................. 25

C.  Requiring Filtering to Satisfy Either the "Knowledge" Provision or
the "Right and Ability to Control" Provision ................................ 28

D.  Consequences for Linking Liability – Section 512(d) .................. 32

CONCLUSION ................................................................................................ 34

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) .......................................................................19

*Arista Records LLC v. Lime Group LLC*,
715 F.Supp.2d 481 (S.D.N.Y. 2010) ...............................................................19

*Columbia Pictures Indus., Inc. v. Fung*,
96 U.S.P.Q.2d 1620 (C.D. Cal. 2009) .............................................................19

*Fortnightly Corp. v. United Artists Television, Inc.*,
392 U.S. 390 (1968).........................................................................................10

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005)............................................................................ 17, 18, 19

*Newmark v. Turner Broad. Network*,
226 F.Supp.2d 1215 (C.D. Cal. 2002) .............................................................16

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) .........................................................................33

*RIAA v. Diamond Multimedia Sys.*,
180 F.3d 1072 (9th Cir. 1999) ............................................................. 14, 15, 22

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984)................................................................ 4, 11, 15, 17, 18

*Teleprompter Corp. v. Columbia Broadcasting Sys.*,
415 U.S. 394 (1974).........................................................................................10

*UMG Recordings Inc. v. MP3.com Inc.*,
56 U.S.P.Q.2d 1376 (S.D.N.Y. 2000)...............................................................24

*Viacom Intern. Inc. v. YouTube, Inc.*,
718 F.Supp.2d 514 (2010) ........................................................................ 20, 26

*White-Smith Music Publishing Co. v. Apollo Co.*,
209 U. S. 1 (1908)..............................................................................................8

iv

*Williams & Wilkins Co. v. United States*,
487 F.2d 1345 (Ct. Cl. 1973) (*en banc*),
*aff'd by an equally divided court*,
420 U.S. 376 (1975)......................................................................................11

## Statutes

17 U.S.C. §111.............................................................................................10

17 U.S.C. §504(c)........................................................................................23

17 U.S.C. §512................................................................................. passim

17 U.S.C. §512(c).................................................................................. 4, 28

17 U.S.C. §512(c)(1)(B)................................................................. 28, 30, 32

17 U.S.C. §512(c)(3)(A).................................................................... 27, 28

17 U.S.C. §512(d)................................................................................. 5, 32

17 U.S.C. §512(d)(1)....................................................................................32

17 U.S.C. §512(d)(2)....................................................................................32

## Other Authorities

Edward Samuels, THE ILLUSTRATED STORY OF COPYRIGHT
(Thomas Dunne Books, 2000)....................................................... 9, 12

FED. R. APP. P. 29 ........................................................................................1

Frederick Wasser, VENI, VIDI, VIDEO: THE HOLLYWOOD EMPIRE AND THE VCR
(University of Texas Press, 2001) ........................................... 11, 12, 13

Gary Shapiro, THE COMEBACK: HOW INNOVATION WILL RESTORE THE
AMERICAN DREAM (Beaufort Books 2011) ................................ 12, 33

*Home Recording of Copyrighted Works: Hearings on H.R. 4783, H.R. 4794,
H.R. 4808, H.R. 5250, H.R. 5488, and H.R. 5705 Before the Subcomm. on
Courts, Civil Liberties, and the Administration of Justice, H. Comm. on the
Judiciary*, 97th Cong. (April 12-14, 1982)............................. 2, 11, 14

John Philip Sousa, *The Menace of Mechanical Music*,
8 APPLETON'S MAG. 278 (Sept. 1906)............................................7, 8

Ken Barnes, *Music Sales Boom, but Albums Fizzle*, USA TODAY, Jan. 2, 2009, at 6D ............................................................... 15, 21

*Keynote Speaker Bio: Warren Lieberfarb*, DIGITAL HOLLYWOOD (2005) ..........13

Kit Eaton, *YouTube Monty Python Videos Boost DVD Sales 23,000%*, FAST COMPANY, Jan. 26, 2009 ...............................................................22

Mark Lemley, *Is the Sky Falling on the Content Industries?*, 9 J. TELECOMM. & HIGH TECH. L. 125 (2011) ........................................... passim

Nate Anderson, *100 Years of Big Content Fearing Technology – In Its Own Words*, ARS TECHNICA, Oct. 11, 2009 ..................................................7

Nate Anderson, *Piracy Once Again Fails To Get In Way Of Record Box Office*, WIRED, Feb. 23, 2011 .........................................................................21

Paul Bierley, JOHN PHILIP SOUSA, AMERICAN PHENOMENON (Integrity Press, 1973).............................................................................7

Paul Goldstein, COPYRIGHT'S HIGHWAY: FROM GUTENBERG TO THE CELESTIAL JUKEBOX (Stanford University Press 2003).........................................................9

Press Release, Motion Picture Association of America, Inc., *Global Box Office Reaches Record High in 2012* (March 21, 2013) .................................................21

Press Release, Motion Picture Association of America, Inc., *Worldwide Box Office Continues to Soar*, (March 10, 2010).........................................................20

*Protecting Copyright and Innovation in a Post-Grokster World: Hearing Before the Committee on the Judiciary*, United States Senate, 109th Cong., First Session (Sept. 28, 2005) .........................................................................31

Rule 26.1 of the Federal Rules of Appellate Procedure ........................................ i

Staci D. Kramer, *Content's King*, CABLEWORLD, Apr. 29, 2002 .......................16

*The Law: Copying v. Copyright*, TIME MAGAZINE, May 1, 1972 ......................10

*The state of our video ID tools*, GOOGLE BLOG, June 14, 2007 ..........................31

*Theatrical Market Statistics 2012*, MPAA .........................................................21

# TABLE OF CONVENTIONS

| | |
|---|---|
| Appellants | Plaintiffs/Appellants Viacom International Inc., Comedy Partners, Country Music Television, Inc., Paramount Pictures Corporation, and Black Entertainment Television LLC, collectively |
| Viacom | Plaintiffs/Appellants Viacom International Inc., Comedy Partners, Country Music Television, Inc., Paramount Pictures Corporation, and Black Entertainment Television LLC, collectively |
| Google | Defendant/Appellee Google, Inc. |
| Appellees | Defendants/Appellees YouTube, YouTube LLC and Google, collectively |
| YouTube | Defendants/Appellees YouTube, YouTube LLC and Google, collectively |
| Viacom Br. | Viacom's Opening Brief, dated July 26, 2013 |
| YouTube Br. | YouTube's Brief, dated October 25, 2013 |
| ASCAP Br. | Amicus Brief of American Society of Composers, Authors and Publishers, et al., dated August 2, 2013 |
| MPAA Br. | Amicus Brief of Motion Picture Association of America ("MPAA") et al., dated August 2, 2013 |
| TCA Br. | Amicus Brief of The Copyright Alliance, et al., dated August 2, 2013 |

| AMF Br. | Amicus Brief of American Federation of Musicians, et al., dated August 2, 2013 |
| --- | --- |
| JA__ | Joint Appendix |
| Dkt. No. | District Court Docket No. (in S.D.N.Y. Case No. 07-2103 unless indicated) |

## STATEMENT OF INTEREST[1]

*Amicus curiae* submits this brief pursuant to FED. R. APP. P. 29(a). All parties have consented to the filing of this brief.

Consumer Electronics Association ("CEA") is the preeminent trade association promoting growth in the $200 billion U.S. consumer electronics industry. CEA members lead the consumer electronics industry in the development, manufacturing and distribution of audio, video, mobile electronics, communications, information technology, multimedia and accessory products that are sold to consumers, as well as related services. Its more than 2,000 corporate members contribute more than $125 billion to the U.S. economy.

---

[1] No party's counsel authored this brief in whole or in part. Neither any party nor any party's counsel contributed money that was intended to fund preparing or submitting this brief. No person other than amicus, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief. (Although Appellee Google, Inc. is a member of CEA, it did not author this brief in whole or in part, nor did it make a monetary contribution intended to fund its preparation.) Web sites cited in this brief were last visited on October 31, 2013.

1

## INTRODUCTION AND SUMMARY OF ARGUMENT

Throughout history, the content industries have feared new technologies and repeatedly tried to use copyright law as a barricade to their progress. However, history teaches that the technology at issue in this case, like other technologies that the content industries have feared, can create lucrative new economic markets.

For example, in 1982, Congress held hearings about the legality of the VCR, then a relatively new technology. The content industries tried to use copyright law to block the VCR. MPAA President Jack Valenti warned that the VCR would make the film and television industry "bleed and bleed and hemorrhage."[2] In response to the assertion that the VCR was a "friend" to film producers, Mr. Valenti testified:

> I say to you that the VCR is to the American film producer and the American public as the Boston strangler is to the woman home alone.[3]

History has proven Mr. Valenti wrong. The VCR didn't drive copyright holders out of business – it launched a huge source of new income for them. After the Supreme Court's *Sony* decision legalized the sale of VCRs, the film industry

---

[2] *Home Recording of Copyrighted Works: Hearings on H.R. 4783, H.R. 4794, H.R. 4808, H.R. 5250, H.R. 5488, and H.R. 5705 Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice, H. Comm. on the Judiciary*, 97th Cong. 8 (April 12-14, 1982) ("Home Recording Hearings") (testimony of Jack Valenti). Mr. Valenti's testimony is available at:

http://cryptome.org/hrcw-hear.htm.

[3] *Id*.

made a fortune selling more than $100 *billion* of videotapes, and later, DVDs. (*See* Section I.B.5 below.) Far from being the "Boston strangler" to the film industry, the VCR was indeed a great friend, just as the VCR manufacturers predicted.

This amicus brief makes three points. First, content owners like Appellants and their amici have repeatedly been proven wrong when they have claimed that new technologies that facilitate access to their content would ruin their industries. This pattern started with John Philip Sousa trying to stop the gramophone, and continued as the content industries tried to stop radio, cable television, photocopiers, VCRs and DVRs, MP3 players, and other new technologies. Appellants' current attempts to expand the scope of copyright liability to encompass YouTube are no different.

The historical precedent strongly suggests that YouTube and other user-generated content ("UGC") websites won't destroy the film, music, and other content industries. Instead, like the technologies the content industries feared in the past, UGC sites can create lucrative new markets. For example, when Britain's Monty Python learned that fans were posting poor quality video clips of its films on YouTube, the Pythons posted better quality versions, along with an amusing video asking viewers to buy their DVDs. These promotional YouTube videos boosted Monty Python's DVD sales *23,000 percent*.

Second, Appellants are wrong in seeking to impose substantial policing

3

obligations on a product or service like YouTube which unquestionably has substantial non-infringing uses. The real danger is that this Court will fail to honor the Supreme Court's precedent, and permit copyright law to "block the wheels of commerce" in products having substantial non-infringing uses. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 440-42 (1984) ("*Sony*"). Appellants hardly discuss YouTube's technology at all. They instead rely on cases about peer-to-peer file sharing services that have no significant non-infringing uses – incorrectly implying that YouTube is a similar service. Appellants are wrong. Unlike the file sharing services discussed in Appellants' cases, YouTube has numerous non-infringing uses, and was neither designed nor advertised to cause large-scale sharing of infringing files.

Third, if this Court adopts Appellants' view of 17 U.S.C. §512, the free flow of information and commerce on the Internet would suffer devastating consequences. If the standards for establishing willful blindness or "control and benefit" are construed as Appellants wish, UGC sites would be threatened with liability for every infringement their users cause. With maximum statutory damages of up to $150,000 per infringement, and the huge quantities of data transmitted and stored on the Internet, potential exposure for running a UGC site could reach the trillions of dollars. Most UGC sites would be at risk of shutting down. Worse yet, the safe harbor provision in §512(c) (for UGC sites) is identical

4

to the safe harbor in §512(d), for liability for linking to a site containing copyrighted material. Eviscerating the UGC safe harbor would do the same for the linking safe harbor, meaning that any site that contains links could have to shut down. It goes without saying that the result of such an interpretation would be devastating to commerce and the free flow of information over the Internet.

## ARGUMENT

I. **THROUGHOUT HISTORY, THE CONTENT INDUSTRIES HAVE REPEATEDLY – AND ERRONEOUSLY – CONTENDED THAT NEW TECHNOLOGIES WOULD HARM THEM**

### A.    Contentions in This Case

Relying on misleading and horribly out of context snippets from YouTube documents, Appellants and their amici try to paint YouTube (and by extrapolation other UCG sites) as a "pirate" enterprise that has placed the entire content industry at grave risk by its "practice of welcoming copyright infringement and its strategic use of piracy to achieve its business objectives." Viacom Br. at 2. Viacom suggests that affirming the district court's ruling would "grant[] immunity even to avowedly piratical websites that 'welcome' and benefit from massive infringement," to the detriment of content owners like Viacom. Viacom Br. at 1.

Appellants' amici are even more direct in their predictions of gloom and doom if the district court's decision is affirmed. For example, the ASCAP amicus

brief complains that affirming the district court's ruling will permit "unlawful competition" by "companies operating as 'user generated' content websites, search engines, and advertising brokers," and that these UGC sites will continue to "inhibit optimal growth of authorized online services" established by content owners. ASCAP Br. at 5-6. The Copyright Alliance amici argue that affirmance would "grant[] a type of blanket license for infringement, and "would lean to ruinous results for authors, including the inevitable cannibalization of legitimate outlets for new works." TCA Br. at 3, 8. Other amici claim that YouTube is a "catalyst and engine for copyright infringement on a global scale," "unleashing a Pandora's box of illegal activity" that threatens "the output of America's creative industries." AFM Br. at 18.  They further charge that YouTube and the district court's decision are somehow "destabilizing," and a "serious threat" to "the future creative output of this country," that will "cause detriment and ruin," and will even deprive union members in the content industries "of both compensation and pension and health benefits." *Id*. at 5, 11, 13, 17.

This dire picture should sound familiar.  The content industries have made similar statements for the last 100 years – virtually every time a new technology emerges. *See* Mark Lemley, *Is the Sky Falling on the Content Industries?*, 9 J.

TELECOMM. & HIGH TECH. L. 125 (2011) ("Lemley")[4]; Nate Anderson, *100 Years of Big Content Fearing Technology – In Its Own Words*, ARS TECHNICA, Oct. 11, 2009.[5]  The following examples demonstrate the historical pattern.

### B.    Contentions About Previous Technologies

### 1.    John Philip Sousa and the Gramophone/Player Piano

Over 100 years ago, the famous composer John Philip Sousa tried to block two new technologies, the gramophone (phonograph) and the player piano.  Lemley at 126-27.  In 1906, Sousa testified before Congress about his concerns: he "viewed the mechanical reproduction of music as an ominous threat."  Paul Bierley, JOHN PHILIP SOUSA, AMERICAN PHENOMENON 70 (Integrity Press, 1973).

In an article attacking the new technologies, Sousa warned of "a host of other injuries to music . . . by virtue – or rather by vice – of the multiplication of the various music-reproducing machines."  John Philip Sousa, *The Menace of Mechanical Music*, 8 APPLETON'S MAG. 278 (Sept. 1906).[6]

---

[4] Available at:

http://www.jthtl.org/content/articles/V9I1/JTHTLv9i1_Lemley.PDF

[5] Available at:

http://arstechnica.com/tech-policy/news/2009/10/100-years-of-big-content-fearing-technologyin-its-own-words.ars

[6] Available at:

http://books.google.com/books?id=4ps8AAAAYAAJ&pg=PA278#v=onepage&q&f=false

According to Sousa, composers were "victims of a serious infringement." *Id.* Thus, the "host of mechanical reproducing machines" would stifle composers' incentives to create new music: the new technology supposedly would "supplant . . . the dance orchestra, the home and public singers and players," so that "all incentive to further creative work is lacking." *Id.* at 281, 284.

The phonograph and piano rolls didn't destroy music, as Sousa predicted. After the Supreme Court decided *White-Smith Music Publishing Co. v. Apollo Co.*, 209 U. S. 1 (1908), Congress created a compulsory license for mechanical reproductions in the 1909 Copyright Act. The recording industry became highly profitable. Over time, new formats of the mechanical music Sousa despised were especially profitable: the recording industry resold the same music multiple times as mechanical formats evolved from 78 RPM records, to LPs, 45's, eight-track tapes, audiocassettes, and CDs.

### 2.    Radio

The music industry first predicted that the gramophone would destroy it, and then cried that radio would destroy the gramophone. Who would buy records if you could listen to music on the radio for free? Lemley at 127. By the 1920's, music industry professionals feared that free music on the radio "undercut opportunities to make money from live or recorded performances." Edward Samuels, THE ILLUSTRATED STORY OF COPYRIGHT 39-40 (Thomas Dunne Books,

2000) (describing radio as a "technological development" that "threatened to undermine the 1909 victory of composers") ("Samuels").[7]

Radio turned out not to be a threat. Consumers discovered new music via the radio, and continued to buy recorded music, notwithstanding its availability on the radio for free. The creation of the performing rights societies (ASCAP and BMI) facilitated licensing revenues from music played on the radio. Samuels at 41-43. Revenues from radio broadcasts dwarfed the revenues from public performances. Paul Goldstein, COPYRIGHT'S HIGHWAY: FROM GUTENBERG TO THE CELESTIAL JUKEBOX 57-60 (Stanford University Press 2003).

### 3. Cable Television

From free television, the content industries should have realized that you can not only compete with "free," but also profit from it. But "[c]uriously, the aspect of television programming that threw a monkey wrench into existing copyright was not broadcast television but cable television." Samuels at 63. Here, the content industries didn't argue that "paid content can't compete with free," rather they argued that "*free* content can't compete with *paid*." Lemley at 127. The content industries claimed that cable television had to be shut down, or no one would bother to produce new TV shows. The industry filed two lawsuits seeking to shut

---

[7] Available at:

http://www.edwardsamuels.com/illustratedstory/index.htm

9

down cable television, but the Supreme Court didn't agree. *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390 (1968); *Teleprompter Corp. v. Columbia Broadcasting Sys.,* 415 U.S. 394 (1974).

Congress resolved the dispute in the 1976 Copyright Act by making cable television subject to copyright, and providing content to cable companies subject to a compulsory license. 17 U.S.C. §111. Ironically, after initially suing the cable companies to shut them down, broadcast stations now fight to be included on cable networks to expand their market. Lemley at 127.

### 4.    The Photocopier

In the 1970's, photocopiers were viewed as a menace to print media. The photocopier permitted people to duplicate things they would otherwise have to pay for, namely books. In 1972, Melville Nimmer, then the author of the leading copyright treatise, was quoted as saying "the day may not be far off when no one need purchase books." *The Law: Copying v. Copyright*, TIME MAGAZINE, May 1, 1972.[8]

Some copyright owners responded to this "threat" by filing a lawsuit trying to prevent government institutions from photocopying books and journal articles. *Williams & Wilkins Co. v. United States*, 487 F.2d 1345 (Ct. Cl. 1973) (*en banc*),

---

[8] Available at:

http://www.time.com/time/printout/0,8816,877716,00.html

*aff'd by an equally divided court*, 420 U.S. 376 (1975).  Even though this lawsuit failed, books and journal articles did not disappear, and instead have seemed to thrive.  *See* Lemley at 128.  Journals have worked with libraries and universities both through traditional publication models and more recently through electronic and open access options.

### 5.    The VCR

In 1976, two movie studios sued Sony Corp. to try to block sales of Sony's Betamax, a videocassette recorder (VCR or VTR), in probably the most famous example of the content industries' attempts to block new technology.  *Id*. Overstatements about the supposed effects of the VCR were rampant.  As quoted above, Mr. Valenti likened the VCR to the "Boston Strangler."  He complained that the VCR would be an "avalanche" or "tidal wave" and demanded that Congress protect the industry "from the savagery and the ravages of this machine."  Valenti testimony, *supra* note 2; *see also* Lemley at 128-29.  The movie and TV industries complained that home viewers would use the VCR to skip commercials and to time shift (watch pre-recorded shows later).  Frederick Wasser, VENI, VIDI, VIDEO: THE HOLLYWOOD EMPIRE AND THE VCR 86 (University of Texas Press, 2001) ("Wasser").  The music industry also warned of "dire consequences" if the studios lost the *Sony* case.  *Id*. at 90.

After the Supreme Court ruled in Sony's favor, the content industries not

11

only survived, but prospered.  After the decision, one commentator noted:

> Those of us who were sympathetic [to the movie and TV industry] braced for the disaster that we predicted would occur.  Guess what? The disaster never came.  Instead, the VCR turned out to be one of the most lucrative inventions—for movie producers as well as hardware manufacturers—since movie projectors.

Samuels at 70.  Another commentator stated that "the VCR has proven to be a rich profit center for copyright holders and, in the greatest irony of the video age, a great friend of the co-plaintiff, Disney."  Wasser at 91.  The market "quickly validat[ed] the Supreme Court results," as "average Americans were buying VCRs and loving them."  Gary Shapiro, THE COMEBACK: HOW INNOVATION WILL RESTORE THE AMERICAN DREAM 78 (Beaufort Books 2011) ("Shapiro").

In other words, "the market for videocassettes matured without weakening other revenue sources for the film industries."  Wasser at 152.  Major studio revenues grew from $2.1 billion in 1975, when the Betamax was released, to $17.4 billion by 1993.  *Id*. at 4.  From 1980 to 1992, cumulative home video sales were over $36 billion.  *Id*. at 153.  And U.S. consumers alone spent another $53 billion on VHS recordings from 1999 to 2005.[9]

The DVD was the successor technology to the videotape – one that likely wouldn't have existed had the VCR been stopped.  The DVD has similarly been a

---

[9] *See*

http://www.businesswire.com/news/home/20060105005462/en/Consumer-Spending-Reaches-24.3-Billion-Yearly-Home

financial boon to the content industries.  As a result of the DVD's development, "the entire home entertainment industry has been transformed from a stagnating business facing technological obsolescence into the fastest growing segment of the motion picture industry."  *Keynote Speaker Bio: Warren Lieberfarb*, DIGITAL HOLLYWOOD (2005).[10]  By 2002, only five years after its introduction, the DVD generated worldwide consumer revenues for both hardware and software of over $30 billion.  *Id*.

Wasser's book aptly summarizes the VCR's history:  "The great irony is that initially Hollywood was still sufficiently old and set in its ways not to recognize the potential salvation home video offered. . . . videocassettes . . . turned out to be a gold mine . . . the money from video vastly exceeded expectations."  Wasser at 10.  The same language could well apply to this case and YouTube.

### 6.    Audiocassettes and Home Taping

While *Sony* was progressing through the courts, the content industries became concerned about audiocassettes.  Although gramophone records didn't destroy the music business, and radio didn't destroy records, audiocassette taping was supposedly a threat.  People could tape music off the radio for free.  Surely, this would shut down the music industry.  Lemley at 129.  The RIAA's President

---

[10] Available at:

http://www.digitalhollywood.com/%231DHFall05/DVDOne.html.

said he was "scared" and called tape machines a "handy dandy copyright killer." Home Recording Hearings, *supra* note 2, at 307. The industry even started an ad campaign entitled, "Home Taping is Killing Music," with a fancy logo:



Lemley at 129-30. Again, this alarm was unjustified. Music sales continued to increase through the 1980s and the 1990s, notwithstanding home taping. *Id.* at 129.

### 7.    The MP3 Player

In 1999, copyright owners tried to enjoin the manufacture and sale of MP3 players. Such portable media players, like Apple's iPod, are now among the most popular consumer electronics devices. The recording industry's trade association sued Diamond Multimedia over the company's Rio product, an early MP3 player. *RIAA v. Diamond Multimedia Sys.*, 180 F.3d 1072 (9th Cir. 1999).

The alleged threat was that because digital copies are "perfect or near perfect copies," unlike the earlier analog technologies, music "pirates" could distribute unlicensed, perfect copies. *Id.* at 1073. The RIAA asserted that demand for these devices would be non-existent without infringement and maintained that the

14

devices had to be redesigned to comply with the Audio Home Recording Act of 1992 ("AHRA"). *Id.* at 1075. The Ninth Circuit disagreed, holding that MP3 players weren't subject to the AHRA. The Court noted with foresight that the devices' popularity was driven in part by a "burgeoning" legitimate trade in Internet music. *Id.* at 1074.

After the decision, music sales continued to grow, thanks to digital music sources like Apple's iTunes and players like the iPod. U.S. music purchases reached a record high of 1.5 billion in 2008, more than 70% of which were digital track downloads. Ken Barnes, *Music Sales Boom, but Albums Fizzle*, USA TODAY, Jan. 2, 2009, at 6D ("Barnes") (music purchases are "astronomically high"). And according to the Nielsen Music Industry Report, they have continued to grow over the past few years due in large part to digital music sales, surpassing 1.65 billion units in 2012, up more than 3% from the previous record high set in 2011.[11]

## 8.    The DVR

In 2001, seeking to narrow *Sony*, the movie industry attacked digital video recorders (DVRs), separately challenging both their consumer-friendly storage and indexing capabilities as well as features facilitating commercial skipping and

---

[11] Available at:

http://www.businesswire.com/news/home/20130104005149/en/Nielsen-Company-Billboard%E2%80%99s-2012-Music-Industry-Report.

permitting remote access.  *See Newmark v. Turner Broad. Network*, 226 F.Supp.2d 1215, 1217-18 (C.D. Cal. 2002).  ReplayTV, the first DVR company, couldn't afford to defend the case and was forced into bankruptcy.  Lemley at 131.  The CEO of Turner Broadcasting called the DVR's commercial skipping capabilities "theft . . . [a]ny time you skip a commercial . . . you're actually stealing the programming."  Staci D. Kramer, *Content's King*, CABLEWORLD, Apr. 29, 2002.[12]

The television industry has done quite well despite DVRs' commercial-skipping capabilities.  DVRs such as TiVo have revitalized the TV industry. Lemley at 131.

## II.  COURTS SHOULD NOT RESTRAIN NEW TECHNOLOGIES HAVING SUBSTANTIAL NON-INFRINGING USES

### A.  Previous Technologies

Despite the repeated claims that the technologies discussed above would be used to infringe copyright, they all have at least one important feature in common: substantial non-infringing uses.  It is important not to restrain new technologies with substantial non-infringing uses, even if they could be used for infringement. In *Sony*, the Court refused to impose liability for contributory infringement for such "staple articles":

---

[12] Available at:

http://www.2600.com/news/050102-files/jamie-kellner.txt

> '[A] sale of an article which though adapted to an infringing use is also adapted to other and lawful uses, is not enough to make the seller a contributory infringer. Such a rule would block the wheels of commerce.'. . .
>
> The staple article of commerce doctrine must strike a balance between a copyright holder's legitimate demand for effective—not merely symbolic—protection of the statutory monopoly, and the rights of others freely to engage in substantially unrelated areas of commerce.

*Sony*, 464 U.S. at 441-42. In *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 937 (2005) ("*Grokster*"), the Court reaffirmed this important principle:

> We are, of course, mindful of the need to keep from trenching on regular commerce or discouraging the development of technologies with lawful and unlawful potential. Accordingly, just as *Sony* did not find intentional inducement despite the knowledge of the VCR manufacturer that its device could be used to infringe, 464 U.S., at 439, n. 19, mere knowledge of infringing potential or of actual infringing uses would not be enough here to subject a distributor to liability.

Subject to this important limitation, *Grokster* imposed liability in certain narrow circumstances: "one who distributes a device with the object of promoting its use to infringe copyright, shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." *Id*. at 936-97. The *Grokster* defendants satisfied this test by sending explicit messages to their users "designed to stimulate others to commit violations." Their "active steps were taken with the purpose of bringing about infringing acts." *Id*. at 937-38. Like the technologies discussed in Section I of this brief, and as set

17

forth in Appellee's brief and the brief of other Amici, YouTube took none of these active steps. Therefore, YouTube should be treated similarly, as a protected new technology capable of substantial non-infringing use.

### B.    Like Previous Technologies, YouTube Was Designed and Marketed for Its Substantial Non-Infringing Uses

Like the earlier technologies the content industries tried to shut down, YouTube is not liable under either *Sony* or *Grokster*. YouTube clearly has substantial non-infringing uses. Indeed, such uses are overwhelming. *See* JA 3799-3813 (Walk declaration); YouTube even has substantial non-infringing uses that benefit the *Appellants*. For example, Viacom used YouTube for its own marketing purposes. JA 3020-25 (Chan declaration); JA 3101-04 (Ostrow declaration); JA 3142-49 (chart of Viacom's use of YouTube for promotional purposes); JA 3238-42 (chart of mistaken takedowns by Viacom).

Appellants and their amici ignore these facts and YouTube's *actual* technology. They inaccurately portray YouTube as a peer-to-peer file sharing service, like cases involving Napster, Aimster, Grokster, Isohunt and Limewire. But YouTube was neither designed nor marketed as a peer-to-peer file sharing service. YouTube was designed for sharing user-generated home videos, such as a video of a child sent to a distant parent.

The following table shows some of the stark differences between YouTube's

18

original design and cases involving file sharing technologies:

| Feature | YouTube[13] | Peer-to-Peer File Sharing Cases[14] |
|---|---|---|
| (1)  Does the user get a permanent copy of the content? | No (content is streamed, not downloaded) | **Yes** |
| (2)  Quality of content | Often poor quality (especially on a full screen) | **Identical quality to the original** |
| (3)  Any file size limit? | Yes, 10 minutes | **No limit** |
| (4)  Promotional messages sent to users to encourage copyright violations? | No | **Yes** |
| (5)  Promptly complied with §512 takedown notices? | Yes | **No** |
| **(6)  Percentage of content that is infringing** | **Almost none** | **Almost all** |

---

[13] Examples of support for the middle column of this table (YouTube features) include: (1) JA 3797-98 (at ¶10); (2) *see* the video in note 18 below; (3) JA 3088 (at ¶12); (4)  JA 3026-35 (at ¶¶11, 15-17), 3050-51, 3060-63, 3066, 3068-69; JA 3084-96 (at ¶¶5-10, 24, 27-28); JA 3978 (at ¶6), 3981-84; (5) JA 3089-91 (at ¶¶19-22); (6) JA 3092 (at ¶26).

[14] Examples of support for the right column of this table (file sharing features) include:  (1) *Grokster* at 923; *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1011, 1016 (9th Cir. 2001); (2) *Napster*, 239 F.3d at 1011; (3) this follows from the previous two items; (4) *Grokster* at 923-25, 937-39; *Arista Records LLC v. Lime Group LLC*, 715 F.Supp.2d 481, 510-12 (S.D.N.Y. 2010); (5) *Columbia Pictures Indus., Inc. v. Fung*, 96 U.S.P.Q.2d 1620, 1637 (C.D. Cal. 2009); (6) *Grokster* at 947-48 ("overwhelming" infringing use); *Napster*, 239 F.3d at 1013 (87% copyrighted); *Arista*, 715 F.Supp.2d at 507 (93% copyrighted).

19

Nonetheless, Appellants improperly try to hold YouTube liable under *Grokster*. The district court correctly rejected Appellants' reasoning; indeed, in the original *Viacom* district court opinion, the court observed that Viacom's own general counsel undisputedly admitted that "the difference between YouTube's behavior and Grokster's is staggering." *Viacom Intern. Inc. v. YouTube, Inc.*, 718 F.Supp.2d 514, 526 (2010).

### C.    Like Previous Technologies, YouTube Has Not Harmed the Content Industries – Just the Opposite

The first section of this brief shows that when copyright law is interpreted to permit advances in new technologies with substantial non-infringing uses, copyright holders adjust to the change and profit handsomely. The same is true for YouTube's service. The amici supporting Appellant express concerns that this case will have severe negative consequences for all types of copyright owners" if affirmed However, the MPAA's box office figures tell the opposite story: during YouTube's existence, movie revenues reached record highs. Press Release, Motion Picture Association of America, Inc., *Worldwide Box Office Continues to Soar*, (March 10, 2010)[15] (noting "[f]our straight years of box office growth– the last

---

[15] Available at:
http://www.mpaa.org/resources/756f90f0-f982-49d7-9f02-35da3773cc8c.pdf

three each setting a new record" through 2009, including a 30% increase from 2005 when YouTube was founded); Press Release, Motion Picture Association of America, Inc., *Global Box Office Reaches Record High in 2012* (March 21, 2013)[16] (2012 worldwide revenue totaled $34.7 billion, up 6% from 2011).

MPAA's summary chart is illustrative[17]:



Similarly, the music business continued to prosper since YouTube was founded. *See* Barnes, discussed in Section I.B.7 above.

YouTube is more appropriately viewed as a free marketing tool that helps

---

[16] Available at:

http://www.mpaa.org/resources/43a3b102-6703-45f4-a15c-ac75573f4352.pdf

[17] *Theatrical Market Statistics 2012*, MPAA, at 4, available at:

http://www.mpaa.org/resources/3037b7a4-58a2-4109-8012-58fca3abdf1b.pdf

improve copyright owners' revenues.  People watch streaming videos on YouTube. If they like what they see, they buy permanent copies to keep (as CDs, DVDs, or digital downloads).  *See also RIAA v. Diamond*, 180 F.3d at 1074 (recording artists provide free samples "intended to entice listeners to purchase either mail order recordings or recordings available for direct download.")

Britain's Monty Python comedy troupe is one instructive example.  Since some of their humorous clips were on YouTube anyway, in late 2008 the Pythons decided to upload better quality versions of their videos onto YouTube.  They began this effort with an entertaining and amusing YouTube video asking their viewers to buy their DVDs.[18]

The result?  Not the disaster that Appellants might predict.  Instead, the YouTube videos boosted Monty Python's DVD sales *23,000 percent*.  Kit Eaton, *YouTube Monty Python Videos Boost DVD Sales 23,000%*, FAST COMPANY, Jan. 26, 2009.[19]

---

[18] *See The Monty Python Channel on YouTube*, available at:
http://www.youtube.com/watch?v=OGqX-tkDXEk

[19] Available at:
http://www.fastcompany.com/blog/kit-eaton/technomix/monty-python-youtube-move-boosts-dvd-sales-23000

22

### III.    PRACTICAL AND TECHNOLOGICAL CONSEQUENCES OF REVERSAL

#### A.    Background: The Problem of Massive Statutory Damages

Affirming the district court won't have the dire consequences Appellants and their amici predict.  If this case were only about the YouTube web site, a reversal might not have consequences beyond the parties to these lawsuits.  However, it's not.  This case will set precedent that will determine the future of the Internet for decades.

Specifically, if Appellants' interpretations of §512 are accepted, most if not all UGC sites, Internet links, and perhaps even the Internet generally would be at risk of having to shut down.  Unlike the "sky is falling" assertions Appellants make, the consequences of reversal would be very real, and very disastrous.  Under Appellants' interpretation of the willful blindness doctrine, once a service provider like YouTube receives generalized knowledge of infringement, the service provider must either affirmatively police its site by searching for unidentified specific infringements, or lose the benefit of the §512 safe harbor and be held liable for those infringements. Viacom Br. at 48-50.

And liability causes this problem: Appellants seek massive statutory damages under 17 U.S.C. §504(c).  *See, e.g.*, Viacom Complaint at 26, ¶3 (Dkt. No. 1). Section 504(c) provides for statutory damages of up to $30,000 *per infringed work* with a mandatory minimum of $750 per work for even ordinary, non-willful

23

infringement.  The per-work maximum for willful infringement is $150,000.  *Id.*
When technologies are capable of handling thousands or millions of separate
works, even the mandatory minimum can quickly become ruinous.  *See, e.g.*, *UMG
Recordings Inc. v. MP3.com Inc.*, 56 U.S.P.Q.2d 1376, 1381 (S.D.N.Y. 2000)
(awarding $25,000 per work for thousands of works "copied," without
demonstration of injury).

Since today's Internet handles vast quantities of data, the statutory damages
could be truly astronomical.  Let's take two examples, starting with YouTube itself.
Users upload 100 hours of video to YouTube every *minute*.[20]  Assuming 10 minutes
per clip, that's 600 videos per minute, about 864,000 clips per day, or about 315
million new videos per year.  If only 1% of them infringe someone's copyright,
YouTube could be liable for 3,150,000 works per year.  Assuming $10,000 in
statutory damages for each of these would cost YouTube $31.5 billion per year.

Another example is Facebook, the popular social networking site.  Facebook
allows its users to upload blog posts, stories, pictures, videos, and links to its site.
Facebook's users share 75 billion pieces of content each month.[21]  Applying this
over a year, and assuming 1% infringe someone's copyright, gives about 9 billion
potential infringements.  Like YouTube, Facebook makes it easy to report any such

---

[20]    *See*    http://www.youtube.com/yt/press/statistics.html.

[21]    *See*    http://digiday.com/brands/10-stats-brands-should-know-about-facebook/

infringements.[22]  But if Appellants are right and Facebook has no §512 defense despite its DMCA compliance, then at $10,000 per work, Facebook is looking at $90 *trillion* in exposure, every year.  (These examples don't even use the $150,000 maximum possible statutory damages.)

Clearly, no UGC site could risk such exposure – it would have to shut down. Depriving UGC sites of their §512 defense unless they affirmatively police their site for infringement upon receiving generalized information suggesting potential infringement may exist will thus have a serious impact on the Internet.  Almost all sites are at least partly UGC sites, including not only YouTube and Facebook, but also Google Search, Google Images, newspapers and blogs that allow reader comments, blogs that don't allow comments, online forums, Amazon.com, eBay, Scribd, Twitter, Flickr, MySpace, and many more.

We now discuss some specific consequences if the Court adopts Appellants' interpretations of §512.

### B.    "Willful Blindness" to Alleged Infringements

One of the central issues in this appeal is the proper interpretation of "willful blindness," as articulated by this Court in the previous *Viacom* appeal.  SPA55-56. The issue is whether this doctrine requires that a service provider that has a general awareness of infringement must then investigate for all specific instances of

---

[22] https://www.facebook.com/legal/copyright.php?copyright_notice=1

25

infringement, or whether "willful blindness" only applies where the service provider receives information regarding "specific and identifiable instances of infringement" and fails to act. SPA81 (quoting SPA 51). The court correctly concluded that the latter interpretation was correct. *Id.*; *see* YouTube Br. at 33-42.

Appellants and their amici say that the district court is wrong, arguing that once a service provider receives generalized information that provides the service provider with "reason to suspect" that users of the service are infringing a plaintiff's copyrights, it is "willfully blind" and therefore ineligible for the §512 safe harbor unless it takes affirmative measures (the scope of which are not clearly defined by Appellants) to identify and ferret out any such works. App. Br. at 40-41, 50. However, were this Court to hold that the §512 safe harbor imposed an affirmative duty to police for and remove specific works upon receipt of generalized knowledge of infringement, most UGC sites would be disqualified from the safe harbor's protection– as would many colleges, universities, and private companies.

Information sufficient to give "reason to suspect" infringement could result from a newspaper article, a random email, employee gossip, and the like. Or content providers could simply send letters to every UGC site they could find, advising of such "general knowledge." The letter would be an utterly deficient takedown notice under §512(c)(3)(A), but it would suffice as "general knowledge"

imposing a "reason to suspect" infringement if that were the legal test.

Imagine if a trade association such as Appellants' amicus ASCAP sent the following hypothetical letter[23]:

********

Dear [UGC site]:

We represent the American Society of Composers, Authors and Publishers (ASCAP), a membership association of more than 470,000 U.S. composers with a repertory of several million songs. You can search for our copyrighted songs on our web site, located at: https://www.ascap.com/Home/ace-title-search/index.aspx.

It has come to our attention that you operate a web site located at www.___.com. It is inevitable that your users will upload copyrighted content owned by our members onto your site. Indeed, it appears that large amounts of our songs have already been uploaded to your site, as you can easily tell by searching our database and your site's index.

Accordingly, this letter is to give you reason to suspect there may be infringements occurring on your site. This letter therefore disqualifies your site from any future use of the DMCA safe harbor, 17 U.S.C. §512. Please act accordingly.

********

It takes little imagination to see the mischief such a letter would accomplish under the "willful blindness" regime Appellants request. First, the UGC site would have no idea what specific content to take down. Next, content owners or trade associations could send such letters and then sue to shut down UGC sites

---

[23] Information about ASCAP in this hypothetical letter is available at:
http://www.ascap.com/about/
http://www.ascap.com/licensing/termsdefined.html

27

everywhere.  Finally, one technology company could entice a content owner to send such a letter to a competitor, thus putting its competitor out of business.

Given this scenario, this Court should affirm the district court's interpretation of "willful blindness" as a doctrine that "may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of specific instances of infringement."  SPA56. Congress enacted §512(c) on the assumption that UGC sites would inadvertently host some infringements, and provided a way for content owners and UGC sites to cooperatively remove infringements.  The statutory scheme would be meaningless if its basic premise disqualified any use of its takedown procedure.  Nor would the specific, detailed requirements for a valid takedown notice under §512(c)(3)(A) ever again be needed – or used – if the above "reason to suspect" letter defeated the safe harbor.

### C.    Requiring Filtering to Satisfy Either the "Knowledge" Provision or the "Right and Ability to Control" Provision

Appellants argue that to qualify for the safe harbor, UGC sites must adopt filtering technology for two reasons: (1) the "reason to suspect" requirement discussed above, and (2) the requirement in §512(c)(1)(B) that the service provider not have "the right and ability to control such [infringing] activity."  *See, e.g.*, Viacom Br. at 33, 35-37 (arguments re filtering for the knowledge issue), at 41 (regarding control issue); Viacom Br. at 50-52.

28

For good reasons, there is no such legal requirement. YouTube Br. at 31, 58-73. Primarily, this argument confuses the UGC site's control over its own content with control over its users. Moreover, there are many undesirable consequences if §512 was interpreted to require filtering.

**Filtering's Technological Limitations.** Filtering technology has technical limitations, and isn't perfect. Filtering technologies tend to be simultaneously overinclusive and underinclusive. Filtering technologies are overinculsive because they often filter legitimate content (such as licensed content or fair use) along with infringing content. This overinclusiveness creates a "false positive" problem.

Filtering technologies also tend to be underinclusive (the "false negative" problem). No technology ever works perfectly, and filters sometimes fail to identify copyrighted content. What's more, once copyright filters are widely implemented, enthusiasts and hackers will develop methods to circumvent them.[24] Encryption alone can defeat filtering. Because there are many ways to encode video files,[25] filtering software can result in false negatives if not all of the many coding formats are properly scanned. It would be unfair to hold UGC sites liable for

---

[24] *See, e.g.*, the 2004 exchange between Audible Magic and the Electronic Frontier Foundation, where Audible Magic disagreed with EFF's evidence that filtering "is no silver bullet" and that Audible Magic's filtering could be defeated: http://w2.eff.org/share/audible_magic.php and

http://w2.eff.org/share/audible_magic.php?f=audible_magic2.html.

[25] *See* https://en.wikipedia.org/wiki/List_of_codecs

29

infringements when filtering technology lets infringing content get through.

**"Catch 22."**   A filtering requirement puts UGC sites in a "Catch 22" position.   If a UGC site declined to filter, and the Court adopts Appellants' interpretations of §512, the site could find itself disqualified from the safe harbor under the "willful blindness" and "control" provisions.   However, if the site *did* filter, it could find copyright owners asserting either or both of the following: (1) the site *does* have "the right and ability to control such [infringing] activity," so as to disqualify it under §512(c)(1)(B); and/or (2) the site is vicariously liable.   *See, e.g.*, Viacom Br. at 60-61.

**Confusion and litigation over design choices.**   A filtering requirement would cause several problems due to the many design choices involved.

- Filtering technology will never work as a substitute for copyright owners' identification of what content they want available on UGC sites.   Most works posted on these sites are protected by copyright – but their owners want them to remain available.   No matter how sophisticated "video identification technology gets, it will never be able to read copyright holders' minds."   *The state of our video ID tools*, GOOGLE BLOG, June 14, 2007.[26]

---

[26] Available at:

http://googleblog.blogspot.com/2007/06/state-of-our-video-id-tools.html

- Content owners have not agreed on a finite set of acceptable filtering technologies. The huge numbers of copyright owners can't all be expected to agree. As their opinions and filtering products evolve, a UGC site will not be able to predict what technology is sufficient to avoid liability.

- Content owners and "approved" filtering companies could refuse to license their technology on reasonable terms, and allege that the safe harbor isn't available otherwise. This would lead to holdup situations and unreasonable barriers to entry for new companies. There is a real risk that content providers "will 'license' only technologies and techniques that are satisfactory to them, and will not license, or will challenge, others."[27] In other words, a filtering requirement would give content providers veto power over filtering technologies.

- The result would be endless litigation over what is "commercially reasonable" filtering (Viacom Br. at 33). Courts would be required to second-guess each design decision. Any copyright owner could

---

[27] *Protecting Copyright and Innovation in a Post-Grokster World: Hearing Before the Committee on the Judiciary*, United States Senate, 109th Cong., First Session 138 (Sept. 28, 2005) (Testimony of Gary Shapiro, CEA's President and CEO), available at:

http://www.gpo.gov/fdsys/pkg/CHRG-109shrg34113/pdf/CHRG-109shrg34113.pdf

present its favorite content protection system and argue that it would have been relatively inexpensive to adopt it. Courts would be required to perform technical and economic analyses of myriad protection technologies, including various forms of encryption, watermarking, fingerprinting, digital rights management, and others not yet invented. They also would be required to determine which technologies would be "disproportionately costly" and to consider whether other, less costly means could be employed by either the technology provider or copyright owner. If a technology provider guesses wrong, it will be subject to potentially ruinous statutory damages.

### D.    Consequences for Linking Liability – Section 512(d)

Finally, this case has consequences beyond YouTube and other UGC sites. While §512(c) protects UGC sites, 17 U.S.C. §512(d) protects "information location tools" such as directories, indexes, or linking. Both sections' safe harbors have *identical* "knowledge" and "control" subsections. *Compare* §512(c)(1)(A)-(B) *with* §512(d)(1)-(2). Web sites are potentially liable for linking to infringing content, but can rely on a §512(d) defense. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173, 1175 (9th Cir. 2007).

Thus, a decision reversing the district court and narrowly construing the safe

32

harbor would affect not only UGC sites, but every web site that contains links. And that's almost the whole Internet. Virtually every web site contains links to other sites. *This Court's* own web site has links.[28] Most web sites would promptly remove infringing links on receipt of sufficient takedown notices – but what if Appellants are right and the safe harbor is so narrow that most sites won't be eligible? Search engines like Google Search and Microsoft's Bing index literally billions of web pages and trillions of Internet pages.[29] If linking did not have a robust safe harbor, then search engines and Internet functionality would be crippled by the constant threat of copyright liability.

---

[28] *See* http://www.ca2.uscourts.gov/links.htm.

[29] *See* http://www.worldwidewebsize.com/

## <u>CONCLUSION</u>

The world would have been a much worse place had the content industries successfully shut down phonograph records, radio, cable TV, photocopiers, VCRs, audio cassettes, MP3 players, or DVRs.  Indeed, those battles "have proven that to err on the side of technology is always good policy."  Shapiro at 80.  The Court should reject the content industries' latest attempt to block new technologies – here, YouTube and similar Internet-based services – and should affirm the district court.

Dated: November 1, 2013          By:   /s/ Kenneth B. Wilson____

Kenneth B. Wilson
COASTSIDE LEGAL
455 1st Avenue
Half Moon Bay, CA 94019
Telephone: (650) 440-4211
Facsimile: (650) 440-4851
ken@coastsidelegal.com


*Attorneys for Amicus Curiae*
*Consumer Electronics Association*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION,
## TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS
## PURSUANT TO FED. R. APP. P. 32(a)(7)(C)

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify as follows:

1.     This Brief of Amicus Curiae Consumer Electronics Association In Support Of Appellees and Affirmance complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6834 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013, the word processing system used to prepare the brief, in 14 point font in Times New Roman font.

Dated: November 1, 2013

By:   /s/ Kenneth B. Wilson
Kenneth B. Wilson
COASTSIDE LEGAL
455 1st Avenue
Half Moon Bay, CA 94019
Telephone: (650) 440-4211
Facsimile: (650) 440-4851
ken@coastsidelegal.com

*Attorneys for Amicus Curiae*
*Consumer Electronics Association*

35

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of November, 2013, a true and correct copy of the foregoing Brief of Amicus Curiae Consumer Electronics Association In Support Of Appellees And Affirmance was served on all counsel of record in this appeal via CM/ECF pursuant to Second Circuit Rule 25.1(h)(1)-(2).

Dated: November 1, 2013

By: /s/ Kenneth B. Wilson
Kenneth B. Wilson
COASTSIDE LEGAL
455 1st Avenue
Half Moon Bay, CA 94019
Telephone: (650) 440-4211
Facsimile: (650) 440-4851
ken@coastsidelegal.com

*Attorneys for Amicus Curiae*
*Consumer Electronics Association*

36